JOHN THOMAS H. DO (SBN 285075)
jdo@aclunc.org
EMI YOUNG (SBN 311238)
eyoung@aclunc.org
GRAYCE ZELPHIN (SBN 279112)
gzelphin@aclunc.org
BRANDON GREENE (SBN 293783)
bgreene@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
Facsimile: (415) 255-8437

GLENN KATON (SBN 281841)
glennk@advancingjustice-alc.org
ASIAN AMERICANS ADVANCING JUSTICE -
ASIAN LAW CAUCUS
55 Columbus Avenue
San Francisco, CA 94111
Telephone: (415) 896-1701
Facsimile: (415) 896-1702

*Counsel for Plaintiffs*

STANLEY YOUNG (SBN 121180)
syoung@cov.com
COVINGTON & BURLING LLP
3000 El Camino Real 5 Palo Alto Square,
10th Floor Palo Alto, CA 94306-2112
Telephone: (650) 632-4704
Facsimile: (650) 632-4800
MELISSA DECKER (SBN 330062)
mdecker@cov.com
COVINGTON & BURLING LLP
Salesforce Tower, 415 Mission Street, Suite 5400
San Francisco, CA 94105-2533
Telephone: (415) 591-7085
SILVIA WU (pro hac vice application forthcoming)
swu@cov.com
COVINGTON & BURLING LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662 5391

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **GER CHONG ZE CHANG, MAI NOU VANG, RUSSELL MATHIS, YING SUSANNA VA**, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**COUNTY OF SISKIYOU** and **JEREMIAH LARUE**, in his official capacity as Sheriff,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT** |

## INTRODUCTION

1.    Siskiyou County and its Sheriff Jeremiah LaRue (together "Defendants") are engaged in a sweeping campaign to harass and intimidate Hmong and other Asian Americans. In service of this campaign, the Defendants have used widespread racial profiling in traffic stops, restricted access to water making it difficult for Asian American residents to live, and placed unlawful liens to dispossess Asian Americans of their land.

2.    This targeting is designed to drive a disfavored racial minority from the County and has its roots in anti-Asian racism in Siskiyou dating back to the 1800s. Indeed, much of the language used in recent years to describe problems supposedly tied to Asian Americans in Siskiyou is disturbingly like the rhetoric used during the shameful history of anti-Chinese policies and practices in the County and the State of California.

3.    The County and Sheriff's attack on Asian Americans is often cloaked under the pretense of enforcing water and cannabis-related laws. However, the County's water concerns are not uniquely attributable to its Asian Americans, and cannabis cultivation has existed in the County for decades, long before the more recent arrival of a significant number of Asian Americans. As recently as last year, the Sheriff acknowledged that cannabis is cultivated throughout the County by people of a variety of racial and ethnic backgrounds.

4.    Nevertheless, the County and Sheriff have singled out Asian Americans and targeted their neighborhoods at staggeringly disproportionate rates.

5.    For example, the Sheriff's Department stops Asian American drivers at a rate roughly twelve times greater than their proportion of the driving-age population. County data further shows that the Sheriff's Department stops Asian Americans during the day, when a driver's race is more readily visible, at a *nearly 60% higher* rate than during the night.

6.    Further, after enacting a water transportation ordinance prohibiting the transportation of more than 100 gallons of water without a special permit, the County unabashedly applied the restriction to roads surrounding Asian American neighborhoods, while leaving the rest of the County untouched. The County also issues liens on real property that are

unauthorized by California law to unlawfully collect cannabis fines. Well over 80% of those liens are issued against Asian American property owners.

7.      Plaintiffs bring this case on behalf of themselves and other Asian Americans, as a putative class and subclasses, under the Equal Protection and Substantive Due Process Clauses of the Fourteenth Amendment, and the Fourth Amendment to the Unites States Constitution, along with similar provisions of California state law. They ask the Court to enjoin the County and Sheriff's blatantly discriminatory policies, practices, and customs that have made it difficult or impossible for Asian Americans to live and travel peacefully in Siskiyou County.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' claims arise under the laws and Constitution of the United States. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' claims under California state law because they form part of the same case or controversy under Article III of the United States Constitution as their federal claims.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district and, further, one or more Defendants reside in this district and all Defendants are residents of California. This action is properly assigned to the Sacramento Division of this Court, pursuant to Eastern District Civil Local Rule 120(d).

## PARTIES

### *Plaintiffs*

10.      Plaintiff Ger Chong Ze Chang lives in the Pleasant Valley Highlands Subdivision, outside of the town of Dorris and within Siskiyou County, California. He has lived in the County since 2016, although he typically spends part of the year with family members in Minnesota. Mr. Chang is an Asian American of Hmong descent. He has suffered several traffic stops and searches by the Sheriff's Department, as detailed later in the Complaint, and is likely to be targeted for such stops in the future because of his race and continued presence in the County.

11.     Plaintiff Mai Nou Vang owns property in the Shasta Vista area, within Siskiyou County, California, and returns regularly to the County to visit her family and friends who reside there. Ms. Vang is an Asian American of Hmong descent. She has been stopped and searched by the Sheriff's Department while driving in the Shasta Vista area and is likely to be targeted again for such stops because of her race and regular return to the County. Additionally, the property she owns in the County is subject to a lien issued by the Siskiyou County Board of Supervisors and remains encumbered by this lien, which decreases the property's value, interferes with her ability to get financing, and subjects the property to risk of foreclosure.

12.     Plaintiff Russell Mathis lives in the Shasta Vista area, within Siskiyou County, California. Mr. Mathis is an Asian American of Japanese descent. Mr. Mathis does not have a well and relies on off-parcel water that he transports using his vehicle or that he receives from other community members. He uses this water for bathing, personal hygiene, cleaning, fire protection, and caring of his pets. The well water is vital for his health as he uses it to keep cool and will use it to cook if needed.

13.     Plaintiff Ying Susanna Va owns a property outside of the town of Macdoel, within Siskiyou County, California. Ms. Va is an Asian American of Hmong descent. She acquired her property in Siskiyou County intending to reside there but is no longer able to do so. She wishes to return to live in the County, if and when she can do so. Her property is subject to a lien issued by Siskiyou County Board of Supervisors and remains encumbered by this lien, which decreases the property's value, interferes with her ability to get financing, and subjects the property to risk of foreclosure.

**Defendants**

14.     Defendant Siskiyou County is a political subdivision of the State of California, organized and existing under the Constitution of the State of California. It is a person under 42 U.S.C. § 1983, and thus can sue and be sued in its own name. Defendant Siskiyou County is run by a five-member Board of Supervisors (currently consisting of Brandon Criss, Ed Valenzuela, Michael Kobseff, Nancy Ogren, and Ray Haupt). Defendant Siskiyou County passed the challenged water ordinances, discussed below, with racial animus towards Asian Americans in

Siskiyou County, and is liable for racial discrimination against these communities by the Sheriff and County agencies. Defendant Siskiyou County is further responsible for recording unlawful property liens to collect cannabis-related fines. These liens have been used almost exclusively against Asian American property owners.

15.    Defendant Jeremiah LaRue is the head of Siskiyou County Sheriff's Department, acting within the scope of his employment as the Sheriff for all allegations in this Complaint. He is the final policymaker for Siskiyou County in the area of law enforcement and is thus responsible for implementing those policies and practices of Siskiyou County, including, but not limited to, the control, supervision, operation, and administration of the Siskiyou County Sheriff's Department. Defendant LaRue is sued in his official capacity as the Sheriff of Siskiyou County.

## GENERAL ALLEGATIONS

**Asian Americans in Siskiyou County**

16.    Siskiyou County is an expansive, rural county at the northernmost reach of California. It is mostly undeveloped, with much of the County's land being forest or wilderness area. The County is home to fewer than 45,000 people, 85% of whom are white. A mere 1.6% of the population in Siskiyou County is Asian American according to the latest U.S. Census.

17.    In 2014 and 2015, the Asian American population in the County began to increase, as a number of Hmong people moved in. They came from larger refugee communities in the Central Valley and the Midwest, many tracing their roots to Laos, where they were part of an ethnic minority and fought alongside U.S. forces during the Vietnam War.

18.    In addition to Hmong people, other Asian people of Chinese, Cambodian, and Laotian descent have started to move into Siskiyou County in recent years.

19.    In Siskiyou County, many Asian Americans, especially Hmong residents, have settled in and around the "Shasta Vista" subdivision and in smaller communities in the north of the County (by the towns of Dorris and Macdoel). Historically these were some of the more affordable areas in the County to purchase land, and the areas remained relatively undeveloped

for many years. Some of the Hmong residents sought out this land to spend their elderly years in the mountains, which reminded them of their homes in Laos and Southeast Asia.

20.     Many residents of these areas live in unpermitted structures or recreational vehicles, as a water well is a prerequisite for a septic system and building permit, and their properties do not have wells – whether because the residents have had difficulty obtaining well permits, have waited years for a well to be installed, have land unsuitable for a well, or simply cannot afford to install one. For those without a well, water trucks are the primary source of water.

21.     The communities in these areas are diverse and comprised of full families and multi-generational family units. English is not the dominant language, particularly for the older generations. The Asian American residents of these areas are actively engaged in being part of Siskiyou County, enrolling children in local schools, holding community events, selling traditional cuisine, and otherwise sharing their culture. Some volunteer for or donate to local firefighting efforts. Others are politically active and have attempted to engage with their local elected officials.

**The Defendants' Hostile Treatment of the County's Asian Americans**

22.     Despite their engagement with the broader community, the rising population of Asian Americans in Siskiyou County has been met with widespread hostility.

23.     The County's Board of Supervisors ("Board") and Sheriff treat Asian Americans, including Hmong residents, as unwelcome compared to their white, longer-established neighbors. Like some of their most vocal constituents, they view Asian Americans as a monolithic group of which every single person is part of a violent drug cartel and blame the County's widespread cannabis cultivation on Asian Americans in explicitly racialized terms, notwithstanding that cannabis has been grown in the County for decades.

24.     The Board has encouraged this bigoted narrative, and official meeting minutes and recordings reflect a hostile focus on race. In one striking example, the Board singled out Hmong attendees at a 2015 public meeting, calling first for a show of hands from "the Hmong

residents" on the issues presented, and then calling for a vote of "those County residents present," as if the Hmong people were outsiders.

25.    Speaking about Shasta Vista, one Board Supervisor contended "[t]here is a misconception that there are all these people living out there. They're not – they're just growing marijuana." And because it was widely known that some Asian American residents of Shasta Vista live in RVs or informal structures, one Supervisor falsely proclaimed that a permitted home was necessary "in order to be a legal resident," making it clear that the residents of the subdivision were seen as illegal and unwelcome.

