**SPINELLI, DONALD & NOTT**
A Professional Corporation
J. SCOTT DONALD (SBN: 158338)
300 University Avenue, Suite 100
Sacramento, CA 95825
Telephone:  (916) 448-7888
Facsimile:   (916) 448-6888
Email: scottd@sdnlaw.com

Law Offices of
**MATHENY SEARS LINKERT & JAIME LLP**
RICHARD S. LINKERT, ESQ. (SBN 88756)
MADISON M. SIMMONS, ESQ. (SBN 292185)
3638 American River Drive
Sacramento, California 95864
Telephone: (916) 978-3434
Facsimile: (916) 978-3430
Email: rlinkert@mathenysears.com
Email: msimmons@mathenysears.com

Attorneys for Defendants
COUNTY OF SISKIYOU and
JEREMIAH LARUE

**[Fee Exempt Pursuant to Gov. Code § 6103]**

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GER CHONG ZE CHANG, MAI NOU VANG, RUSSELL MATHIS, YING SUSANNA VA, and all others similarly situated,<br><br>    Plaintiffs,<br>  v.<br><br>COUNTY OF SISKIYOU and JEREMIAH LARUE, in his official capacity as Sheriff<br><br>    Defendants. | Case No.: 2:22-cv-01378-KJM-AC<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>**[Fed. R. Civ. P. 12(b)(6)]**<br><br>Date:         May 17, 2024<br>Time:        10:00 AM<br>Judge:       Kimberly J. Mueller (KJM)<br>Courtroom:  3<br><br>Action Filed:  August 3, 2022<br>Trial Date:     Not assigned |

I. **INTRODUCTION**

Defendants COUNTY OF SISKIYOU ("the County") and JEREMIAH LARUE, in his official capacity as Sheriff (the "Sheriff") (collectively, "Defendants") instant Motion to Dismiss should be granted because Plaintiffs GER CHONG ZE CHANG, MAI NOU VANG, RUSSELL MATHIS, and YING SUSANNA VA's (collectively, "Plaintiffs") First Amended Complaint (hereinafter "Complaint") fails to state sufficient facts to support claims for Conspiracy to Violate Constitutional Rights (Claim One),  Equal Protection (Claims Two, Three, Six, and Seven), and Unreasonable Search and Seizure (Claims Four and Five). Additionally, ordinances that are the basis of Plaintiffs' claims for Violation of Substantive Due Process pursuant to 42 U.S.C. § 1983 and Violation of Substantive Due Process – State Created Danger (claims Eight and Nine) have been either repealed or modified and those claims are now moot.  Finally, County Ordinances enacted in part to enable the collection of administrative fines through liens placed on real property that Plaintiffs contend violate their rights to substantive due process have been repealed and the liens expunged thus rendering Plaintiffs' tenth claim moot.

Before even alleging their first claim against Defendants, Plaintiffs dedicate an impressive 210 paragraphs fraught with rhetoric and hyperbole in their Complaint to vilify County Officials and the Sheriff and his deputies as "racists" to create this amazing, but false, narrative that Plaintiffs are victims of race-based discrimination. However, upon stripping the irrelevant rhetoric and hyperbole from the Complaint and carefully examining the actual factual allegations, the Complaint is devoid of any causal link between Defendants' actions and Plaintiffs' race. Simply put, Plaintiffs' complaint fails to allege facts to show that Plaintiffs' race was the motivating factor behind any of the ordinances or traffic stops that Plaintiffs complain about. Because Plaintiffs cannot show that any of Defendants' conduct was ***because of*** Plaintiffs' race, Plaintiffs have no option but to rely on rhetoric and hyperbole to create a false narrative for which Plaintiffs' complaint is founded upon. For example, Plaintiffs rely on derogatory comments made by the general public, ***not*** County officials, during open forum at County Board Hearings as evidence of discriminatory conduct but cannot identify any actual discriminatory race-based comments made by Defendants. These comments made by the public cannot be attributed to Defendants and cannot be relied upon by Plaintiffs as a basis of their claims.

///

Similarly, in what appears to be an attempt to confuse or mislead the true motivations behind Defendants' conduct, Plaintiffs dedicate much of their Complaint equating Defendants justifiable, nondiscriminatory actions to the discrimination early Chinese immigrants were subjected to nearly 200 years ago. However unfortunate, those events that occurred in the late 19th Century have nothing to do with, is completely irrelevant, and bear no resemblance to present circumstances between Plaintiffs and Defendants. Plaintiffs' broad-sweeping allegations devoid of any specificity as to actual discriminatory conduct committed by Defendants is nothing more than improper attempt to "rouse" up emotions and create a bias against Defendants.

The dispute between Plaintiffs and Defendants has ***nothing*** to do with Plaintiffs' race, but has everything to do with protecting the general public, irrespective of race, color, gender, sexual orientation, or any other protected classification, from the very real and documented adverse consequences that the illegal cannabis industry has, and continues to have, on the County of Siskiyou. To classify the actions taken by Defendants as a race-based discrimination is dishonest, reckless, and without regard to the ***true*** devastation that the illegal cannabis industry has caused on the County. Defendant Siskiyou County's government officials were elected and entrusted by the people of Siskiyou to make and execute laws necessary to protect the health and safety of the People of Siskiyou. Their actions were to accomplish this end, and not for any other malevolent reason as suggested by Plaintiffs' fantastic narrative. Because Defendants actions were solely intended to serve these ends, Plaintiffs' Complaint fails as Plaintiffs do not allege any specific facts to support their claims. Finally, several of Plaintiffs' claims are based on ordinances that have been repealed since Plaintiffs filed their Complaint. Those claims are now moot. Accordingly, Defendants' instant motion should be granted.

