1

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT

8              FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10   Ger Chong Ze Chang, et al.,                    No. 2:22-cv-01378-KJM-AC

11                          Plaintiffs,             ORDER

12          v.

13   County of Siskiyou, et al.,

14                          Defendants.

15

16          In this action, plaintiffs allege defendants unlawfully discriminated against them based on

17   their race in violation of the United States Constitution and California State Constitution.

18   Defendants move to dismiss the complaint.  The court **denies** the motion.

19   **I.     REQUESTS FOR JUDICIAL NOTICE AND MOTION TO STRIKE**

20          Both parties request judicial notice of documents outside the pleadings.  Defs.' Req.

21   Judicial Notice, ECF No. 52-2; Pls.' Req. Judicial Notice, ECF No. 57.  Plaintiffs separately

22   move to strike portions of defendants' motion to dismiss and Exhibits D and E to defendants'

23   request for judicial notice.  Mot. Strike, ECF No. 58.  The motion to strike is fully briefed.  Opp'n

24   Mot. Strike, ECF No. 59; Reply Mot. Strike, ECF No. 61.

25          The court considers the requests for judicial notice first.  The court grants defendants'

26   request for judicial notice in part as to Exhibits A, B and C—the minute order dismissing the

27   related action in *Lo v. Siskiyou County*, No. 21-00999 (E.D. Cal.), the joint stipulation of

28   dismissal filed in *Lo*, and the County of Siskiyou Ordinances 21-07 and 21-08, respectively.  *See*

1

1   Fed. R. Evid. 201; *Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (court may

2   consider "undisputed matters of public record," including "documents on file in federal or state

3   courts," in response to a motion to dismiss).  The court also grants plaintiffs' request for judicial

4   notice of the court's order in the *Lo* case, enjoining the County from enforcing ordinances, the

5   joint stipulation noted above, two sets of minutes from Siskiyou County Board of Supervisors

6   meetings, a letter from the Siskiyou County Board of Supervisors, County Legislative

7   Information website page showing a comparison of California Assembly Bill 1448 to the final

8   version of the bill, and California Assembly Bill 1448.  *See* Fed. R. Evid. 201; *Harris*, 682 F.3d at

9   1132; *see, e.g.*, *Kater v. Churchill Downs Inc.*, 886 F.3d 784, 788 n.3 (9th Cir. 2018) (taking

10  "judicial notice of the slideshow, meeting minutes, and pamphlet").  The court takes judicial

11  notice of the existence of these materials without assuming the factual accuracy of their contents,

12  as explained further below.

13       The court declines to take judicial notice of the facts recited in the injunction order in *Lo*.

14  *See, e.g.*, *Marsh v. San Diego County*, 432 F. Supp. 2d 1035, 1043 (S.D. Cal. 2006) ("A court

15  may take judicial notice of the existence of matters of public record, such as a prior order or

16  decision, but not the truth of the facts cited therein."); *Zargarian v. BMW of N. Am., LLC*, No. 18-

17  4857, 2019 WL 6111732, at *1 n.1 (C.D. Cal. Sept. 23, 2019) (collecting cases).  Likewise, the

18  court declines to take judicial notice of a declaration and an affidavit filed by defendants in *Lo*—

19  defendants' Exhibits D and E here—because the facts described in the declaration and affidavit

20  are not "generally known," Fed. R. Evid. 201(b)(1), and the declarants are not "sources whose

21  accuracy cannot reasonably be questioned," *id.* 201(b)(2); *see also, e.g.*, *Giganews, Inc. v. Perfect

22  10, Inc.*, No. 17-5075, 2018 WL 6118431, at *3 (C.D. Cal. Feb. 28, 2018) (similarly declining to

23  take judicial notice of declarations filed in other proceedings; collecting authority); *see also*

24  Opp'n Mot. Strike at 2 (conceding judicial notice would not be proper).

25       The court also will not consider the evidence recited in the injunction order in *Lo* under

26  the incorporation-by-reference doctrine.  "[A] defendant may seek to incorporate a document into

27  the complaint 'if the plaintiff refers extensively to the document or the document forms the basis

28  of the plaintiff's claim.'"  *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir.

1   2018) (quoting *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003)).  "[T]he mere mention

2   of the existence of a document is insufficient to incorporate the contents of a document." *Coto*

3   *Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (citing *Ritchie*, 342 F.3d at 908–

4   09)).  Although plaintiffs refer to the preliminary injunction order in their operative complaint,

5   First Am. Compl. (FAC) ¶¶ 138–39, 173, 181, ECF No. 47, that order does not form the basis of

6   their claims.  None of plaintiffs' claims depend on the preliminary injunction order.  Permitting

7   defendants to rely on this court's summary of evidence produced in *Lo* also would improperly

8   permit defendants "to insert their own version of events into the complaint," and thus wrongly

9   risk the improper dismissal of "otherwise cognizable claims."  *See Khoja*, 899 F.3d at 1002.

10      Because the court will not consider the evidence that is the subject of plaintiffs' motion to

11  strike, that motion is **denied as moot**.  *See, e.g.*, *Merlino v. United States*, No. 90-1515, 1991 WL

12  152378, at *3 (W.D. Wash. May 24, 1991) (similarly denying motion to strike).

13  **II.    BACKGROUND**

14      The four individual plaintiffs, Ger Chong Ze Chang, Mai Nou Vang, Russell Mathis and

15  Ying Susanna Va, are Asian Americans who either reside in or own property in or near the Mount

16  Shasta Vista division and the towns of Dorris and Macdoel in Siskiyou County.  FAC ¶¶ 10–13.

17  Defendants are the County of Siskiyou and Sheriff Jeremiah LaRue, sued in his official capacity.

18  *Id.* ¶¶ 14–15.  Plaintiffs allege defendants have discriminated against them based on their race

19  through 1) racially discriminatory traffic stops and unreasonable search and seizure; 2) racially

20  discriminatory water ordinances; and 3) unlawful liens.  *See id.* ¶¶ 10–13, 105–22, 176–83, 197–

21  210.  Plaintiffs bring this lawsuit individually and on behalf of similarly situated members of a

22  proposed class.  *Id.* ¶ 211.  The putative class consists of "All Asian Americans who reside, own

23  property, and/or travel by automobile in Siskiyou County."  *Id.*  The class includes the following

24  three subclasses: 1) a traffic class, 2) a water class, and 3) a liens class.  *Id.* ¶ 212.  The court

25  construes all factual allegations in the light most favorable to plaintiffs, as it must at this stage.

