1    UNITED STATES DISTRICT COURT    **ORIGINAL**

2    FOR THE EASTERN DISTRICT OF CALIFORNIA

3    BEFORE THE HONORABLE
     KIMBERLY J. MUELLER, CHIEF DISTRICT JUDGE PRESIDING

4    _____

5    GER CHONG ZE CHANG, MAINOU    )    Case No:  2:22-cv-01378-KJM-AC
     VANG, RUSSELL MATHIS, YING     )
6    SUSANNA VA, and all others     )    Motion Hearing
     similarly situated,            )
7                                   )    Date:  9/13/2024
     Plaintiffs,                    )
8                                   )
              v.                    )
9                                   )
     COUNTY OF SISKIYOU and         )
10   JEREMIAH LARUE, in his official)
     capacity as Sheriff,          )
11                                  )
     Defendants.                    )
12   _____

13              **REPORTER'S TRANSCRIPT OF PROCEEDINGS**

14                   Pages 1 through 38

15

16

17

18

19

20

21   _____
     OFFICIAL REPORTER:         Abigail R. Torres, CSR, RPR/RMR, FCRR
22                              CSR No. 13700
                                United States District Court
23                              Eastern District of California
                                501 I Street, Suite 4-100
24                              Sacramento, California 95814

25   *Proceedings recorded by mechanical stenography.  Transcript*
     *produced by computer-aided transcription.*

```
1    APPEARANCES:

2

3    For the Plaintiffs:       ACLU OF NORTHERN CALIFORNIA
                                39 Drumm Street
                                San Francisco, CA 9411
4                               By:  JOHN THOMAS H. DO, ESQ.
                                By:  EMI YOUNG, ESQ.
5                               By:  GRAYCE ZELPHIN, ESQ.
                                     -oOo-
6                               COVINGTON & BURLING LLP
                                Salesforce Tower
7                               415 Mission Street
                                Suite 5400
8                               San Francisco, CA 94105
                                By:  ALISON CLARKE WALL, ESQ.
9                               By:  ELLEN CHOI, ESQ.
                                      -oOo-
10                              COVINGTON & BURLING LLP
                                3000 El Camino Real
11                              5 Palo Alto Square
                                Suite 10th Floor
12                              Palo Alto, CA 94306
                                     -oOo-
13                              ASIAN AMERICANS ADVANCING JUSTICE
                                ASIAN LAW CAUCUS
14                              55 Columbus Avenue
                                San Francisco, CA 94111
15                              By:  MEGAN VEES, ESQ.

16   For the Defendants:        MATHENY SEARS LINKERT & JAIME, LLP
                                3638 American River Drive
17                              P.O. Box 13711
                                Sacramento, CA 95853
18                              By:  RICHARD STONE LINKERT, ESQ.
                                By:  MADISON M. SIMMONS, ESQ.
19                              By:  J. SCOTT DONALD, ESQ.
                                By:  ELISE RICE, ESQ.

20

21

22

23

24

25
```

1      **SACRAMENTO, CALIFORNIA; FRIDAY, SEPTEMBER 13, 2024; 9:32 A.M.**

2                                    -oOo-

3            THE CLERK:  Calling Civil Case No. 22-1378, Chang, et

4      al., v. County of Siskiyou, et al.

5            This is on for plaintiffs' motion for leave to file a

6      supplemental complaint, plaintiffs' motion for preliminary

7      injunction, and plaintiffs' motion for provisional class

8      certification, Your Honor.

9            THE COURT:  All right.  Good morning.

10           Appearances, please.  Lead counsel for plaintiffs.

11           MR. DO:  Good morning, Your Honor.  John Do for

12     plaintiffs.

13           THE COURT:  Good morning, Mr. Do.  Would you like to

14     identify other persons appearing, even if not speaking today?

15           MR. DO:  Yes, of course.

16           THE COURT:  Are the microphones on?

17           MR. DO:  Yes.  Of course, I can certainly introduce

18     folks.

19           THE COURT:  All right.

20           MR. DO:  Also appearing is Alison Wall for plaintiffs.

21     Megan Vees for plaintiffs.  Emi Young for plaintiffs.  In

22     addition to Grace Zelphin, Stanley Young, and Ellen Choi.  I'm

23     happy to identify who will be handling any particular motion,

24     if the Court pleases.

25           THE COURT:  As I ask questions, the person on point

```
1    for the question can speak up.  How about that?

2            MR. DO:  That's perfectly fine.  Thank you, Your

3    Honor.

4            THE COURT:  All right.  And for the County?

5            MR. LINKERT:  Good morning, Your Honor.

6            Richard Linkert on behalf of the County.  With me is

7    my partner, Madison Simmons, and my colleague Scott Donald.

8    And we have Elise Rice at the far end of the table.

9            THE COURT:  Rice.

10           MS. RICE:  Yes.

11           THE COURT:  Ms. Rice, all right.  Also counsel?

12           MS. RICE:  Yes.

13           THE COURT:  All right.  All right.  But you're lead

14   counsel, Mr. Linkert?

15           MR. LINKERT:  I am.

16           THE COURT:  All right.  I understand the three motions

17   before the Court.  Here are my questions.  On the standing

18   question, for you, Mr. Linkert, just looking at the reply, and

19   the Interpipe Contracting case, the Ninth Circuit case, 2018,

20   that the plaintiffs cite, plaintiffs say they do have

21   standing -- and I'm quoting here -- "because third parties have

22   changed their behavior in response to the challenged regulation

23   as to the detriment of plaintiffs or are likely to resume their

24   prior beneficial actions if the regulation is enjoined."

25           Why is that not right given Interpipe Contracting?
```

```
1          MR. LINKERT:  We don't believe third parties have
2    changed their behaviors, Your Honor.
3          THE COURT:  All right.  Zero third party has changed
4    their behavior, based on what's before the Court?
5          MR. LINKERT:  Well, our view on standing is they're
6    trying to affect the rights of nonparties to this litigation,
7    non-putative class members, who have no standing before this
8    Court by asking this Court to affect them and affect other
9    third parties, like the State of California or the district
10   attorney.  We don't think that they have standing to ask that
11   from this Court.
12         THE COURT:  Well, Mr. Do, is this for you to respond
13   to?  Anything further you want the Court to know besides what's
14   in your reply?
15         MR. DO:  I believe Ms. Young will be handling the
16   standing question.
17         THE COURT:  All right.  Ms. Young.
18         MS. YOUNG:  Thank you, Your Honor.  I recognize that I
19   don't have a microphone in front of me.
20         THE COURT:  Well, we need you to get in front of a
21   microphone, because I understand there's overflow in a
22   different courtroom.
23         MS. YOUNG:  Certainly, Your Honor.  Is this better?
24         THE COURT:  I think so.
25         MS. YOUNG:  Okay.  So, Your Honor, as the case you
```

