UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Ger Chong Ze Chang, et al., | No. 2:22-cv-01378-KJM-AC |
| Plaintiffs, | ORDER |
| v. | |
| County of Siskiyou, et al., | |
| Defendants. | |

The plaintiffs in this civil rights action allege Siskiyou County, California and the Siskiyou County Sheriff (together, "the county" for ease of reference) have recently violated the Fourteenth Amendment's Equal Protection Clause and California law by employing county zoning ordinances in a racially discriminatory manner.  They also allege the county's recent zoning enforcement efforts have affirmatively put them in danger by depriving them of the water they need to cook, drink, bathe, wash clothes, grow food, raise animals and fight fires, all in violation of the Fourteenth Amendment Due Process Clause.

As explained in this order, plaintiffs' motion for permission to supplement their complaint is **granted** to permit them to assert claims about the county's recent enforcement actions.  Their motion to certify a class on a provisional basis, however, is **denied without prejudice**, as they have not satisfied the requirements of Federal Rule of Civil Procedure 23(a) and (b).  Finally, their motion for a preliminary injunction is **granted in part:** plaintiffs have demonstrated they

1

1   are likely to succeed on their Due Process Claim, they have shown irreparable harms are likely in

2   the absence of a preliminary injunction, and they have demonstrated a limited injunction would

3   appropriately balance the competing harms and serve the broader public interest.  As detailed in

4   the conclusion of this order, the court directs the parties to submit simultaneous supplemental

5   briefs about the scope of the appropriate injunctive relief and bond.

6   **I.      BACKGROUND**

7          Federal law prohibits the use, possession, manufacture and sale of marijuana.  *See*

8   *Gonzales v. Raich*, 545 U.S. 1, 13–14 (2005) (citing 21 U.S.C. §§ 811–12, 821–30, 841(a),

9   844(a)).  California, by contrast, has "less restrictive marijuana laws."  *City of Vallejo v.*

10  *NCORP4, Inc.*, 15 Cal. App. 5th 1078, 1081 (2017).  It broadly permits both medical and

11  recreational marijuana use.  *See id.*  Although California law permits marijuana use and

12  cultivation, it does not require that local governments allow people to distribute or cultivate

13  marijuana and cannabis within their borders.  *See id*.  California cities and counties retain their

14  authority to "make and enforce within [their] limits all local, police, sanitary, and other

15  ordinances and regulations not in conflict with general laws."  *Id.* (quoting Cal. Const., art. XI,

16  § 7).  State law confirms expressly that local governments may even "completely prohibit"

17  marijuana and cannabis businesses, including by adopting "local zoning and land use

18  requirements."  *See* Cal. Bus. & Prof. Code § 26200(a).

19         Siskiyou County is a large, mostly rural and undeveloped county on California's northern

20  border.  *See Lo v. County of Siskiyou*, 558 F. Supp. 3d 850, 854 (E.D. Cal. 2021).  It has banned

21  commercial cannabis cultivation for many years.  *See id.*  For almost as long, it also has

22  contended with the effects of illegal cannabis grow operations within its territory, as this court

23  summarized in a related case a few years ago in an order preliminarily enjoining two county

24  water ordinances.  *See id.* at 854–57.

25         Although the plaintiffs in this action have expressed skepticism about the true harms of

26  illegal cannabis cultivation, including those summarized in this court's orders in the related *Lo*

27  action, they do not dispute the county's claims about those harms, at least not currently, and they

28  offer almost no evidence about cannabis cultivation in Siskiyou County.  *See, e.g.*, Reply Prelim.

1  Inj. at 3, 5 n.1, ECF No. 90 (contending "water use for cannabis is miniscule").  Similarly,

2  although plaintiffs agreed at hearing that this court may take judicial notice of its orders in the

3  related *Lo* action, they do not concede this court may rely on the conclusions it reached or factual

4  findings it made in that case.  Again, however, in this respect, plaintiffs do not offer evidence or

5  argument to show any particular conclusions or findings in the *Lo* action were inaccurate or

6  unreliable.  The county, by contrast, expressly requests that the court keep its orders in the *Lo*

7  action in mind.  *See, e.g.*, Opp'n Prelim. Inj. at 15, ECF No. 88 (citing *Lo*, 558 F. Supp. 3d 850).

8  "Due to the urgency of obtaining a preliminary injunction at a point when there has been

9  limited factual development, the rules of evidence do not apply strictly to preliminary injunction

10  proceedings." *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 n.5 (9th Cir.

11  2013).  A district court has discretion to consider and weigh even inadmissible evidence "for

12  purposes of deciding whether to issue [a] preliminary injunction." *Republic of the Philippines v.*

13  *Marcos*, 862 F.2d 1355, 1363 (9th Cir. 1988).  Plaintiffs have cited no authority to show this

14  court may not consider the contents of its orders in the *Lo* action under these evidentiary

15  principles.  For that reason, and because plaintiffs have offered no evidence casting doubt on this

16  court's previous conclusions, the court has relied on relevant parts of the record to the extent

17  developed in the related *Lo* action, as summarized in the order published at 558 F. Supp. 3d 850.

18  To illustrate the harms of illicit cannabis cultivation within its borders, in addition to

19  citing this court's orders in the *Lo* case, the county relies on a recent presentation by the

20  California Environmental Protection Agency.  *See* Opp'n Prelim. Inj. at 3 (Hasti Javid, Cal.

21  Envt'l Prot. Agency, Public Health & Environmental Impacts Related to Illegal Cannabis

22  Cultivation Activities (2023), Carroll Decl. Ex. L, ECF No. 88-13)).  Among other topics, the

23  presentation describes how pesticides found in remote illegal marijuana grow sites contain

24  suspected carcinogens that can pollute groundwater, are "highly toxic to fish and aquatic

25  invertebrates," and that have been reported to cause nausea, vomiting, eye and throat irritation,

26  shortness of breath, redness of the face, severe eye irritation, skin rash, blistering, and itching.

27  Carroll Decl. Ex. L at 11.  The presentation reports that authorities have found flammable,

28  corrosive, and combustible liquids at illicit grow sites, which can increase the risk of wildfires, *id.*

1    at 14–19; pits filled with trash, debris, hazardous waste, and pools or containers of unknown

2    liquids, *id.* at 22–23, 25–26, 29; illegal burn pits, *id.* at 24; human waste and sewage dumped

3    from trailers directly into the ground, *id.* at 28, 32; and illegally diverted water, *id.* at 31.

4           The presentation also cites a Siskiyou County civil grand jury report, which identified

5    illegal cannabis cultivation as the root of most code enforcement problems within the county's

6    borders.  *Id.* at 35; *see also* Siskiyou County Civil Grand Jury Report, "The Impact of

7    Commercial Cannabis Grows in Siskiyou County" (2021–2022).[1]  The grandy jury also reached

8    other conclusions, as summarized in the presentation, including the estimation that more than five

9    thousand large grow operations were found within the county's borders and that growers destroy

10   the land and the native vegetation, abandon vehicles and build unsafe structures.  *See* Carroll

11   Decl. Ex. L at 35.

12          The evidence in the related *Lo* action painted a similarly concerning picture of

13   environmental harms and dangerous living conditions at the time.  *See* 558 F. Supp. 3d at 854–57.

14   Violent crime also rose in areas where cannabis was illegally grown.  *See id.* at 857.  Sustained

15   and costly law enforcement efforts proved inadequate to address these dangers, and the county's

16   limited resources were strained.  *See id.* at 855.  For context, Siskiyou County's population was

17   lower than 50,000 by the most recent census figures.  *See* United States Census Bureau, Siskiyou

18   County, California (2020).[2]

19          The county also cites a letter from a local Unit Chief of the California Department of

20   Forestry and Fire Protection, who has expressed similar concerns about people living in "travel

21   trailers" and "recreational vehicles" or "erecting make-shift structures" and "camping on lands

22   that are covered with flammable vegetation for long periods of time."  Letter from Phillip Anzo to

---

[1] https://www.co.siskiyou.ca.us/sites/default/files/fileattachments/civil_grand_jury/
page/3421/gj_20220607_report_impactcommericalcannabisgrowssiskiyoucounty.pdf
(downloaded Oct. 23, 2024).  The court takes judicial notice of these findings as contained in
public records, without deciding whether they are accurate.  *See* Fed. R. Evid. 201(b); *Sommers v.
City of Santa Clara*, 516 F. Supp. 3d 967, 980 (N.D. Cal. 2021) (taking notice of grand jury
report).

