**SPINELLI, DONALD, & NOTT**
A Professional Corporation
J. SCOTT DONALD (SBN: 158338)
300 University Avenue, Suite 100
Sacramento, CA 95825
Telephone: (916) 448-7888
Facsimile: (916) 448-6888
Email: scottd@sdnlaw.com

Law Offices of
**MATHENY SEARS LINKERT & JAIME LLP**
RICHARD S. LINKERT, ESQ. (SBN 88756)
MADISON M. SIMMONS, ESQ. (SBN 292185)
3638 American River Drive
Sacramento, California 95864
Telephone:    (916) 978-3434
Facsimile:    (916) 978-3430
Email: rlinkert@mathenysears.com
            msimmons@mathenysears.com

*Exempt from filing fees per Gov. Code § 6103*

Attorneys for DEFENDANT COUNTY OF SISKIYOU AND
JEREMIAH LARUE, in his official capacity as Sheriff

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFONIA

| | |
|---|---|
| GER CHONG ZE CHANG, MAI NOU VANG, RUSSELL MATHIS, YING SUSANNA VA, and all other similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SISKIYOU and JEREMIAH LARUE, in his official capacity as Sheriff<br><br>Defendant. | Case No.: 2:22-cv-01378-KJM-AC<br><br><br><br>**DECLARATION OF SISKIYOU COUNTY COMMUNITY DEVELOPMENT DIRECTOR RICK DEAN IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br><br>ACTION FILED: AUGUST 3, 2022<br>TRIAL DATE:    TBD |

1

SPINELLI, DONALD
& NOTT

*DECLARATION OF SISKIYOU COUNTY COMMUNITY DEVELOPMENT DIRECTOR RICK DEAN IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION*

I, Rick Dean, declare as follows:

1.      I am currently employed as the Community Development Director for the County of Siskiyou. I have been in this role since February of 2020 and my job calls for the management of the Environmental Health, Planning, and Building Divisions of the Community Development Department. Prior and concurrently to my current position, I was employed by the County of Siskiyou as the Deputy Director of Environmental Health, from July 2017 to 2022, in which I managed the Consumer Protection, Waste Management and Land-use Divisions of the Environmental Health Division. From 2005-2017 I held the position of Waste Management Unit Manager, in which I managed the CUPA, solid waste and medical waste programs. Culmination of my career with the County of Siskiyou as a registered environmental health specialist of near 31 years, began 1993. If called as a witness, I could and would testify competently to the facts stated herein.

2.      The Community Development Department is made up of three divisions: Planning, Building, and Environmental Health. The Code Enforcement unit is part of the Planning Division, and it is responsible for investigating potential Siskiyou County Code violations.

3.      Safe and legal habitation in the state of California requires permitted dwelling units to have a permanent potable water supply for drinking and bathing. The source of this supply for new dwellings cannot be water transported by water hauler, bottled water, a water-vending machine, or a retail water facility. California Water Code §10608.12(x) defines potable water as "water that is suitable for human consumption." Human consumption "means the use of water for drinking, bathing or showering, hand washing, oral hygiene, or cooking, including, but not limited to, preparing food and washing dishes." (Cal. Health & Safety Code §116275.) Non-potable water, such as the water pumped from off-site parcels and trucked into MSV, is not suitable for human consumption. The water being trucked in is not tested or treated for potential contaminants that may cause health risks if ingested or utilized for external use such as bathing by humans.

4.      California Water Code § 106.3 states that Californians have a right to clean drinking water, but subsection (c) explains that this right to clean water does not expand the County's duty to

2

1 "provide water or require the expenditure of additional resources to develop water infrastructure."

2 California Health and Safety Code § 116270 also stands for the proposition that residents of

3 California have the right to clean water but only requires the County to ensure that water delivered

4 by *public water systems* is clean, leaving the private delivery system of known non-potable water

5 unregulated regarding the safety of the water. Siskiyou County does not provide a public water

6 system. The California Department of Public Health licenses and regulates private water source

7 operators and private water haulers that provide hauled, vended, or bottled potable water.

8      5.      For water to be considered potable as defined by California Health and Safety Code

9 Section 113869, a water and delivery truck must be specifically maintained and licensed. *See* Cal.

10 Health & Safety Code § 111120(c) ("It shall be unlawful for any person to bottle, collect, treat,

11 hold, distribute, haul, vend, or sell bottled water, vended water, operate a retail water facility, or

12 operate a private water source without the license as required by this article."); Cal. Health & Safety

13 Code § 111080(a) ("Bottled water and vended water shall meet all maximum contaminant levels set

14 for public drinking water that the department determines are necessary or appropriate so that bottled

15 water may present no adverse effect on public health.") Cal. Health & Safety Code § 111145(a)

16 ("The department shall require each bottler, distributor, or vendor of bottled water, each owner or

17 operator of any water-vending machine, each water hauler, each retail water facility operator, each

18 private water source operator, and each applicant for a license, to test for all substances necessary to

19 establish conformance to standards adopted pursuant to Section 111080.").

20      6.      The California Health and Safety Code requires potable water haulers to get a Water

21 Hauler's License from the Department of Public Health, Food and Drug Branch (FDB). To insure

22 that delivered potable water remains potable for human use, the receiving vessel for the end user

23 must also be maintained enclosed, clean and sanitized for that purpose. Typical water tanks that can

24 be purchased at tractor supply and farm supply stores are commonly used to store this type of water.

25 Open pools do not meet the standard for potable water storage and may not be used for that

26 purpose.

27      7.      There are several private companies located in Siskiyou County and surrounding

28

3

*DECLARATION OF SISKIYOU COUNTY COMMUNITY DEVELOPMENT DIRECTOR RICK DEAN IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION*

1   regions that actively provide potable water and delivery services to customers within the County.

2       8.      Siskiyou County has adopted a permissive zoning ordinance. This means that if a

3   use is not expressly called out in a zoning district it is prohibited. Siskiyou County Code, § 10-

4   6.203(a) (prohibiting "any land, building, or premises be used, designated, or intended to be used

5   for any purpose or in any manner other than is included among the uses listed as permitted in the

6   district in which such building, land, or premises are located.") The Siskiyou County Code

7   Enforcement unit investigates potential violations of the Siskiyou County Zoning Ordinance. In

8   2020, code enforcement was confronted by conditions heretofore unseen in the County related to

9   the operation of water fills stations with a high volume of water tenders. Initial code enforcement

10  investigations of water fill stations operating in zoning districts not authorized for that use was

11  focused on the most egregious violators in terms of the impact the zoning violation was having on

12  the surrounding neighborhood and the intensity of the use associated with the violation, for example

13  the scale of the groundwater distribution operations, including the volume of truck activity and

14  extended operational hours into the night. Based on code enforcement investigations and neighbor

15  reports of wells running dry and harm from substantial trucking occurring in their areas, the initial

16  focus was on Mr. Griset, Mr. Spencer and Mr. Sousa.

17      9.      Groundwater is an essential resource in Siskiyou County, including in the Shasta

18  Valley groundwater basin, which is a medium priority basin under the Sustainable Groundwater

19  Management Act. Due to local drought conditions, average climate, and other factors, the County

20  and other local and state agencies with shared jurisdiction strive to sustainably manage groundwater

21  resources to ensure its availability for legal beneficial use by agricultural, residential, industrial,

22  municipal, and ecological users. This is consistent with the "policy of the state that groundwater

23  resources be managed sustainably for long-term reliability and multiple economic, social, and

24  environmental benefits for current and future beneficial uses. Sustainable groundwater management

25  is best achieved locally through the development, implementation, and updating of plans and

26  programs based on the best available science." Cal. Water Code § 113.

27      10.     The ongoing water conditions in Siskiyou County and the Shasta Valley watershed

28

4

SPINELLI, DONALD
& NOTT

*DECLARATION OF SISKIYOU COUNTY COMMUNITY DEVELOPMENT DIRECTOR RICK DEAN IN SUPPORT
OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION*

1 are not just a matter of County concern. The availability of groundwater as well as protection of the

2 groundwater basins and interconnected surface waters in and around Siskiyou County are a matter

3 of State (State Water Resources Control Board, Central Valley and North Coast Regional Water

4 Quality Control Boards, California Department of Fish and Wildlife, Department of Water

5 Resources) and Federal (National Oceanic and Atmospheric Administration) concern as well.

6 Attached hereto as Exhibit A is a list of the properties in the Shasta Valley watershed most recently

7 curtailed from diverting groundwater or surface water by the California State Water Resources

8 Control Board under its Emergency Regulations. Attached hereto as Exhibit B is a list of the

9 properties most recently curtailed by the California State Water Resources Control Board under

10 Emergency Regulations. Attached hereto as Exhibit C is a true and correct copy of the 2023

11 readoption of the State Water Resource Control Board's Emergency Regulations, Article 23.5. Scott

12 River and Shasta River Watersheds Drought Emergency Regulations, Article 23.5. Scott River and

13 Shasta River Watersheds Drought Emergency Requirements § 875 Emergency Curtailment Where

14 Insufficient Flows are Available to Protect Fish in Certain Watersheds.

15      11.    Per the complaints of wells going dry, it has been the experience in the County that

16 when a landowner extracts substantial amounts of water from a well, other overlying water rights

17 holders in same groundwater basin feel the detrimental effects.

18      12.    When the multitudes of illegal cannabis operations began to operate in Siskiyou

19 County, it became clear that these operations were obtaining non-potable water from landowners

20 within Siskiyou County based on the observations of the Code Enforcement unit observing water

21 trucks being filled up directly from agricultural wells and such trucks being used to fill swimming

22 pools, and other large water containers, with connecting pipes to illegal cannabis operations.

23 Attached hereto as Exhibit D is a true and correct copy of the data collected in May of 2023 and

24 compiled in the County's Geographic Information System demonstrating the proliferation of illegal

25 cannabis in concentrated areas, particularly in Mt. Shasta Vista.

26      13.    Any vegetable gardens that plaintiffs may have for subsistence are largely limited to

27 gardens of 10 ft. x 10 ft. in size or less. Attached hereto as Exhibit E are true and correct copies of

28

SPINELLI, DONALD
& NOTT

*DECLARATION OF SISKIYOU COUNTY COMMUNITY DEVELOPMENT DIRECTOR RICK DEAN IN SUPPORT
OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION*

PowerPoint slides with explanations and photographs of observed gardens on illegal cannabis cultivation sites.

14. The continued extraction of agricultural groundwater will result in the need for increasing degrees of remediation as the cultivation of illegal cannabis spreads and continues to apply illegal and dangerous pesticides that jeopardize the groundwater aquifer and firefighters. *See* Decl. of Shane Lauderdale

15. Quantifying environmental cleanup costs for illegal cannabis grows is difficult to assess as there are many site-specific factors, such as terrain, site accessibility, and trucking distances to approved disposal facilities for each identified waste stream. Accurate accounting of solid waste, hazardous materials, hazardous waste volumes, as well as pesticide and or hazardous waste contamination requires a professional consultant present on-site to differentiate and characterize waste classification for safe removal and proper disposal. Accurate property assessment is particularly difficult on illegal grow sites as Code Enforcement Officers can only enter properties with the standby support of Law Enforcement due to personal safety concerns given the nature of dangers associated with illegal cannabis cultivation. Additionally, commencement of cleanup activities would require additional cost to provide law enforcement security.

16. Often trash and other unknown materials are buried on-site in several locations on a single property, which increases the cost and safety factors to excavate for removal and proper disposal. Additionally, extensive sampling to meet disposal acceptance thresholds at receiving landfill facilities may be required. Ultimately cleanup and abatement of properties used for illegal cannabis cultivation and associated unpermitted occupancy would be determined by the actual cleanup cost billed by the successful bidding contractor.

17. However, there are some parallels that can be made to recent fire cleanup efforts that occurred in Siskiyou County in October 2024. There were eight (8) parcels totaling twenty-one (21) acres that were mitigated for debris removal at a cost of approximately $570,000 which equates to $71,250 per parcel or $27,143 per acre.

SPINELLI, DONALD & NOTT

*DECLARATION OF SISKIYOU COUNTY COMMUNITY DEVELOPMENT DIRECTOR RICK DEAN IN SUPPORT OF DEFENDANTS' SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION*

18.     Extrapolating this cost estimate County wide cost estimates based on the GIS site data conducted in May of 2023 and including cannabis cultivation site specific factors reveals a total cost per acre of $29,000. Attached hereto as Exhibit F is a true and correct estimation of the remediation cost for both the County wide and Mt. Shasta Vista Subdivision specifically, demonstrating remediation costs are dependent on the percentage of acreage that would require remediation and a factor in a range of input costs to account for any variability in the complexity of the clean-up effort.

19.     Remediation is a raw and imperfect measure of the costs associated with a preliminary injunction that will 1) allow water fill stations to operate in any zoning district in the unincorporated County in violation of its lawfully adopted zoning code, without any environmental review and without any limiting operational conditions beyond the identity of allowable customers, 2) facilitating the continuation of the delivery of non-potable water in aid of the illegal cannabis cultivation occurring in Siskiyou County. The waste and unreasonable use of water on illicit cannabis, which may be seized and destroyed, may reduce the water available to other beneficial users of groundwater in a basin, including in the Shasta Valley watershed where property owners have been subjected to groundwater pumping curtailment orders to ensure emergency minimum flows are met in the Shasta River for threatened aquatic species.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this was executed on this 22nd day of November, 2024 in Siskiyou County, California.

*Rick Dean*
_____
Rick Dean

# Exhibit A

**EXECUTIVE ORDER N-3-24**

**WHEREAS** on April 21, 2021, May 10, 2021, July 8, 2021, and October 19, 2021, I proclaimed States of Emergency to exist across all counties in the State due to drought conditions; and

**WHEREAS** the drought emergency has required a dynamic and flexible response from the State, and several provisions in my prior Proclamations and Orders have already been terminated or superseded; and

**WHEREAS** drought conditions have improved substantially, and lingering effects of the drought have largely abated in several areas of the California coast, Southern California, and the eastern Sierra Nevada; and

**WHEREAS** today I have therefore terminated the drought State of Emergency in the Counties of Imperial, Inyo, Los Angeles, Marin, Mendocino, Mono, Monterey, Orange, Riverside, San Bernardino, San Diego, San Francisco, San Luis Obispo, San Mateo, Santa Barbara, Santa Clara, Santa Cruz, Sonoma, and Ventura; and

**WHEREAS** the multi-year nature of this drought, which began three years after the record-setting drought of 2012-2016, continues to have ongoing, significant impacts on the Sacramento and San Joaquin River basins, the Tulare Lake basin, the Scott, Shasta, and Klamath River watersheds, and the Clear Lake watershed, which include many communities with vulnerable water supplies, farms that rely on irrigation to grow food and fiber, and fish and wildlife that rely on stream flows and cool water; and

**WHEREAS** improved conditions have helped rehabilitate surface water supplies, but have not eliminated the effects of the drought that remain in the Sacramento and San Joaquin River basins, the Tulare Lake basin, the Scott, Shasta, and Klamath River watersheds, and the Clear Lake watershed, and many groundwater basins remain depleted from overreliance and successive multi-year droughts; and

**WHEREAS** continued action by the State is needed to address ongoing consequences of the drought emergency in the Sacramento and San Joaquin River basins and the Klamath River and Clear Lake watersheds, including groundwater supply shortages, domestic well failures, and drought-related harm to native fishes; and

**WHEREAS** improved conditions even in the counties where the drought State of Emergency remains in effect warrant a more targeted State response, and certain provisions in my prior Proclamations and Orders provide authority that is no longer needed to mitigate the effects of the drought conditions, or direct actions by state agencies, departments, and boards that have already been completed; and

**WHEREAS** notwithstanding the rescission of certain emergency authorities for emergency drinking water action, state agencies have existing legal authority and funding to continue expedited work to advance the human right to water, and state agencies will continue all ongoing drought resilience

planning work, including through coordination with local agencies and tribes; and

**WHEREAS** the coming winter's hydrology is uncertain and the most efficient way to preserve the State's improved surface water supplies is for Californians to continue their ongoing efforts to make conservation a way of life; and

**WHEREAS** on March 1, March 8, March 12, March 14, March 28, April 20, May 15, and June 16, 2023, I proclaimed a State of Emergency to exist in 53 counties, cumulatively, as a result of a series of winter storms that initially struck California beginning in late February 2023; and

**WHEREAS** on March 31, 2023, and May 17, 2023, respectively, I issued Executive Orders N-6-23 and N-7-23 to further bolster the emergency response to the 2023 Late Winter Storms, particularly in the Tulare Lake Basin; and

**WHEREAS** improved conditions in the Tulare Lake Basin and other regions affected by the 2023 Late Winter Storms warrant a more targeted emergency response to the effects of those storms.