26.    Further, in the lead up to the 2016 elections, the County flagged new voter registration from Asian Americans as potentially fraudulent.[1] The Sheriff proceeded to send armed deputies to investigate these claims and set up barricades blocking Hmong neighborhoods during the 2016 election. The California Department of Justice ultimately ordered election monitoring to ensure Asian Americans' right to vote.

27.    The heads of the Sheriff's Department have also used racist stereotyping in the County's cannabis enforcement. Former Sheriff Jon Lopey gave interviews for, and inspired news stories framed as: "Are Asian gangs showing up to grow marijuana in our neck of the woods?"; "Numerous properties have sold at higher than normal prices to individuals with Asian last names for cash"; and "Lopey discusses what his department is doing, in conjunction with other agencies, to get rid of Hmong gang members with connections to drug cartels."

28.    Sheriff Lopey compared cannabis enforcement in Siskiyou to a war in a foreign country and, when asked about Asian Americans and Hmong people in the County, commented, "too bad they didn't use their ingenuity, intelligence and skills to engage in something lawful," as if the whole community were a monolith of criminals.

29.    Defendant Sheriff LaRue, the current Sheriff, has made similar statements when asked about Asian Americans in the County: "I just wish they'd contribute better…It's like a third world country out there and that cannot be okay. Forget about cannabis, it's just about quality of life and how people are living out there."

---

[1] *Vang et al v. Lopey, et al*., 16-cv-02172-JAM-CMK (filed on September 12, 2016).

CLASS ACTION COMPLAINT

30.    Defendant LaRue has also publicly blamed a purported increase in crime and cannabis cultivation on "Chinese nationals that are in our community." Although it is unclear what, if any, grounds he has for asserting the citizenship status of people of Chinese descent in the County or attributing crime to a particular ethnic group, LaRue's rhetoric aligns with the general sentiment that Asian Americans are perpetual "foreigners" and criminals who neither belong in nor contribute to Siskiyou County.

31.    With prejudice against Asian Americans and Shasta Vista as a backdrop, Defendant LaRue has asked the public to "direct our anger at the right people" to help choke out and isolate the community, and to not do business with them.

32.    Specifically, Defendant LaRue has instructed businesses not to deliver to the predominantly Asian American neighborhoods of Shasta Vista and around the area of Dorris under the guise of cannabis enforcement. His deputies have gone so far as to pull over commercial vehicles as they approached predominately Asian American neighborhoods to intimidate them and ensure they are not making deliveries.

33.    The Sheriff's 2021 Annual Strategic Plan also explicitly uses racial and ethnic categories to describe potential targets of cannabis enforcement, for no apparent law enforcement purpose.

34.    Finally, at a July 2021 demonstration against the new water restrictions that primarily impacted Asian American neighborhoods, the Sheriff restricted the movements of Asian American protesters, while white counter-protesters were allowed greater access to the courthouse where the Board was meeting.

35.    These actions and statements demonstrate that racial animus is a throughline from the Sheriff's targeted enforcement practices to a series of ordinances the Board designed to drive out what one Board Supervisor characterized as the "bad actors who thumb their nose at our society, at our way of life."

36.    Labelling a racial or ethnic minority as a threat to "our way of life" and using this rhetoric to justify the targeting and exclusion of a racial or ethnic group is not new to the County. Indeed, nearly a century and a half ago, white settlers of Siskiyou County convened to address

the so-called "Chinese evil," precipitated by the increasing numbers of Chinese immigrants brought to the County during the Gold Rush, and passed a series of resolutions expressing their opposition to Chinese immigration to Siskiyou County.

37.    Then, as now, the anti-Asian resolutions those settlers adopted were couched in the language of morality, decency, crime, and preserving the traditional American "way of life."

38.    By way of illustration, one article, published in the Yreka Union on January 22, 1879, discussed the increasing number of Chinese people in the County as follows:

> All countries having been troubled with swarms of Chinamen, have become disgusted with them, and regret the day that any of them were allowed to set foot on their shores. Where only a few arrive their influence is scarcely felt, but where they come in great numbers, as on this coast, they degrade labor as well as morality and decency, besides breeding disease and hog like uncleanliness.

39.    Nearly 150 years later, on June 15, 2021, members of the public addressed the Siskiyou Board of Supervisors to air their complaints about the present-day Asian American community. Echoing anti-Asian tropes of the past, one commenter made these statements:

> It's a cesspool waiting for an outbreak of disease and other health issues... they come, they destroy, they plunder, and they leave their garbage behind for us to clean up…Please use everything necessary to get rid of the cancer that has infected our community.

Another added, "they are nests, we have nests of these horrible people out there."

40.    As these examples suggest, although many years have passed since the enactment of explicitly anti-Chinese resolutions in Siskiyou County, the rhetoric and reasoning invoked by the County and its constituents largely remain the same.

41.    The wholesale characterization of Asian American residents as unsanitary, criminals, or outsiders seeking to destroy the County's "way of life" is merely another way of expressing racial animus and xenophobia.

**The Sheriff's Policy, Practice, or Custom of Racially Targeted and Illegal Traffic Stops**

42.    The former and current Sheriffs' openly hostile view of the Asian American minority as drug traffickers and criminals has shaped the Sheriff's Department's ("Department")

treatment of Asian Americans, especially on the County's roads. This has resulted in the widespread targeting of Asian American drivers for traffic stops, as well as a pattern of unconstitutional seizures and searches carried out under the pretense of drug enforcement.

### A. Origins of the Sheriff's Racially Discriminatory Traffic Stops

43.     At the January 8, 2019 Board of Supervisors meeting, then-Sheriff Lopey informed the Board that, although highway and traffic enforcement were not historically part of the Department's primary enforcement duties, he had begun putting deputies on the road with the purported goal of increasing drug seizures.

44.     Sheriff Lopey highlighted this "on-highway" traffic interdiction program throughout his remaining tenure in the Sheriff's Department, including at the January 2020 Board of Supervisors meeting where he discussed his efforts to put more deputies on the road during seasons when he suspected more cannabis would be transported.

45.     Despite Sheriff Lopey's previous comments equating unlawful drug activity with Asian Americans, the Board expressed no concerns that Sheriff Lopey's use of increased traffic stops for interdiction was certain to be rife with racial profiling, indicating tacit approval of the practice by the Board.

46.     When Defendant LaRue assumed the role of Sheriff, he both embraced and expanded the use of traffic stops to seek out evidence of cannabis activity, while continuing in his predecessor's footsteps by attributing drug activity to Asian American groups and neighborhoods.

47.     In his Annual Strategic Plan for Fiscal Year 2021, Sheriff LaRue wrote that his Department was doing the "majority" of on-highway interdiction in the County, and that he intended to increase both daytime and nighttime interdiction efforts, with particular emphasis on "problem areas" including Highways 96 and 97.

48.     In practice, the Department's stops were largely concentrated on or near Highway 97, which borders the predominantly Asian American communities in the County, while few stops were conducted along Highway 96, in the western and largely white area of the County.

49.     The plan to increase traffic interdiction efforts was presented to the Board at its April 6, 2021 meeting, when the Board voted to accept grant funding for this activity.

50.     By explicitly racializing cannabis cultivation and other crimes in the County and emphasizing drug busts as the goal of traffic stops, Defendant LaRue set up a system of racial profiling and unlawful vehicle stops to seek out alleged drug activity. The Department's public records confirm this policy, practice, or custom has resulted in the vastly disproportionate targeting of Asian American drivers and passengers in the County.

*B. Compelling Data Shows the Sheriff's Racially Discriminatory Traffic Stops*

51.     The Sheriff's Department has shared or sole jurisdiction over traffic enforcement in all unincorporated areas of the County and contracts to police several municipalities, including Dorris and Montague. Traffic stops are a powerful enforcement tool in these areas precisely because Siskiyou County is rural, and residents largely rely on personal vehicles for transportation. According to the American Community Survey, well over 90% of households in the County have at least one vehicle for transportation purposes.

52.     The Siskiyou Sheriff's Department utilizes Computer Aided Dispatch ("CAD") logs, which record entries each time a call for service or civilian contact is registered through dispatch. These logs record information about vehicle-based detentions or traffic stops, including the units involved, the duration between when the contact was called in and when the detention ended, and the location of the stop. These logs also typically include officer-reported information about the names of drivers and passengers contacted, and whether a search, citation, or arrest resulted from the detention.

53.     Based on the County's CAD records, in 2021 the Department conducted over 1,200 traffic stops. This number excludes vehicle contacts that were identified as relating to the June 2021 Lava fire evacuation, vehicle "safety checks," and stops of water-bearing vehicles under County Ordinance 21-14.

54.     Based on the available data,[2] over 28% of traffic stops conducted by the Sheriff's Department in 2021 were of Asian American drivers, although Asian and Pacific Islanders made up only about 2.4% of Siskiyou County's adult (voting-age) population in the most recent Census. These numbers mean that *the Sheriff's Department stopped Asian American drivers at a rate roughly twelve times what would be expected given their proportion of the driving-age population*.

55.     By comparison, white residents make up close to 80% of the adult population in Siskiyou County but constituted only 50% of the drivers stopped by the Sheriff in 2021, based on information currently made available by the County. Thus, an Asian American person in the County was roughly 17 times more likely to be pulled over by the Sheriff's Department than a white individual during this period.

56.     The overrepresentation of Asian American drivers in Siskiyou Sheriff's traffic stop data is highly atypical, as illustrated by comparison to statewide data on traffic enforcement. In 2022 the Racial and Identity Profiling Act ("RIPA") Board published its Annual Report, which analyzed stop data from eighteen agencies across the state from January to December 2020. This report found that Asian Americans made up only 5.2% of reported stops across all agencies, although they constituted 14% of the weighted residential population in the relevant jurisdictions. This is consistent with a body of other studies which find that Asian Americans are typically stopped by law enforcement at a lower or comparable rate to white drivers.

57.     The Siskiyou Sheriff's stops of Asian American drivers also reflect racial targeting compared to other police agencies in the County. For example, the Weed Police Department has jurisdiction over the City of Weed, located just south of the Shasta Vista subdivision at the junction of Highway 97 and Interstate 5. The Weed Police Department

---

[2] While the County has indicated that the disclosed CAD records constitute all such records for 2021, not all these records contain sufficient information to determine the identity or race of the person stopped. In total, approximately three-quarters of the CAD records had sufficient information to identify the probable race of the vehicle driver. Plaintiffs have no reason to believe these stops are unrepresentative of the other unidentified stops. The analysis of the CAD records in this section uses publicly available racial surname data from the US Census Bureau, which gives a probabilistic value that a person with a given surname identifies as a particular race. This data was used to identify the racial makeup of traffic stops using driver last names.

CLASS ACTION COMPLAINT

12

conducted over 220 traffic stops between May 1, 2021 and August 31, 2021. Only 4.5% of those stops were of Asian American drivers. In that same period, over 44% of the Siskiyou Sheriff's stops were of Asian American drivers, meaning that the Sheriff's Department was stopping Asian Americans at nearly ten times the rate of the Weed Police Department.