## II. STATEMENT OF RELEVANT FACTS.

### A. Procedural Background

The instant action was filed on August 3, 2022 (*See* ECF No. 1) while a related case already before this Court entitled *Lo v. County of Siskiyou*, Case No. 2:21-cv-00999-KJM-AC, was pending. Counsel for Plaintiffs filed a Notice of Related Case referencing the Lo matter on August 3, 2022. (*See* ECF No. 3) As declared by Plaintiffs' counsel in their Notice of Related Case, both the *Lo* matter and the instant action "involve claims arising from the passage and enforcement of the same three water

ordinances." See ECF No. 3; p. 2:19-27. Prior to the Defendants filing a responsive pleading, this matter and the *Lo* matter were stayed on December 28, 2022 while the parties attempted to informally resolve both cases. Initially, mediation was conducted by Magistrate Judge Claire. The *Lo* matter settled on May 11, 2023 and the settlement was approved by this Court in a Minute Order issued on September 12, 2023. See Request for Judicial Notice, Ex. A. The terms and conditions of the settlement included the repeal of the two ordinances that had been enjoined by this Court in the *Lo* matter and the modification of the third ordinance which was not enjoined. See RJN, Ex. B.

The instant matter did not settle at the time the Lo matter was resolved, however, negotiations continued during which time this matter was stayed. Following a termination of negotiations and a lapse of the stay, the Defendants filed a 12(b)(6) motion. While that motion was pending, Plaintiffs amended their Complaint and the County has filed this motion in response.

**B.     Facts**

Siskiyou County is one of many counties in California that is struggling to combat the illegal cannabis industry. It has been estimated that illegal cannabis sites in the County have increased threefold mostly in the area including Mount Shasta Vista community (the "MSV"). *See Lo v. County of Siskiyou*, Case No. 2:21-cv-00999-KJM-AC; ECF No. 47, p. 2:11-13. Such illegal activity has caused a crisis in Siskiyou County and the Sheriff's office along with the assistance of other public agencies have seized hundreds of thousands of illegal cannabis plants as well as many pounds of processed cannabis, concentrated cannabis and drug-related money with a street value of between $59M and $179M in the illegal drug market. *See Lo,* ECF No. 47, pp. 2:24-3:1. Illegal drug operations of this magnitude create additional nuisances beyond simply having cannabis plants growing in the County. The areas in which the illegal cultivation is occurring has become extraordinarily dangerous. *See Lo,* ECF No. 47, p. 5:13-18. The Sheriff's office has received reports of individuals openly carrying long arm weapons. *See Lo,* ECF No. 47, p. 5:14-16. Citizens have also made reports of gunshots being fired in MSV, robberies at gunpoint with people being tied up, and assault. *See Lo,* ECF No. 47, p. 5:14-18. Few similar crimes were reported in MSV before illegal cannabis cultivation took hold. *See Lo,* ECF No. 47, p. 5:17-18.

Prior to the arrival of the cannabis growers, MSV was an arid, mostly uninhabited and sparsely-treed area of Siskiyou County. With very little available water, the only abundant resource in the area

was sunlight. However, the lure of easy money to be made on extraordinarily cheap land, gradually brought cannabis growers to MSV first in trickles and then in droves. In 2015, due to the alarming increase in cannabis growth, Siskiyou County passed an ordinance making it illegal to cultivate cannabis outside. *See Lo,* ECF No. 47, p. 2:5-7.  In response, cannabis growers switched over to greenhouses which allowed the growers to increase yields by 2-3 times what they could grow outside on a per annum basis. *See Lo,* ECF No. 47, p. 2:7-13. In approximately September of 2017, the County issued an urgency resolution declaring a local state of emergency due to the proliferation of indoor grow sites. *Id*. Unfortunately, since 2017 illegal cultivation has not decreased but in fact has exploded.

      As with any significant criminal enterprise, there are many negative consequences as a result of those unlawful activities. In the case of illegal cannabis cultivation in MSV, they have included related violent crimes, environmental harm to the land and water, and harm to the actors involved in the enterprise. According to Sheriff LaRue, there has been a marked increase in dangerous felonies in MSV since 2017. *See Lo,* ECF No. 47, p. 5:13-18.  While occupants of MSV are typically distrustful of law enforcement and therefore hesitant to report crimes, his office has received reports of armed robberies, assaults and murder where no such crimes were reported in MSV prior to illegal cannabis cultivators moving in.