26      **A.    General Allegations**

27      Siskiyou County is a largely undeveloped, rural county in Northern California.  *Id.* ¶ 16.

28  Asian Americans make up 1.6 percent of the population.  *Id.*  Since 2014 and 2015, the Asian

1    American population in the County has increased. *Id.* ¶¶ 17–18. Many of the Asian American

2    residents live in and around the Shasta Vista subdivision and smaller communities near the towns

3    of Dorris and Macdoel. *Id.* ¶ 19. Historically, this area has been "relatively undeveloped"—

4    many of the residents "live in unpermitted structures or recreational vehicles, . . . and their

5    properties do not have [water] wells." *Id.* ¶¶ 19–20. Although a water well is a prerequisite for a

6    building permit, *id.* ¶ 20, plaintiffs allege the County has enacted barriers to well access for Asian

7    Americans through various means, including denying applications for well permits, threatening

8    property owners who pursue well permits with retaliatory code enforcement, threatening well

9    drillers in the area with criminal prosecution, and targeting predominantly Asian American

10    communities for property inspections. *See id.* ¶¶ 21, 128. Residents who do not own a water well

11    rely on water trucks as their primary source of water. *Id.* ¶ 22.

12        Plaintiffs allege defendants have treated Asian Americans with hostility generally. For

13    example, defendants have engaged in voter suppression, *id.* ¶ 28, discriminately restricted Asian

14    American protestors, *id.* ¶¶ 29, 170, and instructed businesses not to engage in deliveries in Asian

15    American neighborhoods, *id.* ¶ 36. Defendants treated Asian American residents as unwelcome

16    and as part of a monolithic group involved in "a violent drug cartel" and cannabis cultivation. *Id.*

17    ¶ 25. Defendants have used racially charged and coded language, which is reflected in official

18    meeting minutes, recordings, and other documents. *See, e.g.*, *id.* ¶¶ 26–27, 30–35, 37–44.

19        **B.**      **Traffic Subclass Allegations**

20        Plaintiffs allege the former and current Sheriffs have openly hostile views of Asian

21    Americans, which have resulted in their widespread targeting and a pattern of unconstitutional

22    seizures and searches under the pretense of drug enforcement. *Id.* ¶¶ 51–54. The Sheriff s

23    Department attributes drug activity to Asian Americans and has used traffic stops to target Asian

24    Americans. *See id.* ¶¶ 51, 55, 60. For example, plaintiffs allege the Department's stops have

25    been largely concentrated near predominantly Asian American communities, on or near Highway

26    97, with only a few stops conducted near the largely white communities, on or near Highway 96.

27    *Id.* ¶¶ 56–57. The Siskiyou County Board of Supervisors has ratified and provided funds to

support Sheriff LaRue's efforts to increase these traffic interdiction efforts and has not expressed

any concern with the increased traffic stops in the County.  *Id.* ¶¶ 54, 59.

Traffic stops have disproportionately affected Asian American drivers.  *Id.* ¶¶ 61–62.  For

example, data from 2021 show that although Asian Americans make up 2.4 percent of the

County's adult population, over 28 percent of traffic stops conducted by the Department were of

Asian Americans.  *Id.* ¶ 66.  An Asian American in 2021 was "roughly 17 times more likely to be

pulled over by the Sheriff's Department than a white individual[.]"  *Id.* ¶ 67.  Moreover, the

proportion of traffic stops of Asian Americans "was nearly 60% higher during the day," when

officers could see the driver, than during the night, when they could not.  *Id.* ¶¶ 5, 72 (emphasis

omitted).  The proportion of traffic stops of Asian Americans in the County is "highly atypical"

when compared to stops of Asian Americans statewide, stops by other agencies in the County

such as the City of Weed's Police Department, and stops in other nearby counties.  *See id.* ¶¶ 68–

71.

Plaintiffs also allege the Department targets Asian Americans for unjustified and

unreasonably prolonged traffic stops.  *Id.* ¶¶ 73, 75.  There is a pattern of stops conducted without

reasonable suspicion, partially supported by the fact that nearly three-quarters of documented

traffic stops do not result in a citation or arrest.  *Id.* ¶ 73.  For example, deputies cite "swerving"

as one of the most common justifications for stops.  *Id.* ¶ 74.  However, 44 percent of drivers

warned or cited for swerving were Asian American, and "only 14% of these stops resulted in a

traffic citation," suggesting swerving was not the real reason for the stop.  *Id.*  Plaintiffs allege

that when there is reasonable suspicion, deputies have unreasonably prolonged the stops and have

used these stops to question Asian American drivers and to conduct additional searches unrelated

to the purported basis for the stop.  *Id.* ¶¶ 73, 76–78.  The median length of stops for Asian

Americans in 2021 was "over 56% longer than for likely non-Asian drivers."  *Id.* ¶ 79.  For

example, while "Asian American drivers constituted approximately 23% of traffic stops that

resulted only in a warning and lasted ten minutes or less[,] . . . Asian American drivers were over

40% of those stopped for over ten minutes and then released with a warning."  *Id.*  Furthermore,

Asian Americans were 25 times more likely to be searched during a traffic stop than white

5

Americans, with Asian Americans constituting nearly 40 percent of all traffic stop-related searches not including "identifiable probation or parole searches and tow inventory searches[.]" *Id.* ¶ 83.  Although the Department's rationale for the targeted enforcement is drug interdiction, only 2.3 percent of the stops have resulted in the seizure of cannabis and even less for other drugs.  *Id.* ¶ 84.

Plaintiffs allege a few specific examples of traffic stops to illustrate these broader allegations.  First, deputies stopped plaintiff Chang two separate times while he was driving back to his residence, which is outside the town of Dorris, even though he had not committed any traffic violations leading up to the stops.  *See id.* ¶¶ 105–06, 112.  Both stops ended without a citation or ticket.  *Id.* ¶¶ 110, 115.  The first time, the deputy initiated a traffic stop because, he said, he saw items in the truck bed.  *Id.* ¶¶ 106–08.  During this stop, the deputy confirmed Mr. Chang had a receipt for the bags of manure he had purchased, climbed onto the vehicle to examine the bags of manure, told Mr. Chang he was going to check the inside of the vehicle, opened the door and searched the vehicle.  *Id.* ¶¶ 108–10.  The second time, the deputy did not tell Mr. Chang the basis for the stop.  *Id.* ¶ 115.  At the time, Mr. Chang was driving back from a laundromat and had placed his clean laundry in black trash bags.  *Id.* ¶ 111.  During this second stop, a deputy instructed Mr. Chang to exit the vehicle and conducted a pat search even though Mr. Chang did not pose a risk to the deputy's safety in any way.  *Id.* ¶ 113.  Although Mr. Chang tried to explain the trash bags contained his laundry, the deputy ordered him to open the vehicle and empty the trash bags on the ground.  *Id.* ¶¶ 113–14.  After the deputy searched through the laundry, the deputy told Mr. Chang he could leave.  *Id.* ¶ 114.  The second stop lasted around thirty minutes.  *Id.* ¶ 115.  Mr. Chang had to then return to the laundromat to re-launder his clothes, which had been dirtied during the search.  *Id.*

Plaintiff Vang alleges two deputies stopped her during the daytime due to a cracked external vehicle light while she was driving outside of the Shasta Vista subdivision.  *Id.* ¶ 118.  During this stop, a deputy indicated he wanted to search the car, and when Ms. Vang told the deputy the car belonged to her husband, the deputy informed her husband he wanted to search the car.  *Id.* ¶ 120.  Neither Ms. Vang nor her husband believed they had a choice in this matter.  *Id.*

1    The deputies searched the car, did not find anything except a bar of soap, and then issued a fix-it

2    ticket. *Id.* ¶¶ 121–22. The stop lasted for approximately thirty minutes. *Id.* ¶ 121.