1    cited noted -- and this is -- Supreme Court recently confirmed

2    in the *FDA v. Alliance for Hippocratic Medicine* case, "to

3    establish causation and redressability in circumstances where

4    the regulated party is a third party, such as here, the well

5    owners, who are not party to the case, plaintiffs need only

6    show that the third party will likely react in a predictable

7    way to the challenged regulation which in turn will cause

8    injury to the plaintiffs."

9         And plaintiffs have unquestionably met this standard

10   here based on the uncontested evidence about well owners who

11   are refusing to provide water or indicate that they will refuse

12   to provide water based on the County's enforcement of its

13   zoning policies in this way, as well as indications that they

14   wish to resume providing water to the community.

15        THE COURT:  And just so the record is clear, what --

16   what declarations, in particular, are you relying on?

17        MS. YOUNG:  Of course, Your Honor.

18        So as to the causation issues, we have provided

19   declarations from a handful of well owners, including Vue Moua,

20   Neng Vue, Bill Yang, as well as Steve Griset.  I will also

21   note, Your Honor, that the named plaintiff Mathis's

22   declaration, he also indicated that he was specifically

23   informed by someone, who had previously indicated their

24   willingness to provide water to him, that they would no longer

25   do so in light of the County's escalated enforcement.

1          THE COURT:  All right.  Mr. Linkert, those

2    declarations, are you asking the Court to read them out of the

3    record?  Or how do you read them in the context of this

4    question?

5          MR. LINKERT:  Well, we're trying to ask the Court to

6    look at the overall context of what's happening.  We have a

7    billion gallons of water being siphoned out of the ground to

8    support an estimated $2 billion a year illegal drug operation

9    that's polluting this county and infecting the groundwater and

10   wildlife and all the rest of it that we presented to the Court.

11         THE COURT:  I understand that's a part of -- a part of

12   this case, but it's not the entirety.  So let's say the Court

13   is focusing only on lawful uses.  I recognize the County's

14   ability to regulate cannabis.  And I don't plan to issue any

15   order that would undercut that ability in any way.  But there's

16   still the separate question of water needed for subsistence,

17   not illegal activities.

18         MR. LINKERT:  The factual aspect of this, Your Honor,

19   the amount of water that is being consumed would provide

20   12,500,000 baths.  It's nonpotable water.  They have access to

21   potable water.  They have access to nonpotable water.  It's

22   just inconvenient, according to them.

23         THE COURT:  Well, we're skipping ahead a bit.  But on

24   the access to potable water, I know you argue the bottled

25   water.

1          But don't the declarations -- is that what you're

2    pointing to, is the bottled water that's available?

3          MR. LINKERT:  We're not sure where they're getting

4    their potable water, but they're getting it.  And the pumpers,

5    who want to wholesale pump 100 trucks every six hours out of

6    the groundwater beneath their property, are providing

7    nonpotable water that's used in this titanic, illegal

8    environmental disaster.

9          THE COURT:  And your position is that water is only

10   used for cannabis grows?

11         MR. LINKERT:  Well, I don't know for a fact if it's

12   only used for cannabis grows, but the volumes involved

13   certainly indicate that, and the need indicates that.  I

14   mean --

15         THE COURT:  On the bottled water, the declarations say

16   firefighters provided bottle water to one person.  Family

17   members from Sacramento deliver water in bottled form.

18   That's -- and I looked for this -- any support for bottled

19   water.  The County is not providing any bottled water; right?

20         MR. LINKERT:  Mr. -- yeah, Mr. Griset is not providing

21   bottled potable water.  To my knowledge, he's not providing

22   bottled water at all.  He's providing giant trucks by the

23   hundreds that deliver millions and millions of gallons of water

24   throughout the County to sustain this billion-dollar drug

25   operation.

```
 1              THE COURT:  Oh, again --

 2              MR. LINKERT:  That's the problem.

 3              THE COURT:  -- let's just say -- the Court is focused

 4   only on water for lawful uses, recognizing the County's ability

 5   to regulate cannabis as it does.

 6              Do you accept that line drawing, Mr. Do?  Or whoever

 7   is on point for this?  And whoever it is, state your name

 8   first.

 9              MS. WALL:  Alison Wall for plaintiffs, Your Honor.

10              THE COURT:  All right.

11              MS. WALL:  We agree that there -- that there are

12   lawful ways that -- that defendants can regulate cannabis.

13   Here, as Your Honor has been alluding to, there is significant

14   evidence in the record that the water being hauled to Asian

15   Americans are being used for lawful uses including cooling,

16   plants, animals, fire prevention.  All things which do not

17   require potable water.

18              THE COURT:  And do the gardens require potable water?

19              MS. WALL:  No, Your Honor.

20              THE COURT:  All right.  Livestock?

21              MS. WALL:  No, Your Honor.

22              THE COURT:  But bathing and water consumption, direct

23   drinking of water, that's what requires potable?

24              MS. WALL:  I think we're fine if we want to agree with

25   defendants that drinking water certainly would require potable
```

    1    water.  I think there is -- there is a reality that there's

    2    plenty of ways to maybe consume through cooking, through

    3    gardening nonpotable water still, but happy to draw the water

    4    line.