[2] https://data.census.gov/profile/Siskiyou_County,_California?g=050XX00US06093
(Sept. 5, 2024).  The court takes judicial notice of this estimate.  *See* Fed. R. Evid. 201(b); *United
States v. Esquivel*, 88 F.3d 722, 726 (9th Cir. 1996) (taking notice of census figures).

1   Jeremiah LaRue (June 9, 2021) at 1, ECF No. 88-14.  These concerns relate to illicit cannabis

2   cultivation because many illegal grow operations in Siskiyou County are conducted in rural,

3   undeveloped and remote areas.  *See Lo*, 558 F. Supp. 3d at 854–55.  Extended periods of "outdoor

4   living" can lead to increased use of "campfires for cooking and the illegal burning of debris or

5   trash," which "are often not fully extinguished and left unattended or abandoned leading to the

6   potential for a wildfire."  Anzo Letter at 1.  Fires also can start when people use "multiple

7   extension cords, power splitters and power strips."  *Id.*  To compound these problems, quick

8   evacuations from remote and rugged areas can be very difficult.  *See id.*

9       As this court summarized in the *Lo* action, most commercial cannabis growers in Siskiyou

10  County use water trucks filled with pumped groundwater to supply their crops.  558 F. Supp. 3d

11  at 856.  In the summer of 2020, after other efforts to address the problem fell short, the county's

12  Board of Supervisors passed an ordinance banning the use of groundwater for illegal cannabis

13  cultivation.  *See id.* at 858 (citing Siskiyou Cty. Ord. No. 20-13 (Aug. 4, 2020)).  At about the

14  same time, the county began investigating and enforcing its zoning ordinances against the

15  suspected water suppliers—the landowners who were pumping water from the ground and selling

16  the pumped water to illicit cannabis cultivation operations.  *See* Dean Decl. ¶ 8, ECF No. 88-15.

17      The county first targeted "the worst violators" in terms of the "magnitude of groundwater

18  distribution."  *Id.* ¶ 5.  Based on the county's investigations and reports from its residents, "the

19  initial focus" was on three landowners who lived near an area—the Mount Shasta Vista

20  Subdivision or "Shasta Vista"—where many cannabis growers had located their operations.  *Id.*

21  This area includes Shasta Vista, Dorris, Hornbrook and MacDoel, where most of the county's

22  relatively few Asian-American citizens live.  *See, e.g.*, Vang Khang Decl. ¶ 4, 83-4; Va Xiong

23  Thao Decl. ¶¶ 6–7, ECF No. 83-12; Fitz Ya Decl. ¶ 3, 83-16.  As one resident put it, "There are

24  only a few white people who live in Shasta Vista."  Fitz Ya Decl. ¶ 3.  In both this case and the

25  related *Lo* case, the county and its officials have adamantly denied they were motivated at all by

26  the race of the people living in Shasta Vista.  *See, e.g.*, Opp'n Prelim. Inj. at 4; 558 F. Supp. 3d at

27  870–71.  And in both this case and the related *Lo* case, the Asian-American plaintiffs contend the

28  opposite is true.  *See, e.g.*, Mem. Prelim. Inj. at 2–4, 7–11; 558 F. Supp. 3d at 867.

5

1    Whatever the county's motivations were, there appears to be no dispute about what it

2    actually did.  First, in July 2020, investigators collected evidence that large quantities of water

3    were being extracted from a property owned by Shannon Spencer.  Carroll Decl. ¶ 3, ECF

4    No. 88-1.  County investigators watched as trucks pulled up, waited in line, filled their tanks at a

5    pump, and left.  *Id.*  Most had no license plates.  *Id.*; *see also* Dean Decl. Ex. 1, ECF No. 88-16

6    (reproducing photos of trucks and well).  In July, the county counsel's office sent a letter to

7    Spencer demanding she cease and desist the pumping operation.  Carroll Decl. ¶ 4 & Ex. A.  The

8    county eventually filed a civil action against Spencer and obtained a stipulated judgment.  Carroll

9    Decl. ¶¶ 6–7 & Exs. B–C.  Spencer agreed to a fine of more than $160,000, but most of the fine

10   was suspended unless a court found in the future Spencer was again distributing water.  *See*

11   Carroll Ex. C at 1–2.

12   Second, in September 2020, the county counsel's office filed a similar action against

13   Steve Griset, a farmer who owns land in Big Springs, near Shasta Vista.  Carroll Decl. ¶ 12 & Ex.

14   H; Griset Decl. ¶¶ 2, 7–8, ECF No. 83-2.  According to the complaint, Griset, like Spencer, was

15   extracting groundwater from a well on his property, piping the water to a loading area and

16   pumping it into trucks, which took the water elsewhere, all during the cannabis growing season.

17   *See* Carroll Decl. ¶ 12; *see also* Dean Decl. Ex. 1 (reproducing photos of Griset's property).

18   Griset unsuccessfully sought mandamus relief from the Superior Court, *see* Carroll Decl. ¶ 13 &

19   Ex. I, and the district attorneys' office amended its complaint, which expanded their allegations of

20   illegal water distribution, *see id.* ¶ 14 & Ex. J.  A few months later, in the second half of 2021, the

21   California Water Resources Control Board issued an order directing many water users, including

22   Griset, to cease diverting water.  *Id.* ¶ 16.  Finally, in 2023, the state water board imposed a

23   $16,000 penalty against Griset.  *See id.* ¶ 16 & Ex. K.

24   Third, in March 2021, the county counsel's office sent a cease-and-desist letter to Darrell

25   Sousa about a similar water distribution operation on his property.  Carroll Decl. ¶ 8 & Ex. D.

26   But Sousa continued distributing water: code enforcement officers saw water trucks filling on his

27   property, and a neighbor reported the operation was affecting the neighbor's well.  *See id.* ¶ 9 &

28   Ex. E; *see also* Dean Decl. Ex. 2, ECF No. 88-17 (photos of Sousa property).  The county

6

1    counsel's office sent another letter, which warned the county would file a civil enforcement

2    action, Carroll Decl. ¶ 10 & Ex. F, but a settlement agreement eventually made litigation

3    unnecessary, *see id.* ¶ 11 & Ex. G. Sousa agreed among other things "not to make available or

4    provide any water from [his] Property for off-site transportation, or otherwise allow [his] Property

5    to be a place of water supply and distribution for other properties." *Id.* Ex. G ¶ I.B.

6           Despite the county's new ordinance and zoning enforcement efforts, water trucks still

7    appeared to be transporting groundwater to illicit cannabis operations within the county's borders.

8    *See Lo*, 558 F. Supp. 3d at 858. The Board of Supervisors passed two more ordinances in May

9    2021. *See id.* at 858–60. One required landowners to obtain a permit "in all instances in which

10   groundwater is extracted and transported off the parcel from which it was extracted." *Id.* at 859

11   (citing Siskiyou County Ord. No. 21-07 § 3, amending Siskiyou County Code § 3.5-13.102). The

12   other imposed a permit requirement on water truck drivers. *See id.* at 859–60 (citing Siskiyou

13   County Ord. No. 21-08 § 3, amending Siskiyou County Code § 3-4.1501(b)).

14          Soon after those ordinances were passed, several people of Hmong descent who lived in

15   the Shasta Vista area filed the *Lo* action. *See generally* Compl., *Lo v. Siskiyou County*, No. 21-

16   999 (E.D. Cal. June 4, 2021). They moved immediately for a temporary restraining order and a

17   preliminary injunction, claiming the county's ordinances deprived them of rights under the

18   Fourteenth Amendment's Due Process and Equal Protection Clauses, among other things,

19   because the ordinances had effectively shut off the supply of water they had relied on to meet

20   their basic needs, from drinking and cooking to raising animals and growing gardens.