**NOW, THEREFORE, I, GAVIN NEWSOM,** Governor of the State of California, in accordance with the authority vested in me by the State Constitution and statutes, including the California Emergency Services Act, and in particular, Government Code sections 8567, 8571, and 8627, do hereby issue the following Order to become effective immediately:

**IT IS HEREBY ORDERED THAT:**

1. The orders and provisions contained in my State of Emergency Proclamations dated April 21, 2021; May 10, 2021; July 8, 2021; October 19, 2021; March 1, 2023; March 8, 2023; March 12, 2023; March 14, 2023; March 28, 2023; April 20, 2023; and May 15, 2023, and Executive Orders N-10-21 (July 8, 2021), N-7-22 (March 28, 2022), N-3-23 (February 13, 2023), N-4-23 (March 10, 2023), N-6-23 (March 31, 2023), and N-7-23 (May 17, 2023), remain in full force and effect, except as modified by those Proclamations and Orders, Executive Order N-5-23, my Proclamation Terminating the Drought States of Emergency in 19 counties dated today, and this Order. State agencies shall continue to implement all directions from those Proclamations and Orders and accelerate implementation where feasible.

2. The following provisions of my State of Emergency Proclamation dated May 10, 2021, are terminated:

   a. Paragraph 8; and
   b. Paragraphs 11–13.

3. The following provisions of my State of Emergency Proclamation dated October 19, 2021, are terminated:

   a. Paragraphs 6–7;
   b. Paragraph 9; and
   c. Paragraph 12.

4. The following provision of Executive Order N-10-21 is terminated:

   a. Paragraph 2.

5. The following provisions of Executive Order N-7-22 are terminated:

   a. Paragraph 4;
   b. Paragraphs 7–8; and
   c. Paragraph 10.

6. The following provisions of Executive Order N-3-23 are terminated:

   a. Paragraph 2; and
   b. Paragraphs 4–5, except to the extent that Paragraph 4
      withdraws Paragraph 9 of Executive Order N-7-22.

7. The following provisions of Executive Order N-4-23 are terminated:

   a. Paragraphs 2–7.

8. The following provisions of Executive Order N-6-23 are terminated:

   a. Paragraphs 7–10.

9. The following provisions of Executive Order N-7-23 are terminated:

   a. Paragraphs 2–11, except to the extent that they withdraw
      provisions of prior Executive Orders.

**IT IS FURTHER ORDERED** that as soon as hereafter possible, this Order be filed in the Office of the Secretary of State and that widespread publicity and notice be given of this Order.

This Order is not intended to, and does not, create any rights or benefits, substantive or procedural, enforceable at law or in equity, against the State of California, its agencies, departments, entities, officers, employees, or any other person.

**IN WITNESS WHEREOF** I have hereunto set my hand and caused the Great Seal of the State of California to be affixed this 5th day of September 2024.

GAVIN NEWSOM
Governor of California

**ATTEST:**



SHIRLEY N. WEBER, PH.D.
Secretary of State

# Exhibit B



# State Water Resources Control Board

October 25, 2024

**Subject: Order WR 2024-0006-DWR, Addendum 2: Temporary Suspension of All Curtailments in Shasta River Watershed through October 31, 2024**

To:     Shasta River Watershed Water Right Holders (sent to water right holders for which the Board has email addresses) and Interested Parties on Scott-Shasta Drought E-mail List

The State Water Resources Control Board (State Water Board or Board) is suspending all curtailments for water rights in the Shasta River watershed until the end of the month. This means that the water right diverters, which are noted in Attachment A to this addendum, may divert under their priority of right through October 31, 2024 unless otherwise amended or superseded prior to this date.

Background: On June 7, 2024, the State Water Board issued a curtailment order (Order WR 2024-0006-DWR[1]) to water right holders in the Shasta River watershed, including all post-Adjudication appropriative surface water rights and appropriative groundwater rights described in section 875.5, subdivision (b)(1)(A) of the Emergency Regulation[2], as well as more senior appropriative rights with priority dates of or junior to November 25, 1912, as described in section 875.5, subdivision (b)(1)(B). On June 21, 2024, the Board noticed the most junior water rights with a priority of or junior to January 1, 1958, that they must cease diversions immediately. On July 3, 2024 an Addendum was issued reinstating conditional curtailments for water rights with a priority date of or junior to January 1, 1958, in the Shasta River watershed.

Flows at the Yreka United States Geological Survey (USGS) gage have been generally meeting the minimum instream flow requirements established in the Emergency Regulation since September 10, 2024 . The flow at the Yreka USGS gage as of 2:00 pm today is 126 cubic feet per second (cfs) and has been greater than the October minimum flow requirement of 105 cfs throughout October. Based on current flows and recent flow trends, the precipitation forecast through the end of October, and discussion with the Scott Valley and Shasta Valley Watermaster District (Watermaster) it is appropriate to temporarily suspend curtailments for all water rights in the Shasta River watershed through the end of October.

---

[1] URL: https://www.waterboards.ca.gov/drought/scott_shasta_rivers/docs/2024/shasta-order-WR-2024-0006-DWR.pdf
[2] URL: https://www.waterboards.ca.gov/drought/scott_shasta_rivers/docs/2024/scott-shasta-reg-2024.pdf

This Addendum amends Order WR 2024-0006-DWR for water users in the Shasta River watershed. The Addendum **temporarily suspends all curtailments of water rights in the Shasta River watershed and will expire at 11:59 pm on Thursday, October 31, 2024**, unless otherwise extended or curtailments are reimposed sooner. The State Water Board will be monitoring weather forecasts and stream gages to determine if suspensions should be extended, or if curtailments are needed. Water diverters in Attachment A shall monitor flows at the Yreka USGS gage and their email for correspondence from the State Water Board.

**Livestock Diversions**

The Emergency Regulation includes provisions related to inefficient surface water diversions for livestock watering. The following provisions apply to everyone who diverts surface water for livestock from September 1, 2024, through January 31, 2025 (expiration of the current Regulation). **The inefficient livestock watering requirement applies to all surface water diversions, no matter what priority. The following criteria needs to be met in the Shasta River watershed before diverting surface water for livestock:**

1. The diverter shall notify the State Water Board by email to: ScottShastaDrought@waterboards.ca.gov with: their Name, Water Right Number and point of diversion, anticipated diversion amount(s), and their plans to track compliance and maintain records.

2. There are no active curtailments in the respective watershed. With this suspension, there are no active curtailments in the Shasta River watershed through October 31, 2024, unless this addendum is amended or superseded.

3. The California Department of Fish and Wildlife (CDFW) has made determinations that flows have been sufficient to stimulate salmon migration.

   a. After September 1st for fall-run Chinook salmon[3]; and/or
   b. After November 1st for coho salmon.

4. For diversions on tributaries below Dwinnell Dam, the relevant tributary is and remains connected to the mainstem.

5. Except for diversions upstream of Dwinnell Dam, diversions are operated to **bypass 90 percent of flow** at the point of diversion, except that when flows in the Shasta River are greater than 220 cfs at the Yreka USGS gage the diversions may operate to bypass 80 percent of flow.

6. The diversions are limited further if necessary to avoid disturbing redds.

---

[3] As discussed later this this addendum, CDFW notified the Board that there had been sufficient flow to stimulate fall-run Chinook salmon migration in the Shasta River watershed on October 24, 2024. Note a similar determination for coho salmon has not been made and livestock diversions under this provision of the Emergency Regulation must cease by November 1, 2024 unless all conditions in Emergency Regulation section 875.7(b) are met.

On October 24, 2024, CDFW notified the State Water Board that it had made the determination that there has been sufficient flow to stimulate fall-run Chinook salmon migration into the Shasta River. With the temporary suspension of curtailments in the watershed, inefficient surface diversions for livestock are permissible when the remaining criteria are met. The Addendum and suspension of curtailments expires at 11:59 pm October 31, 2024. Inefficient livestock diversions must cease when the curtailment suspension expires or curtailments are otherwise reinstated in the Shasta River watershed.

If you have questions regarding this email, please contact staff by email to: ScottShastaDrought@waterboards.ca.gov or leave a message at our dedicated Scott River and Shasta River Emergency Regulation phone line at: (916) 327-3113.


Sincerely,

Erik Ekdahl
Deputy Director
Division of Water Rights


Attachment A:       List of Water Rights in Shasta River Watershed Associated with
                    Order WR 2024-0006-DWR

# Attachment A: List of Water Rights in Shasta River Watershed Associated with Order WR 2024-0006-DWR

| MWCD Primary Owner | Application Number | Source | Priority Date | Curtailment Status |
|---|---|---|---|---|
| GEORGE S GRISET | SG005922 | Groundwater[1] | -- | Not Curtailed |
| STEPHEN DAVID GRISET | SG005923 | Groundwater[1] | -- | Not Curtailed |
| STEPHEN DAVID GRISET | SG005924 | Groundwater[1] | -- | Not Curtailed |
| GEORGE S GRISET | SG005925 | Groundwater[1] | -- | Not Curtailed |
| MICKE WILLIAM A & LORI A TRUST | SG005926 | Groundwater[1] | -- | Not Curtailed |
| Darrell Sousa | SG005927 | Groundwater[1] | -- | Not Curtailed |
| Darrell Sousa | SG005956 | Groundwater[1] | -- | Not Curtailed |
| Doug Enloe | SG005957 | Groundwater[1] | -- | Not Curtailed |
| Koua Yang | SG005445 | Groundwater[1] | -- | Not Curtailed |
| Lake Shastina Community Service District | SG005433 | Groundwater[1] | -- | Not Curtailed |
| Lake Shastina Community Service District | SG005434 | Groundwater[1] | | Not Curtailed |
| Lake Shastina Community Service District | SG005435 | Groundwater[1] | -- | Not Curtailed |
| Lake Shastina Community Service District | SG005436 | Groundwater[1] | | Not Curtailed |
| Lake Shastina Community Service District | SG005437 | Groundwater[1] | -- | Not Curtailed |
| LAKE SHASTINA COMMUNITY SERVICE DISTRICT | SG005915 | Groundwater[1] | 2/11/2019 | Not Curtailed |

---

[1] You exercise an appropriative groundwater right when you: (1) do not own (or rent or lease) land overlying the basin that you use the water on; (2) own overlying land but use the water on non-overlying land; or (3) sell or distribute the water to someone else. The priority date for an appropriative groundwater right is the date when the groundwater well was constructed and water was first used for a non-overlying use. You may exercise an overlying groundwater right, which is not curtailed by this order.

*Last Updated: July 3, 2024*

1

# Attachment A: List of Water Rights in Shasta River Watershed Associated with Order WR 2024-0006-DWR

| MWCDPrimary Owner | Application Number | Source | Priority Date | Curtailment Status |
|---|---|---|---|---|
| LAKE SHASTINA COMMUNITY SERVICE DISTRICT | SG005916 | Groundwater[1] | 2/11/2019 | Not Curtailed |
| CITY OF WEED | SG005914 | Groundwater[1] | 1/10/2015 | Not Curtailed |
| Lake Shastina Community Service District | SG005432 | Groundwater[1] | 8/21/2014 | Not Curtailed |
| SAMUEL BIRKHOLZ | D031892 | UNSP | 5/12/2011 | Not Curtailed |
| CITY OF WEED | SG005913 | Groundwater[1] | 12/13/2010 | Not Curtailed |
| Lake Shastina Community Service District | SG005430 | Groundwater[1] | 7/13/2010 | Not Curtailed |
| Lake Shastina Community Service District | SG005431 | Groundwater[1] | 7/14/2010 | Not Curtailed |
| GRENADA SANITARY | SG005909 | Groundwater[1] | 9/6/2003 | Not Curtailed |
| ARIC CENA | A031522 | UNNAMED STREAM | 7/30/2003 | Not Curtailed |
| PAUL ZWETSLOOT | D031166 | UNST | 1/17/2001 | Not Curtailed |
| JERRY L BACIGALUPI | A029558 | FOGG GULCH | 8/23/1989 | Not Curtailed |
| ARNOLD KUTTEL TRUST | A029415 | UNST | 2/23/1989 | Not Curtailed |
| Suzanne Rathburn | A028450A | PARKS CREEK | 5/10/1985 | Not Curtailed |
| TOM JOHNSON | A028450B | PARKS CREEK | 5/10/1985 | Not Curtailed |
| SHERWIN NELSON | A028250 | UNSP | 9/24/1984 | Not Curtailed |
| HATTIE J BATSON | A028119 | ZOLLS GULCH | 4/24/1984 | Not Curtailed |
| MARK GILMAN | A028120 | ZOLLS GULCH | 4/24/1984 | Not Curtailed |
| US KLAMATH NATL FOREST | A027528 | UNSP | 9/23/1982 | Not Curtailed |
| MICHAEL K CREBBIN | A027483 | UNST | 8/20/1982 | Not Curtailed |
| BIG SPRINGS I. D. | SG005919 | Groundwater[1] | 5/1/1982 | Not Curtailed |
| MONTAGUE WATER CONS. | SG005911 | Groundwater[1] | 6/1/1982 | Not Curtailed |
| ALLAN E JONES | A026792 | GREENHORN CREEK UNDERFLOW | 4/16/1981 | Not Curtailed |

*Last Updated: July 3, 2024*

# Attachment A:  List of Water Rights in Shasta River Watershed Associated with Order WR 2024-0006-DWR

| MWCDPrimary Owner | Application Number | Source | Priority Date | Curtailment Status |
|---|---|---|---|---|
| David E. & Mary Lea Lemos Trust | A026590 | UNST | 10/28/1980 | Not Curtailed |
| DALE P KUCK | A026316 | UNST | 4/25/1980 | Not Curtailed |
| CALTRANS D2 WATER MANAGER | A025786 | UNSP | 7/17/1978 | Not Curtailed |
| STEPHEN E KOLPACOFF | C001014 | HUMBUG GULCH | 10/11/1977 | Not Curtailed |
| GRENADA IRR.DIST. | SG005908 | Groundwater[1] | 4/1/1977 | Not Curtailed |
| Montague Water Conservation District | SG005441 | Groundwater[1] | 1977 - | Not Curtailed |
| LAURA LONGSTAFF | A025024 | UNSP | 3/18/1976 | Not Curtailed |
| BIG SPRINGS I. D. | SG005918 | Groundwater[1] | 1/1/1974 | Not Curtailed |
| DALE G MIHOLOVICH | A024200 | UNST | 10/5/1972 | Not Curtailed |
| MONTAGUE WATER CONS. | SG005910 | Groundwater[1] | 1/1/1972 | Not Curtailed |
| CHRISTOPHER  BROWN | A023796 | PARKS CREEK | 6/2/1971 | Not Curtailed |
| EMMERSON INVESTMENT, INC | A023767 | UNST | 4/23/1971 | Not Curtailed |
| Montague Water Conservation District | SG005438 | Groundwater[1] | 12/1/1970 | Not Curtailed |
| Montague Water Conservation District | SG005439 | Groundwater[1] | 1970 to 1981 | Not Curtailed |
| Montague Water Conservation District | SG005440 | Groundwater[1] | | Not Curtailed |
| CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE | A023452A | LITTLE SHASTA RIVER | 2/19/1970 | Not Curtailed |
| CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE | A023452B | LITTLE SHASTA RIVER | 2/19/1970 | Not Curtailed |
| CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE | A023117 | UNST | 8/27/1968 | Not Curtailed |
| BRICE C MARTIN | A022961 | UNSP | 12/26/1967 | Not Curtailed |
| MONTAGUE, CITY OF | SG005912 | Groundwater[1] | 5/1/1967 | Not Curtailed |
| ROBERT MANLEY | A022336 | OREGON SLOUGH | 11/16/1965 | Not Curtailed |
| Bryan DeRoo | A022099 | OREGON SLOUGH | 4/7/1965 | Not Curtailed |
| MARK FRANK MITCHINSON | A021986 | UNSP (2) | 12/1/1964 | Not Curtailed |