58.    Similarly, the California Highway Patrol ("CHP") made 104 traffic stops in the Dorris area in 2019 (the most recent available year for RIPA stop data). Only 5.8% of those stops were of Asian American drivers. By comparison, 53% of the Siskiyou Sheriff's stops in the Dorris area in 2021 were of Asian American drivers.

59.    The fact that Siskiyou Sheriff's traffic enforcement targets Asian Americans at rates dramatically higher than the rest of the state and other local law enforcement shows that the Sheriff's Department has made a highly concerted and effective effort to target Asian American drivers for traffic stops.

60.    In addition, the Sheriff's targeting of Asian Americans is established by the "cover of darkness" theory, which compares the racial distribution of traffic stops during daylight and nighttime hours. Although Asian American drivers were stopped by the Siskiyou Sheriff's Department at a higher rate than would be expected at all hours of the day, analysis of currently available CAD data shows that *their proportion of traffic stops was nearly 60% higher during the day when compared to nighttime stops*. This demonstrates that the stops of Asian drivers are to a large extent dependent on deputies' ability to see the race of the driver and strongly indicates racial profiling by the Sheriff's Department.

   *C.    Siskiyou Sheriff's practice of illegal and prolonged traffic stops against Asian Americans*

61.    The Sheriff's Department not only conducts disproportionate traffic stops against Asian Americans, but also targets them for unjustified and unreasonably prolonged traffic stops. Nearly three-quarters of all documented traffic stops conducted by the Sheriff's Department do not result in any citation or arrest. This low citation rate is partially attributable to a pattern of stops conducted without reasonable suspicion. In other instances where reasonable suspicion

may exist, Siskiyou Sheriff's deputies use discretionary traffic enforcement as a pretext to conduct stops of Asian Americans for other investigative purposes.

62.     For instance, one of the most common stop justifications reflected in the County's CAD data is the alleged failure to maintain a single lane or "swerving," variously categorized under Vehicle Code sections 21658, 21460a, and 21650. The CAD data indicates that roughly 44% of all drivers in the County warned or cited for this alleged violation were Asian American, although only 14% of these stops resulted in a traffic citation, suggesting that the supposed swerving was not the real reason for the stop.

63.     Approximately one in eleven Asian American drivers stopped during 2021 was stopped for "swerving," compared to one in twenty-six white drivers. Although Sheriff's deputies used the "swerving" justification to stop Asian American motorists at a much higher rate than other motorists, they rarely if ever inquired about indicators of intoxication or conducted follow up investigation related to the purported basis for the stop.

64.     Instead, Siskiyou Sheriff deputies used and continue to use these, and other so-called traffic enforcement stops, as an opportunity to question Asian American vehicle occupants on matters unrelated to traffic violations and look inside of or search the vehicle for contraband.

65.     By fabricating or using highly subjective bases to initiate traffic stops, many of which never result in any citation or further enforcement action, the Department targets Asian American drivers for traffic enforcement to try to locate drugs or contraband and otherwise harass and intimidate them.

66.     Additionally, the targeting of Asian American drivers for interdiction-motivated stops means that stops under the guise of traffic enforcement often are unreasonably prolonged to support other ends.

67.     The Sheriff's CAD data supports this conclusion. In 2021, the median stop length for Asian American drivers was over 56% longer than for likely non-Asian drivers. The disparities were particularly evident when examining the duration of stops that did not result in any citation or other enforcement action. Asian American drivers constituted approximately 23% of traffic stops that resulted only in a warning and lasted ten minutes or less. By contrast, Asian

American drivers were over 40% of those stopped for over ten minutes and then released with a warning.

68.     These numbers indicate a policy, practice or custom of unjustified and extended traffic stops for Asian American drivers, without any legal justification to prolong the stop for further investigation.

*D. Siskiyou Sheriff's unlawful searches of Asian Americans' vehicles*

69.     Consistent with its use of prolonged traffic stops, the Sheriff's Department also has a policy, practice, or custom of targeting Asian American drivers for vehicle searches, including without legal justification.

70.     The Department's CAD logs provide some insight into its practices around documenting a legal justification for a search. While in some cases the log lists the officer's stated justification for a search, in over half of the identifiable searches, the officer provided no justification.

71.     Available data indicates that Asian American drivers were targeted for searches during traffic stops at significantly higher rates than other drivers. Excluding identifiable probation or parole searches and tow inventory searches – which are governed by very different legal standards – Asian American drivers constituted nearly 40% of all searches performed during traffic stops, including roughly half of all searches conducted without a reported justification, and nearly 60% of what deputies identified as "consent" searches. The available data shows that Asian Americans in the County were nearly 25 times more likely to be searched during a traffic stop than white residents.

72.     The CAD data also strongly suggests that the Department's stated rationale for its targeted traffic enforcement, namely cannabis and drug interdiction, is largely unjustified, as very few of the Department's traffic stops resulted in the seizure of cannabis or other drugs. Based on the available CAD data, only 2.3% of the traffic stops conducted by the Sheriff's Department in 2021 resulted in the seizure of any cannabis, and far fewer resulted in the seizure of other drugs.

E. *Defendants' knowledge of, participation in, and failure to properly train against racially biased and unlawful traffic enforcement*

73.     The Defendants' practices of racial profiling and unjustified and prolonged stops of Asian Americans are the clear and expected consequence of Defendant LaRue's explicit decision to racialize the County's alleged cannabis problem and use drug interdiction as the stated goal of traffic enforcement.

74.     As head of the Sheriff's Department, Defendant LaRue is the final decisionmaker for the County's law enforcement tactics and strategies.

75.     Defendant LaRue likely has required or encouraged deputies in his Department to engage in racial profiling and unjustified traffic stops and searches. At the very least, Defendant LaRue has been aware or on notice of these practices and failed to take any actions to deter them.

76.     Critically, the practice of targeting Asian Americans for traffic enforcement is consistent across all regions of the County where the Sheriff's Department patrols, and the CAD data also shows that high-ranking command staff are integrally involved in these practices.

77.     For instance, Lieutenant Tharsing, the Administrative Lieutenant for the Department, appears to have conducted a significant number of traffic stops in 2021, over 71% of which were against Asian American drivers.[3] Defendant LaRue, who served in the Administrative Lieutenant role immediately before being appointed as Sheriff, described the position as involving management of "policy and procedure creation and implementation" and training.

78.     Similarly, Sergeant Pannell, who is assigned to oversee Sheriff operations for the contract-city of Dorris, made 80% of his traffic stops against Asian American drivers.

79.     The participation of high-ranking and supervising personnel within the Department supports the conclusion that Defendant LaRue has required, encouraged, knew of, or was at least on notice of, the pattern of racial profiling and unconstitutional stops by his Department.

---

[3] Lieutenant Tharsing has also been quoted in media sources characterizing people of Hmong descent as the most "arrogant" and "dominant" growers in the County.

CLASS ACTION COMPLAINT

16

80.     Indeed, Defendant LaRue's responsibilities as Department head include the collection and reporting of information relating to his traffic interdiction program, both to the Board of Supervisors and to the outside agencies that provide funding support for his drug enforcement programs.

81.     The Sheriff would have to be willfully blind to be unaware of how one of his key enforcement strategies was functioning to target Asian Americans.

82.     Despite knowing about, or being on notice of, the pattern of constitutional violations, Defendant LaRue has persisted in the use of traffic stops for so-called drug interdiction, expanding the program from its use under his predecessor Jon Lopey.

83.     Defendant LaRue has done so without instituting corresponding checks on unconstitutional behavior by his officers, knowing that such failures will result in illegal stops and searches in violation of the Fourth Amendment and racially targeted stops in violation of the Fourteenth Amendment. Defendant LaRue has failed, and continues to fail, to properly train his personnel and departmental supervisors concerning adequate documentation of the bases for traffic stops and searches to ensure that stops are supported by reasonable suspicion and are of a reasonable duration, that searches are conducted for a lawful basis, and that none of these actions are undertaken because of perceived race or ethnicity.

84.     The Department does not consistently document or report the basis for its vehicle stops, the race of the people detained, or the justification for actions undertaken during these stops, despite having a policy dated December of 2019 mandating the preparation of such data for these stops.

85.     The County and the Sheriff have failed to train and supervise deputies, acting under color of state law, on how to lawfully conduct traffic stops and vehicle searches in a manner consistent with the Fourth and Fourteenth Amendments.

86.     The training and supervision policies of the County and the Sheriff are not adequate to prevent violations of law by the Sheriff and his deputies in the usual and recurring situations with which they must deal, including conducting traffic stops as described in this Complaint.

87.     The County and the Sheriff were and are deliberately indifferent to the substantial risk that the Department's policies are inadequate to prevent violations of law by the Sheriff and his deputies, and the known or obvious consequences of their failure to train and supervise them adequately, as described in this Complaint.

88.     The failure of the County and the Sheriff to prevent violations of law by the Sheriff and his deputies and to provide adequate training and supervision has played a substantial part in bringing about or actually causing the racially motivated and illegal stops and searches described in this Complaint.

*F.  Allegations of Plaintiffs Chang and Vang*

  *Ger Chong Ze Chang*

89.     The Sheriff's Department has stopped Mr. Chang twice while he was driving to his residence in the Pleasant Valley Highlands Subdivision, outside the town of Dorris.

90.     In the summer of 2020, Mr. Chang was returning from a trip to Mountain Valley Gardens on the other side of the Oregon-California border after purchasing five bags of manure. He was driving his pick-up truck down US-97 and approaching the town of Dorris when a Sheriff's deputy initiated a traffic stop. Mr. Chang had not committed any traffic violation justifying the stop.

91.     Next, an unknown deputy came toward Mr. Chang's vehicle with his gun unholstered and pointed downward, and signaled for Mr. Chang to exit his vehicle. Mr. Chang complied. The deputy said he stopped Mr. Chang because he saw items in the bed of his truck.

92.     The deputy then climbed into the bed of Mr. Chang's truck to examine the five bags of manure he had just purchased. He asked Mr. Chang if he had a receipt for the purchase, to which Mr. Chang replied yes.

93.     The deputy told Mr. Chang that he was going to check his vehicle. Mr. Chang understood this to be a statement, not a question or request. The deputy opened the door to the cab of the vehicle and began searching inside. He pulled out a bucket containing mangoes and a small fruit knife and questioned Mr. Chang about the knife before confiscating it.

94.     After completing his search of the car, the deputy asked Mr. Chang where he lived. Mr. Chang pointed in the direction of his subdivision. The deputy then released Mr. Chang without a ticket or citation.

95.     The second stop occurred in late Spring of 2021. Mr. Chang was driving back to his property through the town of Dorris, after taking his laundry to the laundromat. He had put his clean laundry in black trash bags in the back of his van.