      The negative environmental consequences as a result of a proliferation of cannabis cultivation is also significant. MSV has virtually no water aside from a few wells located on a very small percentage of the "lots" located in the subdivision. As a result, the grow sites located in MSV are dependent upon water delivery trucks to provide the necessary water for illegal cannabis cultivation. *See Lo,* ECF No. 47, p. 4:24-25.  Approximately 100 or more trucks typically ranging in volume between 2,500 -4,000 gallons each transport water to the illegal cannabis grows on a daily basis. *See Lo,* ECF No. 47, p. 4:26-27. This water typically comes from ranchers who can charge premium prices from the cannabis growers for the water that they would otherwise leave in the ground or utilize for legitimate purposes. In the last year, the owners of more than thirty wells adjacent to ranchers pumping water for illegal cannabis growers reported that their wells had run dry due to the excessive pumping of ground water. *See Lo,* ECF No. 47, p. 4:27-28. In response to the crimes being committed and to this gross misuse of a precious resource during an extreme drought, the County passed ordinances intending to limit these

1  illegal cannabis growers access to the ground water they required in order to grow their illegal crop. See
2  Siskiyou County Resolution, 21-07 and 21-08. *See* RJN, Ex. C.

3        In addition to its extraordinarily detrimental impact on the County's water supply, the illegal
4  cultivation of cannabis at the level known to occur in MSV requires the unregulated use of significant
5  amounts of insecticides, pesticides, rodenticides, and fertilizers. *See Lo,* ECF No. 47, p. 5:8-9. In the
6  course of raids into MSV by law enforcement, significant unsanitary conditions including trash and fire
7  hazards have been noted which significantly impact the safety of County residents. Prior to January of
8  2020, four carbon monoxide deaths were reported in the County as a result of exposure to the poisonous
9  gas inside of the illegal greenhouses. *See Lo,* ECF No. 47, p. 5:10-12.

10       Aside from their exposure to violent crime both from the outside and within the district itself, the
11 inhabitants of MSV live in a constant state of danger due to the conditions they have created in
12 furtherance of their enterprise. It should not be a surprise to anyone that the illegal cannabis growers in
13 MSV illegally occupy the land in unpermitted, unapproved and unregulated structures. *See* RJN; Ex. D.
14 Legal occupation of a property requires a demonstration that the inhabitants have a potable water source.
15 *See* RJN; Ex. D. Every single family home in the County of Siskiyou is required to have a permanent
16 potable water source that meets the State drinking water standards. *See* RJN; Ex. D.  Plaintiffs in the
17 instant matter contend that the water trucks that are in excess of 100 gallons as covered by the applicable
18 ordinance provides them with water they need to cook with and drink on a day to day basis. However,
19 the water trucks utilized for water delivery to the illegal cannabis growers in MSV are non-potable water
20 haulers, that is pumped and delivered from agricultural wells. *See* RJN; Ex. D.

21       Given the dire situation created by the illegal cannabis industry throughout the County, County
22 Officials and the Sheriff and his deputies have taken certain measure to protect the citizens of the
23 County. These measures included the enactment of the Water Ordinances, the Lien Ordinances, and
24 traffic stops where the totality of the circumstances suggest that motorist are trafficking illegal cannabis
25 or are taking part in the conspiracy to grow illegal cannabis. The sole purpose of the measures taken by
26 Defendants is protect the citizens of Siskiyou County.

27       In spite of the County's intent to limit the waste of groundwater use for illegal cannabis
28 cultivation and mitigate all of the negative consequences that the illegal cannabis industry has brought to

1  the County, the Board of Supervisors, faced with extraordinarily aggressive litigation, repealed the Code
2  Sections that had been enjoined in the Lo matter, specifically Ordinance No. 21-07 which was
3  subsequently replaced by Ordinance No. 21-13; and Ordinance No. 21-08 which was replaced by
4  Ordinance No. 21-14.  *See* RJN, Ex. B.
5       On December 5, 2023, following public hearings, the Board of Supervisors for Siskiyou County
6  repealed Siskiyou County Code Section 10-14.100(g)(3) and Section 1-5.09(i)(3) which had formerly
7  provided for the collection of unpaid administrative fines through the imposition of property liens. On
8  January 16, 2024, the Board of Supervisors rescinded the property liens that had been recorded under
9  Resolutions 21-17, 21-40, 21-76, 21-149, and 21-157 for unpaid administrative fines and at that time
10 directed the County Clerk to execute and record notices of rescission of the property liens. In accordance
11 with these actions, the liens upon Plaintiffs in the instant matter were expunged.

### III.   LEGAL STANDARD FOR MOTION TO DISMISS

13      To avoid dismissal pursuant to Federal Rules of Civil Procedure, Rule12(b)(6), a complaint must
14 contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*,
15 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is
16 facially plausible when "the court [can] draw the reasonable inference that the defendant is liable for the
17 misconduct alleged." *Id.* "Factual allegations that are merely consistent with a defendant's liability fall
18 short of being facially plausible." *Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012)
19 (quotation marks and citations omitted). Merely stating a "cognizable legal theory" is not enough and
20 the claim necessarily fails if the plaintiff does not allege facts to support the claim. *Balisteri v. Pacifica*
21 *Police Dep't.* 901 F. 2d 696, 699 (9th Cir. 1990). In fact, "a plaintiff's obligation to provide the 'grounds'
22 of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the
23 elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).
24 "[F]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* "Naked
25 assertions devoid of further factual enhancement" no longer suffice to state a claim. *Ashcroft v. Iqbal*,
26 556 U.S. at 678. Facts actually pled must give rise to a plausible claim for relief. *Id.* at 679. Further, the
27 complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it
28 rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. at 555 (quotation marks and citation omitted).