3        Plaintiffs allege these unlawful stops and searches are emblematic of the Department's

4    discriminatory policies and practices. *See id.* ¶¶ 80–81, 85, 122. They allege Sheriff LaRue has

5    required, encouraged, or at the very least, has been aware of or on notice of his deputies' racial

6    profiling and unjustified traffic stops and searches, and/or prolonged stops. *Id.* ¶¶ 87–100. Both

7    the County and Sheriff LaRue have failed to train and supervise deputies to prevent violations of

8    law. *Id.* ¶¶ 101–04.

9        **C.    Water Subclass Allegations**

10        Plaintiffs allege the County has passed ordinances "designed to drive out the Asian

11    American community and punish their supporters." *Id.* ¶ 123. The three "water ordinances" at

12    issue are the water nuisance ordinance (Urgency Ordinance 20-13 and later Ordinance 20-15,

13    codified at Siskiyou Cnty. Code § 3-13-702), water extraction ordinance (Urgency Ordinance 21-

14    07 and later Ordinance 21-13, codified at Siskiyou Cnty. Code § 3.5-13.101 et seq.), and water

15    truck ordinance (Urgency Ordinance 21-08 and later Ordinance 21-14, codified at Siskiyou Cnty.

16    Code § 3-4.1501). *Id.*

17        The plaintiffs in the related *Lo* case filed their action against the County of Siskiyou,

18    Sheriff LaRue and various other defendants, challenging the same water ordinances at issue in

19    this case. *See* First Am. Compl., *Lo*, No. 21-00999 (E.D. Cal. July 15, 2021), ECF No. 29. In

20    that action, the plaintiffs alleged the defendants violated their rights under the Fourteenth

21    Amendment Due Process and Equal Protection Clauses and their rights under the Fourth

22    Amendment. *Id.* ¶ 1. Among other allegations, the plaintiffs alleged defendants deprived them of

23    their property interest in access to water without due process of law. *See id.* ¶¶ 61–83. They also

24    alleged the water ordinances had a disparate impact on the Hmong people in Siskiyou County and

25    that defendants targeted the Hmong people when enforcing those ordinances. *See id.* ¶¶ 84–104.

26    The plaintiffs sought damages as well as declaratory and injunctive relief. *Id.* ¶ 1. In that case,

27    the court entered a preliminary injunction prohibiting defendants from enforcing two of the three

28    water ordinances—the water extraction ordinance (Ordinance No. 21-07) and the water truck

1 | ordinance (Ordinance No. 21-08).  Order, *Lo*, No. 21-00999 (E.D. Cal. Sept. 3, 2021), ECF No.
2 | 47.

3 |       The water nuisance ordinance "bans the 'extracting and discharging groundwater
4 | underlying Siskiyou County for use in cultivating cannabis' as a nuisance."  FAC. ¶ 124.  The
5 | ordinance does not have a knowledge requirement.  *Id.*  As with the traffic stops, plaintiffs allege
6 | Asian Americans have been disproportionately cited and fined under this ordinance, with Asian
7 | Americans receiving 68 percent of all such citations.  *Id.* ¶ 125.  The ordinance has been used to
8 | bring civil actions against well operators, has had a chilling effect on well-owners and has
9 | reduced the number of water sources available to Asian Americans.  *Id.* ¶¶ 124–26.

10 |       The water extraction ordinance requires a permit to transport water regardless of use.  *Id.*
11 | ¶ 127.  However, permit issuance is conditioned on a property's compliance with all County
12 | codes.  *Id.* ¶ 128.  As noted, many residents who live in and around the Shasta Vista subdivision
13 | and near Dorris and Macdoel do not have water wells and therefore do not live in approved
14 | structures.  *Id.* ¶¶ 19–20.  Because they do not live in approved structures, permits are available
15 | only in theory.  *Id.* ¶ 130.  Plaintiffs allege the County also has disproportionately cited Asian
16 | Americans under this ordinance.  *Id.* ("73% of those cited under this ordinance were Asian
17 | American.").

18 |       The water truck ordinance prohibits hauling water in excess of 100 gallons without a
19 | permit on specifically named streets.  *Id.* ¶ 131.  After passing the ordinance, the Board initially
20 | adopted a resolution explicitly limiting the geographic application of the water truck ordinance to
21 | streets servicing primarily Asian American neighborhoods.  *Id.* ¶¶ 131, 174.  As with the other
22 | two ordinances, the County disproportionately cited Asian Americans under this ordinance.  *Id.*
23 | ¶ 131 ("About 70% of those cited under this ordinance were Asian American.").

24 |       Plaintiffs allege the water ordinances have led to a humanitarian crisis in the Asian
25 | American communities.  *Id.* ¶¶ 132–39.  The lack of water has degraded people's health and left
26 | community members unable to abate fires.  *Id.* ¶¶ 135–37.  For example, after the water
27 | ordinances went into effect, plaintiff Mathis did not have water for months.  *Id.* ¶ 178.  When a
28 | fire burned through Shasta Vista, he depleted his water reserves abating the fire and was unable to

1   obtain more water.  *Id.* ¶¶ 178–79.  Although the preliminary injunction in *Lo* alleviated some

2   hardships, his water access remains limited because "potential water providers are still afraid of

3   being targeted by the County and Sheriff."  *Id.* ¶ 181.

4          Plaintiffs allege the primary motivation for these water ordinances is animus against Asian

5   Americans.  *Id.* ¶ 140.  Although defendants have pointed to cannabis enforcement, drought and

6   public health as justifications for adoption, these rationales are intended to conceal their primary

7   motivation.  *Id.*  This is demonstrated by their shifting and unsubstantiated justifications, *see, e.g.*,

8   *id.* ¶¶ 143–48, and the small number of enforcement actions against unlawful cannabis cultivation

9   in predominantly white neighborhoods, *id.* ¶ 142.  According to plaintiffs, the County has ratified

10  the Department's discretionary enforcement of the ordinances.  *See, e.g.*, ¶¶ 164, 167.