    5             THE COURT:  But you do -- I think it's an issue.

    6    Let's just say, for sake of argument -- this hearing is to

    7    inform my ultimate decision as to whether or not to issue an

    8    injunction.

    9             But if I issue an injunction, I have to engage in some

   10    line drawing because I'm not -- I am not going to undercut the

   11    County's ability, as provided by state law, to regulate

   12    cannabis grows.

   13             MS. WALL:  I understand, Your Honor.  I think, first,

   14    as a reminder, the water at issue here, we agree, is nonpotable

   15    water.  Right.  It's --

   16             THE COURT:  That's the only water at issue.

   17             MS. WALL:  Correct.

   18             So to the extent that helps resolve this specific

   19    issue, we agree that the water at issue is -- is nonpotable

   20    water.

   21             THE COURT:  But that doesn't answer the question in

   22    full.  Because nonpotable -- the County is correct.  Nonpotable

   23    water, the volumes it points to, can be used for cannabis

   24    grows.

   25             MS. WALL:  Potentially, Your Honor.  But the County's

1   arguments with regard to cannabis are problematic for a few

2   reasons.  First, I will point out that the County has not

3   substantiated these harms, including their suggestion that

4   these harms are unique to Shasta Vista Asian Americans or that

5   the wells that they're enforcing against are providing water

6   for cannabis use.

7          But, second, taking defendants' statements as to

8   cannabis harms at face value, the zoning policy is an

9   unconstitutional and illegal way to go about preventing those

10  harms.

11         And that's because it is -- it is under equal

12  protection, at least.  Defendants don't address State-created

13  danger and California Statute --

14         THE COURT:  I'm going to get to that.  I'm going to

15  get to that.

16         MS. WALL:  -- but under equal protection, because it

17  is racially motivated and targeted at -- at Asian Americans.

18         THE COURT:  All right.  Anything more to say on

19  standing, Mr. Linkert?

20         MR. LINKERT:  I have a lot more to say, but not on

21  standing.

22         THE COURT:  All right.  I think the record allows the

23  Court to conclude that at least some landowners and truck

24  drivers have stopped providing water as a result of the

25  County's enforcement reference.

1           You'd agree with that?

2           MR. LINKERT:  I think so.  I mean, that was the point.

3           THE COURT:  Understood.

4           So on the class certification question, the plaintiffs

5   are seeking a class that would include persons throughout

6   Siskiyou County, not just Shasta Vista.  Right?  Who is on this

7   one?

8           MS. YOUNG:  Emi Young for plaintiffs, Your Honor.

9           And that is correct.  Although, as other evidence in

10  the record indicates, it is also the case that Asian Americans,

11  who are impacted by these policies, tend to be located in a few

12  discrete neighborhoods or regions of the County.

13          THE COURT:  Other than Shasta Vista?

14          MS. YOUNG:  Your Honor, there is evidence in the

15  record relating to communities in and around the Dorris and

16  McDowell areas, for instance.

17          THE COURT:  But what allows me to conclude that the

18  proposed class representative can fairly and adequately

19  represent people throughout the County?

20          MS. YOUNG:  Your Honor, because of the way that the

21  class has been defined, the sole criteria is that the class --

22  proposed class members are Asian Americans, who do not have

23  independent water access by virtue of having their own well on

24  their property or access to municipal water systems.

25          And so in those circumstances, we respectfully propose

1    that it is irrelevant which community the proposed class

2    representative resides in.  Provided that it is the case that

3    for all people who are affected by these -- excuse me -- that

4    for all people within the proposed class, they are by

5    definition affected by these policies, which restrict their

6    access to off-parcel water.

7         THE COURT:  But those -- the -- those persons are

8    primarily, if not exclusively, in communities -- Shasta Vista,

9    Dorris, and you said McDowell?

10        MS. YOUNG:  That is the evidence from the

11   declarations, yes.

12        THE COURT:  All right.  And so you would say, I don't

13   need to think about whether or not there's evidence in the

14   record showing that defendants have acted or refused to act on

15   grounds that apply generally throughout the County?

16        MS. YOUNG:  Your Honor, I believe that there is, in

17   fact, evidence that the defendants have acted on grounds that

18   apply generally throughout the County.  Their own description

19   of what they are authorized to do under their zoning ordinance

20   is not restricted to a particular neighborhood or region of the

21   County.

22        Although, it is true that some of their enforcement

23   actions that have been cited as recent actions taken by the

24   County in this regard have been largely centered around the

25   area of Shasta Vista.

1           THE COURT:  So more on this question of whether or not

2    water is used to irrigate an unlawful cannabis cultivation

3    enterprise.

4           The proposed class would include persons using water

5    for that purpose; right?

6           MS. YOUNG:  It is, as a practical matter, true, but if

7    there are hypothetically persons who are using off-parcel water

8    for purpose of cannabis growing and do not have wells or other

9    access to water on the property where they reside, that it

10   could hypothetically include people who are using it for that

11   purpose.

12          But, of course, in this context, Your Honor, where the

13   class at issue is -- we are seeking to certify the class under

14   Rule 23(b)(2), there is less of a concern about whether the

15   class could be potentially overbroad in some respects with

16   respect to the relief that the Court might issue.

17          THE COURT:  How do you respond to the County's

18   position, if I understand it correctly, that the -- the local

19   ordinances are not really an obstacle to those who need only a

20   relatively small amount of potable water for their legitimate

21   needs?

22          MS. YOUNG:  Well, Your Honor, I think the -- the

23   uncontested record here says otherwise.  So, for example, named

24   plaintiff, Russell Mathis, relies on nonpotable water for all

25   of the purposes that are indicated in his declaration.