21          The court denied their request for a temporary restraining order but later granted their

22   motion for a preliminary injunction. *See generally* 2021 WL 2439550 (E.D. Cal. June 15, 2021)

23   (denying ex parte application for a temporary restraining order); 558 F. Supp. 3d 850 (granting

24   motion for preliminary injunction). The court found plaintiffs demonstrated the county's

25   ordinances had disproportionately burdensome effects on the Hmong people in Shasta Vista, and

26   they had raised "serious questions" about the county's motivations. *See* 558 F. Supp. 3d at 867–

27   71. "First, County officials knew that most if not all of the Hmong families in Shasta Vista were

28   living in unpermitted structures without a reliable supply of potable water and other essentials.

7

Yet the County expected to grant only a few permits under its groundwater regime." *Id.* at 870 (citation omitted).  "Second, the County's permits are uniquely burdensome for people in the Shasta Vista Hmong community to obtain." *Id.*  "Third, County officials [had] used concerning language when describing their intent." *Id.*  "Fourth, the County's permitting ordinances [were] a poor fit for its purposes." *Id.* at 871.  The balance of harms weighed sharply in the plaintiffs' favor: they showed they would likely lack water for drinking, cooking, bathing, and other basic needs absent an injunction.  *See id.* at 871–72.  The court therefore enjoined the county from enforcing the two permitting ordinances while the case was pending.  *See id.* at 872.  But the court did not bar the county from enforcing the original ordinance, which prohibited the use of groundwater in cannabis cultivation.  *See id.*

A few months later, after the county modified the two enjoined ordinances, it sought unsuccessfully to be relieved from the strictures of the preliminary injunction.  *See generally* 2022 WL 1505909 (E.D. Cal. May 12, 2022).  The court directed the parties to participate in a court-convened settlement conference before a Magistrate Judge.  *See id.* at 12.  The purpose of the settlement conference was to "identify mutually acceptable modifications to the preliminary injunction that [would] minimize the risk of irreparable harms to the plaintiffs while also allowing the County to prevent the irrigation of commercial cannabis crops within its borders, including within the Mount Shasta Vista Subdivision." *Id.*

The plaintiffs filed this action while the *Lo* action was pending and while the settlement talks were underway.  *See generally* Compl., ECF No. 1.  Their complaint alleges the county "engaged in a sweeping campaign to harass and intimidate Hmong and other Asian Americans." *Id.* ¶ 1.  They seek to represent a class and several subclasses of similarly situated people, and they assert claims under federal and California civil antidiscrimination laws, the U.S. Constitution, and the California Constitution.  *See generally id.*  The parties jointly requested to stay the case and refer it to settlement alongside the *Lo* case, and the court granted that request. *See* Stip. & Order, ECF No. 19.

The *Lo* case eventually settled in its entirety.  *See* Joint Stip. Dismissal, No. 21-999 (E.D. Cal. Sept. 11, 2023), ECF No. 107.  The county agreed to repeal the two enjoined ordinances, to

1   modify the third and to pay an undisclosed monetary sum.  *See id.*  In this case, however, the

2   parties could not reach a settlement agreement.  Pretrial litigation resumed in early 2024.  *See*

3   Order (Jan. 23, 2024), ECF No. 45.  Plaintiffs amended their complaint, and the county moved to

4   dismiss.  *See generally* First Am. Compl., ECF No. 47; Mot. Dismiss, ECF No. 52.  The parties

5   finalized briefing in April, and the court held a hearing in May.  *See* Mins., ECF No. 68.

6        The court ultimately denied the motion to dismiss, *see generally* Order (Aug. 21, 2024),

7   ECF No. 85, but before then, plaintiffs filed the three motions the court addresses in this order.

8   First, they seek permission to supplement their complaint with allegations and claims about a

9   series of allegedly discriminatory code enforcement efforts the county has undertaken while this

10  case has been pending.  *See generally* Mot. Suppl. Compl., ECF No. 82.  Second, they request a

11  preliminary injunction against those enforcement efforts.  *See generally* Mot. Prelim. Inj., ECF

12  No. 83.  And third, they ask the court to provisionally certify a class under Federal Rule of Civil

13  Procedure 23(b)(2) in connection with the proposed preliminary injunction.  *See generally* Mot.

14  Class Cert., ECF No. 84.

15       The code enforcement efforts in question continue those the county undertook against

16  Spencer, Griset and Sousa between 2020 and 2022.  In April 2024, for example, the county sent a

17  "notice to comply" to Vue Moua, an Asian American man who lives in Big Springs, near Shasta

18  Vista.  *See* Vue Moua Decl. ¶¶ 2, 8, ECF No. 83-10.  He bought his property in March 2024.  *See*

19  *id.* ¶ 7.  The notice Vue Moua received in April alleged he was violating the county's zoning

20  ordinances by allowing water trucks to fill on his property.  *Id.* ¶ 8.  According to the notice, that

21  use violated the zoning designation for his property: it was an industrial rather than an agricultural

22  or residential use.  *See id.* & Ex. A.  Vue Moua continued to allow water trucks to fill on his

23  property despite that notice and a $100 fine; he was providing water "to elderly family members

24  and Moua clan members who rely on [him] as their source of water."  *See id.* ¶¶ 5, 9.  In the

25  weeks that followed, county officers inspected and investigated further, and the county imposed

26  multiple escalating fines.  *Id.* ¶¶ 9–16.  During one inspection, an officer told Vue Moua he could

27  not distribute water to other parcels, whether he was selling or giving it away, unless he obtained

28  a change to the zoning designation.  *See id.* ¶ 10.  That prompted him to visit the County

9

Community Development Department, where he asked staff how he could change his zoning designation. *Id.* ¶ 11. They told him he "could not get a zoning change" and if his family needed water, "they had to drill a well on their parcels." *Id.* ¶ 11 & Ex. B. Vue Moua understands he could avoid continued fines by preventing water trucks from filling on his property, but feels that if he did so, he would be turning his back on "many people in [his] Asian American community, particularly in Shasta Vista, who do not have a well and rely on [him] to provide them with water." *Id.* ¶ 17. That said, he cannot afford to provide water if the county continues to impose fines or begins a different enforcement action. *See id.*

Neng Vue and Bill Yang, also Asian-American men, have come under similar scrutiny by county code enforcement officers in the past year or so. Both live in or near Shasta Vista, and both have wells on their properties. *See* Neng Vue Decl. ¶¶ 2–4, ECF No. 83-14; Bill Yang Decl. ¶¶ 2–3, ECF No. 83-17. Neng Vue received a notice in July 2024 that he was violating the county's zoning ordinances by allowing water trucks to fill on his property. *See* Neng Vue Decl. ¶ 6. He stopped providing water after receiving this notice out of fear of future county enforcement efforts. *Id.* ¶ 7. Bill Yang received a notice from the county in December 2023, which warned him he was running a "water distribution enterprise" and could not continue to do so unless he changed the zoning designation of his property. Bill Yang Decl. ¶ 6 & Ex. A. He wants to continue offering water to others, but he is afraid the county will sue or fine him if he does. *Id.* ¶ 9. Plaintiffs also cite a notice the county sent collectively to a group of property owners (Botang Wu, Dai Weiqing, Vong Kevin, Wu Ya Yang and Lam Sam Phu) in June 2024, which imposed a fine of $100 based on findings like those underlying the notices described above. Verner-Crist Decl. ¶¶ 5–6 & Ex. A at 9–14, ECF No. 83-13. The evidence in the record here does not reveal whether these property owners have provided water to people in need, why, and whether they would continue, as none has submitted a declaration, and plaintiffs have not offered any other clarifications.

In addition to this evidence about property owners distributing water, plaintiffs offer evidence about people who haul water or need water. Koua Lee, for example, is an Asian-American man who lives in Big Springs, near Shasta Vista. Koua Lee Decl. ¶ 2, ECF No. 83-7.

He drives a water truck and brings water from wells on the properties on County Road A12 to Asian-Americans who live in Shasta Vista, but at least one well owner declined to offer water due to the risk of a fine. *Id.* ¶¶ 3, 9. Koua Lee also uses trucked water himself to bathe, wash food and cook, and he has used water from his truck to put out fires. *Id.* ¶¶ 4, 7–8. He claims Sheriff's deputies have pulled him over and questioned him many times, most recently in July 2024. *Id.* ¶ 5. Siskiyou County code enforcement officers have also followed him and taken photos of his truck, but he does not claim to have been targeted in an enforcement action. *Id.* ¶ 6.