*Last Updated:  July 3, 2024*

3

**Attachment A: List of Water Rights in Shasta River Watershed Associated with Order WR 2024-0006-DWR**

| MWCDPrimary Owner | Application Number | Source | Priority Date | Curtailment Status |
|---|---|---|---|---|
| MEAMBER 2000 TRUST | A021238 | SHASTA RIVER | 4/11/1963 | Not Curtailed |
| MEAMBER 2000 TRUST | A021180 | UNDR | 3/6/1963 | Not Curtailed |
| MEAMBER 2000 TRUST | A021141 | UNDR | 1/28/1963 | Not Curtailed |
| CHRIS DEL DOTTO | A020016 | UNST | 3/3/1961 | Not Curtailed |
| US KLAMATH NATL FOREST | A019522 | MARTIN DAIRY SPRING | 7/7/1960 | Not Curtailed |
| ANDY E EAGAN | A018557 | SHASTA RIVER | 2/26/1959 | Not Curtailed |
| ROBERT MANLEY | A018434 | UNST | 12/15/1958 | Not Curtailed |
| CITY OF YREKA | A018186 | GREENHORN CREEK | 6/17/1958 | Not Curtailed |
| BIG SPRINGS I. D. | SG005920 | Groundwater[1] | 1/1/1958 | Not Curtailed |
| CHRIS DEL DOTTO | A017639 | UNST | 6/7/1957 | Not Curtailed |
| MEAMBER 2000 TRUST | A017334 | UNSL | 10/19/1956 | Not Curtailed |
| CITY OF YREKA | A016392 | YREKA CREEK UNDERFLOW | 5/24/1955 | Not Curtailed |
| CHRIS DEL DOTTO | A015687 | UNST | 1/15/1954 | Not Curtailed |
| CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE | A014580 | LITTLE SHASTA RIVER | 11/15/1951 | Not Curtailed |
| JACK I COWLEY | A014074 | LITTLE SHASTA RIVER | 11/28/1950 | Not Curtailed |
| CAVEN CRAWFORD | A013631 | SHASTA RIVER | 3/13/1950 | Not Curtailed |
| CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE | A013462A | LITTLE SHASTA RIVER | 11/14/1949 | Not Curtailed |
| CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE | A013462B | LITTLE SHASTA RIVER | 11/14/1949 | Not Curtailed |
| JULIEN RANCH TRUST | A013283 | JULIEN CREEK | 8/8/1949 | Not Curtailed |
| DALE P KUCK | A013200 | LITTLE SHASTA RIVER | 6/30/1949 | Not Curtailed |

*Last Updated: July 3, 2024*

4

**Attachment A: List of Water Rights in Shasta River Watershed Associated with Order WR 2024-0006-DWR**

| MWCDPrimary Owner | Application Number | Source | Priority Date | Curtailment Status |
|---|---|---|---|---|
| JACK COWLEY FAMILY RANCH | A013150 | LITTLE SHASTA RIVER | 6/13/1949 | Not Curtailed |
| CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE | A011705 | LITTLE SHASTA RIVER | 1/23/1947 | Not Curtailed |
| TIM NIELSEN | A011092 | KIERNAN SLOUGH | 6/29/1945 | Not Curtailed |
| THOMAS D H CONNICK | A011059 | BASSY SPRING CREEK | 5/26/1945 | Not Curtailed |
| DALE P KUCK | A010982 | LITTLE SHASTA RIVER | 2/14/1945 | Not Curtailed |
| CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE | A010949A | LITTLE SHASTA RIVER | 1/8/1945 | Not Curtailed |
| CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE | A010949B | LITTLE SHASTA RIVER | 1/8/1945 | Not Curtailed |
| FREDERICK SCHNACK | A010930 | UNSP | 12/11/1944 | Not Curtailed |
| EMMERSON INVESTMENT, INC | A008809 | CLEAR SPRING | 10/10/1936 | Not Curtailed |
| MONTAGUE WATER CONSERVATION DISTRICT | A004909 | LITTLE SHASTA RIVER | 2/4/1926 | Not Curtailed |
| RAYMOND D EKSTROM | A004831 | SHASTA RIVER (lower) | 11/9/1925 | Not Curtailed |
| MONTAGUE WATER CONSERVATION DISTRICT | A003555 | PARKS CREEK | 7/30/1925 | Not Curtailed |
| WILLIAM B DUNCAN | A003952 | UPPER SHASTA RIVER | 4/12/1924 | Not Curtailed |
| MONTAGUE WATER CONSERVATION DISTRICT | A003544 | SHASTA RIVER | 7/23/1923 | Not Curtailed |

*Last Updated: July 3, 2024*

# Attachment A:  List of Water Rights in Shasta River Watershed Associated with Order WR 2024-0006-DWR

| Present Owner | Decreed Owner | Source | Creek | Summer Right (CFS) | Winter Right (CFS) | Paragraph Number | Priority Date | Curtailment Status |
|---|---|---|---|---|---|---|---|---|
| Duncan, William B. & Darlene L. Etal | Alexander S. | Shasta River | Upper Shasta | 0 | 0.039 | 5 | 4/12/1924 | Not Curtailed |
| Underwood, Bradley | Webb Brothers Company | Shasta River | Lower Shasta | 0.01 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Debenedetti, J. & M. | Webb Brothers Company | Shasta River | Lower Shasta | 0.012 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Infelise, Peter F. | Webb Brothers Company | Shasta River | Lower Shasta | 0.013 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Hagedorn, Harvey | Webb Brothers Company | Shasta River | Lower Shasta | 0.016 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Taylor, L. E. & E. A. | Webb Brothers Company | Shasta River | Lower Shasta | 0.016 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Fasig, L. & J. | Webb Brothers Company | Shasta River | Lower Shasta | 0.027 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Campbell, Jeffrey D. & Candi M. | Webb Brothers Company | Shasta River | Lower Shasta | 0.031 | 0 | 388 | 6/17/1915 | Not Curtailed |

*Last Updated:  July 3, 2024*

**Attachment A: List of Water Rights in Shasta River Watershed Associated with Order WR 2024-0006-DWR**

| Present Owner | Decreed Owner | Source | Creek | Summer Right (CFS) | Winter Right (CFS) | Paragraph Number | Priority Date | Curtailment Status |
|---|---|---|---|---|---|---|---|---|
| Campbell, Karen J. | Webb Brothers Company | Shasta River | Lower Shasta | 0.031 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Bridwell, Martin Andrew III & Hannah | Webb Brothers Company | Shasta River | Lower Shasta | 0.038 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Flansburg, Micah | Webb Brothers Company | Shasta River | Lower Shasta | 0.053 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Dickson Samantha J. | Webb Brothers Company | Shasta River | Lower Shasta | 0.056 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Gusaas, Casey & Jaycey | Webb Brothers Company | Shasta River | Lower Shasta | 0.056 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Cota, Jennifer | Webb Brothers Company | Shasta River | Lower Shasta | 0.057 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Easton, Edwin L. | Webb Brothers Company | Shasta River | Lower Shasta | 0.065 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Terry, H. & D. | Webb Brothers Company | Shasta River | Lower Shasta | 0.07 | 0 | 388 | 6/17/1915 | Not Curtailed |
| DN Duerr Properties, LLC | Webb Brothers Company | Shasta River | Lower Shasta | 0.076 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Hendrickson, R. & T. | Webb Brothers Company | Shasta River | Lower Shasta | 0.076 | 0 | 388 | 6/17/1915 | Not Curtailed |

*Last Updated: July 3, 2024*

**Attachment A:  List of Water Rights in Shasta River Watershed Associated with Order WR 2024-0006-DWR**

| Present Owner | Decreed Owner | Source | Creek | Summer Right (CFS) | Winter Right (CFS) | Paragraph Number | Priority Date | Curtailment Status |
|---|---|---|---|---|---|---|---|---|
| Montague, City of | Webb Brothers Company | Shasta River | Lower Shasta | 0.134 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Buck, Robert | Webb Brothers Company | Shasta River | Lower Shasta | 0.198 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Meamber, D. & S. | Webb Brothers Company | Shasta River | Lower Shasta | 0.219 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Peters, T. & E. | Webb Brothers Company | Shasta River | Lower Shasta | 0.226 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Manley, R. & L. | Webb Brothers Company | Shasta River | Lower Shasta | 0.319 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Micke, W. & L. | Webb Brothers Company | Shasta River | Lower Shasta | 0.714 | 0 | 388 | 6/17/1915 | Not Curtailed |
| Amen, I. & C. | Webb Brothers Company | Shasta River | Lower Shasta | 2.177 | 0 | 388 | 6/17/1915 | Not Curtailed |
| CALIFORNIA DEPARTMENT OF FISH AND WILDLIFE | Mills, Frank H. | Shasta River | Lower Shasta | 1.2 | 0 | 264 | 3/18/1914 | Not Curtailed |
| Yates et.al | Dow, I.M. | Shasta River | Upper Shasta | 0.2 | 0 | 77 | 3/1/1914 | Not Curtailed |

*Last Updated:  July 3, 2024*

# Attachment A: List of Water Rights in Shasta River Watershed Associated with Order WR 2024-0006-DWR

| Present Owner | Decreed Owner | Source | Creek | Summer Right (CFS) | Winter Right (CFS) | Paragraph Number | Priority Date | Curtailment Status |
|---|---|---|---|---|---|---|---|---|
| Ronald Presley | Henry H. Perry | Guys Gulch | Julian and Miscellaneous creeks | 0.1 | 0 | 316 | 3/1/1913 | Not Curtailed |
| Shasta R.W.A. | Shasta R.W.A. | Shasta River | Lower Shasta | 42 | 0 | 341 | 11/25/1912 | Not Curtailed |

*Last Updated: July 3, 2024*

Exhibit C

TO ADOPT AN EMERGENCY REGULATION THAT ESTABLISHES MINIMUM
INSTREAM FLOW REQUIREMENTS, CURTAILMENT AUTHORITY,
AND INFORMATION ORDER AUTHORITY IN THE SCOTT RIVER AND
SHASTA RIVER WATERSHEDS

WHEREAS:

1. Western North America is experiencing an ongoing and persistent drought.
   Across California and within the Klamath Basin, the water years from 2013-2015
   and 2020-2022 were some of the driest on record. Even after more normal
   precipitation in the Klamath basin in water year 2022-2023, the Klamath River
   watershed continues to experience drought effects. The Scott and Shasta rivers,
   important tributaries to the Klamath river, specifically continue to experience
   drought effects. Increases in weather extremes on a global and more local scale,
   as well as the extended drought conditions, heighten the risk of continued or
   worsening drought effects in 2024.

2. On May 10, 2021, Governor Newsom proclaimed a State of Emergency for
   41 counties, including those in the Klamath River watershed
   ([May 2021 Proclamation](#)), in response to drought conditions. The May 2021
   Proclamation finds that it is necessary to act expeditiously to mitigate the effects
   of drought conditions in the Klamath River watershed, both to ensure the
   protection of health, safety, and the environment and to prepare for potential
   sustained drought conditions. On July 8, 2021, the Governor
   [expanded the emergency declaration](#) and called upon Californians to voluntarily
   reduce their water use by 15 percent. On October 19, 2021 the Governor
   expanded the [drought state of emergency](#) to the entire state of California.

3. On March 24, 2023, the Governor issued [Executive Order N-5-23](#), repealing
   many provisions of the various drought proclamations in light of significant
   precipitation, particularly in the Sierra Nevada range. However, the executive
   order specifically found that the severe drought conditions in the Klamath River
   watershed had not abated, and that continued action is needed to abate drought
   harm to native fish in the Klamath River watershed.

4. Executive Order N-5-23 directs the State Water Resources Control Board (State
   Water Board or Board) and California Department of Fish and Wildlife (CDFW) to
   evaluate minimum instream flows and other actions to protect salmon, steelhead,
   and other native fishes in critical systems in the Klamath River and Clear Lake
   watersheds and work with water users, tribes, and other parties on voluntary
   measures to implement those actions. To the extent voluntary actions are not
   sufficient, the State Water Board, in coordination with CDFW, is to consider
   emergency regulations to establish minimum instream flows to mitigate the
   effects of drought conditions.

5.  The Southern Oregon/Northern California Coast (SONCC) coho salmon is listed as a threatened species under both the federal and state Endangered Species Acts (ESAs). The Scott River and Shasta River coho salmon are both "core, functionally independent" populations of the SONCC Evolutionarily Significant Unit under the federal ESA, indicating that the Scott River and Shasta River have a critical role in the continuation and recovery of SONCC coho. The species is at high and moderate risk of extinction in the Shasta River and Scott River, respectively. The species spawns, hatches, and rears in tributaries to the Klamath River, including the Scott River and Shasta River, and is divided into three run-years or "cohorts." Any cohort failure represents loss of a significant component of the population, increases the potential for extirpation, and greatly impedes recovery.

6.  The Scott River and Shasta River are also key streams in the Klamath Basin for the fall-run Chinook salmon. The fall-run Chinook is a fish species of high commercial importance, as the major salmon stocks targeted by ocean fisheries south of Cape Falcon are Sacramento River fall-run Chinook salmon and Klamath River fall-run Chinook salmon. For most of the past three decades, Klamath River fall-run Chinook salmon has been more constraining on the troll fishery than the Sacramento River fall-run Chinook salmon, and low returns of Klamath River fall-run Chinook salmon have resulted in a complete closure of hundreds of miles of the coast to commercial fishing multiple times in the past 15 years, including this year. Coastal ocean fishing-dependent communities have suffered severe economic impacts due to decreases in fish numbers and related harvest limitations. The species also supports commercial and tribal river fishing. The river fisheries have also been closed multiple times in the past decade when the numbers of returning Klamath River fall-run Chinook salmon are low, including at times foregoing even ceremonial fishing.

7.  Steelhead in the Scott River and Shasta River watersheds are part of the federally-designated Klamath Mountains Province (KMP) Distinct Population Segment (DPS). KMP steelhead are a United States Forest Service Sensitive species, and Summer-run steelhead in this DPS are a CDFW recognized species of special concern. Steelhead populations have declined dramatically in the Klamath River watershed compared to historical levels. While recent monitoring in the Scott River and Shasta River watersheds is incomplete, the trends in those watersheds similarly show significant decline, with both watersheds having record-low adult returns in 2022.

8.  The coho and Chinook salmon and steelhead in the Klamath River watershed are of particular cultural, spiritual, and nutritional significance to many Klamath Basin tribes, including but not limited to the Karuk Tribe, the Yurok Tribe, the Hoopa Valley Tribe, the Quartz Valley Indian Reservation, the Shasta Nation, and the Shasta Indian Nation, which have all raised concerns regarding these species with the State Water Board in recent years.

9. The Quartz Valley Indian Reservation's land base is in the Scott River watershed. Traditionally used fish resources of the Scott River include Chinook and coho salmon, steelhead, and Pacific lamprey. The Quartz Valley Indian Reservation relies on these fish for sustenance and their spiritual well-being.

10. Prior to the drought proclamation in 2021, the State Water Board, CDFW, diverters, tribes, federal agencies, nonprofit organizations, and other interested parties have undertaken efforts to protect the fish in the Scott River and Shasta River watersheds, short of curtailments for minimum instream flows. These efforts include: sending notices of water unavailability in the Scott River watershed; distributing educational materials to promote voluntary conservation efforts; providing information on funding availability at public meetings; making planting decisions for a dry year; contracting to cease diversions earlier in the year; coordination of diversions to protect redds and juvenile salmon; dedications of water to instream use; and funding and technical assistance for restoration and forbearance actions and groundwater substitutions to improve water temperatures. Such efforts improved the availability of water, including for instream uses, but did not result in meeting flows necessary to adequately protect fish in the ongoing drought situation.

11. Without the ability to protect instream flows or to provide greater incentives for voluntary action and cooperation, voluntary efforts have not yet been sufficient to adequately support important fisheries in the Scott River and Shasta River watersheds.

12. Flows in the Shasta River dropped sharply immediately after expiration of the drought emergency regulations on July 31, 2023. Subsequent coordination by a group of major diverters in the Shasta River watershed resulted in improved flows that generally met a lower, locally recommended flow target that the Board had rejected in 2022. However, Shasta River flows did not consistently meet the expired minimum flows until September 26th, 2023. In the Scott River watershed, flows gradually fell to below expired drought emergency flow requirements for most of August 2023 until recovering on September 4 after rainfall. Flows have remained greater than the expired drought minimum flow requirements from early September until December 2023. Flows have varied in December, at times failing to meet and at times exceeding the expired drought minimum flow requirements.