96.     Mr. Chang was driving past the church on Picard Road when he saw a Siskiyou Sheriff's deputy turn on his emergency lights behind him. Mr. Chang was driving slowly and did not believe he had committed any traffic violations.

97.     Mr. Chang pulled over to the side of the road, and an unknown deputy approached him and motioned for him to roll down his window. The deputy had his hand on his gun although he did not unholster it. The deputy asked Mr. Chang where he lived, and Mr. Chang pointed in the direction of Pleasant Valley Highlands. The deputy then instructed Mr. Chang to get out of the car with his hands raised. Mr. Chang complied and was pat searched.

98.     The deputy proceeded to walk around Mr. Chang's van to look inside, before ordering Mr. Chang to open the back of his van. Mr. Chang tried to tell the deputy that the bags in the van contained laundry, but the deputy ordered him to dump his things out. Mr. Chang was forced to empty his bags of laundry on the ground, and the deputy searched through them. After the deputy confirmed that the bags contained only laundry, Mr. Chang was instructed to pick up his belongings and told he could leave.

99.     This stop lasted approximately thirty minutes. The deputy did not tell Mr. Chang the reason for the stop and the deputy did not give Mr. Chang any ticket or citation. After the stop, Mr. Chang had to return to the laundromat to re-wash the clothes that had been dumped on the ground and dirtied during the search.

*Mai Nou Vang*

100.     On or about March 19, 2021, Ms. Vang was stopped by Siskiyou Sheriff's deputies while driving on Big Springs Road near County Highway A12, outside of the Shasta Vista subdivision.

101.    Ms. Vang was driving with her husband Chong Lee Xiong and adult son in the car, when she noted a Siskiyou Sheriff's vehicle stopped on the side of the road and facing in her direction. As she passed the patrol car, it pulled out onto the road behind her and two deputies in the car initiated a traffic stop. It was mid-morning and light outside, with full visibility at the time of the stop.

102.    Two unknown deputies approached Ms. Vang's vehicle from either side and instructed Ms. Vang and her husband to get out of the vehicle. One of the deputies informed Ms. Vang that she was stopped because the cover of one of the external lights was cracked, even though it was daytime and there was no requirement that the light be activated.

103.    Once Ms. Vang stepped out of the driver's side of the car, one of the deputies began questioning her about what she was doing in the County, what she did for work, where she had come from, whether she could provide verification of her son's identity, and whether she had anything illegal in the car. Ms. Vang understands but does not speak English, so her son assisted her in interpretation. She answered the deputy's questions to the best of her ability and could hear the other deputy questioning her husband on the passenger side of the car. This questioning took up a significant portion of the detention.

104.    After concluding his questions, the deputy who was speaking with Ms. Vang indicated he wanted to search her car. Based on the length and nature of the preceding detention, Ms. Vang believed the deputy would search the car no matter what she said but told him the vehicle belonged to her husband. The deputy then turned to her husband and informed him that he wanted to search the car. Mr. Xiong feared arguing would extend their detention and interrogation, and acquiesced. The deputies searched the vehicle and did not find anything except for a bar of soap, which they asked Ms. Vang more questions about before returning it to her.

105.    After being detained for approximately thirty minutes, Ms. Vang was released with a fix-it ticket.

106.    Like Mr. Chang, Plaintiff Vang was unlawfully detained and had her vehicle searched as a direct result of the Siskiyou Sheriff's policies and practices.

**The County's Passage of Racially Motivated Water Ordinances Designed to Deprive Asian American Communities of Water**

107.    In addition to the discrimination seen in the enforcement of pre-existing traffic laws, the County has also passed a dragnet of racially motivated ordinances designed to drive out the Asian American community and punish their supporters. This includes the passage of a **water nuisance ordinance** (Urgency Ordinance 20-13 and later Ordinance 20-15, codified at Siskiyou Cnty. Code § 3-13-702), a **water extraction ordinance** (Urgency Ordinance 21-07 and later Ordinance 21-13, codified at Siskiyou Cnty. Code § 3.5-13.101 et seq.), and a **water truck ordinance** (Urgency Ordinance 21-08 and later Ordinance 21-14, codified at Siskiyou Cnty. Code § 3-4.1501) (collectively, "**water ordinances**").

108.    On August 4, 2020, the Board passed the **water nuisance ordinance** which bans the "extracting and discharging groundwater underlying Siskiyou County for use in cultivating cannabis" as a nuisance. This ordinance, which does not require evidence that a well-owner *knew* of the unlawful end use for enforcement, was then used to bring civil actions against well operators like Steve Griset for providing necessary water to Shasta Vista and its Asian American residents.

109.    The County has also disproportionately cited Asian American residents with fines under this ordinance, with 68% of all such citations being given to Asian-Americans.

110.    This has resulted in a chilling effect on well-owners who previously sold or distributed groundwater to areas without well access and has reduced the number of water sources for Asian American communities.

111.    On May 4, 2021, the Board passed the **water extraction ordinance,** which requires a permit for any transportation of water off the parcel from which it was extracted, regardless of use. Both the water suppliers and water users required permits.

112.    But the May 4, 2021 ordinance erected a number of obstacles to acquiring a water permit, like property inspections, Siskiyou Cnty. Code § 3.5-13.103, and permit issuance conditioned on the property's compliance with all County codes.

113.    In effect, these provisions made denial of a permit and the basic water it would supply a penalty for any code violation on the property.

114.    In contrast to other, more developed areas of the County, many people in Shasta Vista and the areas around Dorris and Macdoel do not live in approved structures, because they do not have their own water wells. This is the very reason why they would apply for a water extraction permit in the first place, to receive water from a different parcel. Thus permits were available in theory only to most people living in these communities. As they have been effectively cut out from the permitting scheme, 73% of those cited under this ordinance have been Asian American.

115.    Also on May 4, 2021, the Board passed the **water truck ordinance**, which prohibited hauling of water in excess of 100 gallons without a permit on streets to be named by the County. Although the water truck ordinance did not include geographic enforcement restrictions on its face, the Board adopted Resolution 21-61 on the same day, which limited the water truck ordinance to streets that service primarily Asian American neighborhoods, including access points to Shasta Vista, Dorris, and Macdoel. About 70% of those cited under this ordinance were Asian American.

A.    *The County's creation of a water crisis aimed at Asian Americans*

116.    The compounding effects of these three ordinances created a humanitarian crisis that severely impacted Asian American residents, particularly in Shasta Vista, Dorris, and Macdoel.

117.    Without wells, Asian American residents relied on water trucks to haul water from other parcels to meet their needs for bathing, hygiene, consumption, cleaning, gardens, fire protection, pets, and livestock. Much of this water was provided by nearby farmers with large agricultural wells, like Steve Griset.

118.    After the water ordinances were enacted and the County undertook enforcement actions against Steve Griset and water haulers, residents in these communities relied on the few in their neighborhoods with wells or, in some instances, went to more extreme lengths like

acquiring water from public parks and streams. Businesses limited the purchase of bottled water. Vehicles used to transport water were stopped, searched, seized, and not returned.

119.    The water ordinances degraded community members' health, killed off their livestock and gardens, left them unable to fend off wildfires, and resulted in many being forced to leave their homes.

120.    During the water prohibitions, the Lava Fire ravaged much of Shasta Vista, including land belonging to Asian American community members who were unable to abate the fire themselves.

121.    On September 3, 2021, the Honorable Kimberly J. Mueller of the District Court for the Eastern District of California issued a preliminary injunction enjoining the County from enforcing the water extraction and water truck ordinances, but leaving the water nuisance ordinance in place, in the matter of *Lo v. County of Siskiyou,* Case no. 2:21-cv-00999-KJM-AC.

122.    Some water access has been restored following the Court's injunction, but large agriculture wells which Defendants targeted under the water nuisance ordinance remain unavailable.

### B. *The Defendants' pretextual justifications for the water ordinances*

123.    Defendants have attempted to justify the water ordinances by variously pointing to cannabis enforcement, drought, and public health as the motivating factor. These changing and at times contradictory rationales conceal the fact that a primary motivation was animus against the County's increasing Asian American population.

124.    First, Defendants have alleged that the water ordinances were directed at areas with illicit cannabis grows. But this allegation is undermined by the fact that Defendants have failed to enforce the County's cannabis restrictions as stridently in other areas of the County that are not predominantly Asian American.

125.    The County's own records of public complaints regarding cannabis indicate that the Defendants were on notice of substantial unlawful cultivation and alleged water use for this purpose in the *western* part of the County – which is predominantly white – but took relatively few enforcement actions in those areas of the County and did not include them at all in the initial

CLASS ACTION COMPLAINT

water truck resolution that targeted the regions around Shasta Vista, Dorris, and Macdoel. Indeed, Defendants explicitly discussed and ignored suspected cannabis-related water truck movements in other parts of the County when passing the water truck ordinance.

126.    The County has also asserted it was motivated to enact the three water ordinances because of concerns relating to use of the County's water resources for cannabis and drought. Yet several facts undercut this reasoning.

127.    First, after conducting a review in 2020, the State Water Board informed the County that cannabis cultivation and water truck movements had a negligible impact on ground and surface water, especially when compared to other agricultural uses the County leaves unchecked.

128.    Second, as part of its effort to restrict water transported to the Asian American community near the city of Dorris, the County specifically targeted an out-of-state water tender that was supplying water brought in from across state lines. This action belies any rationale that the County sought to protect the water supply in Siskiyou or California and, ironically, would lead to additional reliance on local Siskiyou wells. The incongruity of this result is highlighted by the fact that the Governor's recent Executive Order N-7-22 calls for the use of water trucks carrying water from outside jurisdictions to ensure public water.

129.    Third, at least one County official has explicitly conceded that the water ordinances were "not designed to protect the aquifer, or the groundwater." This statement, along with the other evidence cited above, indicates that the County's alleged conservation rationale is largely pretextual.

130.    Finally, Sheriff LaRue has contended that quality of life and public health are the driving concerns for the County, not cannabis enforcement, although this explanation flies in the face of the dramatic detrimental effects of the ordinances on residents' health and safety. Moreover, while Defendant LaRue and Board members have complained of people living in unpermitted structures and other code violations in areas like Shasta Vista – purportedly out of concern for public health and safety – the County has ignored similar code violations elsewhere in the County.

131.    These ever-changing justifications are pretext for an actual motivating factor underlying the water ordinances: racial animus.

### C. Racial animus in the adoption of the water ordinances

132.    Racial animus is reflected in the Board's official meeting minutes, recordings, and communications, which demonstrate an increasingly pejorative narrative about Asian Americans in Siskiyou County leading up to adoption of the water ordinances. In particular, the explicit racialization of cannabis issues over the last five years clearly illustrates the anti-Asian narratives the Board adopted in its subsequent actions.