In considering a motion pursuant to Fed. R. Civ. P. 12(b)(6), a court need not accept as true unreasonable inferences or conclusory legal allegations cast in the form of factual allegations. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001); *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981). Further, "[C]onslusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss for failure to state a claim." *In re Stac Elecs. Sec. Litig.*, 89 F. 3d 1399, 1403 (9th Cir. 1996) (quoting *In re VeriFone Sec. Litig.*, 11 F. 3d 865, 868 (9th Cir. 1993).

Here, and as argued in detail below, Plaintiffs first seven causes of actions fail to state a valid claim and therefore Defendants' motion should be granted. Plaintiffs' first claim for conspiracy fails to allege the necessary "agreement" between Defendants to state a valid claim for conspiracy.  Plaintiffs' equal protection claims fail to allege sufficient facts to establish that Defendants' alleged conduct towards Plaintiffs were "***because of***" Plaintiffs' race. Plaintiffs' allegations giving rise to their equal protection claims are nothing more than conclusory "naked" assertions that are merely consistent with defendant's alleged liability. Similarly, Plaintiffs' allegations pertaining to illegal searches and seizures in violation of the Fourth Amendment are also subject to dismissal as Plaintiffs' claim, even if assumed to be true, do not state a valid claim because the totality of the circumstances establish that the Sheriff and his deputies had reasonable suspicion to initiate traffic stop and engage in a limited warrantless search consistent with well-established exceptions to the Fourth Amendment.

## IV.   LEGAL ARGUMENT

### A.   Plaintiff's First Claim for Conspiracy To Violate Constitutional Rights Fails To Plead Specific Facts

"To state a claim for a conspiracy to violate one's constitutional rights under section 1983, the plaintiff must state specific facts to support the existence of the claimed conspiracy." *Burns v. County of King,* 883 F.2d 819, 821 (9th Cir. 1989).  "[A] plaintiff must demonstrate the existence of an agreement or meeting of the minds to violate constitutional rights." *Crowe v. County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (quoting *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283, 1301 (9th Cir. 1999) (internal quotation marks omitted). The agreement "may be inferred on the basis of circumstantial evidence such as the actions of the defendants. *Id.* (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir. 1989) (en banc) (internal quotation marks omitted). "To be liable,

each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) (quoting *United Steelworkers*, 865 F.2d at 1541 (9th Cir. 1989)).

Here, a careful examination of Plaintiffs' Complaint reveals that there is ***no*** factual allegation of an agreement between government officials to support a claim for conspiracy. Instead, Plaintiffs' Complaint relies solely on the following allegations to support their conspiracy claim: (1) irrelevant discrimination of Chinese immigrants from nearly two centuries ago; (2) inflammatory statements made by ***the public*** pertaining to how the illegal cannabis pandemic in Siskiyou County has had an adverse effect on the community (an adverse effect that is commonly known throughout the State of California and even acknowledged by both Governor Newsome and Attorney General Bonta, S*ee* RJN, Exhibit E); (3) the creation of ordinances that were specifically enacted for the ***sole purpose*** of combatting the well known adverse effects of the illegal cannabis pandemic; and (4) law enforcement conducting proper traffic stops and subsequent searches in conformity with the requirements of *Terry v. Ohio* such that the totality of the circumstances gave rise to justifiable law enforcement conduct. No agreement, whatsoever, between Defendants evidencing a "conspiracy" is alleged in the Complaint.

Assuming, *arguendo*, that the above conduct were "circumstantial evidence" of a conspiracy (and they are not), Plaintiffs' claim would still fail. The allegations pertaining to discrimination that occurred nearly two centuries ago is wholly irrelevant and is rhetoric intended to appeal to the emotions to lay a foundation of bias against Defendants, but is not factual evidence to support Plaintiffs' claim. The statements made by the public cannot be imputed on Defendants. While Defendants do not condone any derogatory comments pertaining to Plaintiffs made by the general public, the public is free to voice their opinion without the fear of County Official taking action to chill speech. To suggest that Defendants adopted selected portions of public statements and used those selected statements to create the ordinances and engage in "conspiracy" to discriminate is not only misplaced but a gross overreach as there is no evidence to suggest that County Officials did anything other than allow the public to exercise their First Amendment rights and voice their opinion during open forum. With respect to the enactment of the water and lien ordinances, the Complaint is devoid of any facts to suggest that the ordinances were created for discriminatory purpose. The ordinances were created solely as an aggressive response

to the illegal cannabis industry that is devating the County. Like the ordinances, the Complaint is devoid of any evidence that Defendants conspired to enforce traffics stops solely against "Asians." As argued in detail, below, each and every traffic stop alleged in the Complaint was supported by reasonable suspicion based on the totality of the circumstances.

Plaintiffs' entire Conspiracy claim is rooted in a subjective belief that Defendants conspired against them. However, such subjective belief is insufficient to support a claim for conspiracy. See *Holman v. Chrans*, NO. 00 C 6424, 2001 U.S. Dist. LEXIS 3562, at *5 (N.D. Ill. Mar. 20, 2001) holding that a "plaintiff's subjective belief, without any facts to buttress his suspicions, is insufficient to state a colorable cause of action for conspiracy." Because a claim for conspiracy requires alleging "the *existence* of an agreement or meeting of the minds to violate constitutional rights." *Crowe v. County of San Diego*, 608 F.3d at 440, Plaintiffs must allege objective facts, not subjective conclusory beliefs, that show the existence of an agreement to conspire. Plaintiffs' Complaint fails to allege such facts; therefore, Plaintiffs' first claim should be dismissed.