11         Additionally, the "Board's official meeting minutes, recordings, and communications"

12  explicitly, or through coded language, reflect racial animus against Asian Americans.  *Id.* ¶¶ 149–

13  50, 161, 163, 175.  The public comments by community members leading up to the ordinances'

14  adoption incorporate racially pejorative language that was "neither disavowed nor disapproved"

15  by the Board and reflects hostility towards Asian Americans.  *See, e.g.*, *id.* ¶¶ 152–59, 168, 171–

16  73.  Defendants have acted in alignment with the requests and sentiments of the community

17  members using this kind of language.  *See, e.g.*, *id.* ¶¶ 160, 172, 175.

18         **D.      Liens Subclass Allegations**

19         Plaintiffs also allege defendants targeted Asian Americans by issuing liens and foreclosing

20  properties subject to unpaid cannabis administrative fines.  *Id.* ¶¶ 184–85.  The County passed

21  Ordinance No. 20-11, which amended County Code section 10-14.100 to increase the fines

22  associated with cannabis cultivation, *id.* ¶ 185, and to permit the County to issue real property

23  liens to recover the fines issued under that section, *id.* ¶¶ 186–87.  The County imposed fines

24  "almost entirely against Asian American-owned properties—that were several times higher than

25  not only the previous fines but the value of many of the properties being fined."  *Id.* ¶ 189

26  (emphasis omitted).  Over 80 percent of liens issued under section 10-14.100 of Ordinance No.

27  20-11 were issued against Asian American property owners, including plaintiffs Va and Vang.

1   *See id.* ¶¶ 192–93, 197–210.  Plaintiffs allege these liens are not authorized by state law.  *Id.*

2   ¶¶ 194–96.

3        **E.**    **Procedural History**

4        Plaintiffs initially brought this action on August 3, 2022.  Compl., ECF No. 1.  The court

5   stayed the proceedings in this case and in *Lo* while the parties in both matters participated in a

6   global settlement conference with the assigned magistrate judge.  *See* Stay Order, ECF No. 19.

7   While the parties were engaged in settlement discussions, defendants repealed two of the three

8   water ordinances, *see* Joint Stip. Dismissal, Defs.' Req. Judicial Notice Ex. B; Bd. of Supervisors

9   Mins. (Aug. 1, 2023), Pls.' Req. Judicial Notice, Ex. 3, ECF No. 57-4, and the liens ordinance,

10  Bd. of Supervisors Mins. (Dec. 5, 2023), Pls.' Req. Judicial Notice, Ex. 4, ECF No. 57-5.  The

11  parties did not settle this action, and plaintiffs then filed their first amended complaint on

12  February 20, 2024.  FAC.

13       Plaintiffs bring the following claims:

14       1.    Conspiracy to Violate Constitutional Rights under the Fourth and Fourteenth

15            Amendment to the U.S. Constitution (all plaintiffs against both defendants);

16       2.    Violation of Equal Protection – Racially Discriminatory Traffic Stops Under the

17            Fourteenth Amendment to the U.S. Constitution (plaintiffs Chang, Vang and

18            Traffic Subclass against both defendants);

19       3.    Violation of Equal Protection – Racially Discriminatory Traffic Stops Under

20            Article I, Section 7 of the California Constitution (plaintiffs Chang, Vang and

21            Traffic Subclass against both defendants);

22       4.    Unreasonable Search and Seizure Under the Fourth Amendment to the U.S.

23            Constitution (plaintiffs Chang, Vang and Traffic Subclass against both

24            defendants);

25       5.    Unreasonable Search and Seizure Under Article I, Section 13 of the California

26            Constitution (plaintiffs Chang, Vang and Traffic Subclass against both

27            defendants);

6.     Violation of Equal Protection – Racially Discriminatory Ordinances Under the Fourteenth Amendment to the U.S. Constitution (plaintiffs Mathis and Water Subclass against both defendants);

7.     Violation of Equal Protection – Racially Discriminatory Ordinances Under Article I, Section 7 of the California Constitution (plaintiffs Mathis and Water Subclass against both defendants);

8.     Violation of Substantive Due Process – State Created Danger Under the Fourteenth Amendment to the U.S. Constitution (plaintiffs Mathis and Water Subclass against both defendants);

9.     Violation of Substantive Due Process – State Created Danger Under Article I, Section 7(a) of the California Constitution (plaintiffs Mathis and Water Subclass against both defendants);

10.    Violation of Substantive Due Process – Unlawful Liens Under the Fourteenth Amendment to the U.S. Constitution (plaintiffs Va, Vang, and Liens Subclass against Defendant Siskiyou County only);

11.    Preemption Under Article XI, Section 7 of the California Constitution (plaintiffs Va, Vang, and Liens Subclass against Defendant Siskiyou County only); and

12.    Violation of California Government Code Section 11135 (plaintiff Mathis, Chang, Water Subclass, and Traffic Subclass against both defendants).

*See id.* ¶¶ 220–87.  Plaintiffs seek declaratory and injunctive relief, attorneys' fees and costs, and other relief that is just and proper.  *Id.* at 53–54 (prayer for relief).  Plaintiffs Va, Vang, and members of the Lien Subclass also seek nominal damages based on claim ten.

Defendants now move to dismiss the complaint for failure to state a claim upon which relief can be granted in accordance with Rule 12(b)(6).  Mot., ECF No. 52; Mem., ECF No. 52-1. The motion is fully briefed.  Opp'n, ECF No. 56; Reply, ECF No. 60.  The court held a hearing on the motion on May 17, 2024.  Mins. Mot. Hr'g, ECF No. 68.  Megan Vees, Alison Wall, John Thomas Do, Glenn Katon and Stanley Young appeared for plaintiffs.  *Id.*  Richard Linkert, J. Donald, Elise Rice and Madison Simmons appeared for Defendants.

11

1    **III.   MOOTNESS**

2          Defendants argue plaintiffs' sixth, seventh, eighth, ninth, tenth and eleventh claims are

3    moot because they are based on repealed ordinances.  Mem. at 17–18.  In every case, the

4    threshold question a federal court must answer affirmatively is whether it has jurisdiction, so the

5    court begins with this argument.  Fed. R. Civ. P. 12(h)(3); *see McDonald v. Lawson*, 94 F.4th

6    864, 868 (9th Cir. 2024) (federal courts have a duty to determine jurisdiction "at all stages").

7          "Because standing and mootness both pertain to a federal court's subject-matter

8    jurisdiction under Article III, they are properly raised in a motion to dismiss under Federal Rule

9    of Civil Procedure 12(b)(1), not Rule 12(b)(6)."  *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir.

10   2000).  "Rule 12(b)(1) jurisdictional attacks can be either facial or factual."  *Id.*  Here, defendants

11   bring a factual attack based on allegations not included in the complaint.  *See Safe Air for*

12   *Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  "In resolving a factual attack on

13   jurisdiction, the district court may review evidence beyond the complaint without converting the

14   motion to dismiss into a motion for summary judgment."  *Id.*

15         "A case is moot if the issues presented are no longer live and there fails to be a 'case or

16   controversy' under Article III of the Constitution."  *In re Burrell*, 415 F.3d 994, 998 (9th Cir.