1        He relies on it for staying cool during the summer

2   when temperatures regularly exceed 100 degrees where he

3   resides.  He relies on it for purposes of being able to bathe

4   and to clean.  He also relies on it for his animals, his two

5   dogs that live with him.

6        And I think that those types of uses, in addition to

7   fire protection, are uses that are indicated all throughout the

8   record in this case.  And it is very clear that, for example,

9   with respect to an issue like water protection, there is no

10  feasible situation in which plaintiffs and the proposed class

11  could buy enough bottles of water in order to be able to

12  meaningfully protect against the risk of fire.  And the same

13  could be said for their ability to provide for animals or water

14  their gardens.

15        It is -- it appears to be the County's position that

16  plaintiff class would have to buy bottled water for all of

17  these purposes.  When the reality is that in the absence of

18  access to nonpotable water, which plaintiffs rely on from

19  off-parcel sources, they are also having to restrict their use

20  of potable water for the purpose you would expect it to be used

21  for, which is drinking, because they're having to stretch their

22  water resources more thinly.

23        THE COURT:  So I have reviewed Mr. Mathis's

24  declaration.  Just -- I think you've conceded, assume the

25  proposed class could include persons who have used or would use

1    water to irrigate an unlawful cannabis cultivation enterprise.

2          How can the proposed class rep fairly and adequately

3    represent those people?

4          MS. YOUNG:  Your Honor, the issue here is whether or

5    not the proposed class representative can fairly and adequately

6    represent the class as to the legal claims that are being

7    brought and the proposed relief.

8          The -- in the text of the proposed order, we have

9    conceded that the issue here -- and also in our arguments to

10   the Court, we have conceded that the issue here is really about

11   ensuring that there is access to nonpotable water for necessary

12   lawful purposes.  And Mr. Mathis is adequate to represent the

13   class with respect to those claims.

14         THE COURT:  And the Court should not worry about

15   unintended consequences of an injunction if some of the water

16   that would flow again is used for cannabis cultivation?

17         MS. YOUNG:  We are not suggesting, Your Honor, that

18   the Court should not be concerned about unintended consequences

19   of its order.  But I would respectfully suggest that that is an

20   issue with respect to the scope of relief that the Court might

21   grant here, and not a question as to class certification and

22   whether certification is proper.

23         THE COURT:  All right.  Mr. Linkert, do I have the

24   County's position right that the ordinances are not an obstacle

25   to those who would use small amounts of potable water for

1    legitimate needs?

2        MR. LINKERT:  Well, the ordinances don't deal with

3    potable water.  The ordinances are Countywide.  They've been on

4    the books since I think they acknowledged them in the 1950s, so

5    this notion that they're racially motivated is just not true.

6    They were modified in 1986.

7        And amongst all the things that are wrong with these

8    motions, of which there are many, the most striking is to

9    present the need for a supplemental complaint based upon a new

10   law or a new interpretation when the very declaration that they

11   rely upon for Mr. Griset is from the person who has been in

12   litigation over these very ordinances and laws for years that

13   predate the filing of this complaint.

14       So, I mean, our position, you'll see from the papers,

15   Your Honor, is that the motion for supplemental complaint is

16   completely improper.  It's based upon something that isn't

17   true.  That it's a new ordinance.  They needed that to, sort

18   of, get within Arlington.  They need Arlington to file the

19   supplemental complaint to have a foot in the door to even argue

20   this preliminary injunction.

21       And then we have all of these -- I mean, I have to ask

22   for additional briefing, I guess, because there are

23   stakeholders involved.  The State is in the midst of a drought.

24   The State of California has all kinds of concerns about this

25   groundwater basin and the impact on the State resources.

1          This preliminary injunction would reach the district

2     attorney, who's not a representative of the County and reach

3     existing settlements.  So there's just so many things wrong

4     with this.  It's hard to know where to begin.

5          But the ordinances are facially neutral.  They -- they

6     have no impairment whatsoever on people buying either potable

7     or nonpotable water wherever they can legitimately buy it.

8     We're just saying that someone who happens to live on property

9     with the well cannot conduct massive off-site bulk sales and

10    drain the groundwater while it's in the process of being

11    polluted by this operation.

12          And on a final comment here, if the -- we can arrange

13    for the Court to take a helicopter tour of the County in this

14    area, if the Court wishes, and an on-the-ground tour to

15    actually see what's going on.  Because reality, at some point,

16    needs to get into this courtroom.

17          This is not about mom-and-pop gardens and watering

18    ducts.  This is supporting a massive multibillion-dollar

19    criminal operation that is ruining this County.

20          THE COURT:  I understand that position.  I think my --

21    from my questions, it should be clear, I understand --

22          MR. LINKERT:  Thank you.

23          THE COURT:  -- that that's the County's position.

24          MR. LINKERT:  I apologize.  I just --

25          THE COURT:  Are you saying that -- I mean, I see this

1   matter as fully briefed.  Is there anything you haven't had a

2   chance to respond to in the briefing that's before the Court?

3           MR. LINKERT:  Yes.  If the Court is inclined to

4   grant -- well, two things.  If the Court is intending to grant

5   class certification, we'd like the opportunity to conduct

6   discovery to find out exactly who's in the class.

7           We suspect that the point of all this is to keep the

8   millions of gallons flowing so that this operation with all the

9   hidden beneficiaries who get the money at the end of all this,

10  so we can identify what's going on.

11          THE COURT:  But apart from class cert?

12          MR. LINKERT:  And the other thing is we think that a

13  bond is going to be necessary.  Because, from what I'm told,

14  the cleanup costs from the pollution, the open sewers, the lack

15  of sanitation is going to be multi, multimillion dollars.  It's

16  there already.

17          So if the injunction has been granted, and the County

18  hog-tied from enforcing an ordinance that a State court has

19  upheld as being constitutional, then we're going to need some

20  kind of protection.