Several other people in Shasta Vista have submitted declarations about their need for groundwater delivered by truck, which they rely on for drinking, cooking, bathing, washing clothes, caring for pets, growing food, raising livestock and fighting fires. *See generally* Vang Khang Decl., ECF No. 83-4; Bao Lee Decl., ECF No. 83-6; Meng Lee Decl., ECF No. 83-8; Mathis Decl., ECF No. 83-9; Via Xiong Thao Decl., ECF No. 83-12; Ntsaiab Kz Xiong Decl., ECF No. 83-15; Fitz Ya Decl., ECF No. 83-16; Yiping Yang Decl., ECF No. 83-18. Still others have submitted declarations about their mostly unsuccessful and sometimes desperate efforts to obtain water from other sources, including efforts to apply for and obtain permits to drill wells. Neng Vue and his wife, for example, moved to their current property in 2024 after waiting four years for the county to process their application for a well drilling permit on the land where they used to live. *See* Neng Vue Decl. ¶ 4. Another Asian-American couple paid fees and applied for permits but never heard from the county about their application or the necessary inspections. *See* Yiping Yang Decl. ¶¶ 4–5. A third man ran into a different problem: local well drillers would not respond to his calls. *See* Va Xiong Thao Decl. ¶ 8. Those who did respond said they did not drill wells in Shasta Vista, said they had year-long waitlists or estimated well-drilling costs in excess of $75,000. *See id.*

Plaintiffs contend the county's recent enforcement efforts are arbitrary, extreme, nonsensical and discriminatory. They rely, for example on a declaration by Steve Griset, the landowner who faced enforcement actions several years ago. *See* Griset Decl. ¶¶ 2, 7–8. He explains that before he moved to Siskiyou County, he worked a farm in Merced County, California, where he provided well water from his farm to other farmers and property owners. *Id.*

1 ¶ 3.  He had never received a complaint or heard that what he was doing violated any zoning

2 laws, and he was doing essentially the same thing in Merced County that he was doing in

3 Siskiyou County: providing non-potable well water to other landowners.  *Id.* ¶¶ 3–4.  Griset also

4 claims the water he provided to local haulers in Siskiyou County "was only a small percentage of

5 the water that [he] pumped for use on [his] own crops."  *Id.* ¶ 4.  He believes the county took

6 interest in him at his neighbors' insistence and in response to the prevailing discriminatory views

7 about Asian-Americans in Siskiyou County.  *Id.* ¶ 5; *see also id.* Ex. A (declarations by other

8 county residents about Griset's water sales and nearby cannabis cultivation).

9       Plaintiffs also rely on a declaration by Gregory House, who has worked as an agricultural

10 consultant for more than forty years, House Decl. ¶ 1, ECF No. 83-3, to show the county's zoning

11 policy is outside the norm.  House is familiar "with farming practices throughout California,

12 livestock-husbandry practices throughout California, and the uses, conveyance, and transfer of

13 water for agricultural and rural-domestic purposes throughout California."  *Id.*  In his opinion, the

14 Siskiyou County zoning codes in question "are similar in intent and in content to counterpart

15 codes of agricultural and rural-residential districts of most if not all the various California

16 counties."  *Id.* ¶ 3.  He also believes "[i]t is common throughout California for water to be

17 diverted, conveyed, or transferred from a source location—that is, one parcel or property, such as

18 a groundwater well, stream, or reservoir—to a neighboring or distant point of use on another

19 parcel or property."  *Id.* ¶ 5.

20       Finally, plaintiffs offer a variety of evidence to show the county's recent efforts were

21 spurred at least in part by racial animus, such as descriptions of traffic stops that appear to have

22 been motivated at least in part by race, *see, e.g.*, Neng Vue Decl. ¶ 9; racially discriminatory and

23 dismissive comments by county officers and administrators, *see, e.g.*, Mathis Decl. ¶¶ 14, 18;

24 internal county correspondence that seems to equate Hmong or Chinese ancestry with lawlessness

25 and drug cartels, *see, e.g.*, Verner-Crist Decl. Exs. F, S, T; and racism among the county's

26 population at large, *see, e.g.*, Fitz Ya Decl. ¶¶ 14–16; Bill Yang Decl. ¶ 5; Verner-Crist Decl.

27 ¶¶ 21, 22.  County officials also appear to have gone out of their way to help non-Asian residents

1    obtain permits and avoid water shortages, including businesses who rely on water delivered from

2    other parcels.  *See* Verner-Crist Decl. Exs. C–E, ECF No. 83-13.

3           The county opposes all three of the pending motions, and briefing is complete.  *See*

4    *generally* Opp'n Suppl. Compl., ECF No. 87; Reply Suppl. Compl., ECF No. 89; Opp'n Prelim.

5    Inj., ECF No. 88; Reply Prelim. Inj., ECF No. 90; Opp'n Class Cert., ECF No. 86; Reply Class

6    Cert., ECF No. 91.  The court held a hearing on September 13, 2024.  *See* Hr'g Mins., ECF No.

7    93.  John Thomas Do, Grayce Zelphin, Stanley Yong, Emi Young, Megan Vees, Alison Wall and

8    Ellen Choi appeared for plaintiffs.  *Id.*  Richard Linkert, J. Scott Donald, Madison Simmons and

9    Elise Rice appeared for the county.  *Id.*

10   **II.    SUPPLEMENTAL COMPLAINT**

11          Plaintiffs first ask permission to file a supplemental complaint with allegations about the

12   county's more recent efforts to enforce its zoning ordinances.  *See generally* Mot. Suppl., ECF

13   No. 82.  Federal Rule of Civil Procedure 15(d) gives district courts discretion to permit

14   supplemental complaints about "any transaction, occurrence, or event that happened after the

15   date" of an original or amended complaint.   This rule is meant to avoid costs, delays, and wastes.

16   *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988).  The Ninth Circuit has held that a motion to file

17   a supplemental pleading "ought to be allowed as of course" absent specific reasons to the

18   contrary, such as the absence of any relationship between the new allegations and the original

19   action. *Id.* 473–74 (citation and quotation marks omitted).  In practice, federal courts apply the

20   same legal standard as they would in response to requests for permission to amend a complaint

21   under Rule 15(a), with a focus on any undue delay in proposing the supplement in question.  *See,*

22   *e.g.*, *Yates v. Auto City*, 299 F.R.D. 611, 613–14 (N.D. Cal. 2013).  Under that standard, courts

23   weigh five factors: "bad faith, undue delay, prejudice to the opposing party, futility of the

24   amendment, and whether the plaintiff has previously amended the complaint.'"  *Johnson v.*

25   *Buckley*, 356 F. 3d 1067, 1077 (9th Cir. 2004).

26          As summarized above, the plaintiffs' proposed supplemental complaint alleges the county

27   has continued to discriminate against Asian-Americans by enforcing zoning ordinances

28   unequally.  *See generally* Proposed Suppl. Compl., ECF No. 82-1.  They assert some of the same

13

1    legal claims as appear in the amended complaint on the docket.  *Compare, e.g.*, First Am. Compl.

2    ¶¶ 254–58 (alleging county deprived plaintiffs of equal protection in violation of Fourteenth

3    Amendment by passing discriminatory ordinances) *with, e.g.*, Proposed Suppl. Compl. ¶¶ 323–26

4    (alleging county zoning enforcement deprived plaintiffs of equal protection in violation of

5    Fourteenth Amendment by enforcing ordinances unequally).  There is an obvious and clear

6    relationship between their current allegations and the supplemental allegations they propose.  It

7    would be more efficient for all concerned for all of these claims to be resolved in one action

8    rather than two.  *See, e.g.*, *California v. U.S. Dep't of Lab.*, 155 F. Supp. 3d 1089, 1099 (E.D. Cal.

9    2016) (permitting plaintiff to file supplemental complaint contesting government agency's

10   "continuing and unjustified effort" in violation of same legal protections).  The court also

11   perceives no bad faith, undue delay or prejudice under the standard adapted from Rule 15(a)

12   amendment requests.