13. Even with more normal annual precipitation in the Winter and Spring of 2023, on June 29, 2023, curtailment of diversions was necessary to maintain the drought minimum flows in the Shasta River watershed.

14. Decades of flow and hydrologic data for the Scott River and Shasta River show that these streams are unlikely to maintain minimum flows for Chinook, coho, and steelhead over the next year without reduced or curtailed water use. Flows in the Scott and Shasta rivers do not regularly achieve the drought minimum flows except in very wet water years in large part due to water development and diversion.

15. The Scott River may not maintain the baseline thresholds to support fish in the most extreme drought situations. When flows are at such minimum levels, every increment of water is important to the species.

16. These proposed drought emergency minimum flows provide rearing habitat and migration corridors that are essential for species survival. There is a continued urgent need to address severe water shortages in the Scott River and Shasta River watersheds to protect minimum flows for critical fish species. There is a continued urgent need to address water shortages in the Scott and Shasta River watersheds to protect minimum flows for critical fish species, particularly in light of their fragility with many years of reduced numbers, limited habitat access, and significant successive periods of drought. Water shortage conditions present during drought, and especially extended drought periods, pose particular risks to steelhead, SONCC coho, and fall-run Chinook that require sufficient cold water throughout their life cycles. Emergency regulatory action to address this need is warranted.

17. During the 2013-2015 drought, localized efforts to manage the coho salmon fishery were insufficient to address the impacts of low flows and high temperatures associated with ongoing diversions and extreme dry conditions. In letter dated May 3, 2021, California Fish and Wildlife explains that the 2013-2015 drought in Scott River watershed resulted in a significant population drop in the strongest coho salmon cohort, from which the cohort has still not recovered. In fall and winter of 2020 and 2022, coho and Chinook salmon both faced significant migration barriers from reduced flows in the Scott River. It is not yet clear the degree of impact this delay may have had on the species. Repeated stress events, such as drought conditions affecting multiple cohorts or affecting the same cohort in short succession, can reduce the resilience of a species.

18. The State Water Board adopted a drought emergency regulation in August 2021, establishing minimum flows for the Scott and Shasta rivers. The emergency regulation was readopted with minor amendments in June 2022, and expired on August 1, 2023.

19. The drought minimum flows adopted in 2021 were based on recommendations provided by CDFW in a letter dated June 15, 2021, and were supported by the National Marine Fisheries Service (NMFS). These flows were based on best available information regarding the survival-level minimum flows required for fisheries, even in a severe drought. In light of continued information development, the regulations include the ability to modify the minimum flow requirements during implementation. During the drought, the State Water Board implemented small amendments to the 2021 CDFW flow recommendations as refinements as new information was developed. These changes were based on CDFW recommendations to lower winter flow requirements in the Shasta River and established transitional flows in both watersheds for key months to avoid harm to fish from a rapid change in flows. The Board and CDFW also considered and rejected other recommendations for flow modifications, as insufficiently supported or contraindicated by available evidence. In light of the importance of

water for all uses, this drought emergency regulation maintains the provision included in the previous drought emergency regulations that CDFW, after coordination with the NMFS, may notify the Deputy Director if lower alternative flows at the compliance gage provide equal or better protection for the pertinent species' relevant life stages.

20. On May 23, 2023, the Karuk Tribe of California, Environmental Law Foundation, Pacific Coast Federation of Fishermen's Associations, and Institute for Fisheries Resources submitted to the State Water Board a Petition for Rulemaking to Set Minimum Flows on the Scott River in Siskiyou County (Petition). On August 15, 2023, the Board held a hearing to consider the Petition. The Board expanded the scope of the hearing to include the Shasta River watershed due to rapid and alarming decreases in flow that were observed when the previous regulation expired on August 1, 2023.

21. On July 20, 2023, CDFW submitted a comment letter in support of setting interim backstop flows for the Scott River. The anticipated benefits of establishing interim flows for the Scott River included increased west side tributary habitat for coho salmon juveniles, increased groundwater elevation, and increased surface flows and stream connectivity during adult Chinook, coho, and steelhead migration. For the Shasta River, the expected benefits included maintaining lower water temperatures throughout the year and an increase to surface flows during cold water species migration. In addition, NMFS submitted comments to the State Water Board in support of the preliminary draft emergency regulation and emphasizing the need to set minimum instream flows for both Scott River and Shasta River.

22. At the August 15, 2023, hearing the Board directed staff to move forward with an emergency regulation re-establishing minimum flows in the Scott River and Shasta River watersheds in light of immediate needs and also to develop science and options that could support long-term flows in the watersheds.

23. To help inform potential updates to the emergency regulation, staff held a workshop on October 6, 2023, to solicit input on the state of the fisheries, the minimum instream flows, groundwater local cooperative solutions, and data needs. Additionally, on October 30, 2023, State Water Board staff met in Siskiyou County with community members and held listening sessions with interested parties regarding the emergency regulation. These specific events were in addition to outreach and discussion meetings, that include technical meetings held every two weeks with tribal, agricultural, and county representatives, and meetings with individual parties to discuss specific aspects of the regulation.

24. A preliminary draft of the proposed regulation was notified on November 7, 2023 and a meeting to answer questions and provide for comments on the preliminary draft regulation was held on November 14, 2023. Comments on the preliminary draft of the proposed emergency regulation were accepted through November 16, 2023, and were considered in developing the proposed emergency regulation.

25. The Shasta River largely met drought minimum flows under the emergency regulation. The Division issued curtailment orders to junior water rights not subject to an exception in order to meet flows in fall of 2021 and much of the 2022 irrigation season, while curtailment of more senior rights was limited to later in the 2022 irrigation season. The most senior rights, including overlying users and riparian, were not curtailed. In the 2023 irrigation season curtailment of junior rights was required for just over a month prior to the expiration of the emergency regulation.

26. The Scott River watershed required curtailment of all diversions not covered by a local cooperative solution (or other exception) in much of Fall 2021, all of December 2021, several days in January of 2022, and much of the 2022 irrigation season. In 2023, no curtailment was required prior to the expiration of the regulation. Despite curtailments, the Scott River did not achieve minimum instream flows in significant portions of Fall 2021 and late summer and fall of 2022.

27. The effects of the drought regulation are still under evaluation; For the fisheries, monitoring of salmonid populations through video weirs, redd surveys, and screw traps helps inform the analysis on how the minimum flows may have benefited various salmonid life stages (e.g., spawning, rearing, and migration into and out of the rivers). Adult migration occurred in both the Scott and Shasta watersheds (albeit with delayed migration and limited spawning habitat in the Scott River watershed in 2022 when flows were not met for an extended period). It is clear that sufficient water for successful juvenile rearing and outmigration was achieved. Regulation implementation appears to have improved water quality and in 2022 and 2023 when salmonids were observed in the Shasta River in reaches where habitat is frequently limited due to poor flow and associated water quality. NMFS has indicated that degraded hydrologic function, including passage impacts and unsuitable water quality conditions, remains a key barrier to recovery. The drought regulation resulted in multiple benefits including significant reductions in groundwater pumping, increased community engagement on water conservation and drought actions, improved understanding of area water use, improved water data, installation of more efficient irrigation equipment, and better gaging. While assessment is still ongoing, comparison of precipitation with streamflow indicates that the regulations resulted in earlier stream reconnection and achievement of the minimum instream flows in the Scott River in Fall and Winter 2021 and 2022. Improved reconnection in 2023 is also likely attributable to increased groundwater levels from previous implementation of the emergency regulations (in 2021 and 2022) as well as from improved hydrology in 2023.

28. The August 2021 drought emergency regulation included provisions for individual, tributary, or watershed local cooperative solutions in lieu of curtailments, and was crafted to build on, support, and allow for expansion of voluntary efforts. Such local cooperative solutions may be granted when the proposal demonstrates the benefits of the actions proposed in the local cooperative solution are equal to or greater than the protections provided by the

flow contribution associated with curtailment. Individuals in the Shasta River watershed have entered into Safe Harbor Agreements with NMFS and CDFW that in some instances include flow-related actions and which may be considered as elements of or as independent local cooperative solutions if they meet the standard established in the regulation.

29. Another pathway for groundwater local cooperative solutions was built into the August 2021 and carried forward in the 2022 drought emergency regulation to both encourage early reductions in groundwater use and allow for greater economic certainty to the agricultural community around water availability during curtailments. Approximately 97 percent of groundwater-irrigated lands in the Scott River watershed operated under overlying groundwater local cooperative solutions during the 2022 irrigation season.

30. Critiques of overlying groundwater local cooperative solutions indicate a lack of data on implementation and the connection of specific conservation actions to surface flows. Other evidence suggests that the program was important in driving innovation and investments in conservation that can improve groundwater levels and associated surface flows in all years, while avoiding the business-threatening risk of sudden loss of water and crops from unplanned curtailment. The overlying groundwater local cooperative solutions offered the agricultural community an alternative to direct curtailment. The proposed regulation requires changes in data and oversight mechanisms to provide for improved information in the current year and help inform future efforts. Specifically, this regulation includes a new provision that requires installation of meters to measure groundwater extraction and use associated with the overlying groundwater local cooperative solutions. The purpose of the metering requirement is to provide improved information to support water use reduction estimates that were claimed during the previous regulations. The proposed regulation also expands options for overlying groundwater local cooperative solutions and allows for early cessation of irrigation and use of the most efficient pivots with limited corner irrigation as two additional and easily-verifiable options that evidence indicates will be effective in conserving groundwater.

31. There is a need to ensure that continued minimum human health and safety needs are met, notwithstanding the water shortage conditions. The California Water Code declares water supplies for consumption, sanitation, and cooking, as a human right (Wat. Code, § 106.3); identifies domestic use as the highest water use (Wat. Code, § 106); and provides water suppliers with authority to declare a water shortage emergency to allow sufficient water for human consumption, sanitation, and fire protection (Wat. Code, § 350). In light of the need to curtail other uses of water in order of priority to ensure drought emergency minimum flows to support fish in the Shasta River and Scott River watersheds, regulatory action is needed in the Klamath River watershed this year to ensure that water right holders and claimants without other means to access water for basic human health and safety, fire prevention, and fire recovery efforts, are able to continue to access water for these uses under the regulation.

32. In the Shasta watershed in particular, Asian-American community members and advocates have noted that it is difficult for sellers of water hauled to areas not served by public water systems or private wells, to certify the amount of water needed for human health and safety purposes, as opposed to commercial agriculture. Additionally, community members and representatives expressed frustration at the difficulty of certification. Modifications to the minimum human health and safety exemption adopted in previous drought emergency regulations are being proposed to reduce the complexity of the certification requirements and to allow a qualified nonprofit or governmental entity to submit certifications related to the use of curtailed water for human health and safety. This change is designed to prevent curtailment orders from resulting in reduced access to water for basic human needs, while also ensuring that any continued diversion under curtailed rights for other uses is curtailed.

33. Further, there is a need for regulatory action to ensure that water remains available for minimum livestock watering purposes, notwithstanding the drought conditions and the associated curtailment of water rights in order of priority. Cattle ranching is a primary economic activity in the Scott River and Shasta River watersheds, with pasture and growing of alfalfa comprising the predominant manner of land cultivation. California law recognizes the obligation to provide sufficient water for livestock (see Penal Code, section 597, subdivision (b)), and the proposed regulation will continue to provide reasonable amounts of water for livestock watering. (See Cal. Code Regs., tit. 23, section 697, subdivision (c).)

34. A number of diversions in the Scott River and Shasta River watersheds involve surface diversions of water through long, unlined ditches in order to provide relatively small amounts of water for livestock use. Diverting into these inefficient ditches can result in removing orders of magnitude greater amounts of water from the stream than will actually be used for livestock. These livestock diversions typically occur during the winter-early spring months, at the time when the water is required throughout the watershed to enable adult salmon migration, as well as rearing, incubation, and juvenile migration. Water is needed in the adult salmon migration periods to provide cues to the salmon that it is time to migrate upstream, as well as ensure there are adequate flows for fish to move upstream and access tributaries where the salmon will incubate and rear. Water is needed during and after the adult salmon migration period to ensure redds are not dewatered and tributaries remain connected so juvenile salmon can move within the system.

35. Alternatives exist to provide water for livestock more efficiently and many people in both watersheds have developed other methods for livestock water delivery in recent decades. While it can be costly over the long term, it is possible for those who do not currently have such an alternative to divert water to trucks for delivery to livestock on a short-term basis. Ranchers may also implement long-term water conservation solutions for post-irrigation-season livestock watering, such as developing groundwater wells, purchasing heated troughs, lining ditches, or switching to piped diversions. There are financial resources available to assist ranchers in finding alternative livestock watering systems during the drought

emergency. Such funding has been provided in the past and funding opportunities focused on installation and use of such livestock systems remains available to diverters in these watersheds.

36. While large diversions of water through inefficient ditches may in some circumstances provide for some amount of recharge of groundwater for later beneficial use, such recharge is uncertain, location-specific, and has not been quantified. Some water users in the Scott River watershed are engaging in groundwater recharge efforts under a temporary permit from the Board and are working with researchers to better understand the potential for managed groundwater recharge in the basin. Potential for additional recharge projects also exists, though temporary water right applications have not yet been filed. The Siskiyou County Flood Control and Water Conservation District, which is the local groundwater sustainability agency for implementation of the Sustainable Groundwater Management Act, supports investigation of groundwater recharge, and has obtained significant funding for additional projects. Such projects and the associated data will provide information that can be used to understand the long-term potential for such projects in the watershed and to tailor groundwater recharge efforts in the most effective manner possible.

37. Diversion for livestock water is the largest water use following the conclusion of the irrigation season and can cause or contribute to tributary or mainstem disconnection or other conditions that prevent salmon from accessing appropriate spawning habitat. Additionally, diverting substantial portions of streamflow can inhibit juvenile migration or dewater of redds.

38. In light of the ongoing emergency, the flow fisheries need and the availability of alternative livestock water supply options, it is generally not reasonable to divert more than 10 times the amount of water that livestock require for drinking, as described in the reasonable water quantities for water rights applications (See Cal. Code Regs., tit. 23, section 697, subdivision (c).), during the September through March period unless certain flow conditions are met to protect the various fish life stages. Changes to the proposed regulation from the prior drought emergency regulation build on the experience of implementation of the prohibition on inefficient livestock watering diversions, and the determination that such diversions are not unreasonable during certain conditions.  Such conditions include  ensuring sufficient flows for the migration of fall-run Chinook salmon and coho salmon prior to diversions for inefficient livestock watering, there is sufficient flow to establish and maintain tributary connectivity with the mainstem river, at least 90 percent of flow is bypassed at the point of diversion unless higher flows are present that provide for up to 80 percent bypass of flows at the point of diversion, diversions are managed to avoid disturbing redds, and appropriate reporting requirements.

39. Providing for livestock diversions through inefficient means under conditions described in the proposed regulation provides the opportunity for potential groundwater recharge outside of permitted projects, recognizing that the benefits of recharge are uncertain.

40. Division of Water Rights staff have been working with University of California at Davis to update the Scott Valley Integrated Hydrologic Model (SVIHM). SVIHM which was initiated by the North Coast Regional Water Quality Control Board and built on by Siskiyou County's groundwater sustainability agency as part of the Sustainable Groundwater Management Act, with input and data from local landowners and other contributors. Division of Water Rights staff have been informed by the preliminary results of the new version of SVIHM as presented in an October 6 staff workshop as well as Scott Valley Groundwater Sustainability Plan (GSP) model results on the efficient timing and effectiveness of local cooperative solutions on streamflow, as well as the contribution of past curtailments in improving flow conditions. Division of Water Rights staff plan work under a contract with the University of California at Davis to continue to refine and update the model with new information, as available, and to run additional targeted drought and curtailment scenarios, and develop and improve tools to inform water management and drought planning in the Scott River watershed. In the coming years, as part of this modeling effort, staff will be evaluating the effectiveness of various local cooperative solutions and other non-curtailment strategies (e.g., groundwater recharge projects) to improve instream flow.