133.    In a video of a 2017 Board meeting regarding a proposed emergency declaration classifying cannabis cultivation as a local emergency, one commenter noted, "I would just like to say that it's pretty evident that the county is under siege, just look at this room [gestures at Asian American attendees] most of these people are here, I assume, to be growing marijuana illegally and commercially. They're part of cartels." There was, of course, no basis to assume that people in the room grew cannabis or were part of so-called cartels by "just looking at the room" unless they assumed those things because of the way people looked – that is, Asian American. After some Asian American attendees used an interpreter, another speaker quipped, "although I am Italian and Albanian, I don't think I need interpretation," receiving laughter from the Board. Afterward, the Board passed the emergency declaration.

134.    These expressions of animus continued into the next year when homeowners complained of newcomers to the Shasta Vista subdivision. One frequent commenter called on the Board and Sheriff to take stronger action in this neighborhood, arguing "they need to not only be eradicated but there needs to be something that says, 'don't come back.' Thank you very much."

135.    In June of 2020, shortly before the Board proposed the first of the three water ordinances, Supervisor Haupt emailed Supervisor Kobseff and another county employee to complain of a reported proliferation of water trucks in the Shasta Vista area. He wrote, "I am fearful that we are losing a portion of our county and being turned into a no-go zone, similar to what we see if foreign countries like Europe where Sharia Law has replaced local governance." Haupt went on to complain that the state was stopping water diversions to one long-term rancher

CLASS ACTION COMPLAINT

in the Scott Valley, indicating that he was not concerned with water use generally, but rather a xenophobic fear that the water was going to the wrong people.

136.    In the lead up to the passage of the water ordinances, the Board and Sheriff heard and responded to frequent public comments which echoed this hostility toward Shasta Vista and Asian Americans. On August 4, 2020, the Board passed the first reading of the water nuisance ordinance to target the Griset Ranch for providing water to the Hmong community. Its passage followed public comment about residents of Shasta Vista "garnishing…their needs," the presence of human trafficking and "people here from other countries," and the need to "eradicate this illness." One commenter noted that the "neighborhood is changing rapidly" and "Big Springs is the holding line" and asked, "[w]ould you want to send your kids to a school in that neighborhood?" The Board responded by encouraging the public to send in their complaints and passed the water nuisance ordinance on a second read. Siskiyou Cnty. Code § 3-13-702. Three weeks later, the County filed a suit against the Griset Ranch.

137.    At a November 2020 Board meeting, Sherry Ellison of Ellison Ranch spoke out about the County targeting her for her well operation and her friendship with the Hmong community, and a representative of a local well driller explained that the County's underlying water table was untouched by the complained-of well usage. But a backlash ensued, with comments including: "The water they are pumping is not for citizens of the County"; "This is not a people without a country"; "It is mob-like activity"; "And Ms. Ellison saying that these people are respectful? They are a slap in the face"; "As a citizen and a Christian it is really unheard of"; "We have laws in these lands… And we as the citizens have only one requirement of anybody in this nation, anybody, anybody from any planet: follow our laws, respect them like the rest of us do."

138.    During the December 2020 Board meetings on the water nuisance ordinance, the Board responded to public comments that largely painted all Hmong people and residents of Shasta Vista as criminals. A member of the public asked a series of rhetorical questions explicitly aimed at Hmong people: "Hmong[,] why do they spend their life savings on land that does not support farming or living?"; "Do they not hold employment or rely on state resources?";

"Why do the Hmong choose to farm and grow marijuana?"; "Are the individuals legally residents of Siskiyou?"   Another speaker characterized all Hmong people as criminals, stating "I do not refer to them as Hmong. I refer to them as illegal pot growers. There's a reason for that. It's because they're doing illegal activity." One speaker alleged that "everyone up here in Shasta Vista [] is violating the law." Others complained of a "massive population increase in the Shasta Vista subdivision," "watch[ing] [the] neighborhood go down the drain," "Hmong and Chinese black market marijuana growers," and "unpermitted housing [and] RVs."

139.    At the end of public comment on the water nuisance ordinance, a letter was read equating the Hmong clan structure to "thievery," murder, and "a third world country" and the idea that the "the Hmong want to make this their home" was ridiculed. The Board was responsive to these public comments, being sure to request a copy of the letter.

140.    The Board neither disavowed nor disapproved of the bigoted public comments on the water nuisance ordinance.

141.    The Board then asked the Sheriff to give a presentation on his cannabis enforcement efforts at the next Board meeting, although there was no related agendized ordinance or action upcoming. At that last meeting of 2020, following the Sheriff's presentation, members of the public asked the Sheriff to increase his focus on water extractions and water haulers themselves. Defendants did just that the next year.

142.    Following the Sheriff's release of the 2021 Strategic Plan for Marijuana Enforcement that listed races and ethnicities of cannabis growers and argued for cannabis-related water enforcement, the Board presented two emergency ordinances at the May 4, 2021 meeting: the water extraction ordinance and the water transportation ordinance. Public comment attempted to downplay any racist intent, yet still portrayed Asian Americans as outsiders rather than true members of the community. "They don't live here," said one member of the public. Another speaker suggested to the Board that "if the communities that do the illegal growing wanted to do it in a legal way, they would have done it when they got here in 2014…These people are not residents." When an Asian American attendee accused the Board of discrimination, the Board responded that "the rest of the county" complied with their laws.

143.    Concerns over the water ordinances and related resolution did not come only from Asian Americans. County CalFire Chief Phil Anzo cautioned that "[t]he County's ban on non-fire water tenders may have impact on fires in the area." One Board member noted that there was similar cannabis-related water truck usage in the eastern part of the County that "no one cares about." In response, the Sheriff proclaimed:

> I think it is important that we direct our anger at the right people.
> You know, we have good people in this county that have agriculture
> and we have people who are abusing that. We know who they are.
> And frankly, I'm perplexed that those people are not shamed
> more… we focus on the people that are causing the problems… this
> is all I think about lately… we need the cooperation of our local
> people… [to] really choke it out… if people were going to do it
> right, they would have done it right from the beginning…

144.    A Board Supervisor agreed that the water ordinances targeted the people "that thumb their nose at us, [] thumb their nose at society, and thumb their nose at our way of life."

145.    The Board emphasized the ordinances would be enforced with "absolute discretion" by the Sheriff in response to complaints – effectively delegating prioritization of enforcement areas to the public, notwithstanding their evident racial hostility and prejudice toward perceived Asian American outsiders.

146.    The Board passed the water extraction ordinance, the water transport ordinance, and the related resolution identifying streets that serve the Asian American communities in Shasta Vista, Dorris, and Macdoel on an emergency basis.

147.    The Sheriff immediately set out to enforce the ordinance illegally by issuing citations and even unlawfully seizing trucks before posting signage as required by the ordinance itself.

148.    Because the Board passed the original water extraction and transportation ordinances on an emergency basis, it took further public comment over the following months. Once again, the racial implications of the commentary were clear. Such comments were directed at the entire Asian American community in Shasta Vista, not individuals believed to be cultivating cannabis, and included: "They're not innocent," "The community out there is not a

community[,] it is squalor out there." Others warned of an impending crisis for the Asian

American and Hmong community. Ahead of the August 3, 2021 Board meeting, Ellison Ranch

cautioned that because "[t]here is no guidance as to … how the end user is evaluated to

determine whether their ultimate use of the water is non-conforming or illegal," "it is highly

likely that no permits would or could be issued." Because a person applying for a permit to

extract or transport water cannot know the actual end use, the water ordinances threatened to

create a humanitarian crisis by discouraging and preventing permit issuances.

149.    At the August 3, 2021 Board meeting, Asian American and Shasta Vista residents

spoke of their attempts to be part of the community as others could be heard outside rallying in

opposition to the water ordinances.

150.    Outside the August 3, 2021 meeting, the Sheriff limited the movements of

protesters in favor of water access while white counter-protesters roamed free.

151.    Inside the August 3, 2021 meeting, the predominantly Asian American protesters

were met with comments expressing racialized fear and indignation. Describing the people

gathering outside, one commenter blanketly asserted that "they are outside right now… illegal

growers are now out around us." The same person complained "they are stealing water from fire

hydrants now," not recognizing the extremes some residents were forced to take to secure water

access for survival. Another complimented the Board: "We within the community recognize ...

the Board of Supervisors, who under extreme pressure to bend to the drums of the mob, have

stood ground against lawlessness. We believe you are all warriors for what America truly

believes in: that law matters," before offering a warning, "[l]astly, I would like those who came

here with intentions of violating the law: you came to the wrong county. . ." The next speaker,

emphasizing they were a "permanent Big Springs resident," dismissed the Hmong community's

history of military service and any claims of a humanitarian crisis from "poor farmers." Yet

another speaker made no attempt to hide her animus toward Asian people.  Referring to the

Asian American residents who wrote letters about the ordinances, the speaker remarked, "It's

funny, you just heard a list of names there that we are dealing with in our subdivision with illegal

marijuana grows" and "they invade our County on an annual basis." The speaker then

admonished Hmong people directly to "live like normal people … be good citizens, you came here to lie to us in the first place about being good citizens. Oh, we want to be good citizens, we fought for you. No, you didn't. You were brought over here to this county and to this country to take advantage of what we offer here . . . ."

152.    The Board adopted the final water extraction ordinance and the final water transportation ordinance the same day, expressing no concern with the sentiment expressed by speakers that Asian Americans invaded the County to engage in criminal activity.

153.    At the first Board meeting following the Court's September 3, 2021 preliminary injunction order, neighboring Big Springs residents came out in force to demand action. Public comment included questions about whether non-citizens would be counted for redistricting purposes to create an entire district of special interest community like "let's say, illegal marijuana growers." Another person, with the Court's preliminary injunction order in hand, dismissed the racism faced by the Asian Americans and Hmong people as "a bunch of baloney" and suggested that it was "the permanent resident citizens that actually live in homes [who] have been intimidated by these people, these illegal pot growers." "These are people who are calling themselves a community out here, give me a break," a public commentator continued, "[t]hese people are not residents … please don't tell me these people are a community, they're all criminals."

154.    Seemingly in response to the above vitriol, the Board agendized a new resolution, Resolution 21-139, which made the water truck ordinance apply to all county roads, not just those surrounding Asian American communities, barring all water trucks from transporting water without special permits. A Board Supervisor characterized the change as designed to merely give the appearance of equal enforcement:

> To me it's a cleaner thing to make it county-wide, that way it's not perceived that we're just going after any one… when we talk about illegal… and I will tell you that marijuana, as we all know, has been around since I've been supervisor. Not only a problem, but an issue. It was initially when I got here, forest service sites, so think about that that surrounds us, they could be using any county road to get there. To me this eliminates that perception that we're going after

> XYZ…If we do this more consistently it will eliminate that perception that we're always targeting someone or something.

The resolution was approved, but the water ordinances themselves were left as is.