      **B.**      **Plaintiffs' Equal Protection Claims Fail Because Plaintiffs Do Not Allege Facts to Show That Facially Neutral Statutes Were Executed For a Discriminatory Purpose**

To prevail on an equal protection claim, Plaintiffs must demonstrate that Defendants, acting under color of state law, discriminated against them as a member of "an identifiable class and that the discrimination was *intentional*." *Flores v. Morgan Hill Unified Sch. Dist.*, 324 F.3d 1130, 1134 (9th Cir. 2003); *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 740 (9th Cir. 2000). Where Plaintiffs seek to prove the invidious discriminatory intent element of a violation of the Equal Protection Clause through disparate impact and "…the challenged governmental policy is 'facially neutral,' proof of its disproportionate impact on an identifiable group can satisfy the intent requirement *only if it tends to show that some invidious or discriminatory purpose underlies the policy*." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001), emphasis added. The mere fact that a law or other official act results in a racially disproportionate impact does not automatically render the law or official act unconstitutional. *Washington v. Davis*, 426 U.S. 229, 239 (1976). In fact, even the "unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection *unless* there is shown to be

present in it an element of intentional or purposeful discrimination." *Snowden v. Hughes*, 321 U.S. 1, 8. Further, in evaluating whether a law or official act violates the Equal Protection Clause, a discriminatory purpose cannot be presumed based on the disparate impact in the execution of the law. *Tarrance v. Florida*, 188 U.S. 519, 520 (1903). Rather, Plaintiff must show a "clear and intentional discrimination." *Gundling v. Chicago*, 177 U.S. 183, 186 (1900).

While disproportionate impact in the execution of a law, alone, is insufficient to establish a claim for violation of the Equal Protection Clause, the Supreme Court has recognized that the requirement of showing some invidious or discriminatory purpose is satisfied when a "stark… and clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Gomillion v. Lightfoot*, 364 U.S. 339, (1960). Discriminatory purpose "implies more than intent as volition or intent as awareness of consequences [citation omitted] … It implies that the decisionmaker… selected or reaffirmed a particular course of action at least in part **"because of," not merely "in spite of,"** its adverse effects upon an identifiable group. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979), emphasis added. Further, when the disparate impact is "essentially an unavoidable consequence" of a legitimate legislative policy, inferences that the policy was enacted for a discriminatory purpose "fail[] to ripen into proof" of an actual discriminatory animus. *Id.* at n.25. See also, *Wayte v. United States*, 470 U.S. 598, 610 (1985).

In *Yick Wo v. Hopkins*, the Supreme Court considered whether a San Francisco Ordinance that made it illegal to operate a laundry facility in a wooden building without a permit was unconstitutional. The Ordinance was racially neutral on its face. However, Plaintiff presented extrinsic evidence showing a discriminatory design to favor one individual or class over another. The extrinsic evidence was independent from the disparate impact of the Ordinance and therefore the discriminatory purpose did not have to be inferred from the consequence of the enforcement of the Ordinance. Accordingly, in reliance on the extrinsic evidence, the Supreme Court held that the San Francisco Ordinance was unconstitutional because "[t]he necessary tendency, if not the specific purpose, of [the] ordinance… [was] to drive out of business all the numerous small laundries, especially those owned by Chinese [individuals]." *Yick Wo v. Hopkins*, 118 U.S. at 373-374. In other words, since the extrinsic evidence

1    showed that the Ordinance was purposefully enacted **because of** the racial disparate impact it would
2    have, not in spite of the disparate impact, the Ordinance was violation of the Equal Protection Clause.
3    In *Yick Wo*, there was a showing of actual discrimination because of race not merely in spite of it.

4          Here, Plaintiffs allege four Equal Protection Claims - Claims Two, Three, Six, and Seven – that
5    pertain to the enforcement of Traffic Stops and the Water Ordinances. All four claims fail because
6    Plaintiffs do not allege any facts to suggest that the enforcement of legally valid traffic stops, and
7    enforcement of facially neutral water ordinances are because of race rather than in spite of race. In other
8    words, Plaintiff's Complaint is devoid of any allegation that Defendants selected or reaffirmed a
9    particular course of action at least in part ***"because of," not merely "in spite of,"*** its adverse effects
10   upon an identifiable group, i.e., the Hmong Community. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256,
11   279 (1979).   Further, contrary to well established law articulated above, Plaintiffs' Complaint does not
12   allege any extrinsic evidence that show a clear and stark intentional discrimination or purposeful
13   discriminatory animus by Defendants. Rather, Plaintiffs rely on mathematical percentages of traffic
14   stops pertaining to Asians and the grossly irrelevant public comments at Board Hearing pertaining to the
15   well-known illegal cannabis cultivation in the MSV community that preceded the enactment of the
16   Water Ordinances.