17   2005) (citing *GTE Cal., Inc. v. FCC*, 39 F.3d 940, 945 (9th Cir. 1994)).  "The basic question in

18   determining mootness is whether there is a present controversy as to which effective relief can be

19   granted."  *Nw. Env't Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988) (citing *United*

20   *States v. Geophysical Corp.*, 732 F.2d 693, 698 (9th Cir. 1984)).  "It is well settled that a

21   defendant's voluntary cessation of a challenged practice does not deprive a federal court of its

22   power to determine the legality of the practice."  *City of Mesquite v. Aladdin's Castle, Inc.*,

23   455 U.S. 283, 289 (1982).  The party asserting mootness bears a "formidable burden."  *Fed.*

24   *Bureau of Investigation v. Fikre*, 601 U.S. 234, 241 (2024) (quoting *Friends of the Earth, Inc. v.*

25   *Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000)).  "To show that a case is truly moot,

26   a defendant must prove 'no reasonable expectation' remains that it will 'return to [its] old ways.'"

27   *Id.* (alteration in original) (quoting *United States v. W. T. Grant Co.*, 345 U.S. 629, 632)).  "That

28   much holds for governmental defendants no less than for private ones."  *Id.*

1    Prior to the Supreme Court's decision in *Fikre*, a Ninth Circuit en banc panel found

2    "legislative actions should not be treated the same as voluntary cessation of challenged acts by a

3    private party, and . . . [courts] should assume that a legislative body is acting in good faith in

4    repealing or amending a challenged legislative provision[.]"  *Bd. of Trustees of Glazing Health &*

5    *Welfare Tr. v. Chambers*, 941 F.3d 1195, 1199 (9th Cir. 2019) (en banc).  "Therefore, in

6    determining whether a case is moot, [courts] should presume that the repeal, amendment, or

7    expiration of legislation will render an action challenging the legislation moot, unless there is a

8    reasonable expectation that the legislative body will reenact the challenged provision or one

9    similar to it."  *Id.*  "The party challenging the presumption of mootness need not show that the

10   enactment of the same or similar legislation is a 'virtual certainty,' only that there is a reasonable

11   expectation of reenactment."  *Id.*  The reasonable expectation must not be speculative, and "must

12   be founded in the record."  *Id.*  The en banc panel in *Chambers* overruled in relevant parts prior

13   Ninth Circuit cases suggesting a different analysis.  *Id.*

14   At hearing, the court directed the parties to file supplemental briefs addressing whether

15   *Fikre* overruled any Ninth Circuit authority with respect to mootness.  The parties have filed

16   supplemental briefs.  Pls.' Suppl. Br., ECF No. 73; Defs.' Suppl. Br., ECF No. 74.  Plaintiffs

17   argue *Fikre* "undermines the burden-shifting framework" established in *Chambers*.  Pls.' Suppl.

18   Br. at 2–3.  Defendants argue the facts in *Fikre* are distinguishable from this case, and the

19   decision does not overrule any Ninth Circuit authority.  Defs.' Suppl. Br. at 2.  Defendants do not

20   address *Chambers* in their brief.  *See generally id.*

21   There is at least a tension between the Supreme Court's decision in *Fikre* and the Ninth

22   Circuit's holding in *Chambers*.  In *Chambers*, the Circuit treats the voluntary cessation of

23   challenged actions by legislative bodies differently from that of private parties.  When a

24   challenged legislative act has been repealed, the Ninth Circuit places the burden on plaintiffs to

25   show there is a reasonable expectation of reenactment.  In contrast, the Supreme Court places the

26   burden solely on defendants to show there is no reasonable expectation of returning to their old

27   ways—there is no presumption of mootness.  Notwithstanding this tension, the court is bound by

28   *Chambers* unless its "reasoning or theory . . . is clearly irreconcilable with the reasoning or theory

13

of" *Fikre*, such that the court can find *Chambers* has been effectively overruled.  *Miller v.*

*Gammie*, 335 F.3d 889, 893 (9th Cir. 2003).  "This is a high standard."  *Lair v. Bullock*, 697 F.3d

1200, 1207 (9th Cir. 2012) (internal marks and citation omitted).  "It is not enough for there to be

'some tension' between the intervening higher authority and prior circuit precedent, or for the

intervening higher authority to 'cast doubt' on the prior circuit precedent[.]"  *Id.* (internal

citations omitted).  If the court can apply the "prior circuit precedent without 'running afoul' of

the intervening authority, [it] must do so."  *Id.* (citation omitted).

 Although *Fikre* casts doubt on *Chambers*' special treatment of legislative actions, in

deciding *Fikre* the Supreme Court was not considering legislative action.  Rather, the Court

affirmed a Ninth Circuit decision, holding the government's administrative action in that case,

removing the plaintiff from the No Fly List, did not render the action moot because the

government did not meet its formidable burden of showing the challenged conduct is not

reasonably expected to recur.  *Fikre*, 601 U.S. at 242–44.  *Chambers*, on the other hand,

considered the Nevada legislature's repeal of a bill.  941 F.3d at 1197.  In that case, the Ninth

Circuit found courts should assume a legislative body acts in good faith in repealing a challenged

legislative provision and applied a presumption that a repeal or amendment of legislation renders

an action challenging the legislation moot.  *Id.* at 1999.  In reaching this conclusion, the Ninth

Circuit joined with the majority of the circuits in concluding legislative actions should be treated

differently.  *Id.*  On the one hand, this conclusion might seem to be in direct conflict with *Fikre*,

which states the burden to prove mootness is the same for both "governmental defendants" and

private defendants.  *Fikre*, 601 U.S. at 241.  However, in *Fikre*, "governmental defendants,"

referred to the FBI and the executive branch of the federal government.  *See id.*  In contrast,

*Chambers* applied a presumption of mootness only to legislative actions by legislative bodies—it

did not extend the holding to actions by the "government" as addressed in *Fikre*.  For example, in

the appellate court decision, which *Fikre* affirmed, the Ninth Circuit panel did not apply the

presumption of mootness and found the "federal government," i.e., the FBI, did not meet its

burden of demonstrating mootness.  *Fikre v. Fed. Bureau of Investigation*, 35 F.4th 762, 771 (9th

Cir. 2022).  In an earlier decision in the same case, the Ninth Circuit distinguished legislative and

1    executive actions.  It explained, "[a] statutory change is usually enough to render a case moot,

2    even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed,"

3    because "[t]he rigors of the legislative process bespeak finality and not for-the-moment,

4    opportunistic tentativeness." *Fikre v. Fed. Bureau of Investigation*, 904 F.3d 1033, 1038 (9th Cir.