21          THE COURT:  Well, on the bond, is that briefed?

22          MR. LINKERT:  It is not.

23          THE COURT:  Why not?  That's pretty important at the

24  preliminary injunction stage.  I mean, that's a question for

25  both sides, really.

1          MR. LINKERT:  Yes.  We should have and didn't.  And we

2     ask the Court's indulgence.

3          THE COURT:  So on the motion for injunction, we

4     already heard the suggestion that defendants have not responded

5     to the arguments regarding the due process claim based on

6     State-created danger.

7          So I think that's fair; right?

8          MR. LINKERT:  We've submitted our briefing, Your

9     Honor.

10          THE COURT:  And unless I'm missing it -- and you can

11     point me to it -- I'm not seeing any mention of irreparable

12     harm, balance of harms, and public interest.

13          Is that fair?

14          MR. LINKERT:  I'm sorry.  I was distracted.

15          THE COURT:  Looking at the preliminary injunction

16     briefing, is there any mention of irreparable harm?  Or is that

17     also conceded?  And what about balance of harms and public

18     interest?

19          MR. LINKERT:  Irreparable harm is apparent, Your

20     Honor.  We have attached a study, not by the County, but by the

21     California EPA.  It's a slide presentation that outlines all

22     the horrors that are being caused by this ongoing operation.

23     There is irreparable harm throughout the documents.  And it's

24     inherent in the nature of our opposition to this.

25          THE COURT:  All right.  Let me just ask about an

1    injunction.  First, what -- response to the suggestion that a

2    bond should be required?

3          MR. DO:  As the Court is aware, certainly, the Court

4    has the discretion to waive any bond requirement, particularly

5    for cases -- civil rights, public interest cases like this.

6          And, of course, the representative here, Mr. Mathis,

7    is a low-income individual.  He's on Social Security.  And that

8    would be, certainly, another basis for any type of waiver of

9    any -- that would -- any bond.

10         But we, of course -- this is the first time we're

11   hearing of a County's assertion of multimillion-dollar bond,

12   despite the opportunity, of course, to brief many of these

13   issues.

14         THE COURT:  But plaintiffs also don't say anything

15   about a bond or request being excused from the posting of one?

16         MR. DO:  That is correct, Your Honor.  I'm providing

17   the answer now for the first time.

18         THE COURT:  All right.

19         MR. DO:  But I just did want to assert that -- at

20   least the factual reasons why are -- are at least before the

21   Court already.

22         THE COURT:  I'll think about whether or not I need

23   more briefing or will allow more briefing on the bond question.

24   So I'm going back to this issue.  Just -- I'm not telling you

25   my decision, but let's assume for sake of argument, so I can

1  get clear on your positions, that I'm considering issuing an

2  injunction.

3        So why shouldn't any injunction be limited to small

4  amounts of water, however that's defined, to ensure no misuse

5  of the water?

6        MR. DO:  Sure.  I think, Your Honor, the most

7  appropriate injunction here should be coextensive with the

8  merits of the preliminary injunction.  And, here, there is a

9  established record that the County has of full-blown bar on all

10  off-parcel water transfers, including small amounts, of course,

11  and large amounts.

12        And at the same time, the County has allowed and is

13  aware of white individuals who do off-parcel water transfers of

14  very large amounts.  Everything from 25 gallons to

15  4,000 gallons for the same type of uses that the Asian American

16  community uses, whether that would be for livestock and fire

17  protection.

18        So, again, we've established that there is a need for

19  nonpotable water.  A substantial need for it.  And even the

20  State recognizes, given the fact that they are funding a

21  nonprofit, to ensure that there is water for basic use.  That

22  includes nonpotable and potable water and are deeply concerned

23  with the County's ability right now.

24        I want to highlight, again, that this case is very

25  similar to *Lowe*, if not more severe than *Lowe*, given the fact

1    in *Lowe* that ordinance was concerned with a permitting program

2    for water extraction.

3          Here, it's -- and the Court enjoined that in its

4    entirety, which we think it would also be appropriate here.

5    Ultimately, I think, the ultimate question is tailoring the --

6    any injunction to what -- the unconstitutional practice here.

7    And it's unconstitutional across the board, because it's

8    discriminatory to have this complete off-the-parcel water

9    transfer.

10         And we -- a more narrow version of it I think would be

11   difficult to administer and gets into the business of, really,

12   a legislative function that the Court should avoid.  So we're

13   in a situation here, Your Honor, where, essentially, a

14   substantial amount of water is needed by a substantial number

15   of folks.

16         We use the analogy that, you know, the County has been

17   tightening a noose around the community, metaphorically.  And I

18   think at this point, it's -- we should take that noose off, as

19   opposed to try to figure out exactly how much to delineate that

20   line-drawing question.

21         Certainly, we can always come back to the Court if it

22   needs clarification.  We can confer if there are particular

23   issues that the County has concerns about.  But, again, their

24   current concerns are predominantly attorney argument.  Their

25   representations with regards to the concern about cannabis,

```
 1    which we concede can be -- certainly, the County has an

 2    interest in doing that.  But they have a variety of tools that

 3    they have not shown, do not address that -- the cannabis.  And

 4    all those tools remain in place just like in Lowe.

 5              THE COURT:  I'll get to administration in just a

 6    moment.

 7              But for Mr. Linkert, the flip side of the coin.  Let's

 8    say I decide I can engage in some line drawing; why wouldn't

 9    the injunction call for persons in Shasta Vista, at least, if

10    not Dorris and McDowell, having a reliable supply of water for

11    basic needs, but not enough to cultivate cannabis, enough for

12    bathing, washing clothes, livestock, pets, gardening -- if the

13    gardening is subsistence?

14              MR. LINKERT:  We believe the Court cannot ignore the

15    State's rulings on --

16              THE COURT:  I'm not.  I'm telling you I'm not going to

17    ignore that.  And I'm not going to undercut the local control

18    here that the County has --

19              MR. LINKERT:  If --

20              THE COURT:  How can I avoid -- how can I ignore -- I

21    don't think the County has shown me.  Has the County shown me

22    that -- that the persons -- that the persons at issue here have

23    a reliable supply of enough water for subsistence?  What in the

24    record allows me to conclude that?

25              MR. LINKERT:  First of all, I don't think that's our
```

1    burden, Your Honor.  But Exhibit K is an administrative civil

2    liability order from the State of California Environmental

3    Protection Agency against Mr. Griset that precludes him from

4    off-site water sales.