13         Nor can the court conclude the proposed supplemental claims are futile by that standard.

14   The county contends otherwise.  In its estimation, the plaintiffs have no stake in another person's

15   zoning dispute and therefore lack constitutional standing.  *See* Opp'n Suppl. Compl. at 4–5.  This

16   argument has some force.  These plaintiffs do not claim to own the land that was the subject of

17   the challenged zoning disputes.  Standing is "more difficult to establish" if, as in this case, "the

18   plaintiff is not himself the object of the government action or inaction he challenges," *Lujan v.*

19   *Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (citation and quotation marks omitted).  But courts

20   have concluded that plaintiffs in similar circumstances have standing to seek similar relief.  *See,*

21   *e.g.*, *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (holding "injury produced by determinative

22   or coercive effect upon the action of someone else" can support claim to federal jurisdiction);

23   *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 262–63 (1977) (finding

24   plaintiff had standing to challenge zoning decision based on non-economic, indirect injury).

25   Plaintiffs contend the county's recent zoning enforcement efforts have cut off their source of

26   water for their basic needs by coercing landowners and truck drivers to stop supplying water.

27   They have submitted evidence showing they could again rely on trucks and water haulers to bring

28   them water if the court enjoined the ordinances they now target.

1    The county's standing argument also rests on the implicit but mistaken assumption that

2    the plaintiffs' legal claims are, at their heart, about whether the county has authority to make land

3    use decisions.  *See, e.g.*, Opp'n Suppl. Compl. at 5 (denouncing plaintiffs' claims as an improper

4    attempt "to limit the County of Siskiyou's ability to regulate water use within the County limits").

5    The plaintiffs' claims are instead about how the county has employed those municipal powers.

6    They allege the county has enforced its ordinances in a discriminatory fashion and has brought

7    harm to them in violation of the Constitution and state law.

8    Finally, the county opposes the plaintiffs' request because, in its view, plaintiffs could

9    have challenged the zoning ordinances in their original complaint, but did not.  *See* Opp'n Suppl.

10   Compl. at 2–3.  This argument, while understandable, also is misdirected.  It is true the zoning

11   ordinances in question have been on the books for decades, and it is true the plaintiffs allege the

12   county enforced the same or similar zoning rules in the years leading up to this lawsuit.  *See, e.g.*,

13   Proposed Suppl. Compl. ¶¶ 300–01 (alleging county enforced ordinances against Griset in 2020).

14   Federal courts have acknowledged that "prejudice to the defendant, laches, or futility may weigh

15   against allowing a supplemental pleading."  *Yates*, 299 F.R.D. at 613.  But the thrust of plaintiffs'

16   motion and proposed supplement to the complaint is not to detail allegations or theories they

17   could and should have asserted sooner.  It is to add allegations about discriminatory enforcement

18   efforts after 2022, when this action was originally filed, and to avoid new harms.  *See, e.g.*,

19   Proposed Suppl. Compl. ¶¶ 304–18 (alleging discriminatory enforcement in 2023 and 2024).

20   The court grants the motion for leave to file a supplemental complaint.

21   **III.   CLASS CERTIFICATION**

22   Plaintiffs also ask the court to provisionally certify "a class of all Asian Americans who

23   reside or will reside within Siskiyou County without access to a residential well or municipal

24   water at their property."  Mot. Class Cert. at 1.  That request parallels the "Water Subclass"

25   proposed in the First Amended Complaint.  *See* First Am. Compl. ¶ 214 (proposing subclass of

26   "[a]ll Asian Americans who, since August 4, 2020, have resided or will reside within Siskiyou

27   County without access to well or municipal water at their property").  Plaintiffs emphasize they

28   are asking now for only "provisional class certification," i.e., an order that applies only to a

15

preliminary injunction, as opposed to a final injunction or judgment.  *See* Mot. Class Cert. at 1, 8.

They propose Russell Mathis as class representative and their current counsel as class counsel.

*See id.* at 7–8, 11.

The county opposes the plaintiffs' motion based primarily on its argument that plaintiffs

lack constitutional standing.  *See* Opp'n Class Cert. at 2–4.  As explained above, the court is

satisfied plaintiffs have constitutional standing to pursue their claims.  The county also urges the

court not to certify a class because the county has "had no opportunity to conduct discovery and

even investigate the claims" in the supplemental complaint.  *Id.* at 4.  The county does not

describe the discovery or the evidence it would seek in more than the most general terms.  *See id.*

The only subject the county identifies broadly in its request for discovery is the plaintiffs'

standing.  *See id.*  Courts often have rejected similarly imprecise arguments in opposition to a

plaintiff's request to certify a class on a provisional basis.  *See, e.g.*, *Carrillo v. Schneider

Logistics, Inc.*, No. 11-8557, 2012 WL 556309, at *9 (C.D. Cal. Jan. 31, 2012) (collecting

authority), *aff'd*, 501 F. App'x 713 (9th Cir. 2012) (unpublished).  The county can pursue the

discovery it needs as the case continues, regardless of whether the court provisionally certifies a

class.

Although the county makes only these limited objections, it is the plaintiffs' obligation to

"affirmatively demonstrate" compliance with the Federal Rules that govern class certification.

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).  A proposed class can be certified only

if the court is persuaded the class meets the requirements of Rule 23(a) and (b), and then only

after a "rigorous analysis."  *Id.* at 350–51 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147,

161 (1982)).  Rule 23(a) sets out four prerequisites for every class:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

/////

1
2

(4) the representative parties will fairly and adequately protect the
interests of the class.

3 Fed. R. Civ. P. 23(a).  Rule 23(b), in turn, defines the three types of classes the court may certify.

4 Plaintiffs propose a class under Rule 23(b)(2).  *See* Mot. Class Cert. at 11–12.  The proponent of a

5 Rule 23(b)(2) class must show "the party opposing the class has acted or refused to act on

6 grounds that apply generally to the class, so that the final injunctive relief or corresponding

7 declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).

8 Plaintiffs have not demonstrated their proposed class meets each of these requirements.

9 Their motion falls short in two respects.  The first is geographic.  The proposed class includes "all

10 Asian Americans who reside or will reside within Siskiyou County without access to a residential

11 well or municipal water at their property."  Mot. Class Cert. at 1.  But plaintiffs have not offered

12 evidence about putative class members who live throughout Siskiyou County.  Their evidence of

13 harms focuses on Shasta Vista.  Although they offer evidence showing Asian-Americans live in

14 other nearby communities, they do not cite evidence about water deprivations in those places, as

15 they do for Shasta Vista.  Plaintiffs also do not cite evidence to show Mr. Mathis has claims or

16 defenses typical of everyone who fits the class definition throughout Siskiyou County, as required

17 by Rule 23(a)(3).  Nor have plaintiffs demonstrated why Mr. Mathis would be a fair

18 representative of people who live in other parts of Siskiyou County, as required by Rule 23(a)(4).

19 The record similarly falls short of showing "the party opposing the class," i.e., the county,

20 has "acted or refused to act on grounds that apply generally" throughout its borders.  Fed. R. Civ.

21 P. 23(b)(2).  To the contrary, plaintiffs have argued the county has focused its enforcement efforts

22 on Shasta Vista in particular.  *See, e.g.*, Mem. Prelim. Inj. at 8 (describing how county's

23 enforcement effort "was originally only directed towards neighborhoods with high Asian

24 American populations" and "[e]nforcement focused only on Shasta Vista").

25 The second problem relates to water use.  The proposed class definition makes no

26 distinction between or among uses.  It would include people who use agricultural groundwater out

27 of necessity for their legitimate day-to-day needs.  It would also include people who irrigate

28 cannabis crops commercially in violation of federal, state and local laws and regulations, as

1    plaintiffs effectively conceded at hearing.  The county's defenses are different—and much

2    stronger—when it comes to claims by those who would employ an injunction to secure a reliable

3    supply of groundwater to irrigate an illicit commercial cannabis crop.  The record does not show

4    Mr. Mathis has claims or defenses in common with people who have or would use trucked

5    groundwater to irrigate an illicit cannabis crop.  *See* Fed. R. Civ. P. 23(a)(3).  He claims no

6    connection with or knowledge about those who cultivate marijuana illegally.  *See generally*

7    Mathis Decl., ECF No. 83-9.  Nor have plaintiffs explained why Mr. Mathis would fairly and

8    adequately represent people who have or would put groundwater to illicit uses.  *See* Fed. R. Civ.