41. Division of Water Rights staff are currently working on a hydrology modeling effort in the Shasta River watershed to help inform long-term instream flow and water management planning. As part of this effort, Division of Water Rights implemented a memorandum of understanding with Siskiyou County to coordinate on the development and refinement of hydrology models for the Shasta Valley. These Shasta Valley hydrology models will help inform instream flow and other water management strategies in the watershed. Staff anticipates submitting the model for peer review in 2024.

42. During emergency drought conditions in the Scott River and Shasta River watersheds, it is imperative that water right holders and claimants who do not have water available at their priority of right and do not have a need or obligation to provide water for minimum human health and safety or minimal livestock watering uses cease diversions of water that is needed for the minimal protection of fisheries resources.

43. Water Code section 1058.5 provides the State Water Board the authority to adopt emergency regulations in certain drought years or when the Governor proclaims a drought state of emergency in order to prevent unreasonable use, require curtailment of diversions when water is not available under the diverter's priority of right, and require reporting of diversion or use or the preparation of monitoring reports.

44. Article X, section 2 of the California Constitution declares that the water resources of the state must be put to beneficial use to the fullest extent possible and the unreasonable use of water be prevented. Relevant to drought conditions, the California Supreme Court has clarified that "[w]hat may be a reasonable beneficial use, where water is present in excess of all needs, would not be a reasonable beneficial use in an area of great scarcity and great need. What is a

beneficial use at one time may, because of changed conditions, become a waste of water at a later time." (*Tulare Irr. Dist. v. Lindsay-Strathmore Irr. Dist.* (1935) 3 Cal.2d 489, 567.) The reasonable use doctrine applies to the diversion and use of both surface water and groundwater, and it applies irrespective of the type of water right held by the diverter or user. *(Peabody v. City of Vallejo* (1935) 2 Cal.2d 351, 367.) Further, the reasonable use doctrine extends to the adoption of drought emergency minimum instream flows under Water Code, section 1058.5 to protect specific species in critical watersheds, and to implementation of these through curtailment of diversions based on water rights priority. (*Stanford Vina Ranch Irrigation Co. v. State of California* (2020) 50 Cal.App.5th 976.) This regulation is in furtherance of article X, section 2 during this drought emergency.

45. Both the Scott River and Shasta River watersheds have groundwater that is closely interconnected with surface flows. Because of this, it is necessary to address both groundwater and surface water in a curtailment regulation. Where groundwater and surface waters are interconnected, the "common source" doctrine applies, integrating the water rights and applying priorities without regard to whether the diversion is from surface water or groundwater. (*Hudson v. Dailey* (1909) 156 Cal. 617, 627–628.).

46. Adoption of an emergency regulation is necessary to address ongoing dire water shortages in the Klamath River watershed. The emergency regulation will enable the State Water Board to act in a timely manner to protect vital flows for fisheries, and to enforce the water right priority system with respect to all water right holders and claimants, including groundwater diversions, while assuring water remains available for minimum human health and safety and livestock watering needs.

47. Emergency regulations adopted under Water Code, section 1058.5 may remain in effect for up to one year.

48. Pursuant to Water Code, section 7, the State Water Board is authorized to delegate authority to staff.

THEREFORE BE IT RESOLVED THAT:

The State Water Board:

1. Adopts as an emergency regulation, California Code of Regulations, title 23, Division 3, Chapter 2, Article 23.5, Sections 875, 875.1, 875.2, 875.3, 875.5, 875.6, 875.7, 875.8, and 875.9 as circulated on December 15, 2023, with the changes in Change Sheet 1 circulated on December 19, 2023 and with language read into the record on December 19, 2023;

2. State Water Board staff will submit the regulation to the Office of Administrative Law (OAL) for final approval;

3. If, during the approval process, State Water Board staff, the State Water Board, or OAL determines that minor corrections to the language or formatting of the regulation or supporting documentation are needed for clarity or consistency, the State Water Board Executive Director, the Deputy Director for the Division of Water Rights, or their designee, may make such changes;

4. This regulation shall remain in effect for one year after filing with the Secretary of State;

5. The State Water Board directs staff to process as expeditiously as possible any proposals for local cooperative solutions which may be offered as alternatives to curtailments;

6. The State Water Board directs staff to continue to work with CDFW to evaluate and refine the drought minimum instream flows adopted in this regulation if new scientifically-defensible information becomes available, and to continue to engage with affected stakeholders and other experts in on-going and longer-term efforts to establish instream flows, including consideration of what is achievable in the watersheds, for the Scott River and Shasta River watersheds beyond this drought emergency;

7. The State Water Board directs staff to continue work with stakeholders this year and in future years on voluntary efforts to meet instream flow needs and avoid curtailments;

8. The State Water Board directs staff to continue to develop and use hydrologic modeling tools in the Scott River and Shasta River watersheds to better understand and support the planning and implementation of groundwater recharge projects, curtailments, local cooperative solutions, and other water management strategies;

9. The State Water Board directs the Division of Financial Assistance to continue to work with communities in the areas covered by the regulation to assess their drinking water needs and provide assistance consistent with established programs and policies, and directs Division of Water rights staff to continue working with the Office of Public Participation to provide appropriate language access in compliance assistance efforts related to the regulation. Staff is directed to coordinate across divisions as appropriate and continue proactive engagement with the Hmong and Asian American communities to clarify the purpose of the regulations, provide clear information regarding the status of curtailments and whether those curtailments could affect hauled water, provide clear information on the process for certifying minimum human health and safety needs or petitioning for increased use greater than 55 gallons per person per day, and identify whether the regulation has resulted in unintended limitations on water delivery for minimum human health and safety needs. If barriers caused by the regulation are identified, staff are directed to update the State Water Board at an upcoming meeting and to provide potential solutions, if possible; and

10. Except for purposes of enforcement of a curtailment order issued pursuant to this regulation, this regulation and any curtailment order issued hereunder shall not be cited as authority for, or evidence of, the validity or priority of any water right or claim affected or protected by this regulation. Given this, it would be inappropriate to consider compliance with the regulation to be an admission or waiver of any rights or claims of affected parties.

## CERTIFICATION

The undersigned Clerk to the Board does hereby certify that the foregoing is a full, true, and correct copy of a resolution duly and regularly adopted at a meeting of the State Water Resources Control Board held on December 19, 2023.

AYE:  Chair E. Joaquin Esquivel
     Vice Chair Dorene D'Adamo
     Board Member Sean Maguire
     Board Member Laurel Firestone
     Board Member Nichole Morgan
NAY:  None
ABSENT: None
ABSTAIN: None

*Courtney Tyler*

Courtney Tyler
Clerk to the Board

**Establishment of Minimum Instream Flow Requirements, Curtailment Authority, and Information Order Authority in the Scott River and Shasta River Watersheds**

=================================================================

In Title 23, Division 3, Chapter 2, adopt Article 23.5, Sections 875, 875.1, 875.2, 875.3, 875.5, 875.6, 875.7, 875.8, and 875.9

Article 23.5. Scott River and Shasta River Watersheds Drought Emergency Requirements

§ 875 Emergency Curtailment Where Insufficient Flows are Available to Protect Fish in Certain Watersheds

(a) It is necessary to prevent the diversion of water that would unreasonably interfere with an emergency minimum level of protection for commercially and culturally significant fall-run Chinook salmon, threatened Southern Oregon/Northern California Coast coho salmon, and culturally significant steelhead. For this reason surface water and groundwater shall not be diverted from the watersheds listed below at a diversion point or for the benefit of a place of use that is subject to a curtailment order, during the effective period of the curtailment order under this article, except as provided under sections 875.1, 875.2, or 875.3.

(b) The Deputy Director for the Division of Water Rights (Deputy Director) may issue a curtailment order upon a determination that without curtailment of diversions, flows are likely to be reduced below the drought emergency minimum flows specified in subdivision (c), within the constraints detailed in this article. Curtailment orders shall be effective the day after issuance.

(1) Where flows are sufficient to support some but not all diversions, curtailment orders shall be issued, suspended, reinstated, and rescinded in order of water right priority provided in section 875.5. In determining which diversions should be subject to curtailment, the Deputy Director shall consider the need to provide reasonable assurance that the drought emergency minimum flows will be met with consideration of hydrologic, weather, and other conditions that influence flows.

(2) If maintaining the flows described in subdivision (c) would require curtailment of uses described in section 875.2 or 875.3, then the Executive Director may determine whether or not those diversions should be allowed to continue based on the most current information available regarding fish populations, human health and safety needs, livestock needs, and the alternatives available to protect human health and safety, livestock, and fish populations.

(3) The Deputy Director may determine not to issue curtailment orders, to issue curtailment orders to a smaller priority grouping described in section 875.5, or to suspend curtailment orders already issued in order of priority as described in section 875.5, as applicable, using information provided by the California Department of Fish and Wildlife described in section 875.1(c)(1)(B), as well as other information that could affect the need for curtailments to meet minimum flow needs for fisheries purposes, including weather forecasting, the need for flows to ramp up or down, the contributions of voluntary flow measures, and future flow needs.

(c) Drought Emergency Minimum Flows are as specified below.

(1) Scott River. The Scott River enters the Klamath River at United States Geological Survey River Mile 145.1.

(A) As measured in cubic feet per second at United States Geological Survey gage 11519500 located downstream of the city of Fort Jones at the northern end of Scott Valley (Scott River Mile 21), the natural flow of the system up to the following amounts:

| Jan | Feb | Mar | Apr | May | June 1-23 | June 24-30 | July | Aug | Sept | Oct | Nov | Dec |
|-----|-----|-----|-----|-----|-----------|------------|------|-----|------|-----|-----|-----|
| 200 | 200 | 200 | 150 | 150 | 125 | 90 | 50 | 30 | 33 | 40 | 60 | 150 |

(B) The California Department of Fish and Wildlife or the National Marine Fisheries Service may notify the Deputy Director that the pertinent life stage(s) of the pertinent species the flows are crafted to protect is not yet present, or is no longer present at the time anticipated. Additionally, the California Department of Fish and Wildlife, after coordination with the National Marine Fisheries Service, may notify the Deputy Director that lower, alternative flows at the Fort Jones gage, or alternative flows at a different point or points in the watershed, provide equal or better protection for the pertinent species' relevant life stages.

(2) Shasta River. The Shasta River enters the Klamath River at United States Geological Survey River Mile 179.5, at the junction of State Routes 263 and 96.

(A) As measured in cubic feet per second at United States Geological Survey gage 11517500 located near Yreka:

| Jan | Feb | Mar 1-24 | Mar 25-31 | Apr | May | June | July | Aug | Sept 1-15 | Sept 16-30 | Oct | Nov | Dec |
|-----|-----|----------|-----------|-----|-----|------|------|-----|-----------|------------|-----|-----|-----|
| 125 | 125 | 125 | 105 | 70 | 50 | 50 | 50 | 50 | 50 | 75 | 105 | 125 | 125 |

(B) The California Department of Fish and Wildlife or the National Marine Fisheries Service may notify the Deputy Director that the pertinent life stage(s) of the pertinent species the flows are crafted to protect is not yet, or is no longer present at the time anticipated, or the California Department of Fish and Wildlife, after coordination with the National Marine Fisheries Service, may notify the Deputy Director that lower alternative flows at the Yreka gage, or alternative flows at a different point or points in the watershed, provide equal or better protection for the pertinent species' relevant life stages.

(3) Compliance with the drought emergency minimum flows will be determined by the Deputy Director.

(d) Notice

(1) Initial curtailment orders will be sent to each water right holder, agent of record on file with the Division of Water Rights, or landowner, as applicable. The water right holder, agent of record on file with the Division of Water Rights, or landowner is responsible for immediately providing notice of the curtailment order(s) to all diverters exercising the water right(s) covered by the curtailment order(s).

(2) The State Water Board has established the "Scott-Shasta Drought" email subscription and distribution list that water right holders, landowners, and other parties may join to receive drought-related notices and updates regarding curtailments in the Scott River and Shasta River watersheds. The State Water Board has also established a "Scott-Shasta Drought" webpage at: https://www.waterboards.ca.gov/drought/scott_shasta_rivers/. Notice provided by email or by posting on the State Water Board's drought webpage shall be sufficient for all purposes related to drought notices and updates regarding curtailment orders.

(e) Suspension, reinstatement, or rescission of curtailment orders shall be noticed using the email subscription and distribution list or webpage described in subdivision (d)(2).

(f) Local Cooperative Solutions

    (1) Local cooperative solutions by individuals or groups may be proposed by petition to the Deputy Director as an alternative means of reducing water use to meet or preserve drought emergency minimum flows, or to provide other fishery benefits (such as cold-water refugia, localized fish passage, or redd protection), in lieu of curtailment as described in this section.

        (A) Petitions to implement local cooperative solutions that coordinate diversions, share water, strategically manage groundwater and/or surface water for fisheries benefits, reduce annual water use, or engage in similar activities may be submitted to the Deputy Director at any time, except as noted in subsection (f)(4)(D)(ii).

        (B) The Division of Water Rights and the Executive Director may coordinate with the California Department of Fish and Wildlife, National Marine Fisheries Service, the Scott River and Shasta River Watermaster District, the developers of any model or other information used as part of the petition, and others in evaluating local cooperative solutions.

        (C) After or as part of approval of a petition, the Deputy Director shall not issue curtailment orders or shall suspend, rescind, or modify, as applicable, such orders already issued, affecting those rights relevant to the proposed local cooperative solution so long as the Deputy Director finds that any continued diversions under the local cooperative solution are reasonable and do not result in unreasonable harm to other legal users of water.

        (D) Deputy Director approval of a petition for a local cooperative solution may be subject to appropriate conditions, including metering, monitoring, and reporting requirements, to assure that no unreasonable injury to users of water will occur, that the terms and purpose of the petition or the associated underlying binding agreement will be met, and to information useful in responding to the ongoing drought.

        (E) The Deputy Director may delegate approval of any local cooperative solution to an Assistant Deputy Director for the Division of Water Rights.

        (F) The Deputy Director may rescind approval of a local cooperative solution and issue or reinstate curtailment orders for the relevant

water rights in the order described in section 875.5, notwithstanding approval of the local cooperative solution, if monitoring or other reliable information indicates that parties are not meeting their obligations under the local cooperative solution or the agreement is not providing the benefits outlined in the local cooperative solution, or based on an objection filed under (f)(2).

(G) A coordinating entity for the purposes of this section shall refer to an entity which possesses the expertise and ability to evaluate and require performance of the commitments made in a local cooperative solution, and which commits that:

(i) Evaluation of local cooperative solution proposals and inspections shall be conducted by representatives who lack a financial or close personal interest in the outcome, and

(ii) Information collected on compliance with local cooperative solutions is provided to the State Water Board monthly and upon request. The entity shall undertake data collection (including metering data) and inspections, either by itself or in coordination with State Water Board staff, sufficient to ensure implementation of local cooperative solutions, including inspection or data collection targeted within two weeks of completion of commitments to cease pumping as of a date certain.

With such commitment, the coordinating entity may be the California Department of Fish and Wildlife, the National Marine Fisheries Service, the Scott Valley and Shasta Valley Watermaster District, the Siskiyou or Shasta Valley Resources Conservation District, a nonprofit organization with expertise and experience in water-saving transactions, or a similarly qualified public entity.

(2) Diversions covered by a local cooperative solution approved by the Deputy Director pursuant to this section are subject to this article and violations of such an approved local cooperative solution shall be subject to enforcement as a violation of this article. Notice of petitions and decisions under this section will be posted as soon as practicable on the State Water Board's drought webpage described in subdivision (d)(2). Normally, notice of the local cooperative solution petition shall post on the website at least one week prior to a decision on the merits; however, the Deputy Director may issue a decision under this article prior to providing such notice. Any interested person may file an objection to the petition or decision. The objection shall indicate the manner of service upon the petitioner. The State Water Board will consider any objection, and may hold a hearing thereon, after notice to all interested persons.

(3) The Division of Water Rights, California Department of Fish and Wildlife, National Marine Fisheries Service, Scott Valley and Shasta Valley Watermaster District, or North Coast Regional Water Quality Control Board may install and maintain additional gages in the Scott River and Shasta River watersheds. The gages may be used to evaluate compliance with the flow requirements defined in subdivisions (c)(1) and (c)(2) on a watershed or tributary scale, as needed. Diverters or other entities may also request to install and maintain a gage or use an existing gage to support new flow requirement compliance points by submitting a written request with supporting data and information to the Deputy Director for approval.