155.    When not referring to the Asian Americans or Hmong people by name, the Board, Sheriff, and members of the public use the barely coded language of drug cartels, enemies of war, noncitizens, of the subdivision "Shasta Vista," the "third world," human traffickers, and people living in squalor and unpermitted housing. Asian American residents are consistently contrasted with long-term permanent residents, "Americans," and law-abiding homeowners, suggesting they are foreigners and have no right to be in the County. In this context, officials have used troubling language regarding the need to "choke out" or "eradicate" "an illness" in reference to communities where Asian Americans reside. These statements and actions, by County decisionmakers and the public, show that the water ordinances were passed with racial animus as at least one motivating factor and likely the predominant one.

### D.  Allegations of Plaintiff Mathis

156.    Plaintiff Russell Mathis lives in the Shasta Vista subdivision on a small plot. Mr. Mathis moved to the subdivision in 2013 from the Bay Area, where he was born and raised. Mr. Mathis was previously homeless in the East Bay. He came to Siskiyou due to the affordable property. Mr. Mathis is disabled and survives on a fixed, limited income. He lives with his dogs.

157.    Mr. Mathis does not have a well for his water needs. He understands that the County makes it difficult to obtain well permits and a well is otherwise cost prohibitive. He previously bought water from the City of Yreka, but the city discontinued that service for anyone who lived outside the city limits. He then began to transport water from his friends and neighbors, many of whom are also Asian American and received their water from the Griset well. Prior to the water ordinances, he would get water from others using two tanks, one 500 gallon and the other 325 gallon, which he would load onto his truck bed.

158.    After the water ordinances took effect, Mr. Mathis did not have water access for the summer months. He could no longer transport water from others' parcels and people became afraid to provide water to him. He did not try to get a water truck permit because he knew that he

could not find a water source. In late June 2021, the Lava Fire burned through Shasta Vista. After Mr. Mathis saw CalFire leaving the subdivision even though the fire continued, he returned to his property to defend it against the flames. He used most of his remaining water fighting the fire and managed to save his property.

159.    After the fire, Mr. Mathis had depleted water reserves in his water tanks and was unable to obtain more due to the water ordinances. He carefully conserved the little water he had. To cool off during the hot summer months, he would pour the water over his head. His dogs would then lie in the wet soil where he had poured the water. With less water for bathing, hygiene, and cooling off, Mr. Mathis, a senior with a history of cancer and current kidney problems, was put under significant bodily stress. The whole experience reminded him of being homeless – it felt like the whole area was against him, just like then, and he had to concentrate his time on getting his basic needs met. His dogs suffered without much water as well.

160.    At one point, Mr. Mathis called Board Supervisor Ed Valenzuela to express his concern over the lack of water. Mr. Mathis also asked whether he voted for the ordinance that targeted Asians to which Mr. Valenzuela replied "why wouldn't I?"

161.    Since the preliminary injunction, Mr. Mathis' options for water have improved but remain limited as he and potential water providers are still afraid of being targeted by the County and Sheriff.

162.    Mr. Mathis points out that the targeting of Asian Americans is the continuation of a long history of discrimination in the County, stemming back to the 1800s. He has seen the discrimination get worse in recent years since more Hmong people began moving to Siskiyou. When outside of Shasta Vista, Mr. Mathis purposefully wears western and country styled clothing in order to obscure his Asian heritage and avoid discrimination. He worries about being targeted all the time, including when he drives anywhere in the County.

163.    Siskiyou County has not been friendly to Mr. Mathis since his arrival. When he moved there, he could not get a post office box even though he properly submitted an application with the required identification. A few months after he arrived, a code enforcement officer came by and told him that he could not live in his unpermitted dwelling for more than three weeks in a

year. He has heard that the Sheriff has told businesses not to help the Hmong. He has tried

calling an electrician and a plumber to come to his property in Shasta Vista, but they would not.

**The County's Unlawful Use of Property Liens to Recover Cannabis-related Fines**

164.    While the Defendants have largely utilized the water ordinances and targeted

enforcement to push people seen as undesirable from the County, the Board has also asserted the

authority to issue property liens and foreclose against people's property that is subject to unpaid

cannabis fines.

165.    In 2020, as part of the County's increasingly punitive approach to cannabis

cultivation, the Board of Supervisors adopted Ordinance No. 20-11 amending the Siskiyou

County Code section 10-14.100 to increase the fines associated with cannabis cultivation from

$500 for a first offense to a $5,000 per day fine that could be assessed immediately, multiplied

by multi-day citations, and combined with steep fines for supposedly related building and water

violations. This section of the County Code explicitly cites California Government Code section

53069.4, which authorizes local governments to issue administrative fines or penalties for

violation of an ordinance.

166.    Ordinance No. 20-11 also permitted the County to issue real property liens to

recover fines or penalties issued for violations under the same section.

167.    Under the language of these amendments, if a property owner did not satisfy their

fines within ninety days of receipt, the Board of Supervisors would have the power to approve

issuance of a lien against the property. The amendments further provided that a lien could be

foreclosed, and the property sold, to satisfy the unpaid fine amounts and interest, and that the

County would be entitled to its fees and costs in addition to satisfaction of the fines.

168.    Several Board of Supervisors members explicitly urged their colleagues to

approve these amendments, noting that the County could consider seeking outside assistance to

undertake foreclosure proceedings. Supervisor Haupt told his colleagues that he was "fully in

favor of" the ordinance in order to "clean up the mess" that the County was dealing with.

Supervisor Nixon urged her colleagues to "not be afraid to foreclose on the properties," telling

them that "if the fines are high enough then the growers won't be able to purchase the properties" in the first place.

169.     Following the adoption of Ordinance No. 20-11, the County's Planning Department began imposing fines – almost entirely against Asian American-owned properties – that were several times higher than not only the previous fines but the *value* of many of the properties being fined.

170.     Several months later, during an interview discussing alleged "Hmong" and "Chinese cartel" growers, Sheriff LaRue told a local reporter that "water restrictions," "water trucks," and "taking land" were three methods that he was looking at to expand the Sheriff's traditional enforcement powers and address the "community problem" of marijuana.

171.     Sheriff LaRue's comments suggested that property liens and the threat of foreclosure were one piece of a concerted effort by the Defendants to drive undesirables out.

172.     On January 19, 2021, the Board of Supervisors issued liens for unpaid cannabis-related fines under section 10-14.100 for the first time. Ten properties were issued liens that day; all were Asian-owned.

173.     Since January of 2021, the County Board of Supervisors has continued to record liens against properties for unpaid cannabis fines at increasing frequency, with approximately 40 liens issued thus far. The lists of property owners affected by liens indicate that well over 80% of all liens issued under section 10-14.100 have been issued against Asian American property owners in the County.

   A. *Liens issued under County Code section 10-14.100 are unauthorized under state law*

174.     While the Board of Supervisors relied on Government Code section 53069.4 to authorize the setting of cannabis-related fines, this section does not authorize the issuance of property liens to collect on such penalties and fines. Nor does any other statute. Government Code section 38773.1 authorizes a local legislative body to establish a procedure to collect abatement *costs* by nuisance abatement lien. In no way does it authorize the collection of fines and penalties.

175.    The County has cited to no other authority that would authorize its use of real property liens and the drastic remedy of foreclosure to collect on fines and penalties assessed for local ordinance violations.

176.    While the liens ordinance and the Board's subsequent lien authorizations are consistent with the County's pattern of racially targeted and increasingly punitive enforcement, the County actually lacks the authority to impose liens in this manner. This new enforcement and collection mechanism, which has been used almost exclusively against Asian property owners, is unauthorized and conflicts with state law.

B.  *Allegations of Plaintiffs Va and Vang*

  *Susanna Va*

177.    Among those impacted by property liens issued under section 10-14.100 is Plaintiff Susanna Va. Ms. Va acquired a ten-acre property (APN 003-650-270) around the Macdoel area in or around 2020. At that time, the property's assessed value was $23,460. Ms. Va previously lived in North Carolina with her now-adult children, and in Sacramento with her sister, but hoped to settle and retire in Siskiyou County to be closer to where her parents are buried.

178.    The previous owners of the property had left two greenhouses on the land. Ms. Va did not remove these additions to the property but inquired about getting a well so that she would not have to purchase water from an external source. She received a referral for a white well-driller, who told her he could dig the well upon payment. She did not understand at that time that a permit was required, nor did the driller inform her of such a requirement.

179.    In or around February of 2021, Ms. Va received a letter posted to her gate. Her son-in-law helped her translate the letter, which informed her that the County was requesting to be allowed to inspect her property. Her son-in-law called the County office to make an appointment, and in late February 2021 Siskiyou code inspector John Ottenberg arrived to inspect the property with several Sheriff's deputies and County employees.

180.    Mr. Ottenberg inspected the entire property, and cited Ms. Va for various code violations including use of the unpermitted well and a number of small cannabis seedlings and

containers located on the property. Ms. Va's son-in-law was present for the search and helped translate for Ms. Va. Mr. Ottenberg informed them that they had ten days from the date of the search to destroy the seedlings.

181.    Ms. Va destroyed the plants as instructed, but neither Ottenberg nor the other County employees ever returned to confirm that this was done.

182.    Later, Ms. Va went to the County Code Enforcement Office to inquire about whether she could remedy the well-permit issue and see if they could reduce the fines, as she was unable to pay the $28,000 in fines and penalties issued by Mr. Ottenberg.

183.    Mr. Ottenberg informed Ms. Va that she could apply for a well permit and have an inspector come to the property for that purpose. Regarding the fine amount, he told her that if she was unable to pay, she needed to go to an appeal hearing with the County.

184.    Ms. Va applied for and paid the fee for a well permit as Mr. Ottenberg had instructed, but when a County employee came to inspect the well, they informed her that it needed to be closed because the driller had improperly constructed the well. Ms. Va did as they instructed but did not have enough money remaining to pay for a new well. She currently does not have any water source for the property.

185.    Ms. Va also went to the abatement fines hearing with the County, where a community member helped to translate, as no interpreter was provided by the County. She attempted to explain that she was unable to pay the fines in her citation, but the hearing officer would not reduce the fines on this basis.

186.    In October of 2021, the County Board of Supervisors issued a lien against Ms. Va's property for the unpaid fines associated with her February citation.

187.    Ms. Va remains unable to pay the lien amounts associated with her property and has returned to her sister's home as she does not have heat or water access at her property, or the present financial ability to address these issues.

*Mai Nou Vang*

188.    Plaintiff Mai Nou Vang presently resides in Sheboygan, Wisconsin where she provides care for her elderly mother. She also owns a property in Shasta Vista located at APN 100-434-050. The assessed value of that property is $15,000.

189.    In July of 2020, while the property was being leased out, Siskiyou County officials conducted a search and issued citations and fines pursuant to County Code section 10-14.100 for a cannabis grow located on the property. Ms. Vang was not at the property or even in Siskiyou County at the time, but she later received notice of approximately $50,000 in related fines and penalties assessed against her for the property.