17         With respect to the traffic stops, such mathematical data cannot support an Equal Protection
18   Claim because data that shows racially disproportionate impact does not automatically render
19   government action unconstitutional. *Washington v. Davis*, 426 U.S. 229, 239 (1976). In fact, racially
20   disproportionate impact in the execution of a government action may be a consequence ***in spite*** of race,
21   but such consequence is not a violation the Equal Protection Clause. To establish a violation of the
22   Equal Protection Clause, Plaintiff must state sufficient facts that establishes a bright-line between
23   disparate impact because of race versus disparate impact in spite of race. Such facts are necessary
24   because a claim that Defendants violated the Equal Protection Clause requires evidence of actual
25   discriminatory intent that is independent from data that shows a mere disparate impact. Because
26   Plaintiffs do not provide any specific evidence actual discriminatory intent, the Complaint is flawed.

27         Additionally, Plaintiffs' Equal Protection Claims pertaining to traffic stops improperly lumps
28   together all traffic stops involving Asians. The validity of a traffic stop depends on the facts and

circumstances of each case and must be evaluated individually. See *Bell v. Wolfish*, 441 U.S. 520, 558-559 (1979). Accordingly, a broad generalization that Defendants' enforcement of traffic stops is a violation of Equal Protection Clause because the majority of stops involved Asians would be per se improper if each of the individual stops were in fact justified because of valid reasonable suspicion. Again, data that shows mere racially disproportionate impact is insufficient evidence of an Equal Protection Violation. In fact, it is legally improper to presume discriminatory purpose based on the disparate impact in the execution of the law. *Tarrance v. Florida*, 188 U.S. 519, 520 (1903)

With respect to the Water Ordinance, the Ordinances are facially neutral. As such, for Plaintiffs to state a valid Equal Protection Claim with respect to the implementation and execution of the Water Ordinances, Plaintiffs must show a "stark… and clear pattern, unexplainable on grounds other than race", of intentional discrimination. *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). To do so, Plaintiffs must allege the existence of extrinsic evidence that show that "[t]he necessary tendency, if not the specific purpose, of [the] ordinance…" was to adversely affect the Hmong community. *Id.* Plaintiffs' Complaints fails to allege such necessary facts. In fact, in numerous allegations in Plaintiffs' Complaint, Plaintiffs acknowledge that the Defendants implemented the Water Ordinances to combat the very real illegal cannabis industry affecting the County. In other words, the implementation of the Water Ordinances are *explainable* on grounds other than race. Because the Water Ordinances are a legitimate policy that address a grave issue of public health and safety, the implementation of the Water Ordinances and their disparate racial impact are "essentially an unavoidable consequence" in spite of race and therefore not actual proof of a discriminatory animus. *Wayte v. United States*, 470 U.S. 598, 610 (1985). Because Plaintiffs' Complaint fails to allege facts to show that the Water Ordinances were implemented *because of race*, their Equal Protection Claims pertaining to the Water Ordinances also fail.

C. **Plaintiffs' Fourth and Fifth Claims for Unreasonable Search and Seizure Fail Because Under the Totality of the Circumstances Test, Law Enforcement Conduct Was Justified**

The Fourth Amendment requires that police officers "not conduct unreasonable searches and seizures." *Mendez County. of Los Angeles*, 897 F.3d 1067, 1075 (9th Cir. 2018). "[R]easonableness is always the touchstone of Fourth Amendment analysis, and reasonableness is generally assessed by

carefully weighing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.'" *County of Los Angeles. v. Mendez*, 137 S. Ct. 1539, 1546 (2017) (citing *Birchfield v. North Dakota*, 579 U.S. 438 (2016); *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." *Bell v. Wolfish*, 441 U.S. 520, 558-559 (1979). The determination of whether a seizure is unreasonable rests on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 19-20. This is a totality of the circumstances analysis. *Tennessee v. Garner*, 471 U.S. at 8-9

With respect to traffic stops, the reasonableness of a traffic stop is determined by its mission "to address the traffic violation that warranted the stop." *Rodriguez v. United States* 575 U.S. 348, 354. For a police officer to initiate an investigatory stop of a motorist, there must at least exist reasonable suspicion that the motorist is engaging in illegal activity. *Bingham v. City of Manhattan Beach*, 341 F.3d 939, 948 (9th Cir. 2003) citing *Delaware v. Prouse*, 440 U.S. 648, 663 (1977) (requiring at least articulable and reasonable suspicion that a motorist has committed a traffic violation such as operating a vehicle without a license or that the vehicle is not registered to stop an automobile and detain the driver). Where an officer lawfully initiates a traffic stop due to a traffic violation, asking the motorist to step out of his vehicle constitutes an "additional intrusion [that] can only be described as de minimis" and such minimally intrusive searches and seizures may not violate the Fourth Amendment even if they are not supported by reasonable suspicion. *Pennsylvania v. Mimms*, 434 U.S. 106, 111; see also *Ruvalcaba v. City of Los Angeles*, 64 F.3d 1323, 1327 (9th Cir. 1995) (extending Mimms' de minimis doctrine to the requirement that a passenger exit a car at a traffic stop). Additionally, "[r]equiring a driver, already lawfully stopped, to exit the vehicle," is considered part of the mission of the stop when doing so is justified by the government's interest in completing the stop safely. *Id.* at 356.