5    2018) (citation, alterations and marks omitted).  "On the other hand, an executive action that is

6    not governed by any clear or codified procedures cannot moot a claim." *Id.* (citation and marks

7    omitted).  Thus, if the Supreme Court's holding in *Fikre* is limited to executive "governmental

8    defendants" such as the FBI, and the holding in *Chambers* is limited to legislative bodies, the

9    court can follow *Chambers* without running afoul of *Fikre*.  Accordingly, although *Fikre* might

10   have cast doubt on *Chambers*, the court cannot find it has effectively overruled *Chambers*, and

11   therefore, will apply the presumption of mootness.

12          Here, the County has repealed the water extraction and water truck ordinances, and it has

13   modified the water nuisance ordinance.  *See* Joint Stip. Dismissal ¶¶ 2–3; Bd. of Supervisors

14   Mins. (Aug.1, 2023); *see also* Mem. at 17; Opp'n at 8.  The county also has repealed the liens

15   ordinance.  *See* Bd. of Supervisors Mins. (Dec. 5, 2023); *see also* Mem. at 17, Opp'n at 3.  Thus,

16   following *Chambers*, the court begins with the presumption that the water and liens claims are

17   now moot.

18          Nevertheless, plaintiffs have met their burden of overcoming the presumption of mootness

19   as to the water claims by showing the County enacted similar legislation shortly after repealing

20   the others.  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville,*

21   *Fla.*, 508 U.S. 656, 662 (1993) ("There is no mere risk that Jacksonville will repeat its allegedly

22   wrongful conduct; it has already done so.  Nor does it matter that the new ordinance differs in

23   certain respects from the old one."); *see, e.g., Lo v. County of Siskiyou*, No. 21-00999, 2022 WL

24   1505909, at *5 (E.D. Cal. May 12, 2022) (similarly holding claims not moot when defendants

25   repealed a challenged ordinance and replaced it with another ordinance that allegedly caused the

26   same disadvantage).  In their operative complaint, plaintiffs allege the water ordinances were

27   discriminatory and resulted in state-created danger.  *See* FAC ¶¶ 123–75.  The water nuisance

28   ordinance had a chilling effect on well-owners because it has been used to bring civil actions

15

1   against them and has reduced water sources for Asian Americans. *Id.* ¶¶ 124–26.  This has led to

2   numerous safety and health issues.  *See id.* ¶ 135.  The amendment to the water nuisance

3   ordinance added a "knowledge" requirement.  *See* Opp'n at 16.  However, plaintiffs argue the

4   amended ordinance still harms the plaintiffs in a similar way as the prior ordinance because it has

5   the effect of chilling suppliers from providing water to Asian Americans.  *See id.*  In support of

6   that argument, plaintiffs provide a declaration by Stephen Griset.  Griset Decl., ECF No. 56-7.

7   Mr. Griset used to provide water to the Asian American community before he was sued by the

8   County under the former version of the water nuisance ordinance.  *Id.* ¶ 4.  He "no longer

9   provid[es] water to the Asian-American community in light of concerns about being cited or sued

10   again."  *Id.*  Despite the change in the ordinance, he still fears providing water to the Asian

11   American community due to the "County's past enforcement actions taken against [him]."  *Id.*

12   ¶ 6.  Although the amended ordinance may be somewhat less objectionable and the impact of one

13   ordinance may have a smaller impact than three allegedly harmful water ordinances, it is probable

14   as plaintiffs allege that the current ordinance still disadvantages Asian Americans in "the same

15   fundamental way."  *See Ne. Fla. Chapter of Associated Gen. Contractors of Am.*, 508 U.S. at 662

16   ("The new ordinance may disadvantage them to a lesser degree than the old one, but insofar as it

17   accords preferential treatment . . . it disadvantages [plaintiffs] in the same fundamental way.").

18   Plaintiffs' water claims (six, seven, eight and nine) are not moot.

19            Additionally, the County's repeal of the liens ordinance does not moot plaintiffs' liens

20   claims because there remains a live controversy regarding whether plaintiffs are entitled to

21   nominal damages.  *See Bernhardt v. County of Los Angeles*, 279 F.3d 862, 872 (9th Cir. 2002).

22   This is because the plaintiffs here "seek[] damages for a past violation of [] rights" and therefore,

23   the "violation is not mooted by a promise not to repeat the alleged conduct in the future."

24   *Outdoor Media Grp., Inc. v. City of Beaumont*, 506 F.3d 895, 902 (9th Cir. 2007).  Plaintiffs'

25   liens claims (ten and eleven) are not moot.

26            Defendants' motion to dismiss the water and liens claims as moot is denied.

1    **IV.    FAILURE TO STATE A CLAIM**

2         **A.    Legal Standard**

3         A party may move to dismiss for "failure to state a claim upon which relief can be

4    granted." Fed. R. Civ. P. 12(b)(6).  In response, the court begins by assuming the complaint's

5    factual allegations are true, but not its legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79

6    (2009) (citation omitted).  The court construes all factual allegations "in the light most favorable

7    to the nonmoving party." *Steinle v. City of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019)

8    (citation omitted).  The court then determines whether those factual allegations "plausibly give

9    rise to an entitlement to relief" under Rule 8. *Iqbal*, 556 U.S. at 679.  The court "relax[es]

10   pleading requirements where the relevant facts are known only to the defendant." *Concha v.*

11   *London*, 62 F.3d 1493, 1503 (9th Cir. 1995).

12        **B.    Analysis**

13             **1.    Conspiracy to Violate Constitutional Rights (Claim One)**

14        Defendants argue plaintiffs' claim for conspiracy fails because there is no allegation of an

15   agreement between defendants. *See* Mem. at 7–9.

16        To state a claim for conspiracy to violate constitutional rights, plaintiff must allege "the

17   existence of an agreement or meeting of the minds to violate constitutional rights." *Crowe v.*

18   *County of San Diego*, 608 F.3d 406, 440 (9th Cir. 2010) (citation and marks omitted).  "Such an

19   agreement need not be overt, and may be inferred on the basis of circumstantial evidence such as

20   the actions of the defendants." *Id.*  "For example, a showing that the alleged conspirators have

21   committed acts that 'are unlikely to have been undertaken without an agreement' may allow a

22   jury to infer the existence of a conspiracy." *Mendocino Env't Ctr. v. Mendocino County*,

23   192 F.3d 1283, 1301 (9th Cir. 1999) (citation omitted).

24        Plaintiffs have sufficiently alleged circumstantial facts to infer there was an agreement to

25   violate plaintiffs' constitutional rights. *Contra* Mem. at 8.  Plaintiffs have alleged the County has

26   approved and otherwise supported Sheriff LaRue's and the Sheriff's Department's efforts to

27   unlawfully profile, search and seize Asian Americans and target Asian American communities

28   and neighborhoods, *see, e.g.*, *id.* ¶¶ 40–41, 43, 56–62, 88–91, 95, and together, defendants have

17

1  led a concerted effort to violate the constitutional rights of Asian Americans in the County

2  through the passage of and targeted enforcement of ordinances, imposition of fines and property

3  liens and threats of foreclosures, *see, e.g., id.* ¶¶ 125, 130–31, 134, 137, 147, 152, 161–64, 184–

4  93, 200–07, 209–10.