5              The County has -- particularly during this drought

6    crises has an obligation to prevent off-site water sales.  And

7    there's, you know, a body of law that deals with, you know,

8    selling water beyond use on your own property, which is exactly

9    what Mr. Griset was doing and which the State water board said

10   he can't do.

11             THE COURT:  But it's not just about Mr. Griset, is it?

12             MR. LINKERT:  But he -- he is --

13             THE COURT:  I understand he's the key player.  He was

14   in -- I know the name from the *Lowe* case.

15             MR. LINKERT:  All of these are off-site water sales,

16   Your Honor.  They're going into groundwater that's affecting

17   the people's water, if you will, and pulling out more water

18   than the owner of the property uses on his or her property and

19   distributing it.  And they're --

20             THE COURT:  No.  I understand that.  But, I mean, you

21   argue the -- the persons who are complaining here are getting

22   bottled water.  But the record shows they're getting it from

23   firefighters who happen to be nearby, fighting fires, from

24   family members.  I don't see anything else about where the

25   bottled water is coming from.

1        MR. LINKERT:  Then I guess we need more briefing, Your

2  Honor.  The firefighter thing is a ruse.  The firefighters are

3  afraid to go out there because of the chemicals, just like our

4  law enforcement officers --

5        THE COURT:  Well, there's a declaration -- there's a

6  declaration, unrebutted declaration in one case of firefighters

7  providing bottled water.

8        MR. LINKERT:  That can't be the basis --

9        THE COURT:  Well, no.  It's just -- it's that I found

10  that looking for -- for the support for your argument that

11  there's bottled water because I had the impression you were

12  suggesting bottled water is readily available to these persons

13  and sufficient.

14        MR. LINKERT:  They have been living there, obtaining

15  potable water from some source.  I don't know where they obtain

16  it.  This is not about potable water, not about bottled water.

17  It's about hundreds and hundreds of trucks of water pulling

18  water out of one person's property and distributing it to a

19  massive drug operation.  That's what this is about.

20        THE COURT:  I understand the parties don't necessarily

21  think I need to distinguish potable from nonpotable.  I did

22  hear the plaintiff say that, as well.

23        On administration, this Court should not legislate it,

24  I understand that.  I shouldn't legislate for the County.  But,

25  again, if I'm persuaded that an injunction should issue that

1  attempts to make this distinction and -- and prevent, you know,

2  opening the spigot for lots of water for cannabis, why should I

3  not appoint a special master to make some determinations for

4  the Court, if not flying on a helicopter, looking on the ground

5  at what is happening here?  Is that not option?

6          And if so, it seems to me this is a case where I could

7  appoint the assigned magistrate judge as a special master.  So,

8  again, if -- if I were to issue an injunction, would including

9  a provision for appointment of a special master, namely, the

10  assigned magistrate judge, make sense for administration

11  purposes, given the complex issues here?

12          Mr. Do?

13          MR. DO:  Your Honor certainly has the discretion to do

14  that.  If Your Honor would like to engage in that line drawing

15  now, we'd like the opportunity to address it as -- but if I

16  could just address the response to Mr. Linkert's statements

17  there, as well, which I think are very relevant here.

18          Again, the County's -- the dearth of evidence that the

19  County is providing here is striking.  Again, they rely on

20  almost exclusively attorney argument and a PowerPoint that

21  is -- has double hearsay in it.  But that also actually

22  undermines their argument, given the fact that there was

23  cannabis growing in other nonAsian American communities and the

24  like.  And also the State -- the State water board is on record

25  that their estimation of the amount of water being used for

 1  cannabis and its impact on groundwater are -- are actually

 2  very -- is minuscule.  I also want to note that, again, the --

 3  the County hasn't presented any evidence that --

 4          THE COURT:  What's the evidence that supports the

 5  statement you just made, "minuscule"?

 6          MR. DO:  It is minuscule.  I think they said it was

 7  .4 percent of the groundwater usage -- it's in a footnote --

 8          THE COURT:  It's in a footnote, but what's the

 9  evidence?

10          MR. DO:  It's the State water board letter --

11          THE COURT:  All right.

12          MR. DO:  -- from the State itself.  Again, the same

13  State water board that is funding a nonprofit to -- to ensure

14  that there is water access, both potable and nonpotable water

15  access.  Notwithstanding the fact that there are drought

16  concerns despite the drought lessening.

17          I also want to highlight, Your Honor, that the County

18  has been enforcing against individuals with just one piece of

19  evidence of -- of water transfer and with no allegations of

20  cannabis use.  Unlike, for example, the Griset matter; there

21  are allegations of supporting cannabis.  There are none for

22  that notably, so for the County's most recent enforcement, that

23  is exclusively against Asian Americans, despite the fact,

24  again, that white individuals, providing water for white folks

25  for large amounts -- again, 4,000 gallons regularly for things

1    like fire protection -- proceed regardless.

2            So I do want to note that any type of line drawing

3    with regards to amounts will be quite difficult.  Again, the

4    way that water is often distributed here is through water

5    hauling, which the State recognizes is a legitimate way to

6    transfer water, particularly in drought and the like.

7            So, again, perhaps that's something for -- if Your

8    Honor does envision -- a special master can do it.  But in

9    terms of any line drawing done right now, I think that would be

10   very difficult to administer.

11           And, again, I think most appropriate too, they've not

12   rebutted our claims with regards to the unlawfulness of it,

13   aside from, maybe, likelihood of the merits on the equal

14   protection clause claim, none for the rest.