9    P. 23(a)(4).

10           Rather than confronting or addressing illicit water uses, plaintiffs largely dismiss the

11   county's concerns about illicit marijuana cultivation.  Their motion for class certification does not

12   use the word "marijuana" at all.  It mentions cannabis only twice, and then only to assert the

13   county's concerns about cannabis were a pretext for discrimination.  *See* Mot. Class Cert. at 4.

14   They also have not offered any evidence to contradict the county's assertions and the record in

15   the related *Lo* case that people near Shasta Vista have used trucked groundwater to irrigate

16   cannabis on a commercial scale.  When the court addressed these questions to plaintiffs' counsel

17   at hearing, counsel argued the question went to the scope of the injunction rather than class

18   certification.  But by proposing a broad class under Rule 23(b)(2), and by requesting a broad

19   preliminary injunction that would effectively allow for the continued use of water for illicit

20   purposes, the question is one the court must consider when asked to approve class certification.

21           For similar reasons, plaintiffs have not proven the county has "acted or refused to act on

22   grounds that apply generally" to everyone, regardless of intended water use, as required to certify

23   a class under Rule 23(b)(2).  Rather, the opposite seems to be true.  The county has attempted to

24   bring a halt to illicit marijuana cultivation within its borders for years, and it has argued

25   stringently, though not always persuasively, that its ordinances allow people to transport potable

26   water for their day-to-day needs.  *See, e.g.*, Opp'n Prelim. Inj. at 1 ("The Plaintiffs and putative

27   class members . . . derive potable water, typically in bottle form, from legitimate sources that are

28   not impacted by any ordinance including the subject zoning ordinance."); *Lo*, 558 F. Supp. 3d at

1   862 (reviewing evidence related to potable water use and transportation).  The county has drawn

2   similar distinctions between the quantities of water necessary to irrigate a cannabis crops and the

3   quantity necessary for the day-to-day needs of an average rural user.  *See, e.g.*, Opp'n Prelim. Inj.

4   at 4 (citing Dean Decl., ECF No. 88-15).

5          In sum, an injunction granted on behalf of the proposed class "as a whole" under Rule

6   23(b)(2) would cover both those who have used and will use trucked groundwater for legitimate

7   purposes, such as raising animals and bathing, and those who have used or will use trucked

8   groundwater to irrigate illicit cannabis crops.  The proposed injunction and class also would cover

9   all of the county's expansive territory.  Plaintiffs have not justified a class-wide injunction barring

10  the county from keeping groundwater away from illicit cannabis operations, no matter where they

11  might be found within Siskiyou County.

12         The court denies the motion for provisional class certification, without prejudice to

13  renewal.[3]

14  **IV.    PRELIMINARY INJUNCTIVE RELIEF**

15         To obtain a preliminary injunction, plaintiffs must establish four things "by a clear

16  showing": they are "likely to succeed on the merits," they are "likely to suffer irreparable harm in

17  the absence of preliminary relief," "the balance of equities tips in [their] favor," and "an

18  injunction is in the public interest."  *City & County of San Francisco v. U.S. Citizenship &*

19  *Immigr. Servs.*, 944 F.3d 773, 788–89 (9th Cir. 2019) (emphasis omitted) (first quoting *Mazurek*

20  *v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam), then quoting *Winter v. Nat. Res. Def.*

21  *Council, Inc.*, 555 U.S. 7, 20 (2008)).  "Alternatively, 'serious questions going to the merits and a

22  balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

23  injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and

24  that the injunction is in the public interest.'"  *Id.* at 789 (quoting *All. for the Wild Rockies v.*

25  *Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011)).  District courts within the Ninth Circuit must

---

[3] At hearing the county requested additional discovery related to class certification. Subject to this court's advance meet and confer requirements, the county may seek that discovery in anticipation of a renewed motion for class certification.

1    consider whether plaintiffs are likely to succeed on the merits of any constitutional claims they

2    assert. *See Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023); *contra Del. State Sportsmen's*

3    *Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024).  The

4    court begins with that question.

5           Plaintiffs contend they are likely to succeed on the merits for two basic reasons.  First,

6    they contend the county has enforced its ordinances in a discriminatory fashion in violation of the

7    Fourteenth Amendment's Equal Protection Clause.  *See* Mot. Prelim. Inj. at 12–15.  Their

8    statutory claim under California law rests on essentially the same reasoning.  *See id.* at 15–16.

9    Second, they contend the county has subjected them to a danger they would not otherwise have

10   faced in violation of the Fourteenth Amendment's Due Process Clause.  *See id.* at 16–19.  In

11   response, the county argues plaintiffs lack standing—incorrectly, as explained above.  *See* Opp'n

12   Prelim. Inj. at 6–7.  The county also contends the proposed injunction is overbroad, *see id.* at 7–8,

13   and it disputes plaintiffs' claims of discrimination, *id.* at 8–16.  But it does not dispute plaintiffs'

14   claim that the county's recent zoning enforcement actions have unconstitutionally subjected them

15   to dangers they would not otherwise have faced.

16          In this district, as in others, the failure to respond to an argument is a waiver of any

17   opposition to that argument.  *See, e.g.*, *Weekly. v. United States*, No. 22-00341, 2023 WL

18   6796428, at *5 & n.6 (E.D. Cal. Oct. 13, 2023) (collecting authority).  Courts within this district

19   have understood its local rules similarly, as barring a litigant from making an argument at a

20   hearing if it did not raise that argument in its opposition brief.  *See, e.g.*, *Abdali v. Agiliti Surgical,*

21   *Inc.*, No. 19-02362, 2020 WL 5642355, at *3 (E.D. Cal. Sept. 22, 2020) (citing E.D. Cal. L.R.

22   230(c)).  The failure to make an argument can even be construed as a silent concession that the

23   opposing party is correct.  *See, e.g.*, *Ardente, Inc. v. Shanley*, No. 07-4479, 2010 WL 546485, at

24   *6 (N.D. Cal. Feb. 9, 2010).  This rule commonly leads to not only to the rejection of the omitted

25   arguments, but even the outright dismissal of any claims that go unmentioned in an opposition

26   brief.  *See, e.g.*, *Doe v. Ritz-Carlton Hotel Co., L.L.C.*, No. 23-05218, 2024 WL 2059087, at *2

27   (N.D. Cal. May 7, 2024) (citing *Namisnak v. Uber Techs., Inc.*, 444 F. Supp. 3d 1136, 1146 (N.D.

28   Cal. 2020) and *Ardente*, 2010 WL 546485, at *6).

1    Despite the county's silence about the plaintiffs' potential success on their Due Process

2    claim, it is still the plaintiffs' burden to prove they are "likely to succeed on the merits." *Winter*,

3    555 U.S. at 20.  Plaintiffs have shown they are likely to succeed on at least one of their claims.

4    The court begins with the Due Process Clause, as the record supports their due process

5    claim clearly.  The Fourteenth Amendment Due Process Clause prohibits state government bodies

6    from depriving "any person of life, liberty, or property, without due process of law."  U.S. Const.

7    amend. XIV, § 1.  This language demands fair procedures by its own terms, but it also bars some

8    government actions outright, "regardless of the fairness of the procedures used to implement

9    them."  *Daniels v. Williams*, 474 U.S. 327, 665 (1986) (citing *Rochin v. California*, 342 U.S. 165

10   (1952)).  This "substantive" protection prevents "government power from being 'used for

11   purposes of oppression.'"  *Id.* (quoting *Murray's Les v. Hoboken Land & Improvement Co.*,

12   18 How. (59 U.S.) 272, 277 (1856)).

13   The substantive protection does not generally impose an affirmative duty on governments

14   to protect their citizens' lives, liberty, and property from all harms.  *See DeShaney v. Winnebago*

15   *Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989).  But several federal courts of appeals

16   have held government actors violate the Fourteenth Amendment if, through deliberate

17   indifference, they take affirmative actions exposing a person to a danger that person would not

18   otherwise have faced.  *See Pauluk v. Savage*, 836 F.3d 1117, 1122 (9th Cir. 2016) (collecting

19   authority).  For example, a police officer could be liable under the Due Process Clause if he

20   pulled a woman over in the dead of night and left her alone in a dangerous place where she was

21   later attacked.  *See Wood v. Ostrander*, 879 F.2d 583, 596 (1989).  A government might also face

22   liability under this deliberate indifference rule if it assigned one of its employees to a building

23   known to be infested with toxic mold, then repeatedly denied requests for a transfer.  *See Pauluk*,

24   836 F.3d at 1119, 1124–25.