(4) The Deputy Director may approve a petition to implement local cooperative solutions under this article as follows:

(A) For watershed-wide cooperative solutions: The Executive Director determines that a watershed-wide local cooperative solution will provide sufficient assurance that the flows in subdivision (c)(1) or (c)(2) are achieved for a specific time period, considering the amount of flow anticipated and the level of assurance that flows made available by agreements will be protected.

(B) For tributary-wide local cooperative solutions: The Deputy Director may approve the petition submitted under this article by a diverter or group of diverters that provides for tributary-wide benefits if:

(i) Sufficient information allows the Deputy Director to identify the appropriate contribution of the tributary to the flows identified in subdivision (c)(1) or (c)(2), and the Executive Director makes a finding that a local cooperative solution is sufficient to provide the pro-rata flow for that tributary. The Deputy Director may approve this solution regardless of whether the flows identified in subdivisions (c)(1) and (c)(2) are being met; or

(ii) The California Department of Fish and Wildlife finds that the in-tributary or downstream benefits are equal to or greater than the anticipated contribution to protections provided by the flows in subdivision (c)(1) or (c)(2). The Deputy Director may approve this solution regardless of whether the flows identified in subdivisions (c)(1) and (c)(2) are being met.

(C) For individual local cooperative solutions: In the absence of applicable watershed-wide or tributary-specific local cooperative

6

solutions, the Deputy Director may approve a petition submitted under this article:

    (i) Where the watershed-wide flows in subdivision (c)(1) or (c)(2) and tributary-specific pro-rata flows established by the Deputy Director cannot be guaranteed, and there is a binding agreement under which water users have agreed to cease diversions in a specific timeframe. Such binding agreement may be made with a coordinating entity. Where the diverter or coordinating entity submits a petition under this subdivision that includes a certification that diversion under a specified right has ceased for a certain time period, the Deputy Director shall approve the petition unless there is evidence that the diversion is nonetheless occurring.

    (ii) Where an individual diverter or sub-tributary group of diverters has entered into a binding agreement with the California Department of Fish and Wildlife or the National Marine Fisheries Service to perform actions for the benefit of anadromous salmonids, and the California Department of Fish and Wildlife makes a recommendation for an exemption to curtailment based on an assessment that the benefits of the actions to anadromous fish in a specific time period are equal to or greater than the protections provided by their contribution to flow described in section 875, subdivision (c)(1) or (c)(2) for that time period.

(D) For overlying or adjudicated groundwater diversions for irrigated agriculture described under in section 875.5, subdivision (a)(1)(A)(ix) [Scott River] or section 875.5, subdivision (b)(1)(C) [Shasta River] the Deputy Director may approve a groundwater-basin-wide, groundwater-sub-basin-wide, or any number of individual local cooperative solutions where:

    (i) The proposal may be based on a binding agreement made with a coordinating entity with primary responsibility to verify implementation of the local cooperative solution.

    (ii) For individual proposals, the proposal must be submitted no later than April 15 and must be implemented during the entirety of the irrigation season (including during pendency of approval), unless the proponent withdraws.

    (iii) The proposal includes a description of metering in place for groundwater well extractions, and a proposal to meter and record such extractions daily and report monthly to the Deputy Director or the coordinating entity, as applicable,

except as described below. The State Water Board has funding and technical support available to support some amount of metering, and those interested in such assistance are encouraged to promptly contact the State Water Board.

    a. The Deputy Director may waive this requirement for groundwater wells irrigating less than 30 acres. In determining whether to waive the requirement, the Deputy Director may consider, inter alia, distance of the groundwater well from surface water and whether the groundwater well would provide uniquely useful information in light of other metered information being provided. The Deputy Director may require other information in lieu of metering in such an instance.

    b. When a meter is not currently installed and may not be installed prior to the start of the irrigation season, the petitioner may submit a time schedule as part of a proposal that describes and substantiates the efforts, actions, and timelines for installation of a meter. The Deputy Director may approve a proposal with a reasonable time-schedule, and upon a finding that the proponent has taken reasonable steps to procure and install a meter, including coordination with the State Water Board or another entity with funding and/or expertise in meter installation.

    c. The Deputy Director may waive the requirement upon a determination that metering in a particular instance is not feasible.

(iv) The proponent(s) agrees to allow compliance inspections with 24-hour notice.

(v) For percent-based reduction in pumping local cooperative solutions:

    a. For the Scott River: The proposal provides at least:

        1. A net reduction of water use of 30 percent throughout the irrigation season (April 1 – October 31); and

        2. A monthly reduction of 30 percent in the July through October time period.

b. For the Shasta River: The proposal provides at least:

   1. A net reduction of water use of 15 percent throughout the irrigation season (March 1 – November 1); and
   2. A monthly reduction of 15 percent in the June through September time period.

c. The relevant water use reduction shall generally be based on a comparison to the 2020, 2021, 2022, or 2023 irrigation season, and may be demonstrated by evidence that provides a reasonable assurance that the change in farming practice or other action results in at least the relevant proportionate reduction in water use. Such evidence may include but is not limited to: pumping reports; actions that will be taken to reduce water use; estimation of water saved from conservation measures or changes in irrigation or planting decisions; and electric bills. However, if evidence for the amount of water applied for the 2020, 2021, 2022, or 2023 irrigation seasons indicates a base rate of applied water that is higher than 33 inches per year for alfalfa, 14 inches per year for grain, or 30 inches per year for pasture, then the base rate of applied water shall be the aforementioned values unless the proponent makes an additional showing that a higher base rate number is an appropriate comparison in light of relevant information that can include but is not limited to multi-year practices, soil type, and irrigation methods.

d. In implementing a local cooperative solution approved under this subdivision (f)(4)(D)(v), a diverter or water user may adjust the timing of the actions planned to meet the requirements of subdivision (f)(4)(D)(v)a or (f)(4)(D)(v)b, by up to one week as an adaptive response to precipitation or cool weather, if the shift in timing does not reduce the total irrigation season water savings. For example, a diverter may postpone a planned irrigation rotation for one week if rain or cool weather allows for greater time between rotations than initially planned, even if the shift would trigger a failure to meet the monthly reductions described in subdivision (f)(4)(D)(ii)(2) or (f)(4)(D)(iii)(3).

1. The diverter or user must provide the coordinating entity and the Deputy Director at least three (3) business days notice of the intent to shift actions, including the reason for the shift and a demonstration that it will continue to meet the approved irrigation season water savings.

2. The diverter or user may implement the change unless the Deputy Director disapproves the shift based a failure to meet the requirements of this subdivision. Signed binding agreements do not need revision to incorporate this subdivision (f)(4)(D)(v)d. or actions thereunder.

(vi) Graduated Overlying Groundwater Diversion Cessation Schedules: The Deputy Director may approve a petition that provides for cessation of overlying groundwater diversions on one of the following two schedules, after evidence of compliance with the terms is evaluated. Such evidence shall include a demonstration that the proposal reduces irrigation as compared to standard practice on the property (e.g., practice in a similar unregulated year), taking crop rotation and number of alfalfa cuttings into account, unless not applicable (e.g., not for pasture).

a. Option 1: Diversion to irrigate the following percentages of irrigated acres shall cease by the dates below:

1. 15 percent by July 15;
2. 50 percent by August 15; and
3. 90 percent by August 31, with a maximum of 8 inches of water to be applied to the remaining 10 percent of irrigated acres during the remainder of the irrigation season. This 10 percent can be on land previously fallowed.

b. Option 2: Diversion to irrigate the following percentages of irrigated acres shall cease by the dates below:

1. 20 percent by July 20;
2. 50 percent by August 20; and

3. 95 percent by September 5, with a maximum of 6 inches of water to be applied to the remaining 5 percent of irrigated acres during the remainder of the irrigation season. This 5 percent can be on land previously fallowed.

(vii) Best Management Practices Local Cooperative Solution: The Deputy Director may approve a petition that incorporates all of the following:

a. Use of a low-energy precision application (LEPA) system on all irrigated acreage, including no irrigation of corners after June 15 and no use of end guns.

b. Use of soil moisture sensors to inform irrigation timing, with records available for inspection by the coordinating entity, if applicable, and/or State Water Board.

c. In years with a snow pack of 80 percent or less of the Department of Water Resources' California Data Exchange Center's first May snow water equivalent station average (or the average of the first April measurement if May snow pack measurements are not gathered in the irrigation year) in the Scott River watershed, or with a water year determination of dry or very dry in the Shasta River watershed, as determined under Table 2 of the March 2021 Montague Water Conservation District water operation plan, cessation of irrigation on 90 percent of irrigated acreage by August 31, with a maximum of two (2) inches of water/acre to be applied to the remaining 10 percent of irrigated acres for existing alfalfa fields and grain, or four (4) inches of water/acre for pasture or new alfalfa plantings, during the remainder of the irrigation season.

(viii) A diverter may propose a local cooperative solution for all or a portion of their agricultural lands. In considering approval of a proposed local cooperative solution for a portion of irrigated land or affecting only certain diversions exercised by a diverter, the Deputy Director can require assurance that water use is not increased on lands outside the local cooperative solution in a manner that undermines the groundwater reductions achieved through the local cooperative solution. For example, the Deputy Director may

consider whether increasing groundwater pumping on lands outside the area proposed will provide increased run-off to lands that otherwise would have reduced water application or consider whether a proposed local cooperative solution presents a water savings beyond that achieved by a standard grain rotation.

(ix) Overlying groundwater local cooperative solutions may be crafted or amended to allow for enhanced use of valid surface water rights as compared to previous years, in light of the potential for groundwater recharge benefits. Such local cooperative solutions shall include support for an anticipated improvement in groundwater elevations and/or instream benefits and may require monitoring for evaluation of benefits to groundwater elevation and/or instream conditions.

(E) Where a diverter receives a curtailment order for fewer water rights than are used on his or her property, the Deputy Director may approve a petition for a comparable reduction in use of a more senior right in favor of continuing diversion under the more junior right otherwise subject to curtailment where the petition provides reliable evidence sufficient to support the following findings:

(i) The change does not injure other legal users of water, including by reducing the contribution to flows described in subdivision (c) that other users would rely on;

(ii) The change does not result in an increased consumptive use of water; and

(iii) The change does not result in elevation of water temperature above that which would occur from curtailing the original source.

Authority:  Sections 1058, 1058.5, Water Code

Reference:  Cal. Const., Art X, Sec. 2; Sections 100, 104, 105, 109, 186, 275, 1011, 1011.5, 1051.1, 1058.5, 5106, Water Code; *Environmental Defense Fund v. East Bay Muni. Util. Dist.* (1980) 26 Cal.3d 183; *Light v. State Water Resources Control Board* (2014) 226 Cal.App.4th 1463; *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224; *Stanford Vina Ranch Irrigation. Co v. State of California* (2020) 50 Cal.App.5th 976.

§ 875.1 Non-Consumptive Uses

(a) Diversion and use described in this section under any valid basis of right may continue after issuance of a curtailment order under this article without further approval from the Deputy Director, subject to the conditions set forth in this section. Any diverter wishing to continue diversion under this subdivision must submit to the Deputy Director a certification which describes the non-consumptive use and explains, with supporting evidence, how the diversion and use do not decrease downstream flows in the applicable watershed. The Deputy Director may request additional information or disapprove any certification if the information provided is insufficient to support the statement or if more convincing evidence contradicts the claims. If a certification submitted pursuant to this section is disapproved, the diversions are subject to any curtailment order issued for that right. Exceptions to curtailment under this section apply to:

    (1) Direct surface diversions solely for hydropower if discharges are returned to the stream from which they are withdrawn, and water is not held in storage.

    (2) Direct surface water or groundwater diversions dedicated to instream uses for the benefit of fish and wildlife pursuant to Water Code section 1707, including those diversions that divert water to a different location for subsequent release. This subdivision only applies where the location of release is hydraulically connected to the basin or watershed from which it was withdrawn.

    (3) Direct surface water or groundwater diversions where the Deputy Director, the California Department of Fish and Wildlife, and the Executive Officer of the North Coast Regional Water Quality Control Board have approved a substitution of releases of either stored water or groundwater into the Scott River or Shasta River or a tributary thereof for the benefit of fish and wildlife such that there is not anticipated to be a measurable net decrease in stream flow as a result of the diversion at the confluence of the tributary with the mainstem of the Scott River or Shasta River, or the next downstream United States Geological Survey gage, as applicable. The release of water does not have to be conducted by the owner of the water right proposed for the continued diversions, provided an agreement between the water right holder and the entity releasing the water is included in the proposal. The party proposing the substitution of releases shall provide documentation supporting no measurable decrease in stream flow is anticipated as a result of the release of water. The Deputy Director may require reporting and monitoring as part of any approval.

    (4) Other direct diversions solely for non-consumptive uses upon a demonstration that the diversion and use do not decrease downstream flow.

Authority:  Sections 1058, 1058.5, Water Code

Reference:  Cal. Const., Art. X, § 2; Sections 100, 187, 275, 348, Water Code

§ 875.2 Minimum Human Health and Safety Needs

(a) Definition: For the purposes of this article, "minimum human health and safety needs" refer to the amount of water necessary to prevent adverse impacts to human health and safety, for which there is no feasible alternate supply. "Minimum human health and safety needs" include:

(1)  Minimum domestic water uses, including water for human consumption, cooking, or sanitation purposes. Further, minimum domestic water uses include incidental uses necessary for sustenance, such as non-commercial vegetable gardens, and domestic animals but do not include commercial irrigation or commercial livestock. As necessary to provide for minimum domestic water use, water diverted for minimum human health and safety needs may include water hauling and bulk water deliveries, so long as the diverter maintains records of such deliveries and complies with the reporting requirements of section 875.6, and so long as such diversion and use is consistent with a valid water right.

(2) For Urban Water Suppliers, as defined in Water Code section 10617, water uses allowed under and in accordance with the strictest stage of that supplier's adopted Water Shortage Contingency Plan as part of its Urban Water Management Plan.

(3)  Water supplies necessary for energy sources that are critical to basic grid reliability, as identified by the California Independent System Operator, California Public Utilities Commission, California Energy Commission, or a similar energy grid reliability authority.

(4)  Water supplies necessary to prevent tree die-off that would contribute to fire risk to residences, and for maintenance of ponds or other water sources for firefighting, in addition to water supplies identified by the California Department of Forestry and Fire Protection or another appropriate authority as regionally necessary for fire preparedness or post-fire recovery and reforestation efforts.

(5)  Water supplies identified by the California Air Resources Board, a local air quality management district, or other appropriate public agency with air quality expertise, as necessary to address critical air quality impacts to protect public health.

(6)  Water supplies necessary to address immediate public health or safety threats, as determined by a public agency with health or safety expertise.

(7)  Other water uses necessary for human health and safety which a state, local, tribal, or federal health, environmental, or safety agency has determined are critical to public health and safety or to the basic infrastructure of the state. Diverters wishing to continue diversions for these uses must identify the human health and safety need, include approval or similar relevant documentation from the appropriate public agency, describe why the amount requested is critical for the need and cannot be met through alternate supplies, state how long the diversion is expected to continue, certify that the supply will be used only for the stated need, and describe steps taken and planned to obtain alternative supplies.

(b) Diversions described in this section under any valid basis of right may be authorized to continue notwithstanding curtailment of that right, subject to the conditions set forth in this section. A diversion that would otherwise be subject to curtailment may be authorized if:

(1) The diversion is necessary for minimum human health and safety needs; and therefore

(2) The diversion is necessary to further the constitutional policy that the water resources of the state be put to beneficial use to the full extent they are capable, and that waste and unreasonable use be prevented, notwithstanding the effect of the diversions on more senior water rights or instream beneficial uses.

(c)

(1) Diversions for minimum human health and safety needs under any valid basis of right of not greater than 55 gallons per person per day may continue notwithstanding curtailment of that right without further approval from the Deputy Director, subject to the conditions set forth in this section. Any diverter wishing to continue diversion under this subdivision must submit to the Deputy Director a certification of compliance with the requirements of subdivisions (c)(1)(A)-(E), below. The Deputy Director may request additional information or set additional requirements on continued diversion.

(A) Not more than 55 gallons per person per day will be diverted and used for human health and safety purposes under all bases of right.