190.    On January 19, 2021, the Board of Supervisors issued a lien against Ms. Vang's property for the outstanding cannabis nuisance fines and penalties. Notably, the lien amount was over three times the assessed value of the property, and Ms. Vang's property remains encumbered by the lien.

**PLAINTIFFS' PROPOSED CLASS AND SUBCLASSES**

191.    Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other persons similarly situated. Plaintiffs' putative class consists of "All Asian Americans who reside, own property, and/or travel by automobile in Siskiyou County" ("Class")

192.    Plaintiffs' Class includes three subclasses: (1) "Traffic Class"; (2) "Water Class"; and (3) "Lien Class" (collectively "Subclasses"). Each is further defined below:

193.    Traffic Subclass; represented by Plaintiffs Ger Chong Ze Chang and Mai Nou Vang: All Asian Americans who, since January 1, 2020, have been or will be in the future stopped, detained, questioned, or searched by members of the Siskiyou County Sheriff's Department while driving or sitting in a vehicle within Siskiyou County, California.

194.    Water Subclass; represented by Plaintiff Russell Mathis: All Asian Americans who, since August 4, 2020, have resided or will reside within Siskiyou County without access to a residential well or municipal water at their property.

195.    Lien Subclass; represented by Plaintiffs Ying Susanna Va and Mai Nou Vang: All Asian Americans who currently own a property with a lien issued pursuant to Siskiyou County Code section 10-14.100, or who will be subject to a lien pursuant to Siskiyou County Code section 10-14.100 in the future due to unpaid fines under that section.

196.    The proposed Class and each of the proposed Subclasses meet the Rule 23(a) requirements. On numerosity, Census data from Siskiyou County indicates that the putative Class consists of at least 1,200 persons. The Subclasses meet the numerosity requirement based on Siskiyou County's own data. Siskiyou County records indicate that more than 30 persons are members of the Lien Subclass; that more than 1,000 persons are members of the Traffic Subclass; and more than 500 persons are members of the Water Ordinances Subclass.

197.    The interests of the Plaintiffs are not antagonistic to, or in conflict with, the interests of the Class as a whole or any Subclass, and there are no material conflicts between Plaintiffs' claims and those of absent Class or Subclass members that would make class certification inappropriate. The attorneys representing the Class are highly trained, duly qualified, and well experienced in representing plaintiffs in civil rights class actions.

198.    Plaintiffs' legal claims will be decided by questions of law and fact common as to all members of the Class or as to members of each Subclass.

199.    Plaintiffs' claims are appropriate for class treatment pursuant to Rule 23(b)(2) because the Defendants have intentionally discriminated against the Class and seek to expel the Class from Siskiyou County, thereby making final declaratory and injunctive relief appropriate for the Class as a whole. For each of Plaintiffs' specific causes of action, final declaratory and injunctive relief is appropriate as to one or more Subclasses as a whole.

**LEGAL CLAIMS**

**CLAIM ONE**

**Conspiracy to Violate Constitutional Rights**

**Under the Fourth and Fourteenth Amendment to the U.S. Constitution**

***Pursuant to 42 U.S.C. § 1983***

**All Plaintiffs against Defendants**

200.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

201.    When government actors collectively agree to violate individuals' constitutional rights—and take any steps in furtherance of that agreement—all relevant public agencies and employees are liable for constitutional conspiracy pursuant to 42 U.S.C. § 1983.

202.    Defendants have entered into explicit or implicit agreement(s) with one another to violate the Plaintiffs' constitutional rights by having a policy, practice, and/or custom of making the Siskiyou County inhospitable to Asian Americans vis-à-vis restricted water access, discriminatory enforcement of laws, unreasonable searches and seizures, and unlawful property encumbrances.

203.    Defendants have each taken concrete steps in furtherance of the agreement(s) as evidenced by Defendants' ongoing policy, pattern, and/or practice of coordinating with one another to target Asian Americans in violation of their constitutional rights.

204.    Plaintiffs, and those similarly situated, have been and will continue to be harmed as a direct and proximate result of Defendants' ongoing conspiracy.

**CLAIM TWO**

**Violation of Equal Protection – Racially Discriminatory Traffic Stops**

**Under the Fourteenth Amendment to the U.S. Constitution**

***Pursuant to 42 U.S.C. § 1983***

**(Plaintiff Chang, Plaintiff Vang, and the Traffic Subclass against Defendants)**

205.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

206.    The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution requires that all people be treated equally under the law without regard to, among other things, their race or ethnicity. The Equal Protection Clause prohibits law enforcement from policing in a manner that has a discriminatory effect on a racial or ethnic group and is motivated by a discriminatory purpose.

207.    Plaintiff Chang, Plaintiff Vang, and members of the Traffic Subclass are Asian American and are, therefore, members of a protected class under the Equal Protection Clause.

208.    Defendant Sheriff LaRue, acting under color of state law, has a policy, practice, or custom of stopping, detaining, questioning, and searching members of the Traffic Subclass based upon their race that is still in effect. Defendant Siskiyou County is liable for the Sheriff's policy, practice, or custom because he is the final decisionmaker for the County on police practices, and the County has further sanctioned or ratified this policy.

209.    Further, Defendant LaRue has failed to train and supervise deputies, acting under color of state law, on how to lawfully conduct traffic stops and vehicle searches in a manner consistent with the Fourteenth Amendment. He has acted with deliberate indifference to the obvious consequence of his failure to adequately train and supervise members of the Sheriff's Department.

210.    The Sheriff's Department targeted Plaintiff Chang and Plaintiff Vang for traffic stops based on their race. Defendants' unlawful policy, practice, or custom of racial profiling and discriminatory treatment of Asian American drivers, and failure to train and supervise members

of the Sheriff's Department to prevent racially motivated stops, was and is the moving force causing the ultimate injury to the Traffic Subclass, including Plaintiffs Chang and Vang.

211.    The Traffic Subclass' race was and continues to be an unlawful factor in Defendants' traffic enforcement scheme, which places all members of the Subclass at risk of continued racially motivated stops, detentions, and searches.

## CLAIM THREE

**Violation of Equal Protection – Racially Discriminatory Traffic Stops**

**Under Article I, Section 7 of the California Constitution**

**(Plaintiff Chang, Plaintiff Vang, and the Traffic Subclass against Defendants)**

212.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

213.    The Equal Protection right under the California Constitution is comparable to, if not more expansive than, the Equal Protection Clause under the U.S. Constitution.

214.    Plaintiff Chang, Plaintiff Vang, and members of the Traffic Subclass are Asian American and are, therefore, members of a protected class under the Equal Protection Clause.

215.    Defendant Sheriff LaRue, acting under color of state law, has a policy, practice, or custom of stopping, detaining, questioning, and searching members of the Traffic Subclass based upon their race that is still in effect.

216.    Defendant LaRue has failed to train and supervise deputies, acting under color of state law, on how to lawfully conduct traffic stops and vehicle searches in a manner consistent with Article I, section 7 of the California Constitution. He has done so with deliberate indifference to the obvious consequence of his inaction.

217.    Plaintiff Chang and Plaintiff Vang each were targeted for traffic stops based on their race. Defendants' unlawful policy, practice, or custom of racial profiling and discriminatory treatment of Asian American drivers, and failure to train members of the Sheriff's Department, was and is the moving force causing the ultimate injury to the Traffic Subclass, including Plaintiffs Vang and Chang.

218.    The Traffic Subclass' race was and continues to be an unlawful factor in Defendants' traffic enforcement scheme, which places all members of the Subclass at risk of continued racially motivated stops, detentions, and searches.

## CLAIM FOUR

**Unreasonable Search and Seizure**

**Under the Fourth Amendment to the U.S. Constitution**

***Pursuant to 42 U.S.C. § 1983***

**(Plaintiff Chang, Plaintiff Vang, and the Traffic Subclass against Defendants)**

219.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

220.    The Fourth Amendment mandates that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Traffic stops are seizures under the Fourth Amendment and must be supported by reasonable suspicion to believe that a law violation, such as a Vehicle Code violation, has occurred.

221.    A seizure that is reasonable at the outset may become unreasonable when it is prolonged beyond the time necessary to address the violation that warranted the stop and any related safety concerns.

222.    Moreover, the search of a vehicle during a stop generally requires probable cause to believe that the area of the vehicle searched contains contraband. A search may also be justified by consent, if consent is freely and voluntarily given.

223.    Defendant Sheriff LaRue has, under color of state law and as the final law enforcement decisionmaker for Defendant County, implemented or sanctioned a policy, practice, or custom of unlawfully seizing members of the Traffic Subclass in violation of the Fourth Amendment and is continuing to do so.

224.    Defendant Sheriff LaRue has, under color of state law and as the final decisionmaker for Defendant County, implemented or sanctioned a policy, practice, or custom of

unlawfully searching members of the Traffic Subclass in violation of the Fourth Amendment and is continuing to do so.

225.    Further, Defendant LaRue has failed to train and supervise deputies, acting under color of state law, on how to lawfully conduct traffic stops and vehicle searches in a manner consistent with the Fourth Amendment. He has acted with deliberate indifference to the obvious consequence of his failure to adequately train and supervise members of the Sheriff's Department.

226.    Plaintiffs Chang and Vang each have been directly and proximately harmed as a result of these policies, practices, or customs. Plaintiff Chang was stopped without reasonable suspicion and subjected to repeated searches of his vehicle and property in the absence of probable cause or other legal justification. Plaintiff Vang was subject to an unreasonably prolonged detention, followed by a search procured through coerced consent.

227.    The Department's policy, practice, or custom of unlawful vehicle-based seizures and searches, and Defendant LaRue's failure to train and supervise members of the Department, were and are the moving forces causing the ultimate injury to members of the Traffic Subclass and place them and Plaintiffs Chang and Vang at continuing risk of such harm.

## CLAIM FIVE

### Unreasonable Search and Seizure

### Under Article I, Section 13 of the California Constitution

### (Plaintiff Chang, Plaintiff Vang, and the Traffic Subclass against Defendants)

228.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

229.    The California Constitution's protections against unreasonable search and seizure are comparable to, if not more expansive than, those protections under the U.S. Constitution.

230.    Defendant Sheriff LaRue has, under color of state law and as final decisionmaker for Defendant County, implemented or sanctioned a policy, practice, or custom of unlawfully

seizing and searching members of the Traffic Subclass in violation of Article I, section 13 of the California Constitution, and will continue to do so.

231.    Defendant LaRue has failed to train and supervise deputies, acting under color of state law, on how to lawfully conduct traffic stops and vehicle searches in a manner consistent with Article I, section 13. He has acted with deliberate indifference to the obvious consequence of his failure to adequately train and supervise members of the Sheriff's Department.