However, even in those circumstances where a motorist's Fourth Amendment rights are

13
DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT

1   triggered because an officer expands the scope of a traffic stop by ordering a person to exit their vehicle
2   for investigatory purposes, the officer's conduct is justified so long as the officer has reasonable
3   articulable suspicion that the person is engaged in criminal activity. *United States v. Wrobel*, 295 F.
4   Supp. 3d 1127, 1134 (D. Idaho 2018). Reasonable suspicion exists when an officer is aware of specific,
5   articulable facts which, when considered with objective and reasonable inferences, form a basis for
6   particularized suspicion. *United States v. Evans*, 786 F.3d 779, 788 (9th Cir. 2015). Reasonable
7   suspicion encompasses two elements. "First, the assessment must be based upon the totality of the
8   circumstances. Second, that assessment must arouse a reasonable suspicion that the particular person
9   being stopped has committed or is about to commit a crime." *United States v. Montero-Camargo*, 208
10  F.3d 1122, 1129 (9th Cir. 2000). However, it is important to note that reasonable suspicion "is not a
11  particularly high threshold to reach." *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013).
12  For reasonable suspicion "the likelihood of criminal activity need not rise to the level required for
13  probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."
14  *United States v. Arvizu*, 534 U.S. 266, 274, (2002).

15        With respect to the first element – the totality of the circumstances test – the test is objective
16  "and considers not only the factors that an officer subjectively relied on, but also any factors known by
17  him that would reasonably contribute to or mitigate suspicion that a person was engaged in criminal
18  activity." *United States v. Manzo-Jurado*, 457 F.3d 928, 938 (9th Cir. 2006) (finding that "the totality of
19  the circumstances test takes into account both factors weighing for and against reasonable suspicion.").
20  Thus, while "conduct that is not necessarily indicative of criminal activity may, in certain circumstances,
21  be relevant to the reasonable suspicion calculus . . . innocuous conduct does not justify an investigatory
22  stop unless there is other information or surrounding circumstances of which the police are aware,
23  which, when considered along with the otherwise innocuous conduct, tend to indicate criminal activity
24  has occurred or is about to take place." *United States v. Montero-Camargo*, 208 F.3d 1122, 1130 (2000).

25        As to the second element – that the detained individual is about to commit a crime - reasonable
26  suspicion can be based on the officer's own experience and specialized training. *United States v. Arvizu*,
27  534 U.S. at 273. In fact, officers may make inferences from and deductions about the cumulative
28  information available to them that "might well elude an untrained person." *Id*. In other words, the facts

1 and circumstances as to whether a police officer believes the detained individual is about to commit a
2 crime is not measured from an objective reasonable person standard, but rather, considers the specific
3 officers individual training in identifying facts that suggest crime is afoot.

4    Common factors that give rise to reasonable suspicion are the location of the detention (see
5 *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) (a high crime area is a relevant consideration); the
6 characteristics of the area in which law enforcement encounter a vehicle including its proximity to an
7 area of illegal activity, the usual patterns of traffic on the particular road and time of day, and the
8 officer's previous experience with alien traffic (*United States v. Brignoni-Ponce*, 422 U.S. 873, 884-85
9 (1975); *United States v. Tiong*, 224 F.3d 1136, 1139 (9th Cir. 2000)); and aspects of a vehicle itself may
10 also justify suspicion (see *Id.* where it was known to law enforcement that station wagons were used for
11 smuggling). In all situations, officers are entitled to assess the facts in light of their own experience.
12 (*Terry v. Ohio*, 392 U.S. at 27.) So long as law enforcement has reasonable, articulable suspicion that
13 criminal activity is afoot, it may conduct an investigatory stop. *Illinois v. Wardlow*, 528 U.S. at 123.

14    Here, Plaintiffs fail to allege sufficient facts to suggest that Defendants engaged in unlawful
15 search and seizures in violation of the Fourth Amendment or the analogous California Constitution.
16 Rather, Plaintiffs merely state in conclusory fashion that the traffic stops were unreasonably prolonged
17 and that Defendants did not have probable cause to initiate the traffic stops. However, such conclusory
18 statements and formulaic recitation of the elements are improper. *Bell Atlantic Corp. v. Twombly*, 550
19 U.S. 544, 555 (2007). While Plaintiffs do provide a mere two examples of alleged unlawful searches and
20 seizures, the facts pertaining to each example are exceptionally insufficient.

21    The first example is Plaintiff Chang.  Plaintiffs allege that Chang was driving a pick-up truck
22 down highway 97 with five bags of manure in the truck. Plaintiffs then allege that Sheriff Deputy's
23 initiated a traffic stop of Chang even though Chang had not committed a traffic violation. However,
24 what Plaintiffs leave out from their allegations is that the area that Chang was driving through is a
25 known route for trafficking illegal cannabis between California and Oregon, pick-up trucks are
26 commonly used to transport illegal cannabis as well as illegal manure to grown illegal cannabis, and the
27 illegal cannabis trade in the Pacific Northwest uses commercial grade manure that is exceptionally
28 harmful to the environment and are unlawful for general public use. Additionally, due to the

overwhelming illegal cannabis industry infecting the County, law enforcement are trained in identifying vehicles that may be used in trafficking illegal cannabis and/or products/tools used to grow such illegal cannabis. Given the deputies experience and training and the totality of the circumstances, the Deputies had reasonable suspicion to initiate investigatory stop of Chang's vehicle. Contrary to Plaintiffs' allegation at paragraph 242 of their Complaint, law enforcement does not need probable cause to initiate an investigatory stop as reasonable suspicion is sufficient. *Delaware v. Prouse*, 440 U.S. 648, 663 (1977). Plaintiffs do not allege how long this stop lasted.