5          At this stage, the court presumes the general allegations in the complaint "embrace those

6  specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555,

7  561 (1992) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)).  Plaintiffs have

8  sufficiently alleged facts demonstrating defendants have committed concerted acts that are

9  unlikely to have been undertaken without an agreement.  *See Mendocino Env't Ctr.*, 192 F.3d at

10  1301.  Moreover, whether defendants have in fact agreed to violate plaintiffs' constitutional rights

11  is known only to defendants.  *See Concha*, 62 F.3d at 1503.  Plaintiffs have "nudged" their

12  conspiracy claims "across the line from conceivable to plausible."  *See Soo Park v. Thompson*,

13  851 F.3d 910, 928–29 (9th Cir. 2017) (quoting *Iqbal*, 556 U.S. at 680) (finding plaintiff pled

14  sufficient facts to state plausible claim for conspiracy in light of facts in complaint and fact that

15  many relevant facts are known only to defendant).

16          Defendants' motion to dismiss plaintiffs' first claim based on a failure to allege the

17  existence of an agreement is denied.

18                    **2.      Equal Protection (Claims Two, Three, Six and Seven)**

19          Defendants argue plaintiffs' federal and state equal protection claims fail because no

20  allegation establishes defendants' actions were motivated by race.  *See* Mem. at 7, 9–12.

21          The Fourteenth Amendment provides no state shall "deny to any person within its

22  jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  Section 7(a) of

23  Article I of the California Constitution provides: "A person may not be . . . denied equal

24  protection of the laws[.]"  Cal. Const. art. I, § 7(a).  "The equal protection clause contained in

25  article I, section 7, of the California Constitution is coextensive with its federal counterpart found

26  in the Fourteenth Amendment to the United States Constitution."  *Conservatorship of Edde*,

27  173 Cal. App. 4th 883, 891; *see also Safeway Inc. v. City of San Francisco*, 797 F.Supp.2d 964,

28  971 (N.D. Cal. 2011).

1    "Proof of racially discriminatory intent or purpose is required to show a violation of the

2    Equal Protection Clause." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252,

3    265 (1977).  A plaintiff need not show "the challenged action rested solely on racially

4    discriminatory purposes." *Id.*  Rather, a plaintiff must show the discriminatory purpose was a

5    "motivating factor" for the challenged action. *Id.* at 65–66.  That is, a plaintiff must show the

6    challenged action was taken "at least in part 'because of,' not merely 'in spite of,' its adverse

7    effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

8    Determining discriminatory intent "demands a sensitive inquiry into such circumstantial and

9    direct evidence of intent as may be available." *Vill. of Arlington Heights*, 429 U.S. at 266.

10    "[P]roof of disproportionate impact on an identifiable group, such as evidence of 'gross

11    statistical disparities,' can satisfy the intent requirement where it tends to show that some

12    invidious or discriminatory purpose underlies the policy." *The Comm. Concerning Cmty.*

13    *Improvement v. City of Modesto*, 583 F.3d 690, 703 (9th Cir. 2009) (citations omitted).  However,

14    absent "a clear pattern, unexplainable on grounds other than race," disparate impact "alone is not

15    determinative, and the Court must look to other evidence." *Vill. of Arlington Heights*, 429 U.S. at

16    266 (footnotes omitted).  "In addition to statistical evidence showing discriminatory impact, other

17    factors to be considered in determining whether there is evidence of intent or purpose to

18    discriminate include: the historical background of the decision, the sequence of events leading up

19    to the decision, and any relevant legislative or administrative history." *The Comm. Concerning*

20    *Cmty. Improvement*, 583 F.3d at 703.

21    Plaintiffs have sufficiently alleged discriminatory intent or purpose was a motivating

22    factor for the traffic stops and water ordinances. *Contra* Mem. at 9–12.  With respect to the

23    traffic stops, plaintiffs have alleged the following.  There is a history of animus and

24    discriminatory and racially charged language against Asian Americans, documented by official

25    meeting minutes, reports and other documentations characterizing Asian Americans as a whole to

26    be criminals, drug dealers and gang members who are not true "citizens" or members of the

27    community. *See, e.g.*, FAC ¶¶ 25–39, 43–44, 48.  A disproportionate number of traffic stops are

28    conducted near predominantly Asian American communities in the County. *Id.* ¶¶ 57–58.  Asian

19

1   American drivers are disproportionately stopped and searched in the County.  *Id.* ¶¶ 66, 83.  The

2   Department's actions are in stark contrast to the proportion of Asian Americans stopped across

3   the state and in other nearby counties.  *Id.* ¶¶ 68–71.  The proportion of Asian Americans who

4   were stopped during the day, when officers could see the driver, was nearly 60 percent higher

5   than those who were stopped during the night.  *Id.* ¶ 72.  The median length of stops for Asian

6   American drivers was over 56 percent longer than for non-Asian drivers.  *Id.* ¶ 79.

7          With respect to the water ordinances, plaintiffs have alleged the following.  There is a

8   history of racial animus in the County as noted above, and discriminatory and racially charged

9   statements by County officials and employees recorded in meeting minutes and other documents.

10  *See, e.g.,* ¶¶ 137, 149–53, 161–63, 175, 190.   The public comments leading up to the County's

11  actions also demonstrate racial animus and hostility.  *See, e.g.*, *id.* ¶¶ 154–59, 168, 171–73.  The

12  history of the water ordinances' enforcement demonstrates unequal application of the law.  For

13  example, the County initially limited the water truck ordinance geographically, by resolution, to

14  streets in primarily Asian American neighborhoods.  *Id.* ¶¶ 131, 174.  As with the traffic stops,

15  Asian Americans are disproportionately fined and cited for violating the various water

16  ordinances.  *See, e.g.*, *id.* ¶¶ 125, 189.

17         Plaintiffs' allegations are more than "naked assertions" or "conclusory statements."  *See*

18  *Iqbal*, 556 U.S. at 678.  Among other facts, plaintiffs have alleged evidence of gross statistical

19  disparities, a history of racial animus against Asian Americans and racially charged language

20  used against Asian Americans in public forums, including by officials; they have stated a

21  cognizable equal protection claim.  *See, e.g.*, *Elliot-Park v. Manglona*, 592 F.3d 1003, 1006 (9th

22  Cir. 2010) ("And while the officers' discretion in deciding whom to arrest is certainly broad, it

23  cannot be exercised in a racially discriminatory fashion."); *Ave. 6E Invs., LLC v. City of Yuma*,

24  818 F.3d 493, 505 (9th Cir. 2016) (the use of "code words" or racially charged language may

25  demonstrate discriminatory intent).  To the extent defendants deny the factual allegations in the

26  complaint, they will of course have access to the discovery process, further motion practice, and

27  an opportunity to prove their defense at a later stage and on a full record.  *See, e.g.*, Mem. at 12

28  (arguing the water ordinances legitimately address "grave issue[s] of public health and safety").