15           So having -- if the Court is so inclined to find that

16   there is -- that the policy is unconstitutional and unlawful,

17   then the most appropriate remedy would be to at minimum enjoin

18   it.  Because we are here at a situation where we have a County

19   that has violated the Court order 17 times, has found ways to

20   try to avoid Court oversight, and -- and we need to ensure that

21   there is -- there is that spigot that you mentioned there, Your

22   Honor, that it is open for the -- or water for all the right

23   uses that we named, which do -- which we -- I fear -- and

24   almost impossible to differentiate in terms of amount in the

25   way it's transferred and, again, the way that the County has

1  been operating, its white individuals are clearly treated

2  differently.

3          THE COURT:  The State water board letter is from 2020.

4  Right?  That's what you're pointing to?

5          MR. DO:  That's right.  And there's no evidence, Your

6  Honor, that the cannabis issue has increased.  If anything, I

7  suspect it's actually gone down.  Drought has certainly gone

8  down, as well.

9          But there's no evidence of that -- there's no evidence

10  that the County's tools that they have are not addressing the

11  issue.  Just like in *Lowe*, they have all those tools.  And,

12  here, they haven't shown any evidence that like -- why they

13  can't rely on those tools.  And your -- and we're certainly not

14  asking the Court to enjoin those tools that deal with --

15  specifically with cannabis.

16          THE COURT:  All right.  Mr. Linkert, on the special

17  master question?

18          MR. LINKERT:  Well, we don't think the Court should

19  grant any of these motions.  They have not established a right

20  to a supplemental complaint, which is the predicate for the

21  preliminary injunction.  If the Court is inclined to grant --

22          THE COURT:  The Ninth Circuit suggests there's a very

23  lenient standard for allowing supplemental; right?  I mean,

24  I --

25          MR. LINKERT:  I mean --

1          THE COURT:  I've had supplemental complaints in prior

2   cases.

3          MR. LINKERT:  Me too.

4          THE COURT:  I've looked at the Ninth Circuit.  I mean,

5   the Ninth Circuit suggests better do it, unless there's a

6   really good reason not to.

7          MR. LINKERT:  I have, Your Honor, too.  But

8   supplemental complaints deal with new conduct.  Here, they did

9   not inform the Court that Mr. Griset had been in litigation for

10  years over this.  They just presented his declaration here as

11  new evidence.

12          They've been litigating the same ordinance since

13  before this complaint was filed, so that's a misrepresentation

14  to the Court, which, amongst other things, ought to negate the

15  granting of the supplemental complaint which --

16          THE COURT:  So I understand your argument on that, but

17  my question was posed as a pure hypothetical.  I'd say, if I

18  issue an injunction, should I -- why should I not provide for a

19  special master to administer it?

20          MR. LINKERT:  If you issue an injunction -- let me

21  just say this before I -- it's going to have very far-reaching,

22  unanticipated consequences and anticipated consequences.  I

23  think their additional stakeholders, the State and the Federal

24  Government, who need to be involved, as well as the DA, it's

25  just going to affect what they have done in the existing

1    things.

2         But if the Court is inclined to grant a preliminary

3    injunction, then I think a special master to be on the ground

4    and actually see what's going on would make sense to me.

5         THE COURT:  And any objection to the assigned

6    magistrate judge serving as special master, given that that is

7    an option, and more efficient than going out and looking for --

8         MR. LINKERT:  Yeah, certainly up to the Court's

9    judgment.  That's fine with us.

10        THE COURT:  All right.  All right.  I have no other

11   questions.  If there's -- we've covered quite a bit.  We've

12   covered, certainly, my questions.  But if there's wrap-up

13   argument with respect to any of the pending motions, I would

14   hear that now.

15        Mr. Linkert, you can go first.

16        MR. LINKERT:  Well, I guess the most important thing I

17   can say is to ask the Court to look at the reality of the

18   situation this little county faces.  It's 44,000 people.  13

19   deputies.  It's been overrun with these problems.  It's been

20   wrestling with them.  It's taken a while for the ordinances to

21   kick in, so they actually have an impact.  This was presented

22   to us as an emergency.  Such an emergency that with Mr. Donald

23   in trial and me unavailable, we didn't have a meet-and-confer.

24   And, then, the next thing we knew, they wouldn't tell us what

25   it was.  And then we get this massive motion that was obviously

1      in the works for a long time.

2              And the motion is predicated on a falsehood that

3      there's a new ordinance or a new enforcement to meet the

4      Arlington requirements, which they have to meet to get their

5      foot in the door.

6              So the supplemental complaint should not be granted.

7      And then the preliminary injunction we tried to lay out under

8      the -- the duress of time pressure that we had here, the kind

9      of issues that this County is facing.  It is an environmental

10     disaster.  We have a drought situation with groundwater being

11     precious.

12             And there's certainly much more that we could present

13     in terms of the threat to the groundwater.  There's concern

14     about these illegal, smuggled toxic chemicals getting into the

15     groundwater system.  They're using them to fumigate the plants.

16     The plants absorb these chemicals.  And then when the innocent

17     user buys some marijuana legally, they're inhaling carcinogens.

18             Our sheriffs have to have their blood tested once a

19     month because they go into places that are so polluted.

20     There's open sewers and these people, money from who knows

21     where, purchased lots, properties, with no water, no services.

22             So they moved into this, and then we have this

23     proliferation of drug grows to the point where it's become an

24     estimated $2-billion-a-year industry.  Each plant takes three

25     to five gallons a day.  So you do the math on this, and then

1   you get the billion gallons of water that is being siphoned out

2   of this groundwater basin that's under State scrutiny that the

3   County has an obligation to try to protect, and if I heard

4   correctly, I heard that, Well, it doesn't take that much water

5   to grow, if I heard that correctly, which blows my mind, if

6   that's what was said.