25   This interpretation of the Due Process Clause, usually cited in shorthand as the "state-

26   created-danger doctrine," is normally applied using a two-part legal test.  First, plaintiffs must

27   allege and ultimately prove "affirmative conduct on the part of the state" that exposed them to "an

28   actual, particularized danger" they would not otherwise have faced.  *Polanco v. Diaz*, 76 F.4th

1    918, 926 (2023) (first quoting *Patel v. Kent Sch. Dist.*, 648 F.3d 965, 974 (9th Cir. 2011), then

2    quoting *Martinez v. City of Clovis*, 943 F.3d 1260, 1271 (9th Cir. 2019)).  That is, the defendants'

3    actions must have put the plaintiffs in a "worse position" than they would have been if the

4    defendants had done nothing, *id.* (quoting *Pauluk*, 836 F.3d at 1124), and the resulting harm must

5    have been "foreseeable," the danger "known or obvious."  *Id.* (quoting *Martinez*, 943 F.3d at

6    1271).  Second, plaintiffs must allege and ultimately prove the defendants "acted with 'deliberate

7    indifference'" to the danger.  *Id.* (quoting *Martinez*, 942 F.3d at 1271).  In this context,

8    "deliberate indifference" refers to a state of mind that includes both the recognition of an

9    "unreasonable risk" and the intent to expose the plaintiffs to that unreasonable risk.  *Id.* at 928

10   (quoting *Herrera v. L.A. Unified Sch. Dist.*, 18 F.4th 1156, 1160–61 (9th Cir. 2021)).

11          The record shows the plaintiffs are likely to pass this two-part test.  First, the county took

12   affirmative action by enforcing its zoning ordinances against well owners who have sold or

13   donated pumped well water to people on other properties.  These affirmative actions have

14   compelled both landowners and truck drivers to stop offering water to people in Shasta Vista.

15   The plaintiffs have offered unrebutted evidence to show people will go without a reliable source

16   of sufficient water if they cannot rely on water delivered by truck.  There is no question whether

17   people are in a worse position as a result of the county's actions.  They are.  It is also clear these

18   people would not otherwise have faced these dangers if the county had not enforced its zoning

19   ordinances as it has.

20          Second, plaintiffs have shown the danger was obvious and foreseeable to county officials,

21   and perhaps even the result they specifically intended.  This is the second case about the effects of

22   the county's efforts to cut off water to illegal cannabis cultivation, the second time it has used

23   ordinances to achieve its goals, and the second time people in Shasta Vista have come to this

24   court with claims that the county's enforcement efforts have deprived people of the water they

25   need to cook, bathe, fight fires and raise plants and animals.  *See Lo*, 558 F. Supp. 3d at 861–64,

26   869–72.  One of the plaintiffs, proposed class representative Russell Mathis, also has claimed

27   without contradiction that he spoke with Siskiyou County Supervisor Ed Valenzuela "to complain

28   about the County's water ordinances" in 2021.  Mathis Decl. ¶ 18.  He states that in response, also

1    without contradiction, that Valenzuela said he would not provide water, did not care whether

2    Mathis had water, and did not care what Mathis thought about water access. *Id.*  Nor does the

3    county dispute the evidence showing its employees have refused to change zoning designations or

4    even accept applications to change zoning designations.  It does not dispute it also has denied or

5    ignored applications for permits to drill wells on parcels in Shasta Vista.

6          For these reasons, plaintiffs have shown they are likely to succeed in proving the county

7    has affirmatively subjected them to dangers they would not otherwise have faced, in violation of

8    the Due Process Clause of the Fourteenth Amendment.

9          Beyond this due process claim, plaintiffs contend they are likely to succeed in proving the

10   county violated the Equal Protection Clause as well.  As this court explained in the related *Lo*

11   action, and as plaintiffs recognize in their motion, the success of such an equal protection claim

12   depends on "a sensitive inquiry into such circumstantial and direct evidence of intent as may be

13   available." *Lo*, 588 F. Supp. 3d at 869 (quoting *Arlington Heights*, 429 U.S. at 266); *see also*

14   Mem. Prelim. Inj. at 13–15.  A court must consider, for example, the "historical background" of

15   the decision, any "pattern of official racial discrimination," the "specific sequence of events

16   leading up to the challenged decision," any "[d]epartures from the normal procedural sequence"

17   or "[s]ubstantive departures," and even "[t]he legislative or administrative history" behind the

18   challenged decision. *Lo*, 588 F. Supp. 3d at 869 (quoting *Arlington Heights*, 429 U.S. at 266–68

19   & n.14).

20         In the *Lo* case, conflicting evidence prevented this court from finding the plaintiffs were

21   likely to succeed in proving the county discriminated on the basis of race.  The plaintiffs raised

22   only "serious questions" about the county's motivations. *See id.* at 870–71.  The evidence in this

23   case is similarly conflicting, if not more so, given the passage of time since the county first began

24   using local ordinances to combat marijuana cultivation in 2020 and the wider scope of the

25   plaintiffs' legal claims.  Because the record permits no firm conclusions about the county's

26   intentions, and because plaintiffs are likely to succeed in their claim that the county's actions

27   deprived them of due process, the court declines to consider at this stage whether plaintiffs are

1    also likely to succeed in their claims under the Equal Protection Clause and under state statutory

2    law.

3          As for the remaining three requirements—irreparable harm, balance of harms, and the

4    public interest—the county again offered no argument at all, neither in its briefing nor at hearing.

5    It does not disagree plaintiffs are likely to suffer irreparable harms in the absence of a preliminary

6    injunction.  Without water transported by truck, plaintiffs may go without water for cooking,

7    bathing, cleaning and raising plants and animals.  A preliminary injunction will, once again, "not

8    come without costs," but an injunction will serve the public interest and appropriately balance the

9    relevant harms.  *Lo*, 558 F. Supp. 3d at 871–72.  The county may still rely on the criminal law and

10   its land use ordinances to combat illegal marijuana cultivation directly.  *See id.* at 872.  "People

11   may continue to live in unpermitted and dangerous structures, but if so, the county has zoning

12   codes and land use regulations it may enforce, and it can remediate violations and help people

13   avoid danger."  *Id.*

14         The court grants the motion for a preliminary injunction.

15   **V.    TERMS OF THE INJUNCTION**

16         Having determined plaintiffs are entitled to preliminary injunctive relief, the court must

17   set the terms of that injunction.  Plaintiffs propose a broad preliminary injunction barring the

18   county from enforcing its zoning ordinances "to prevent the transfer of water off parcel."  Prop.

19   Order at 1, ECF No. 83-25.  They also ask the court to enjoin the county from "otherwise

20   preventing access to water for lawful domestic, health, and safety needs."  *Id.*  This stricture

21   would enjoin "investigating, citing, fining, issuing notices to comply, declaring a public nuisance

22   for noncompliance, pursuing litigation, collecting fines, enforcing judgments and settlements, and

23   threatening enforcement."  *Id.*  Plaintiffs also propose three reporting and monitoring

24   requirements: (1) a report "regarding the steps Defendants are taking to ensure compliance,"

25   (2) sworn monthly certifications of compliance "from the head of Community development, the

26   District Attorney and the Sheriff," and (3) notifications of "any code citations or notices to

27   comply . . . related to water use or transfer; well permit applications and decisions; and stop of a

28   water truck within 7 days of the date of the citation, notice, application, or stop."  *Id.* at 2.  The

1    county contends such an injunction would be overbroad because it would compel action by the

2    district attorneys' office, which in its view is a state office, not a local office.  *See* Opp'n Prelim.

3    Inj. at 8.  The county does not address the remainder of the plaintiffs' proposal.

4          The court cannot conclude an injunction on the terms plaintiffs propose is warranted on

5    the current record and therefore directs supplemental briefing before issuing the preliminary

6    injunction it is prepared to approve.  To clarify the proper scope of the injunction here, the court

7    reviews below the relevant legal principles and summarizes the court's tentative conclusions.