(B) The diversion is necessary to serve minimum human health and safety needs as defined in section 877.1, subdivision (h), after all other alternate sources of water have been used. To the extent other water sources are available, those sources will be used first and the total used will not exceed 55 gallons per person per day.

(C) The diverter and all end users of the diverted water are operating under the strictest existing conservation plan for that place of use, if such a plan exists for the area or service provider. If additional approvals are required before implementation of the conservation regime, the diverter must certify that all possible steps will be taken immediately to ensure prompt approval.

(D) If the diverter or anyone using water under the diverter's basis of right is an Urban Water Supplier, it has declared a water shortage emergency condition and either already has adopted regulations and restrictions on the delivery of water or will adopt conservation and water delivery restrictions and regulations within a timeframe specified by the Deputy Director as a condition of certification.

(E) The diverter, or the end user where the end user is purchasing water for human health and safety use, has either pursued steps to acquire other sources of water, but has not yet been completely successful, as described in an attached report, or the diverter or end user, where appropriate, will pursue the steps in an attached plan to identify and secure additional water.

(2) To the extent that a diversion for minimum human health and safety needs requires more than 55 gallons per person per day, or cannot be quantified on the basis of gallons per person per day, continued diversion of water notwithstanding curtailment of the applicable water right requires submission of a petition demonstrating compliance with the requirements of subdivisions (c)(1)(B)-(E) above and (c)(2)(A)-(F) below, and approval by the Deputy Director. The Deputy Director may condition approval of the petition on implementation of additional conservation measures and reporting requirements. Any petition to continue diversion to meet minimum human health and safety needs of more than 55 gallons per person per day must:

(A) Describe the specific circumstances that make the requested diversion amount necessary to meet minimum human health and safety needs.

(B) Estimate the amount of water needed.

(C) Certify that the supply will be used only for the stated need.

(D) Describe conservation steps already taken and any other additional steps the diverter or end user, as appropriate, will take to reduce diversions and consumption.

(E) Provide the timeframe in which the diverter or end user expects to reduce usage to no more than 55 gallons per person per day, or

            why minimum human health and safety needs will continue to require more water.

    (F) As necessary, provide documentation that the use meets the definition of minimum human health and safety needs. For water supplies necessary for fire prevention or firefighting purposes, substantiating documentation, such as guidance from the local fire department, local city or county ordinances, or equivalent local requirements, may be requested by the Deputy Director.

(d) For public water systems with 15 or greater connections and small water systems of 5 to 15 connections, gallons per person per day shall be calculated on a monthly basis and the calculation methodology shall be consistent with the State Water Board's Percentage Residential Use and Residential Gallons Per Capita Daily Calculation (PRV and R-GPCD Calculation), dated September 22, 2020, which is hereby incorporated by reference.

(e) For water supplies necessary for electrical power generation critical to grid reliability, substantiating documentation, such as a letter of support from California Independent System Operator, California Public Utilities Commission, California Energy Commission, or a similar energy grid reliability authority, must be provided.

(f) To the extent necessary to resolve immediate public health or safety threats, a diversion subject to curtailment may continue while a petition under subdivision (b)(2) is being prepared and is pending. The Deputy Director may require additional information to support the initial petition, information on how long the diversion is expected to continue, and a description of other steps taken or planned to obtain alternative supplies.

(g) Notice of petitions and decisions under this section and sections 875.3 and 875.1 will be posted as soon as practicable on the State Water Board's drought webpage. The Deputy Director may issue a decision under this article prior to providing notice.

(h) Notwithstanding California Code of Regulations, Title 23, section 1064, a petition pursuant to Water Code section 1435 or 1725 solely for the provision of water for minimum human health and safety shall be accompanied by a filing fee of $250.

(i) For the purposes of this section and section 875.6, subdivision (b) only, a governmental entity or nonprofit organization with the ability to assess human health and human safety water needs for communities without service from a public water system, may "stand in the shoes of" a diverter and file a certification or petition for human health and safety water that otherwise complies with the terms of this section.

Authority: Sections 1058, 1058.5, Water Code

Reference: Cal. Const., Art. X, § 2; Sections 100, 100.5, 104, 105, 106.3, 275, 1058.5, Water Code; Environmental Defense Fund v. East Bay Muni. Util. Dist. (1980) 26 Cal.3d 183; Light v. State Water Resources Control Board (2014) 226 Cal.App.4th 1463; Stanford Vina Ranch Irrigation Co. v. State of California (2020) 50 Cal.App.5th 976.

§ 875.3 Minimum Diversions for Livestock Watering

(a) Limited diversions for minimal livestock watering, even through means that result in some seepage losses, may be authorized to continue after receipt of a curtailment order as specified in this section. Such diversions may include, but are not limited to, pipes, wells, or lined ditches.

(b) Limited livestock watering diversions may be authorized to continue after receipt of a curtailment order upon certification to the Deputy Director that the diversion: (1) is necessary to provide adequate water to livestock, (2) is conveyed without seepage through a means specified in the certification, and (3) either, shall not, on average, exceed the reasonable livestock watering quantities set forth in Article 5, section 697 for livestock addressed in that section, or, for livestock not addressed in Article 5, section 697, shall not, on average, exceed the closest analogous livestock in Article 5, section 697 or a minimum water amount set forth in the certification with reference to supporting evidence regarding the particular livestock needs. The self-certification shall also include the number of livestock being provided with water, diversion location, water source information, the anticipated daily amount diverted to provide water for livestock, and whether the water source is an alternate source used to comply with the emergency regulation. The Deputy Director may request additional information or disapprove any self-certification if the information provided is insufficient to support the statement or if more convincing evidence contradicts the claim(s). If a self-certification submitted pursuant to this section is disapproved, the diversions are subject to any applicable curtailment order issued for that basis of right.

(c) Limited diversions may be temporarily increased to up to twice the amount in Article 5, section 697 to support minimum livestock water needs when the daily high temperatures meet or exceed 90 degrees Fahrenheit.

(d) To the extent that a diversion for minimum livestock water needs requires more than the reasonable livestock watering quantities set forth in Article 5, section 697, or that it relies on conveyances with minimal amounts of seepage, the continued diversion of water after issuance of a curtailment order for the diversion requires submission of a petition demonstrating compliance with the requirements of subdivisions (d)(1)-(5), below, and approval by the Deputy Director. The Deputy Director may condition approval of the petition on implementation of additional conservation measures, monitoring, or reporting requirements. Any petition to continue diversion to meet minimum livestock

watering needs greater than the reasonable livestock watering quantities set forth in Article 5, section 697 must:

    (1) Describe the specific circumstances that make the requested diversion amount necessary to meet minimum livestock watering needs, if a larger amount is sought.

    (2) Estimate the total amount of water needed.

    (3) Certify that the supply will be used only for the stated need.

    (4) Describe any other additional steps taken to reduce diversions and consumption.

    (5) Provide the timeframe in which the petitioner expects to reduce usage to no more than the reasonable livestock watering quantities specified in Article 5, section 697, or why minimum livestock needs will continue to require more water.

Authority: 1058, 1058.5, Water Code

Reference: Cal. Const., Art. X, § 2; Sections 100, 100.5, 104, 105, 275, 1058.5, Water Code; Environmental Defense Fund v. East Bay Muni. Util. Dist. (1980) 26 Cal.3d 183; Light v. State Water Resources Control Board (2014) 226 Cal.App.4th 1463; Stanford Vina Ranch Irrigation Co. v. State of California (2020) 50 Cal.App.5th 976.

§ 875.5 Priority for Curtailments in the Scott River and Shasta River Watersheds

(a) Scott River

    (1) Regarding curtailment orders in the Scott River watershed:

        (A) Curtailment orders in the Scott River watershed to meet drought emergency minimum fisheries flows in the Scott River shall be issued taking into account water right priority, in groupings from lowest to highest priority, as follows:

            (i) All post-Scott River Adjudication appropriative water rights.

            (ii) Surplus Class Rights in all schedules of the Scott River Adjudication.

            (iii) All Post-1914 Appropriative water rights in the Scott River Adjudication, Shackleford Adjudication, and French Creek Adjudication, collectively.

            (iv) Diversions in Schedule D4 of the Scott River Adjudication.

            (v) Diversions in Schedule D3 of the Scott River Adjudication.

            (vi) Diversions in Schedule D2 of the Scott River Adjudication.

            (vii) Diversions in Schedule D1 of the Scott River Adjudication.

            (viii) Diversions in French Creek Adjudication, the Shackleford Adjudication, and Schedule B of the Scott River Adjudication, collectively.

(ix) Diversions in Schedule C of the Scott River Adjudication, and overlying groundwater diversions not described in the Scott River Adjudication.

(B) Surface diversions from the Scott River, Big Slough, Etna Creek, or Kidder Creek and described in Scott River Adjudication Schedules D2, D3, D4, B18, B23, and B26 that have moved from surface water to groundwater diversions as permitted under Scott River Adjudication, Paragraph 44, will be curtailed in priority grouping (a)(1)(A)(ix), rather than under (a)(1)(A)(iv), (a)(1)(A)(v), (a)(1)(A)(vi), or (a)(1)(A)(viii).

(C) Domestic and Livestock Water Uses during the non-irrigation season by diverters in Scott River Adjudication Schedules A, B, C, and D, under paragraph 36 shall follow the priority groups under (a)(1)(A)(iv) through (a)(1)(A)(viii), as applicable.

(D) To the extent that curtailment of fewer than all diversions in the groupings listed in (a)(1)(A)(i) and (a)(1)(A)(iii) through (a)(1)(A)(viii) would reliably result in sufficient flow to meet drought emergency minimum fisheries flows, the Deputy Director shall maintain the authority to issue, suspend, reinstate, or rescind curtailment orders for partial groupings based on the priorities in the applicable adjudication or through the appropriative right priority date, as applicable. Any partial curtailment of groups (a)(1)(A)(ii) and (a)(1)(A)(ix) shall be correlative, except that the Deputy Director may issue curtailments to groundwater diverters in (a)(1)(A)(ix) first to diversions closest to surface waterbodies, or use other reliable information to determine which diversions have the highest potential impact on surface flows.

(E) Diversions under Paragraph 39 of the Scott River Adjudication shall be curtailed with the group defined in (a)(1)(A) that corresponds to the schedule in which the diversion would be placed if the right were defined in the adjudication. If partial curtailment of the group is issued, suspended, reinstated, or rescinded under (a)(1)(D), these rights will be subordinated to the other rights in that schedule.

(F) Diversions under paragraph 41 of the Scott River Adjudication shall be curtailed with the group defined in (a)(1)(A) that corresponds to the schedule in which the diversion would be placed if the right were defined in the adjudication. If partial curtailment of the group is issued, suspended, reinstated, or rescinded under (a)(1)(D), these rights shall be treated as

subordinate to first priority rights in the schedule, and senior to second priority rights in that schedule.

(G) Diversions under paragraph 42 of the Scott River Adjudication shall be curtailed with the group defined in (a)(1)(A) that corresponds to the schedule in which the diversion would be placed if the right were defined in the adjudication. If partial curtailment of the group is issued, suspended, reinstated, or rescinded under (a)(1)(D), these rights shall be treated as first priority rights compared to downstream rights in that schedule, and subordinate to all upstream rights in that schedule.

(H) Diversions under paragraph 43 of the Scott River Adjudication shall be curtailed with the group defined in (a)(1)(A) that corresponds to the schedule in which the diversion would be placed if the right were defined in the adjudication. If an order for partial curtailment of the group is issued, suspended, reinstated, or rescinded under (a)(1)(D), these rights shall be treated as first priority rights in that schedule.

(I) Diversions under paragraphs 49 and 61 of the Scott River Adjudication shall be curtailed with the group defined in (a)(1)(A)(viii). If an order for partial curtailment of the group is issued, suspended, reinstated, or rescinded under (a)(1)(D), these rights will be treated as first priority rights in the schedule for the appropriate tributary.

(2) Curtailment orders in the Scott River watershed for lack of water availability at a diverter's priority of right shall be issued:

(A) First to appropriative rights that were initiated after the relevant adjudication, in the Shackleford Creek watershed, the French Creek watershed, and the Scott River Stream System as defined in paragraph 2 of the Scott River Adjudication,

(B) Then in accordance with the priorities set forth in the Scott River, Shackleford Creek, and French Creek Adjudications, as applicable, and

(C) Then correlatively to unadjudicated overlying groundwater diversions.

(b) Shasta River

    (1) Curtailment orders in the Shasta River Watershed to meet drought emergency minimum fisheries flows shall be issued taking into account water right priority, in groupings from lowest to highest water right priority, as follows:

        (A) Appropriative diversions initiated after the Shasta Adjudication. Appropriative surface water diversions obtained after the Shasta Adjudication in priority of the issuance date specified in the permit or license by the State Water Board. Groundwater appropriations in order of the priority date from when the well was constructed and water first used for appropriative purposes. For the purposes of this article, an appropriative groundwater right is distinguished from an overlying groundwater right when the diverter: 1) does not own land overlying the basin, 2) owns overlying land but uses the water on non-overlying land, or 3) sells or distributes the water to another party.

        (B) Post-1914 and pre-1914 water rights under the priorities and quantities set forth in the Shasta Adjudication. Groundwater appropriations initiated prior to the Shasta Adjudication in priority of when the well was constructed and water first used.

        (C) Riparian diversions and overlying groundwater diversions. The Deputy Director may limit overlying groundwater curtailment orders to larger diversions or diversions with the highest potential impact on surface flows.

            (i) If there is insufficient natural flow to furnish all rights of equal priority, then the available natural flow in excess of the minimum instream flow established in section 875, subdivision (c)(2) shall be distributed proportionally among the rights of the priority in question.

            (ii) Water released from storage or bypassed pursuant to a Water Code section 1707 Order is not available to downstream users.

(c) There are numerous small groundwater diversions in the Scott River and Shasta River watersheds, that are primarily used for domestic uses, firefighting ponds, and other uses closely related to human health and safety and minimum livestock watering needs. The Deputy Director may determine not to curtail such diversions of less than two acre-feet per annum in light of their de minimis impact on flows and the considerable effort required on the part of diverters and of the

State Water Board's staff to issue and respond to curtailment orders, and to file, review, and act on appropriate minimum use petitions.

(d)  Definitions: For the purposes of this section:

(1) "Scott River Adjudication" shall refer to the Decree entered on January 30, 1980 in Siskiyou County Superior Court Case No. 30662, In the Matter of Determination of the Rights of the Various Claimants to the Waters of Scott River Stream System, Except Rights to Water of Shackleford Creek, French Creek, and all Streams Tributary to Scott River Downstream from the U.S. Geological Survey Gaging Station, in Siskiyou County, California, and all supplements thereto.

(2) "Shackleford Adjudication" shall refer to the Decree entered on April 3, 1950 in Siskiyou County Superior Court Case No. 13775, In the Matter of the Determination of the Rights of the Various Claimants to the Waters of Shackleford Creek and its Tributaries in Siskiyou County, California, and all supplements thereto.

(3) "French Creek Adjudication" shall refer to the Judgement entered on July 1, 1959 in Siskiyou County Superior Court Case No. 14478, Mason v. Bemrod, and all supplements thereto.

(4) "Shasta Adjudication" shall refer to the Judgement and Decree entered on December 29, 1932 in Siskiyou County Superior Court Case No. 7035, In the Matter of the Determination of the Relative Rights, Based Upon Prior Appropriation, of the Various Claimants to the Waters of Shasta River and its Tributaries in Siskiyou County, California, and all supplements thereto.

Authority: Sections 101, 103,174, 186, Water Code

Reference: Sections 1058, 1058.5, Water Code; Cal. Const., Art. X, § 5; Hudson v. Dailey (1909) 156 Cal. 617; Shasta River Adjudication; Shackleford Adjudication; French Creek Adjudication; Scott River Adjudication; Stanford Vina Ranch Irrigation. Co v. State of California (2020) 50 Cal.App.5th 976.