232.    Plaintiff Chang and Plaintiff Vang were unlawfully seized and searched in violation of Article I, section 13, as a direct and proximate result of this policy, practice, or custom.

233.    The Department's policy, practice, or custom of unlawful vehicle-based seizures and searches, and Defendant LaRue's failure to train and supervise members of the Department, were and are the moving forces causing the ultimate injury to members of the Traffic Subclass and place them and Plaintiffs Chang and Vang at continuing risk of such harm.

## CLAIM SIX

### Violation of Equal Protection – Racially Discriminatory Ordinances

### Under the Fourteenth Amendment to the U.S. Constitution

### *Pursuant to 42 U.S.C. § 1983*

### (Plaintiff Mathis and the Water Subclass against Defendants)

234.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

235.    Plaintiff Mathis and the Water Subclass are Asian American and are, therefore, members of a protected class under the Equal Protection Clause.

236.    The water ordinances were advanced and adopted with racial animus as an unlawful, motivating factor.

237.    Defendant Siskiyou County's water ordinances restricted water access to Plaintiff Mathis and the Water Subclass and continue to do so.

238.    The passage and enforcement by Defendants of the water ordinances are so closely related as to be the moving force causing the ultimate injury to Plaintiff Mathis and members of the Water Subclass and places them at continuing risk of such harm.

**CLAIM SEVEN**

**Violation of Equal Protection – Racially Discriminatory Ordinances**

**Under Article I, Section 7 of the California Constitution**

**(Plaintiff Mathis and Water Subclass against Defendants)**

239.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

240.    The right of equal protection under the California Constitution is comparable to, if not more expansive than, the right under the U.S. Constitution.

241.    Plaintiff Mathis and the Water Subclass are Asian American and are, therefore, members of a protected class under the Equal Protection Clause.

242.    The water ordinances were advanced and adopted with racial animus as an unlawful, motivating factor.

243.    Defendant Siskiyou County's water ordinances restricted water access to Plaintiff Mathis and the Water Subclass and continue to do so.

244.    The passage and enforcement by Defendants of the water ordinances are so closely related as to be the moving force causing the ultimate injury to Plaintiff Mathis and members of the Water Subclass and places them at continuing risk of such harm.

## **CLAIM EIGHT**

**Violation of Substantive Due Process – State Created Danger**

**Under the Fourteenth Amendment to the U.S. Constitution**

***Pursuant to 42 U.S.C. § 1983***

**(Plaintiff Mathis and the Water Subclass against Defendants)**

245.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

246.    Defendants affirmatively and intentionally put Plaintiffs Mathis and the Water Subclass in great physical and bodily danger by depriving them of water to hydrate, bathe, and otherwise sustain life and health.

247.    Defendants were aware of, and expressly indifferent to, the danger Defendants' actions inflicted upon Plaintiff Mathis and the Water Subclass yet refused to take obvious steps to address the risks created.

248.    The passage and enforcement by Defendants of the water ordinances are so closely related as to be the moving force causing the ultimate injury to Plaintiff Mathis and members of the Water Subclass and places them at continuing risk of such harm.

## **CLAIM NINE**

**Violation of Substantive Due Process – State Created Danger**

**Under Article I, Section 7(a) of the California Constitution**

**(Plaintiff Mathis and the Water Subclass against Defendants)**

249.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

250.    Governmental action that affirmatively places a person in a position of danger deprives that person of substantive due process rights guaranteed by the California Constitution. Cal. Const., art. I, § 7(a). The substantive due process protections under the California Constitution are at least as expansive as those under the U.S. Constitution.

251.    Defendants affirmatively and intentionally put Plaintiffs Mathis and the Water Subclass in great physical and bodily danger by depriving them of water to hydrate, bathe, and otherwise sustain life and health.

252.    Defendants were aware of, and expressly indifferent to, the danger Defendants' actions inflicted upon Plaintiff Mathis and the Water Subclass, yet refused to take obvious steps to address the risks created.

253.    The passage and enforcement by Defendants of the water ordinances are so closely related as to be the moving force causing the ultimate injury to Plaintiff Mathis and members of the Water Subclass and places them at continuing risk of such harm.

## CLAIM TEN

### Violation of Substantive Due Process – Unlawful Liens
### Under the Fourteenth Amendment to the U.S. Constitution
### *Pursuant to 42 U.S.C. § 1983*

### (Plaintiff Va, Plaintiff Vang, and the Liens Subclass against Defendant Siskiyou County)

254.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

255.    A land use action "that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 542 (2005). The Ninth Circuit has concluded that there is a substantive due process claim where a challenged regulation or action "serves no legitimate government purpose." *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 484 (9th Cir. 2008). Such a claim must be grounded in the wrongful interference with a property interest through arbitrary regulation. *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990).

256.    Lien Subclass Plaintiffs, including Plaintiff Va and Plaintiff Vang, have suffered an ongoing injury to their property interests due to the imposition of liens on their real property. The Board of Supervisors' action authorizing the imposition of these liens was in direct conflict

with and preempted by California law. *Mechammil v. City of San Jacinto*, 653 Fed. Appx. 562, 563-64 (9th Cir. 2016). There can be no "legitimate" exercise of the county's power that conflicts with the state's general laws. Cal. Const., art. XI, § 7. As such, the Defendant's actions are arbitrary and illegitimate, and constitute a violation of Plaintiff Va, Plaintiff Vang, and the Liens Subclass' substantive due process rights.

## CLAIM ELEVEN

### Preemption

### Under Article XI, Section 7 of the California Constitution

### (Plaintiff Va, Plaintiff Vang, and the Liens Subclass against Defendant Siskiyou County)

257.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

258.    Under the California Constitution, "a county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7. Local legislation that conflicts with general state laws is preempted and void. *Big Creek Lumber Co. v. County of Santa Cruz*, 38 Cal.4th 1139, 1150 (2006). "Conflicts exist if the ordinance duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication." *Id.* (internal citations omitted).

259.    "Whenever the Legislature has seen fit to adopt a general scheme for the regulation of a particular subject, the entire control over whatever phases of the subject are covered by state legislation ceases as far as local legislation is concerned." *Ex Parte Lane*, 58 Cal.2d 99, 102 (1962). The legislature may expressly or impliedly signal its intent to fully occupy an area of law, as is the case where: "(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state

outweighs the possible benefit to the locality." *Am. Fin. Servs. Assn. v. City of Oakland*, 34 Cal.4th 1239, 1252 (2005) (internal citations omitted).

260.    A conflict exists between the Defendant's action authorizing property liens under Siskiyou County Code section 10-14.100 against Plaintiff Va, Plaintiff Vang, and the Liens Subclass, and the relevant body of state law prescribing what actions localities may take to collect local nuisance fines and penalties.

261.    The California legislature has given local governments the power to enforce ordinances by way of nuisance fines and penalties. Cal. Gov't Code § 53069.4. However, the state does not permit local governments to levy property liens as a collection mechanism for these penalties, limiting the use of liens to recover the actual costs of abatement only. The Ninth Circuit has previously addressed this issue, finding that localities cannot attach liens or impose special assessments to collect outstanding nuisance fines or penalties, as such action violates state law. *Mechammil,* 653 Fed. Appx. at 563-64.

262.    Because Defendant Siskiyou County's lien authorizations conflict with and enter into an area fully occupied by state law, the property liens issued against Plaintiff Va, Plaintiff Vang, and the Liens Subclass under Siskiyou County Code section 10-14.100 are impermissible. Plaintiff Va, Plaintiff Vang, and the Liens Subclass suffer an ongoing injury from this unlawful practice, and without relief the violations will continue to occur.

**<u>CLAIM TWELVE</u>**

**California Government Code Section 11135**

**(Plaintiff Mathis, Water Subclass, Plaintiff Chang, and Traffic Subclass**

**against Defendants)**

263.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

264.    California Government Code section 11135 sets forth a nondiscrimination requirement for state programs. It provides that in pertinent part:

> [n]o person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

Cal. Gov't Code § 11135(a).

265.    Defendants are recipients of financial assistance from the State of California.

266.    Defendants were, at all times relevant to this action, and are currently operating or administering a program or activity that receives state financial assistance, within the meaning of section 11135.

267.    Defendants have violated the rights of Plaintiff Mathis, the Water Subclass, Plaintiffs Chang and Vang, and the Traffic Subclass secured by Cal. Gov't Code § 11135 et seq., and those violations were and are a substantial factor in causing Plaintiffs' harms.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of a class of all those similarly situated, demand the following relief:

A.    A certification of the proposed Class and Subclasses as indicated above, and an appointment of the named Plaintiffs as class representatives and the undersigned counsel as class counsel;

B.    A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants have engaged in discrimination based on race, color, and/or ethnicity and denied Plaintiffs and plaintiff class due process and equal protection of the laws in violation of the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983;

C.    A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' stops, interrogations, detentions, and/or searches of Plaintiffs Chang and Vang and others similarly situated without probable cause or reasonable, articulable suspicion to believe that they

1  had committed a crime violated the Fourth Amendment guarantee against unreasonable searches

2  and seizures and 42 U.S.C. § 1983;

3      D.    An order enjoining Defendants from continuing to engage in such race, color,

4  and/or ethnicity-based discrimination as described herein and putting in place safeguards

5  sufficient to ensure that such discrimination does not continue in the future;

6      E.    A permanent injunction prohibiting Defendants from engaging in stops,

7  interrogations, detentions, and/or searches of Plaintiffs and other similarly situated individuals

8  without probable cause or reasonable, articulable suspicion to believe that they have committed a

9  crime;

10      F.    A permanent injunction prohibiting Defendants from engaging in racial profiling

11  of Asian American people in stops, interrogations, detentions, and/or searches stemming from

12  traffic stops;

13      G.    A permanent injunction prohibiting Defendants from enforcing Ordinances Nos.

14  20-13, 21-07, and 21-08;

15      H.    A permanent injunction that prohibits Defendants from enforcing Ordinance No.

16  20-11, codified under § 10-14.100(a)(g)(3);

17      I.    An award to Plaintiffs of attorneys' fees;

18      J.    An award to Plaintiffs of costs and expenses incurred in the filing and prosecution

19  of this action; and

20      K.    Such other and further relief in favor of Plaintiffs as is just and proper.

21

22

23  DATED this 3rd day of August 2022.    */s/ John Thomas H. Do*
    John Thomas H. Do

24      Emi Young

25      Grayce Zelphin
    Brandon Greene

26      AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION OF NORTHERN

27      CALIFORNIA

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

/s/ *Glenn Katon*
Glenn Katon
ASIAN AMERICANS ADVANCING
JUSTICE-ASIAN LAW CAUCUS


/s/ *Stanley Young*
Stanley Young
Melissa Decker
Silvia Wu
COVINGTON & BURLING LLP

*Counsel for Plaintiffs*