The second example is Plaintiff Vang. Vang, her husband, and her adult son were driving their vehicle with a broken external light. A broken external light is a violation of Vehicle Code Section 24252(a) which explicitly requires all lighting equipment to be maintained and in good working order ***at all times*** irrespective of the time of day. As alleged in the Complaint, law enforcement initiated a traffic stop of Vang due to her broken external light. Accordingly, Vang's detention was a valid traffic stop. See *Delaware v. Prouse*, 440 U.S. 648, 663 (1977). Because the traffic stop was valid, law enforcement would ask Vang and her husband to exist the vehicle as such additional intrusion was "de minimis" and therefore not a Fourth Amendment violation. *Pennsylvania v. Mimms*, 434 U.S. 106, 111. Vang then consented to a search of her vehicle. Plaintiffs do not allege any facts to suggest that the consent was coerced. After completing their investigation and search of the vehicle, Vang was released with a fix-it ticket for the broken external light. The entire detention lasted 30 minutes.

Under California law, detentions as long as 30 minutes have been upheld so long as the officer diligently pursue the investigation. *People v. Soun*, 34 Cal.App.4th 1499, 1520 (2002). Plaintiffs do not allege any facts to suggest that law enforcement delayed their investigation. To the contrary, Plaintiffs allege that the officers asked Vang a series of investigative questions, because Vang did not speak English very well her son had to assist with translating, and after the questioning and search of the vehicle pursuant to Vang's consent were completed, Vang was released. Under the ***totality of the circumstances test***, there is nothing to suggest that Vang stop was a violation of the Fourth Amendment.

Because Plaintiffs' Complaint fails to allege any facts to show that Defendants violated Plaintiffs' Fourth Amendment rights, Claims Four and Five should be dismissed.

///

**D.     Plaintiffs' Claims Based on Repealed Statutes Are Now Moot**

Plaintiffs' sixth claim is entirely based on the contention that the ordinances at issue violated their rights to equal protection under the Fourteenth Amendment. *See* Complaint, ECF No. 47, pp. 47:20-48:3.  Similarly, Plaintiffs' seventh claim is based on a contention that those same ordinances violate their right to equal protection under Article 1, Section 7 of the California Constitution. *See* Complaint, ECF No. 47, p. 48:9-21.  Finally, both the eighth and ninth claims are predicated on a claim that Plaintiffs' right to substantive due process under the Fourteenth Amendment of the U.S. Constitution and Article 1, Section 7(a) of the California Constitution have been violated due to enactment and enforcement of the same water ordinances. *See* Complaint, ECF No. 47, pp. 49:1-50:9.

As noted above, the County through a Board Resolution, repealed the two water ordinances giving rise to Plaintiffs' claims and modified a third in accordance with a settlement with the plaintiffs in the *Lo* matter. This settlement was reached after Plaintiffs' Complaint was filed. However, the underlying basis for the four claims is no longer in effect. With the repeal of the ordinances in question, the wrongful behavior alleged by Plaintiffs can no longer occur nor should they reasonably be expected to recur. *See United States v. Consecrated Phosphate Export Association*, 393 U.S. 199, 203 as cited by *Friends of the Earth Inc. v. Laidlaw Environmental Services* 528 U.S. 167, 188.  The burden of proving that the challenged conduct cannot reasonably be expected to start up again, lies with the party asserting mootness. *Supra*  Here it is clear that the action taken by the County Board of Supervisors in repealing the ordinances Plaintiffs contend interfered with their access to water, is no longer an obstacle and cannot reasonably be expected to recur.

For the foregoing reasons, Defendants respectfully request that the instant Motion to Dismiss pursuant to Federal Rules of Civil Procedure, Rule 12(b)(6), be granted. *Friends of the Earth Inc. v. Laidlaw Environmental Services, Supra* at 189. *Id*.

As is the case with the sixth, seventh, eighth and ninth claims, Plaintiffs tenth claim is also moot. Under Claim Ten, Plaintiffs allege that administrative liens they claim are unlawful and violate their right to substantive due process under the Fourteenth Amendment to the United States Constitution. *See* Complaint, ECF No. 47, pp. 50:11-51:5.  Plaintiffs' tenth claim is entirely based on the imposition of liens levied in accord with ordinances which have been repealed. Additionally, all liens that have

been levied against property located in Siskiyou County have been expunged. This includes the representative Plaintiffs. As a result, Plaintiffs' eleventh cause of action has been mooted.

### V. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the instant Motion to Dismiss pursuant to Federal Rules of Civil Procedure, Rule 12(b)(6) be granted.

Dated: March 5, 2024         SPINELLI, DONALD & NOTT

By: _/s/ J. Scott Donald_
J. SCOTT DONALD
Attorneys for Defendants
COUNTY OF SISKIYOU and JEREMIAH LARUE