1   Defendants' motion to dismiss claims two, three, six and seven based on a failure to allege

2   discriminatory purpose is denied.

3              **3.       Unreasonable Search and Seizure (Claims Four and Five)**

4        Defendants argue plaintiffs' federal and state search and seizure claims fails because there

5   was reasonable suspicion to initiate the traffic stops and engage in a warrantless search. *See*

6   Mem. at 7, 12–16.

7        Both the Fourth Amendment and Article I of the California Constitution prohibit

8   unreasonable searches and seizures. *See* U.S. Const. amend. IV; Cal. Const. art. I, § 13.

9   "California has 'ordinarily resolved questions about the legality of searches and seizures by

10  construing the Fourth Amendment and Article I, Section 13 in tandem.'" *Maric v. Alvarado*,

11  748 F. App'x 747, 749–50 (9th Cir. 2018) (unpublished) (quoting *People v. Buza*, 4 Cal. 5th 658,

12  686 (2018)). The Fourth Amendment's protections "extend to brief investigatory stops of persons

13  or vehicles that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002)

14  (quoting *Terry v. Ohio*, 392 U.S. 1, 9 (1968)). "[I]n such cases, the Fourth Amendment is

15  satisfied if the officer's action is supported by reasonable suspicion to believe that criminal

16  activity 'may be afoot.'" *Id.* (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Courts

17  "must look at the 'totality of the circumstances' of each case to see whether the detaining officer

18  has a 'particularized and objective basis' for suspecting legal wrongdoing." *Id.* (citation omitted).

19  "A traffic violation alone is sufficient to establish reasonable suspicion." *United States v.*

20  *Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006) (citing *Whren v. United States*, 517 U.S. 806, 810

21  (1996)). However, "[a] seizure that is justified solely by the interest in issuing a warning ticket to

22  the driver can become unlawful if it is prolonged beyond the time reasonably required to complete

23  that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005).

24       "Warrantless searches are presumptively unreasonable under the Fourth Amendment,

25  subject to certain exceptions." *United States v. Taylor*, 60 F.4th 1233, 1242–43 (9th Cir. 2023)

26  (quoting *Verdun v. City of San Diego*, 51 F.4th 1033, 1037–38 (9th Cir. 2022)). "Consent is one

27  such 'specifically established' exception." *Id.* (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218,

28  219 (1973). However, the consent must be "voluntary," "unequivocal[,] and specific" for an

21

1  officer to lawfully search a car under this exception.  *Id.* at 1243 (quoting *United States v. Basher*,

2  629 F.3d 1161, 1167–68 (9th Cir. 2011)).  "[T]he Fourth and Fourteenth Amendments require

3  that a consent not be coerced, by explicit or implicit means, by implied threat or covert force."

4  *Schneckloth*, 412 U.S. at 228.

5       Plaintiffs have sufficiently alleged the Sheriff's deputies unreasonably searched and

6  seized them following traffic stops in violation of the Fourth Amendment.

7       First, plaintiff Chang alleges deputies unreasonably stopped him twice, both times without

8  reasonable suspicion; he had not committed any traffic violation leading up to the stops.  *See* FAC

9  ¶¶ 105–06, 112.  The deputy initiated the first stop because he saw items in the bed of

10  Mr. Chang's truck.  *Id.* ¶¶ 106–08.  The deputy did not tell Mr. Chang the basis for the second

11  stop.  *Id.* ¶ 115.  Both stops ended without a citation or ticket.  *Id.* ¶¶ 110, 115.  The second stop

12  lasted around thirty minutes.  *Id.* ¶ 115.  Plaintiffs plausibly plead that deputies did not have

13  reasonable suspicion to stop Mr. Chang or to prolong the second stop to thirty minutes.  *Contra*

14  Mem. at 14–16 (citing purported facts outside of the complaint to argue the deputies did have

15  reasonable suspicion).

16       Second, plaintiff Vang alleges despite being stopped due to a cracked external light, *id.*

17  ¶ 118, the deputies prolonged the stop for thirty minutes, *id.* ¶ 121, searched the vehicle, *id.* ¶ 120,

18  and then issued a fix-it ticket, *id.* ¶ 121.  "When stopping an individual for a minor traffic

19  violation, an officer's mission includes ordinary inquiries incident to the traffic stop."  *United*

20  *States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015) (internal marks, alteration and citation

21  omitted).  "Tasks not related to the traffic mission, such as dog sniffs, are therefore unlawful if

22  they add time to the stop, and are not otherwise supported by independent reasonable suspicion of

23  wrongdoing."  *Id.* at 785–86 (internal marks, alteration and citation omitted).  Plaintiff has

24  sufficiently alleged a thirty-minute stop based on a minor violation, followed by a vehicle search

25  and issuance of a fix-it ticket at the end of an unreasonably prolonged stop violated her rights

26  under the Fourth Amendment.  *See, e.g.*, *United States v. Evans*, 786 F.3d 779, 787 (9th Cir.

27  2015) (eight-minute traffic stop violated Fourth Amendment when officer did not have

28  "independent reasonable suspicion justifying this prolongation").

1    Third, plaintiffs allege deputies searched their vehicles without voluntary, unequivocal,

2    and specific consent.  During Mr. Chang's first stop, the deputy climbed onto the vehicle to

3    examine the bags of manure, told Mr. Chang he was going to check the inside of the vehicle, and

4    searched the vehicle without Mr. Chang's consent.  FAC ¶¶ 108–10.  During the second stop, a

5    deputy stopped Mr. Chang, instructed him to exit the vehicle, and conducted a pat search.  *Id.*

6    ¶ 113.  The deputy ordered Mr. Chang to open the vehicle and empty the bags containing laundry,

7    and then searched through the laundry without his consent.  *Id.* ¶¶ 113–14.  During Ms. Vang's

8    stop, deputies indicated they wanted to search the car, and both Ms. Vang and her husband did

9    not believe they had a choice.  *Id.* ¶ 120.  The deputies searched the car.  *Id.*  It is defendants who

10   bear "the heavy burden of demonstrating that the consent was freely and voluntarily given."

11   *United States v. Chan-Jimenez*, 125 F.3d 1324, 1327 (9th Cir. 1997).  Plaintiffs' allegations do

12   not permit defendants to meet that burden at this early stage.  Defendants' motion is denied as to

13   claims four and five.

14   **V.    CONCLUSION**

15       For these reasons, the plaintiffs' motion to strike is **denied as moot.**  Defendants' motion

16   to dismiss is **denied** as explained above.

17       This order resolves ECF Nos. 52 and 58.

18       IT IS SO ORDERED.

19    DATED:  August 20, 2024.

_____
CHIEF UNITED STATES DISTRICT JUDGE