7            This is all about keeping truckload after truckload

8   after truckload after truckload of water flowing from property,

9   in violation of the ordinance in California law that restricts

10  the use to that plant.  And that's all I'll say.

11           THE COURT:  Okay.  Anything else?

12           MR. LINKERT:  No, Your Honor.

13           THE COURT:  All right.  All right.  Mr. Do?

14           MS. WALL:  Alison Wall, Your Honor.

15           THE COURT:  All right.

16           MS. WALL:  I don't know if a lot of what defendants

17  are saying is true because there is not evidence in the record

18  to support it.  It's unsubstantiated.  What I do know is that

19  Asian Americans in the County do not have access to water for

20  basic health and safety needs.  I know that animals have

21  already died and gathering places already burned to the ground.

22  People's health is suffering.  And that is why we are here

23  today.  I know that defendants don't dispute that there -- that

24  they use the zoning ordinance to broadly prevent off-parcel

25  water transfer, nor that Asian Americans need water off parcel.

 1          There are a myriad other ways that defendants can

 2   specifically address cannabis use that does not require a broad

 3   prohibition on water access to the Asian Americans communities.

 4   And we ask that the Court enjoin this unlawful conduct.

 5          THE COURT:  What's your response to the charges

 6   regarding the supplemental complaint?  Not really -- nothing --

 7   not really -- not really anything new, emergency bypassed

 8   meet-and-confer?

 9          MS. VEES:  Megan Vees on behalf of plaintiffs.

10          Defendants' point about --

11          THE COURT:  Wait.  I'm not certain we're getting you

12   on the mic.  Why don't you come forward if --

13          MS. VEES:  Okay.

14          THE COURT:  -- it's between standing at the table or

15   standing at the podium.

16          MS. VEES:  Is this better, Your Honor?

17          THE COURT:  Yes.

18          MS. VEES:  Defendants' point about when the events

19   alleged in the supplemental complaint took place is immaterial.

20   The proposed complaint indisputably alleges events that

21   happened after the original complaint was filed and so

22   supplementation is proper.

23          Further, when the events took place does not affect

24   whether the motion should be granted because the same process

25   applies and the same standard applies, regardless of whether

1    the events predate or postdate the original complaint.

2           Further, there has been no misrepresentation to the

3    Court.  It's true that some of the events alleged in the

4    supplemental complaint predate the filing of the original

5    complaint and that those are the initial instances of what

6    we've come to see as the County's policy of trying to cut off

7    all water access or all off-parcel transfers of water.

8           But the plaintiffs did not misrepresent anything to

9    the Court, who were upfront in the supplemental complaint and

10   in the motion to supplement that the conduct began in 2020 and

11   has continued now in 2023 and, most recently, in 2024.

12          THE COURT:  All right.  Anything further you want to

13   say?

14          MS. VEES:  No, Your Honor.

15          THE COURT:  All right.

16          MR. LINKERT:  May I just add one thing --

17          THE COURT:  Briefly.

18          MR. LINKERT:  I was involved in the *Lowe* case.  But

19   I'm told that this nexus between use and cannabis grow was

20   covered in declarations in that case.

21          THE COURT:  And I can take judicial notice of anything

22   in that case.

23          MR. LINKERT:  Please.  Thank you.

24          THE COURT:  That's undisputed.  All right.

25          Mr. Do?

1      MR. DO:  I just think it's quite telling if that

2  evidence was there, why was it not presented here?  It's quite

3  strange that the -- again, the evidence that's used for

4  preliminary injunction is one declarant -- one nonattorney

5  declarant without laying the foundation with regards to the

6  actual material that's actually presented there.

7      Even the photography is even unauthenticated and the

8  like.  And I apologize.  I believe Ms. Vees has a comment on

9  this.

10      THE COURT:  All right.

11      MS. VEES:  To address the Court's question about

12  whether it may take judicial notice of the declarations from

13  *Lowe*.  I just want to make clear that the Court may take

14  judicial notice of the existence of any declarations, but not

15  the factual contents of those declarations.

16      THE COURT:  Fair enough.

17      All right.  I'm going to submit the matter.  I'll let

18  you know if I'm going to allow further briefing on anything.

19  I'm actually going to take a recess to allow the clearing of

20  the courtroom.  There's also a neighboring courtroom.  And

21  there is one thing I need to do during this recess, so I would

22  expect we'll reconvene at about 20 of 11:00.

23      MR. LINKERT:  To be clear, Your Honor, we would like

24  to have further briefing, so we can provide further evidence to

25  the extent it isn't apparent to the Court from what has been

1  provided.

2            THE COURT:  No.  I understand that.

3            MR. DO:  Your Honor, would you --

4            THE COURT:  I'll let you know if I'm going to allow

5  it.

6            MR. DO:  Would you like us to remain?  It was unclear

7  when you said "a recess" whether or not our matter --

8            THE COURT:  No.  This matter is concluded.

9            MR. DO:  Thank you.

10            THE COURT:  I'm submitting the three motions.  On this

11  matter, I'm taking a recess.  And then we will recall beginning

12  with the Antl case as soon as we reconvene.

13            MR. DO:  Thank you, Your Honor.

14            THE COURT:  Thank you.

15            MR. LINKERT:  Thank you, Your Honor.

16            (The proceedings were adjourned at 10:23 a.m.)

17                          -oOo-

18                  **C E R T I F I C A T E**
              I, Abigail R. Torres, certify that I am a duly
19  qualified and acting Official Court Reporter for the United
    States District Court; that the foregoing is a true and
20  accurate transcript of the proceedings as taken by me in the
    above-entitled matter on 9/13/2024; and that the format used
21  complies with the rules and requirements of the United States
    Judicial Conference.
22                          Dated:  9/18/2024
                            /s/ Abigail R. Torres
23                          _____
                            Abigail R. Torres, RPR/RMR, FCRR
24                          CSR No. 13700
                            U.S. Official District Court Reporter
25