8          "Crafting a preliminary injunction is an exercise of discretion and judgment, often

9    dependent as much on the equities of a given case as the substance of the legal issues it presents."

10   *Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 579 (2017) (per curiam).  And although

11   "injunctive relief generally should be limited to apply only to named plaintiffs where there is no

12   class certification, 'an injunction is not necessarily made overbroad by extending benefit or

13   protection to persons other than prevailing parties in the lawsuit—even if it is not a class action—

14   if such breadth is necessary to give prevailing parties the relief to which they are entitled."

15   *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501–02 (9th Cir. 1996) (emphasis

16   omitted) (quoting *Bresgal v. Brock*, 843 F.2d 1163, 1170–71 (9th Cir. 1987)) (other citations

17   omitted).

18         Under Rule 65, "[t]he court may issue a preliminary injunction or a temporary restraining

19   order only if the movant gives security in an amount the court considers proper to pay the costs

20   and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed.

21   R. Civ. P. 65(c).  The purpose of this requirement is to safeguard a defendant if the court later

22   determines that defendant has been wrongfully enjoined.  *See Moroccanoil, Inc. v. Zotos Intl.,*

23   *Inc.*, 230 F. Supp. 3d 1161, 1179 (C.D. Cal. 2017).  The amount of the security required is within

24   the district court's discretion.  *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009).  "[T]he

25   bond amount may be zero if there is no evidence the party will suffer damages from the

26   injunction."  *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir.

27   2003).  Potential harms to the government's interest may require plaintiffs to post security under

28   this rule.  *See, e.g.*, *Westlands Water Dist. v. U.S. Dep't of Interior*, No. 00-7124, 2001 WL

1    34094077, at *20 (E.D. Cal. Mar. 22, 2001) (requiring plaintiffs to post security to avoid "the

2    possible, but compensable, harm the government may suffer from erroneous issuance of a

3    preliminary injunction").

4              Preliminary injunctions are ordinarily intended "merely to preserve the relative positions

5    of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390,

6    395 (1981). When a plaintiff asks to change the status quo rather than preserve it, district courts

7    exercise greater caution. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

8    To obtain an injunction that instructs an opposing party to change its behavior, thus altering the

9    status quo, a plaintiff must show "extreme or very serious damage" will occur unless the

10   requested injunction is granted. *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (quoting

11   *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)).

12             Under these principles, and based on a review of the current record, the court has reached

13   the following five tentative conclusions about the scope of an appropriate preliminary injunction

14   in this matter:

15             *First*, the court tentatively concludes this is a case of potentially "extreme" and "very

16   serious damage" in which a mandatory injunction is likely necessary to ensure people have water

17   for their basic needs.

18             *Second*, the court tentatively concludes a broad injunction that benefits more than just the

19   plaintiffs is necessary to avoid the irreparable harms described above, just as it was in the *Lo*

20   action. *See* 558 F. Supp. 3d at 872 (broadly enjoying enforcement of disputed ordinances). It is

21   likely impossible as a practical matter to offer relief to the plaintiffs and no one else; the court

22   cannot equitably order plaintiffs, for example, to withhold water from family, friends and

23   neighbors in need. But the court will not bar the county from using the legitimate tools at its

24   disposal to keep groundwater from being used for illicit cannabis operations, or from enforcing

25   the law in other parts of its territory. The injunction likely must be limited to the places in

26   Siskiyou County where plaintiffs live and to the quantities of water needed for daily living and

27   plaintiffs' demonstrated needs.

1    *Third*, the court tentatively declines to grant injunctive relief related to fire protection and

2    firefighting unless necessary to permit plaintiffs to follow specific directives by fire officials.

3    Plaintiffs have offered extensive and uncontradicted evidence showing they previously have

4    relied on water trucks to fight fires in Shasta Vista.  They do not dispute, however, that

5    professional or governmental fire protection services can and do reach properties in Shasta Vista

6    within thirty minutes.  *See, e.g.*, Vang Khang Decl. ¶ 8.  The court cannot conclude on this record

7    that a thirty-minute response time is so long that injunctive relief is necessary to prevent

8    irreparable harm.  Plaintiffs have offered no evidence to show, for example, that response times

9    are shorter in other parts of Siskiyou County or California at large.  Nor have they shown other

10   communities in the county or in California rely on similar informal firefighting efforts.  This kind

11   of evidence would be necessary to support a broader injunction related to firefighting.  Water in

12   the quantities that would be necessary to supply an informal firefighting effort could also be used

13   for purposes unrelated to fire protection and unrelated to the irreparable harms identified in this

14   order.  Any preliminary injunction related to firefighting would need to be tailored to avoid

15   improper water uses.

16   *Fourth*, the court lacks evidence to conclude whether injunctive relief related to gardening

17   is necessary to avoid irreparable harm.  More evidence of this type would be necessary to support

18   a preliminary injunction related to gardening.  In addition, water in the quantities that would be

19   necessary to supply a garden or a similar small-scale agricultural enterprise could also be used for

20   purposes unrelated to the irreparable harms identified in this order.   Any preliminary injunction

21   related to gardening would need to be tailored to avoid improper water uses.

22   *Fifth*, as confirmed at hearing, the parties have not briefed the amount of an appropriate

23   bond under Rule 65(c).  The court cannot currently conclude "there is no evidence [the county]

24   will suffer damages from the injunction." *Conn. Gen. Life, Ins.*, 321 F. 3d at 992.  At hearing, for

25   example, the county argued it would be forced to remediate environmental and other harms if it

26   cannot enforce its ordinances.  Those harms could be costly to repair or remediate.

Based on these five tentative conclusions, a preliminary injunction along the following lines appears likely to be appropriate in this matter, assuming plaintiffs offer the necessary evidentiary support related to firefighting and lawful gardening:

1. Siskiyou County and its agents, employees, representatives, successors, assigns, and anyone or entity that acts on its behalf is enjoined from enforcing Title 10, Chapter 6 of the Siskiyou County Code and any other law or regulation to prevent the transfer of water, for the purposes in paragraph 2(a) below, to residents of parcels in the Mount Shasta Vista Subdivision that lack a residential well or a municipal water source, i.e., the "Injunction Parcels."

2. The injunction in paragraph 1 above will remain in place until any of the following events occurs, whichever is first:

   (a) Defendants demonstrate (i) residents of the Injunction Parcels have an adequate interim source or sources of water for drinking, cooking, bathing, caring for pets, raising domestic animals, firefighting as ordered by local fire officials, lawful gardening and other similar day-to-day personal necessities and (ii) the interim source or sources will remain available while this action is pending; or

   (b) Judgment is entered in defendants' favor on plaintiffs' claim of a "state-created danger" under the Due Process Clause of the Fourteenth Amendment; or

   (c) This court otherwise lifts or modifies the injunction in paragraph 1.

3. The assigned Magistrate Judge is appointed to act as a Special Master with authority under Federal Rule of Civil Procedure 53(a)(1) to determine whether residents of the Injunction Parcels have adequate interim sources of water for drinking, cooking, bathing, caring for pets, raising domestic animals, firefighting as ordered by local fire officials, lawful gardening and other similar day-to-day personal necessities under paragraph 2(a) above.

## VI.   CONCLUSION

The court **grants** plaintiffs' motion for leave to file a supplemental complaint (ECF No. 82). Plaintiffs are directed to file their proposed supplemental complaint **within seven days**. The court **denies without prejudice to renewal** plaintiffs' motion for provisional class certification

1    (ECF No. 84).  The court **grants in part** plaintiffs' motion for a preliminary injunction (ECF No.

2    83), with the terms of the preliminary injunction to be set in a future order.

3          **Within fourteen days**, the parties are directed to submit simultaneous supplemental briefs

4    of no more than ten pages discussing (1) the five tentative conclusions in the previous section

5    (2) any objections to the terms of the tentative preliminary injunction in the previous section and

6    (3) the amount of the bond this court should require under Rule 65(c).

7          IT IS SO ORDERED.

8    DATED:  October 24, 2024.

_____
SENIOR UNITED STATES DISTRICT JUDGE