§ 875.6 Curtailment Order Reporting

(a) All water users or water right holders issued a curtailment order under this article are required, within the timeframe specified by the Deputy Director, but not less than seven (7) days, to certify that one or more of the actions enumerated below was taken in response to the curtailment order. The Deputy Director may grant additional time for the submission of information regarding diversion and use of water upon a showing of good cause. The water user or water right holder shall certify, as applicable, that:

(1) Diversion under the identified water right(s) has ceased;

(2) Any continued use is under other water rights not subject to curtailment, specifically identifying those other rights, including the basis of right and quantity of diversion;

(3) Diversions under the identified water right(s) continue only to the extent that they are non-consumptive, for which a certification for continued diversion has been submitted as specified in section 875.1;

(4) Diversions under the identified water right(s) continue only to the extent that they are necessary to provide for minimum human health and safety needs, a certification has been filed as authorized under section 875.2, and the subject water right authorizes the diversion in the absence of a curtailment order;

(5) Diversions under the identified water right(s) continue only to the extent that they are necessary to provide for minimum livestock watering needs and a certification has been filed as identified in section 875.3, and the subject water right authorizes the diversion in the absence of a curtailment order.

(6) Diversions under the water right(s) continue only to the extent that they are consistent with a petition filed under section 875.2, subdivision (c)(2) or under section 875.3, subdivision (d) and diversion and use will comply with the conditions for approval of the petition; or

(7) The only continued water use is for instream purposes.

(b) All persons who are issued a curtailment order and continue to divert during a period of suspension or conditional suspension of such order, or to continue to divert out of order of the priority established in section 875.5, as authorized under sections 875.1, 875.2, or 875.3, may be required to submit and certify information identified on a schedule established by the Deputy Director as a condition of continued suspension or conditional suspension, or of certification or petition approval. The required information may include, but is not limited to, the following:

(1) The water right identification number(s), well information, or, if not applicable, other manner of identifying the water right under which diversions continue. For wells, this includes the location (GPS coordinates) and depth to groundwater.

(2) The public water system identification number for any public water system served by the diversion.

(3) How the diverter complies with any conditions of continued diversion, including the conditions of certification under section 875.3 or Article 24, section 878.1, subdivision (b)(1).

(4) Any failures to comply with conditions, including the conditions of certification under sections 875.2 or 875.3, and steps taken to prevent further violations. Conservation and efficiency efforts planned, in the process of implementation, and implemented, as well as any information on the effectiveness of implementation.

(5) Efforts to obtain alternate water sources.

(6) If the diversion is authorized under an approved petition filed pursuant to section 875.3, subdivision (d) or 875.2, subdivision (c)(2), progress toward implementing the measures imposed as conditions of petition approval.

(7) If the diversion is authorized under section 875.3, or cannot be quantified on the basis of amount per person per day under section 875.2, subdivision (c)(2):

    (A) The rate of diversion if it is still ongoing;

    (B) Whether the water has been used for any other purpose; and

    (C) The date diversion ceased, if applicable.

(8) The total water diverted for the reporting period and the total population served for minimum human health and safety needs. The total population must include actual or best available estimates of external populations not otherwise reported as being served by a diversion, such as individuals receiving bulk or hauled water deliveries for minimum domestic water use.

(9) The total water diverted for the reporting period and the total population of livestock watered to meet minimum livestock watering needs identified in section 875.3.

(10) Diversion amounts for each day in acre-feet per day, maximum diversion rate in cubic feet per second, pumping rate in gallons per minute, and anticipated future daily diversion amounts and diversion rates.

Authority: Sections 1058, 1058.5, Water Code

Reference: Sections 100, 187, 275, 348, 1051, 1058.5, 1841, Water Code

§ 875.7 Inefficient Livestock Watering

(a) For the purposes of this regulation, inefficient surface water diversions for livestock watering are those that divert, as measured at the point of diversion, more than ten times the amount of water needed to support the number of livestock and reasonable water quantities set forth in Article 5, section 697 (or, for livestock not addressed in Article 5, section 697, the closest analogous livestock to those listed in Article 5, section 697).

(b) From September through March 31, inefficient surface water diversions in the Scott River and Shasta River watersheds for livestock watering, which result in excessive water diversion for a small amount of water delivered for beneficial use, are not reasonable and are therefore prohibited in light of the alternatives available and competing uses unless all of the following minimum flow requirements are met:

(1) The minimum flow requirements in Section 875, subsection (c) are met without any active curtailment orders in the relevant watershed.

(2) The diversions do not occur in the fall until the California Department of Fish and Wildlife has determined there has been flow sufficient to stimulate fall-run Chinook salmon migration.

(3) The diversions do not occur after November 1 until the California Department of Fish and Wildlife has determined there has been a flow sufficient to stimulate coho salmon migration, including in the relevant tributary if applicable.

(4) For tributary diversions, except those from Moffett Creek in the Scott River Watershed, the relevant tributary is and remains connected to the mainstem.

(5) The diversions are operated to bypass 90 percent of flow at the point of diversion, except that when flows exceed those listed below in the relevant watershed, the diversions may operate to bypass 80 percent of flow:

(A) In the Scott River watershed when flows at the United States Geological Survey gage 11519500 located downstream of the city of Fort Jones at the northern end of Scott Valley (Scott River Mile 21), in cubic feet per second, are greater than 62 in September; 134 from October 1-15; 139 from October 16-31; 266 in November; 337 in December; 362 in January and February, and 354 in March.

(B) In the Shasta River watershed when flows are greater than 220 cubic feet per second at the United States Geological Survey gage 11517500 located near Yreka.

(6) The diversions are operated to bypass amounts greater than those described in subdivision (5) as necessary to avoid disturbing redds.

(c) For diversions occurring under the flow conditions described in subdivision (b)(1)-(6):

  (1) Diverters shall notify the State Water Board of the intent to divert by e-mailing ScottShastaDrought@waterboards.ca.gov, including: the diverter's name and contact information; the point of diversion and water right under which the diversion will occur and the anticipated diversion amount; and the means by which the diverter will track compliance with the minimum flow requirements in (b); and

  (2) Diverters shall maintain records of such diversions and provide them to the State Water Board upon request.

(d) The requirements for diversions in subdivision (b)(4)-(6) do not apply to diversions upstream of Dwinell Dam in the Shasta River watershed.

(e) Livestock diversions that would otherwise be prohibited under this section may be included in a proposal for a local cooperative solution, either on their own or as either part of a proposal under section 875 (f)(4)(B) or (C). For a local cooperative solution under section 875(f)(4)(B)(ii) or (C)(ii), California Department of Fish and Wildlife or National Marine Fisheries Service may make an alternative finding that a diversion under a local cooperative solution solely for livestock watering that is otherwise prohibited under this section will not result in redd dewatering or unreasonably interfere with adult or juvenile migration or rearing. The Deputy Director may approve such a local cooperative solution where lifting the prohibition will not cause or substantially contribute to tributary or mainstem disconnection.

(f) The Deputy Director may suspend operation of this provision as to a particular diverter for a limited period of time upon a demonstration that the diverter's existing alternative watering system has failed.

Authority: Sections 1058, 1058.5, Water Code

Reference: Cal. Const., Art. X, § 2; Sections 100, 100.5, 104, 105, 275, 1058.5, Water Code; Environmental Defense Fund v. East Bay Muni. Util. Dist. (1980) 26 Cal.3d 183; Light v. State Water Resources Control Board (2014) 226 Cal.App.4th 1463; Stanford Vina Ranch Irrigation Co. v. State of California (2020) 50 Cal.App.5th 976.

§ 875.8 Information Orders

(a) The Deputy Director may issue information orders to some or all water users, landowners, diverters, or other water right holders in the Scott River and Shasta River watersheds, requiring them to provide additional information related to water use as relevant to implementing this article. The Deputy Director will prioritize information orders for larger diverters and landowners or water right holders with the highest potential to impact surface flows. The Deputy Director, in

determining whether and the extent to which to impose information orders under this subdivision, will consider the need for the information and the burden of producing it, and will take reasonable efforts to avoid requiring duplicative reporting of information that is already in the State Water Board's possession. Information orders shall follow the same procedures set forth in section 875, subdivision (d).

Information required in an order may include, but is not limited to:

    (1) For wells:

        (A) Location of the well;
        (B) Age of well, including date of installation and first use;
        (C) Maximum pump rate and volume pumped per month;
        (D) Place of use and purpose of use (beneficial uses of water);
        (E) Projected estimate of pumping volumes at a frequency of no more than weekly;
        (F) Estimates or measurements of past use;
        (G) Groundwater level; and
        (H) Other available water sources.

    (2) For surface water diversions:

        (A) Place of use and purpose of use (beneficial uses of water);
        (B) Type of water right;
        (C) Source of water;
        (D) Volume of storage;
        (E) Diversion rate;
        (F) Other available water sources; and
        (G) Projected estimate of diversion at a frequency of no more than weekly.

The orders may additionally request other information relevant to forecasting use, impacts to the surface streams in the current drought year, assessing compliance with this article, or in contingency planning for continuation of the existing drought emergency.

    (b) Any party receiving an order under this subdivision shall provide the requested information within the time specified by the Deputy Director, but not less than five (5) days. The Deputy Director may grant additional time for the submission of information regarding diversion and use of water upon a showing of good cause. Each landowner is responsible for immediately providing notice of any information order(s) to all water users associated with the parcel of land related to the information order.

(c) New Diversions. For purposes of this subdivision, a new diversion means a diversion initiated after issuance of a general information order to landowners in the watershed in which the new diversion is located. The owner of any new diversion must submit to the Deputy Director any information required by a general information order issued under section 875.8 prior to commencement of the new diversion, unless the Deputy Director approves commencement of the diversion based on substantial compliance with the general information order or one of the exemptions outlined in sections 875.2 or 875.3.

Authority: Sections 1058, 1058.5, Water Code

Reference: Article X, Section 2, California Constitution; Sections 100, 102, 104, 105, 109, 174, 275, 1051, 1052, 1058.5, Water Code; Light v. State Water Resources Control Board (2014) 226 Cal.App.4th 1463.

§ 875.9 Penalties

(a) A diverter must comply with a curtailment order issued under this article, any conditions of certification or approval of a petition under this article, and any water right condition under this article, notwithstanding receipt of more than one curtailment order. To the extent of any conflict between applicable requirements, the diverter must comply with the requirements that are the most stringent.

(b) Failure to meet the requirements of this article or of any order issued thereunder constitutes:

(1) a violation subject to civil liability pursuant to Water Code section 1846, and

(2) an infraction pursuant to Water Code section 1058.5, subdivision (d). Each of these can carry a fine of up to five hundred dollars ($500) for each day in which the violation occurs.

(c) Nothing in this section shall be construed as limiting the enforceability of or penalties available under any other provision of law.

Authority: Sections 1058, 1058.5, Water Code

Reference: Cal. Const., Art. X, § 2; Sections 275, 1052, 1055, 1058.5, 1825, 1831, Water Code; National Audubon Society v. Superior Court (1983) 33 Cal.3d 419.

# Exhibit D

May 2023 SISKIYOU COUNTY GIS ESTIMATE OF ILLEGAL CANNABIS SITES





BIG SPRINGS-MT. SHASTA VISTA AREA



BUTTE VALLEY AREA

PLEASANT VALLEY HIGHLANDS AREA

HORNBROOK/KRCE AREA

# Exhibit E

# Accessory non-potable water vegetable garden use associated with illegal cannabis cultivation camping.

- Observations: vegetable gardens found on sites are small in nature with an approximate average of 10ft. X 10ft. Or 100 square feet in size.

- Frequency: vegetable gardens observed on site of illegal cannabis grows have not been officially documented as they are not of interest to law enforcement. Photographs of typical vegetable gardens are presented below.



Garden plot within the illegal cannabis cultivation greenhouse.

Vegetable gardening water use component associated with illegal cannabis cultivation.





Raised bed garden plot on-site of illegal cannabis cultivation property.

Raised bed garden plot on-site of illegal cannabis cultivation property.



Garden plot on-site of illegal cannabis cultivation









08.28.2024 11:33





Gardens in Mt. Shasta Vista Subdivision.

- Average observed garden plot is 10 feet by 10 feet

- There are 1205 parcels (2.5-acre per parcel) within the Mt. Shasta Vista Subdivision.

- (79 parcels) in the Mt. Shasta Vista Subdivision have access to on-site water wells and are unaffected by the zoning ordinance.

# Exhibit F

# GIS survey from May 2023

The total acreage of the parcels that contain a grow site based on the data available is 15,335.9 acres. This is the acreage for the entire affected parcel, not the affected area within the parcel.

The actual affected acreage per each parcel has not been delineated, as such a range of percent of affected ground will be employed as estimated range of cleanup costs.



## County Wide Cost Estimate Based on GIS Site Review Conducted May 2023

| Total Parcels | 1,964 | | Total Acres | 15,335.9 |
|---|---|---|---|---|

| Average Site Assessment Cost | Average Hazardous Waste Disposal Cost | Average Solid Waste Disposal Cost | Average E-Waste Disposal Cost | Average Contaminated Soil Disposal Cost |
|---|---|---|---|---|
| $3,000 | $10,000 | $5,000 | $1,000 | $10,000 |
| | | | Total Cost Per Acre: | $29,000 |

| | Percent | Clean Up Acreage | Cost Per Acre | Estimated Cost |
|---|---|---|---|---|
| Estimated Acreage Requiring Cleanup at $29,000 | 25% | 3834 | $29,000 | $111,185,275 |
| | 50% | 7668 | $29,000 | $222,370,550 |
| | 75% | 11502 | $29,000 | $333,555,825 |

| | Percent | Clean Up Acreage | Cost Per Acre | Estimated Cost |
|---|---|---|---|---|
| Estimated Acreage Requiring Cleanup at $20,000 | 25% | 3834 | $20,000 | $76,679,500 |
| | 50% | 7668 | $20,000 | $153,359,000 |
| | 75% | 11502 | $20,000 | $230,038,500 |

| | Percent | Clean Up Acreage | Cost Per Acre | Estimated Cost |
|---|---|---|---|---|
| Estimated Acreage Requiring Cleanup at $35,000 | 25% | 3834 | $35,000 | $134,189,125 |
| | 50% | 7668 | $35,000 | $268,378,250 |
| | 75% | 11502 | $35,000 | $402,567,375 |

## Mt. shasta vista subdivision

| Total parcels | 1,205.0 | Total Acres | 3,012.5 |
|---|---|---|---|
| Total parcels excluded | 79.0 | Total Acres Excluded | 197.5 |
| | | Net Total Acres | 2,815.0 |

| Estimated Acreage requiring cleanup at $29,000 | Percent | Cleanup acreage | Cost per acre | Estimated cost |
|---|---|---|---|---|
| | 0.25 | 703.75 | $29,000 | $20,408,750 |
| | 0.50 | 1407.5 | $29,000 | $40,817,500 |
| | 0.75 | 2,111 | $29,000 | $61,226,250 |

| Estimated Acreage requiring cleanup at $20,000 | Percent | Cleanup acreage | Cost per acre | Estimated cost |
|---|---|---|---|---|
| | 0.25 | 703.75 | $20,000 | $14,075,000 |
| | 0.50 | 1407.5 | $20,000 | $28,150,000 |
| | 0.75 | 2111.25 | $20,000 | $42,225,000 |

# Estimated Clean Up Costs for the Mt. Shasta Vista Subdivision.

## Clean up costs are based on the following assumptions:

- Bulk groundwater deliveries will decline significantly if the zoning ordinance is enforced.

- Majority of property owners will not clean up their cannabis grow sites.

- There are 1205 parcels (2.5-acre per parcel) within the Mt. Shasta Vista Subdivision for a total of 3012.5 acres.

- 197.5 acres (79 parcels) in the Mt. Shasta Vista Subdivision have access to on-site water wells and are unaffected by the zoning ordinance.

- Therefore, the total acreage affected by the zoning ordinance is **2815 acres**. (3012.5 acres – 197.5 acres).

- The estimated clean up cost per acre is **$29,000**.

- It is estimated that 50% of each parcel will require cleanup, for a total of 1407.5 acres. (2815 acres x 0.50).

- **If 50% of affected parcels** require clean up the total cost is estimated at **$40,817,500**. (1407.5 acres x $29,000).

- **If 25% of affected parcels** require clean up the total cost is estimated at **$20,408,750**. (703.74 acres x $29,000).

- **If 75% of affected parcels** require clean up the total cost is estimated at **$61,226,250**. (2111.25 acres x $29,000).

**Recommended course of action:** Discontinue illegal cannabis cultivation practices and encourage voluntary property owner cleanup and abatement of environmental damage of their own property.