**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF NORTHERN CALIFORNIA**
JOHN THOMAS H. DO (SBN 285075)
jdo@aclunc.org
EMI YOUNG (SBN 311238)
eyoung@aclunc.org
GRAYCE ZELPHIN (SBN 279112)
gzelphin@aclunc.org
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 293-6333
Facsimile: (415) 255-8437

**ASIAN LAW CAUCUS**
CARL TAKEI (SBN 256229)
carlt@asialawcaucus.org
MEGAN VEES (SBN 325184)
meganv@asialawcaucus.org
55 Columbus Avenue
San Francisco, CA 94111
Telephone: (415) 896-1701
Facsimile: (415) 896-1702

*Counsel for Plaintiffs Mathis, et al.*

**COVINGTON & BURLING LLP**
STANLEY YOUNG (SBN 121180)
syoung@cov.com
CONNOR KENNEDY (SBN 350911)
ckennedy@cov.com
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306-2112
Telephone: (650) 632-4700
Facsimile: (650) 632-4800

MICHAEL PLIMACK (SBN 133869)
mplimack@cov.com
HAKEEM S. RIZK (SBN 326438)
hrizk@cov.com
ELLEN Y. CHOI (SBN 326291)
echoi@cov.com
DANIEL ESSES (SBN 340193)
desses@cov.com
Salesforce Tower
415 Mission St., Suite 5400
San Francisco, CA 94105-2533
Telephone: (415) 591-6000
Facsimile: (415) 591-6091

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **RUSSELL MATHIS, JORDAN CHONG MOUA, YING SUSANNA VA, MAI NOU VANG,** and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**COUNTY OF SISKIYOU** and **JEREMIAH LARUE**, in his official capacity as Sheriff,<br><br>Defendants. | Civil Case No.: 2:22-cv-01378-KJM-AC<br><br>**SECOND AMENDED COMPLAINT** |

## INTRODUCTION

1.      Siskiyou County and its Sheriff Jeremiah LaRue (together "Defendants") are engaged in a sweeping campaign to harass and intimidate Hmong and other Asian Americans. In service of this agreed upon campaign, the Defendants have used widespread and coordinated racial profiling in traffic stops, restricted access to water making it difficult for Asian American residents to live, and placed unlawful liens to dispossess Asian Americans of their land.

2.      This targeting is designed to drive a disfavored racial minority from the County and has its roots in anti-Asian racism in Siskiyou dating back to the 1800s. Indeed, much of the language used in recent years to describe problems supposedly tied to Asian Americans in Siskiyou is disturbingly like the rhetoric used during the shameful history of anti-Chinese policies and practices in the County and the State of California.

3.      The County and Sheriff's attack on Asian Americans is often cloaked under the pretense of enforcing water- and cannabis-related laws. However, the County's water concerns are not attributable to Asian Americans, and cannabis cultivation has existed in the County for decades, long before the more recent arrival of a significant number of Asian Americans. As recently as 2021, the Sheriff acknowledged that cannabis is cultivated throughout the County by people of a variety of racial and ethnic backgrounds.

4.      Nevertheless, the County and Sheriff have singled out Asian Americans and targeted their neighborhoods at staggeringly disproportionate rates.

5.      For example, the Sheriff's Department stops Asian American drivers at a rate roughly twelve times greater than their proportion of the driving-age population. County data further shows that the Sheriff's Department stops Asian Americans during the day, when a driver's race is more readily visible, at a *nearly 60% higher* rate than during the night.

6.      Further, after enacting a water transportation ordinance prohibiting the transportation of more than 100 gallons of water without a special permit, the County, in coordination with the Sheriff, unabashedly applied the restriction to roads surrounding Asian American neighborhoods, while leaving the rest of the County untouched. The County also issued liens on real property that are unauthorized by

California law to unlawfully collect cannabis fines. Well over 80% of those liens were issued against Asian American property owners.

7.      Plaintiffs bring this case on behalf of themselves and other similarly-situated Asian Americans, as defined in three putative classes, under the Equal Protection and Substantive Due Process Clauses of the Fourteenth Amendment, and the Fourth Amendment to the Unites States Constitution, along with similar provisions of California state law. They ask the Court to enjoin the County and Sheriff's blatantly discriminatory policies, practices, and customs that have made it difficult or impossible for Asian Americans to live and travel peacefully in Siskiyou County.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this action pursuant 28 U.S.C. §§ 1331 and 1343, because Plaintiffs' claims arise under the laws and Constitution of the United States. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' claims under California state law because they form part of the same case or controversy under Article III of the United States Constitution as their federal claims.

9.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district and, further, one or more Defendants reside in this district and all Defendants are residents of California. This action is properly assigned to the Sacramento Division of this Court, pursuant to Eastern District Civil Local Rule 120(d).

## PARTIES

### Plaintiffs

10.      Plaintiff Russell Mathis lives in the Shasta Vista area, within Siskiyou County, California. Mr. Mathis is an Asian American of Japanese descent. Mr. Mathis does not have a well and relies on off-parcel water that he transports using his vehicle or that he receives from other community members. He uses this water for bathing, cleaning, fire protection, and caring for his pets. The well water is vital for his health as he uses it to keep cool and for personal hygiene.

11.      Plaintiff Jordan Chong Moua lives in Southern Oregon, shortly across the border from Siskiyou County, but is regularly in Siskiyou County because his children and their mother reside there. Mr. Moua is an Asian American of Hmong descent. He has been stopped by the Sheriff's Department

while driving in the County and is likely to be targeted again for such stops because of his race and regular presence in the County.

12.     Plaintiff Ying Susanna Va owns a property outside of the town of Macdoel, within Siskiyou County, California. Ms. Va is an Asian American of Hmong descent. She acquired her property in Siskiyou County intending to retire there. Her property is her only home, and was subject to a lien issued by Siskiyou County Board of Supervisors, which decreased the property's value, interfered with her ability to get financing, and subjected the property to risk of foreclosure. She and her husband were at risk of homelessness if the County foreclosed on her property.

13.     Plaintiff Mai Nou Vang owns property in the Shasta Vista area, within Siskiyou County, California, and regularly stays in the County. Ms. Vang is an Asian American of Hmong descent. She has been stopped and searched by the Sheriff's Department while driving in the Shasta Vista area and is likely to be targeted again for such stops because of her race and regular presence in the County. Additionally, the property she owns in the County was subject to a lien issued by the Siskiyou County Board of Supervisors, which decreased the property's value, interfered with her ability to get financing, and subjected the property to risk of foreclosure.

### *Defendants*

14.     Defendant Siskiyou County is a political subdivision of the State of California, organized and existing under the Constitution of the State of California. It is a person under 42 U.S.C. § 1983, and thus can sue and be sued in its own name. Defendant Siskiyou County is run by a five-member Board of Supervisors. Defendant Siskiyou County passed the challenged water ordinances and adopted a zoning practice, discussed below, with racial animus towards Asian Americans in Siskiyou County, and is liable for racial discrimination against these communities by the Sheriff and County agencies. Defendant Siskiyou County is further responsible for recording unlawful property liens to collect administrative fines. These liens have been used almost exclusively against Asian American property owners.

15.     Defendant Jeremiah LaRue is the head of Siskiyou County Sheriff's Department, acting within the scope of his employment as the Sheriff for all allegations in this Complaint. He is the final policymaker for Siskiyou County in the area of law enforcement and is thus responsible for implementing those policies and practices of Siskiyou County, including, but not limited to, the control,

supervision, operation, and administration of the Siskiyou County Sheriff's Department. Defendant
LaRue is sued in his official capacity as the Sheriff of Siskiyou County.

## GENERAL ALLEGATIONS

### *Asian Americans in Siskiyou County*

16.     Siskiyou County is an expansive, rural county at the northernmost reach of California. It
is mostly undeveloped, with much of the County's land being forest or wilderness area. The County is
home to fewer than 45,000 people, 85% of whom are white. A mere 1.6% of the population in Siskiyou
County is Asian American according to the latest U.S. Census.

17.     In 2014 and 2015, the Asian American population in the County began to increase, as a
number of Hmong people moved in. Hmong people are an ethnic group native to Asia. They came from
larger refugee communities in the Central Valley and the Midwest, many tracing their roots to Laos,
where they were part of an ethnic minority and fought alongside U.S. forces during the Vietnam War.

18.     In addition to Hmong people, other Asian people of Chinese, Cambodian, and Laotian
descent have started to move into Siskiyou County in recent years.

19.     In Siskiyou County, many Asian Americans, especially Hmong residents, have settled in
and around the "Shasta Vista" subdivision and in smaller communities in the north of the County (by the
towns of Dorris and Macdoel). Historically these were some of the more affordable areas in the County
to purchase land, and the areas remained relatively undeveloped for many years. Some of the Hmong
residents sought out this land to spend their elderly years in the mountains, which reminded them of
their homes in Laos and Southeast Asia.

20.     The communities in Shasta Vista, Dorris, and Macdoel are diverse and comprised of full
families and multi-generational family units. English is not the dominant language, particularly for the
older generations. Asian American residents of these areas are actively engaged in being part of
Siskiyou County, enrolling children in local schools, holding community events, selling traditional
cuisine, and otherwise sharing their culture. Some volunteer for or donate to local firefighting efforts.
Others are politically active and have attempted to engage with their local elected officials.

21.    Many residents of these areas live in unpermitted structures or recreational vehicles, as a water well is a prerequisite for a septic system and building permit, and their properties do not have wells.

22.    Defendant Siskiyou County has erected a number of barriers to well water access for Asian Americans, through discretionary, undocumented, and/or constructive denials of well permit applications and requests for percolation tests. It has also made veiled and explicit threats that Asian American property owners will be subjected to retaliatory code enforcement if they pursue a well permit. In addition to inspections that occur when an application is submitted, the County's permitting department has targeted properties with existing wells in predominantly Asian American communities for inspections, at the behest of or in collaboration with members of the County Board of Supervisors. Defendants have also approached well drillers who work in areas like Shasta Vista, subjecting them to additional scrutiny and threats of criminal prosecution if they work on properties in the area that could be used for cannabis.

23.    For those without their own water well, water trucks are the primary source of water.

***The Defendants' Hostile Treatment of the County's Asian Americans***

24.    Despite Asian American residents' engagement with the broader community, they have been met with widespread hostility.

25.    The County's Board of Supervisors ("Board") and Sheriff treat Asian Americans, including Hmong residents, as unwelcome compared to their white, longer-established neighbors. Like some of their most vocal constituents, they view Asian Americans as a monolithic group of which every single person is part of a violent drug cartel and blame the County's widespread cannabis cultivation on Asian Americans in explicitly racialized terms, notwithstanding that cannabis has been grown in the County for decades.

26.    The Board has encouraged this bigoted narrative, and official meeting minutes and recordings reflect a hostile focus on race. In one striking example, the Board singled out Hmong attendees at a 2015 public meeting, calling first for a show of hands from "the Hmong residents" on the issues presented, and then calling for a vote of "those County residents present," as if the Hmong people were outsiders.

27.      Speaking about Shasta Vista, one County Supervisor contended "[t]here is a misconception that there are all these people living out there. They're not – they're just growing marijuana." And because it was widely known that some Asian American residents of Shasta Vista live in RVs or informal structures, one Supervisor falsely proclaimed that a permitted home was necessary "in order to be a legal resident," making it clear that the residents of the subdivision were seen as illegal and unwelcome.

28.      Further, in the lead up to the 2016 elections, the County flagged new voter registration from Asian Americans as potentially fraudulent.[1] The Sheriff proceeded to send armed deputies to investigate these claims and set up barricades blocking Hmong neighborhoods during the 2016 election. The California Department of Justice ultimately ordered election monitoring to protect Asian Americans' right to vote.

29.      More recently, in 2021, at a July 2021 demonstration against new water restrictions that primarily impacted Asian American neighborhoods, the Sheriff restricted the movements of Asian American protesters, while white counter-protesters were allowed greater access to the courthouse where the Board was meeting.

30.      The heads of the Sheriff's Department and other members of County law enforcement have also used racist stereotyping in the County's cannabis enforcement. Former Sheriff Jon Lopey gave interviews for, and inspired news stories framed as: "Are Asian gangs showing up to grow marijuana in our neck of the woods?"; "Numerous properties have sold at higher than normal prices to individuals with Asian last names for cash"; and "Lopey discusses what his department is doing, in conjunction with other agencies, to get rid of Hmong gang members with connections to drug cartels."

31.      Sheriff Lopey compared cannabis enforcement in Siskiyou to a war in a foreign country and, when asked about Asian Americans and Hmong people in the County, commented, "too bad they didn't use their ingenuity, intelligence and skills to engage in something lawful," as if the whole community were a monolith of criminals.

---

[1] *Vang et al v. Lopey, et al*., 16-cv-02172-JAM-CMK (filed on September 12, 2016).

32.    Defendant Sheriff LaRue, the current Sheriff, has made similar statements when asked about Asian Americans in the County: "I just wish they'd contribute better . . . It's like a third world country out there and that cannot be okay. Forget about cannabis, it's just about quality of life and how people are living out there."

33.    Consistent with pejorative stereotypes about Asian Americans, Defendant LaRue has asked his deputies to supply him with photographic evidence that dogs are "being cut up and eaten" in the Shasta Vista subdivision. No such evidence was ever supplied.

34.    Defendant LaRue has also publicly blamed a purported increase in crime and cannabis cultivation on "Chinese nationals that are in our community." Although it is unclear what, if any, grounds he has for asserting the citizenship status of people of Chinese descent in the County or attributing crime to a particular ethnic group, LaRue's rhetoric aligns with the general sentiment that Asian Americans are perpetual "foreigners" and criminals who neither belong in nor contribute to Siskiyou County.

35.    With prejudice against Asian Americans and Shasta Vista as a backdrop, Defendant LaRue has asked the public to "direct our anger at the right people," to help choke out and isolate the community, and to not do business with them.

36.    Specifically, Defendant LaRue has instructed businesses not to deliver to the predominantly Asian American neighborhoods of Shasta Vista and around the area of Dorris under the guise of cannabis enforcement. His deputies have gone so far as to pull over commercial vehicles as they approached predominately Asian American neighborhoods to intimidate them and to ensure that they are not making deliveries.

37.    The Sheriff's 2021 Annual Strategic Plan also explicitly used racial and ethnic categories to describe potential targets of cannabis enforcement, for no apparent law enforcement purpose.

38.    Defendant LaRue's assumptions about Asian American criminality were further demonstrated by a message he sent Sheriff's Department personnel in May of 2021, requesting photographs of a "Hmong decal" seen on vehicles so "we can tie these guys to a gang." Aside from the questionable assumption that members of a criminal gang would identify themselves with decals on their cars, Defendant LaRue had no reason other than race to suggest these individuals were part of a criminal

gang. On information and belief, the decal Defendant LaRue was referring to is a decal for Hmong veterans of the United States' secret war in Laos and does not indicate any unlawful affiliation.

39.    Other members of Siskiyou County law enforcement also explicitly characterize criminal activity as being attributable to Asian ethnicities. For instance, in October of 2020 Deputy District Attorney Martha Aker contacted members of the State Water Board seeking their assistance in filing felony-level cannabis prosecutions, claiming that "[a]lmost all of the illegal cultivators" are of "Hmong descent."

40.    Several days later, Aker discussed her plan to use water code violations to elevate cannabis offenses to felonies with several members of the Sheriff's Department and asked them to notify her of how many cases they could refer to her for this purpose, writing "I think that the Hmongs will care about felony charges, so this should help."

41.    Defendant LaRue subsequently confirmed to Aker that his deputies were adjusting their affidavits of probable cause to allege potential felony water code violations, and in April 2021 reported to the Board that his deputies were collaborating with the District Attorney's office on the filing of these felony cannabis charges.

42.    The racist views expressed by Defendant LaRue and Aker are echoed by Sheriff's Department personnel, who frequently characterize innocent behavior attributed to Asian Americans as evidence of criminality.

43.    Internal Sheriff's Department communications reveal that reports like "Asians coming out of" a location, "Asian's [sic]" buying land, "Hmong's [sic] . . . filling up 55 gallon containers" of water, and "Hmongs who wanted to buy water" are treated as evidence of potential criminal activity and reason to investigate, notwithstanding the absence of any reported illegal conduct.

44.    These actions and statements demonstrate that racial animus and biases are a throughline from the Sheriff's targeted enforcement practices to a series of ordinances the Board designed to drive out what one County Supervisor characterized as the "bad actors who thumb their nose at our society, at our way of life."

45.    Labelling a racial or ethnic minority as a threat to "our way of life" and using this rhetoric to justify the targeting and exclusion of a racial or ethnic group is not new to the County.

Indeed, nearly a century and a half ago, white settlers of Siskiyou County convened to address the so-called "Chinese evil," precipitated by the increasing numbers of Chinese immigrants brought to the County during the Gold Rush, and passed a series of resolutions expressing their opposition to Chinese immigration to Siskiyou County.

46.    Then, as now, the anti-Asian resolutions those settlers adopted were couched in the language of morality, decency, crime, and preserving the traditional American "way of life."

47.    By way of illustration, one article, published in the Yreka Union on January 22, 1879, discussed the increasing number of Chinese people in the County as follows:

> All countries having been troubled with swarms of Chinamen, have become disgusted with them, and regret the day that any of them were allowed to set foot on their shores. Where only a few arrive their influence is scarcely felt, but where they come in great numbers, as on this coast, they degrade labor as well as morality and decency, besides breeding disease and hog like uncleanliness.

48.    Nearly 150 years later, on June 15, 2021, members of the public addressed the Siskiyou Board of Supervisors to air their complaints about the present-day Asian American community. Echoing anti-Asian tropes of the past, one commenter made these statements:

> It's a cesspool waiting for an outbreak of disease and other health issues... they come, they destroy, they plunder, and they leave their garbage behind for us to clean up...Please use everything necessary to get rid of the cancer that has infected our community.

Another added, "they are nests, we have nests of these horrible people out there."

49.    As these examples suggest, although many years have passed since the enactment of explicitly anti-Chinese resolutions in Siskiyou County, the rhetoric and reasoning invoked by the County and its constituents largely remain the same.

50.    The wholesale characterization of Asian American residents as unsanitary, criminals, or outsiders seeking to destroy the County's "way of life" is merely another way of expressing racial animus and xenophobia.

### *The Sheriff's Policy, Practice, or Custom of Racially Targeted and Illegal Traffic Stops*

51.    The former and current Sheriffs' openly hostile view of the Asian American minority as drug traffickers and criminals has shaped the Sheriff's Department's ("Department") treatment of Asian Americans, especially on the County's roads. This has resulted in the widespread targeting of Asian

American drivers for traffic stops, as well as a pattern of unconstitutional seizures and searches carried out under the pretense of drug enforcement, all of which has occurred with the agreement and support of the County.

> A.    *Origins of the Sheriff's Racially Discriminatory Traffic Stops*

52.    At the January 8, 2019 Board of Supervisors meeting, then-Sheriff Lopey informed the Board that, although highway and traffic enforcement were not historically part of the Department's primary enforcement duties, he had begun putting deputies on the road with the purported goal of increasing drug seizures.

53.    Sheriff Lopey highlighted this "on-highway" traffic interdiction program throughout his remaining tenure in the Sheriff's Department, including at the January 2020 Board of Supervisors meeting where he discussed his efforts to put more deputies on the road during seasons when he suspected more cannabis would be transported.

54.    Despite Sheriff Lopey's previous comments equating unlawful drug activity with Asian Americans, the Board expressed no concerns that Sheriff Lopey's use of increased traffic stops for interdiction was certain to be rife with racial profiling, indicating at a minimum tacit approval of the practice by the Board.

55.    When Defendant LaRue assumed the role of Sheriff, he both embraced and expanded the use of traffic stops targeting people perceived to be of Asian descent to seek out evidence of cannabis activity, while continuing in his predecessor's footsteps by attributing drug activity to Asian American groups and neighborhoods.

56.    In his Annual Strategic Plan for Fiscal Year 2021, which was submitted to the Board, Sheriff LaRue wrote that his Department was doing the "majority" of on-highway interdiction in the County, and that he intended to increase both daytime and nighttime interdiction efforts, with particular emphasis on "problem areas" including Highways 96 and 97.

57.    In practice, the Department's stops were largely concentrated on or near Highway 97, which borders the predominantly Asian American communities in the County, while few stops were conducted along Highway 96, in the western and largely white area of the County.

58.     In March of 2021, Defendant LaRue formed the Criminal Interdiction Unit ("CIU") within the Department. Undersheriff James Randall indicated that the CIU was created to conduct "enforcement of problem areas within the county" and "to deal specifically with ongoing issues that we are facing" including "drug trafficking" and "water truck violations." Randall further indicated that members of the CIU were selected based on various factors including their "motivation" and ability to "turn something out of nothing."

59.     Defendant LaRue's plan to increase traffic interdiction efforts was presented in written form to the Board at its April 6, 2021 meeting, where the Board voted to ratify the grant application for the Sheriff to accept funds for this activity.

60.     By explicitly racializing cannabis cultivation and other crimes in the County and emphasizing drug busts as the goal of traffic stops, Defendant LaRue set up a system of racial profiling and unlawful vehicle stops to seek out alleged drug activity.

61.     Indeed, in April of 2021 (the first full month of operation) the CIU, comprised of only four deputies, was responsible for pulling over 55 drivers, 63 percent of whom were Asian American. Many of these stops escalated into detentions of drivers and searches of vehicles.

62.     But racial profiling activity was not limited to the CIU alone. The Department's public records confirm this policy, practice, or custom has resulted in the vastly disproportionate targeting of Asian American drivers and passengers throughout the County and throughout the Department's ranks.

B.     *Compelling Data Shows the Sheriff's Racially Discriminatory Traffic Stops*

63.     The Sheriff's Department has shared or sole jurisdiction over traffic enforcement in all unincorporated areas of the County and contracts to police the municipalities of Dunsmuir, Dorris, and Montague. Traffic stops are a powerful enforcement tool in these areas precisely because Siskiyou County is rural, and residents largely rely on personal vehicles for transportation. According to the American Community Survey, well over 90% of households in the County have at least one vehicle for transportation purposes.

64.     The Siskiyou Sheriff's Department uses Computer Aided Dispatch ("CAD") logs, which record entries each time a call for service or civilian contact is registered through dispatch. These logs record information about vehicle-based detentions or traffic stops, including the units involved, the

duration between when the contact was called in and when the detention ended, and the location of the

stop. These logs also often include officer-reported information about the names of drivers and

passengers contacted, and whether a search, citation, or arrest resulted from the detention.

65.     Based on the County's CAD records, in 2021 the Department conducted over 1,200

traffic stops. This number excludes vehicle contacts that were identified as relating to the June 2021

Lava fire evacuation, vehicle "safety checks," and stops of water-bearing vehicles under County

Ordinance 21-14.

66.     Based on the available data,[2] over 28% of traffic stops conducted by the Sheriff's

Department in 2021 were of Asian American drivers, although Asian and Pacific Islanders made up only

about 2.4% of Siskiyou County's adult (voting-age) population in the most recent Census. These

numbers mean that *the Sheriff's Department stopped Asian American drivers at a rate roughly twelve*

*times their proportion of the driving-age population*.

67.     By comparison, white residents make up close to 80% of the adult population in Siskiyou

County but constituted only 50% of the drivers stopped by the Sheriff in 2021, based on information

made available by the County. Thus, an Asian American person in the County was roughly seventeen

times more likely to be pulled over by the Sheriff's Department than a white individual during this

period.

68.     The overrepresentation of Asian American drivers in Siskiyou Sheriff's traffic stop data

is highly atypical, as illustrated by comparison to statewide data on traffic enforcement. In 2022 the

Racial and Identity Profiling Act ("RIPA") Board published its Annual Report, which analyzed stop data

from eighteen agencies across the state from January to December 2020. This report found that Asian

Americans made up only 5.2% of reported stops across all agencies, although they constituted 14% of

---

[2] Although the County has indicated that the disclosed CAD records constitute all such records for 2021, not all these records contain sufficient information to determine the identity or race of the person stopped. In total, approximately three-quarters of the CAD records had sufficient information to identify the probable race of the vehicle driver. Plaintiffs have no reason to believe these stops are unrepresentative of the other unidentified stops. The analysis of the CAD records in this section uses publicly available racial surname data from the US Census Bureau, which gives a probabilistic value that a person with a given surname identifies as a particular race. This data was used to identify the racial makeup of traffic stops using driver last names.

SECOND AMENDED COMPLAINT CASE NO. 22-CV-01378-KJM-AC

the weighted residential population in the relevant jurisdictions. This is consistent with a body of other studies which find that Asian Americans are typically stopped by law enforcement at a lower or comparable rate to white drivers.

69.     The Siskiyou Sheriff's stops of Asian American drivers also reflect racial targeting compared to other police agencies in the County. For example, the Weed Police Department has jurisdiction over the City of Weed, located just south of the Shasta Vista subdivision at the junction of Highway 97 and Interstate 5. The Weed Police Department conducted over 220 traffic stops between May 1, 2021 and August 31, 2021. Only 4.5% of those stops were of Asian American drivers. In that same period, over 44% of the Siskiyou Sheriff's stops were of Asian American drivers, meaning that the Sheriff's Department was stopping Asian Americans at nearly ten times the rate of the Weed Police Department.

70.     Similarly, the California Highway Patrol ("CHP") made 171 traffic stops in the Dorris area in 2021. Less than 20% of those stops were of Asian American drivers. By comparison, 53% of the Siskiyou Sheriff's stops in the Dorris area in 2021 were of Asian American drivers.

71.     The fact that Siskiyou Sheriff's traffic enforcement targets Asian Americans at rates dramatically higher than the rest of the state and other local law enforcement shows that the Sheriff's Department has made a highly concerted and effective effort to target Asian American drivers for traffic stops.

72.     In addition, the Sheriff's targeting of Asian Americans is established by the "cover of darkness" theory, which compares the racial distribution of traffic stops during daylight and nighttime hours. Although Asian American drivers were stopped by the Siskiyou Sheriff's Department at a higher rate than would be expected at all hours of the day, analysis of 2021 CAD data shows that *their proportion of traffic stops was nearly 60% higher during the day when compared to nighttime stops*. This demonstrates that the stops of Asian drivers are to a large extent dependent on deputies' ability to see the race of the driver and strongly indicates racial profiling by the Sheriff's Department.

*C.     Siskiyou Sheriff's Practice of Illegal and Prolonged Traffic Stops of Asian Americans*

73.     The Sheriff's Department not only conducts disproportionate traffic stops against Asian Americans, but also targets them for unjustified and unreasonably prolonged traffic stops. Nearly three-

quarters of all documented traffic stops conducted by the Sheriff's Department do not result in any citation or arrest. This low citation rate is partially attributable to a pattern of stops conducted without reasonable suspicion, for which there is no lawful basis to cite or arrest. In other instances where reasonable suspicion may exist, Siskiyou Sheriff's deputies use discretionary traffic enforcement as a pretext to conduct stops of Asian Americans for other investigative purposes.

74. For instance, one of the most common stop justifications reflected in the County's CAD data is the alleged failure to maintain a single lane or "swerving," variously categorized under Vehicle Code sections 21658, 21460a, and 21650. The CAD data indicates that roughly 44% of all drivers in the County warned or cited for this alleged violation were Asian American, although only 14% of these stops resulted in a traffic citation, suggesting that the supposed swerving was not the real reason for the stop even if the swerving actually occurred.

75. Approximately one in eleven Asian American drivers stopped during 2021 was stopped for "swerving," compared to one in twenty-six white drivers. Although Sheriff's deputies used the "swerving" justification to stop Asian American motorists at a much higher rate than other motorists, they rarely if ever inquired about indicators of intoxication or conducted follow up investigation related to the purported basis for the stop.

76. Instead, Siskiyou Sheriff deputies used and continue to use these, and other so-called traffic enforcement stops, as an opportunity to question Asian American vehicle occupants on matters unrelated to traffic violations and look inside of or search the vehicle for contraband.

77. By fabricating or using highly subjective bases to initiate traffic stops, many of which never result in any citation or further enforcement action, the Department targets Asian American drivers for traffic enforcement to try to locate drugs or contraband and otherwise harass and intimidate them.

78. Additionally, the targeting of Asian American drivers for interdiction-motivated stops means that stops under the guise of traffic enforcement often are unreasonably prolonged to question vehicle occupants and conduct searches unrelated to the basis for the stop.

79. The Sheriff's CAD data supports this conclusion. In 2021, the median stop length for Asian American drivers was over 56% longer than for likely non-Asian drivers. The disparities were

particularly evident when examining the duration of stops that did not result in any citation or other enforcement action. Asian American drivers constituted approximately 23% of traffic stops that resulted only in a warning and lasted ten minutes or less. By contrast, Asian American drivers were over 40% of those stopped for over ten minutes and then released with a warning.

80.     These numbers indicate a policy, practice or custom of unjustified and extended traffic stops for Asian American drivers, without any legal justification to prolong the stop for further investigation.

    D.    *Siskiyou Sheriff's Unlawful Searches of Asian Americans' Vehicles*

81.     Consistent with its use of prolonged traffic stops, the Sheriff's Department also has a policy, practice, or custom of targeting Asian American drivers for vehicle searches, including without legal justification.

82.     The Department's CAD logs provide some insight into its practices around documenting a legal justification for a search. While in some cases the log lists the officer's stated justification for a search, in over half of the identifiable searches, the officer provided no justification.

83.     CAD data for 2021 indicates that Asian American drivers were targeted for searches during traffic stops at significantly higher rates than other drivers. Excluding identifiable probation or parole searches and tow inventory searches – which are governed by very different legal standards – Asian American drivers constituted nearly 40% of all searches performed during traffic stops, including roughly half of all searches conducted without a reported justification, and nearly 60% of what deputies identified as "consent" searches. This data shows that Asian Americans in the County were nearly 25 times more likely to be searched during a traffic stop than white residents.

84.     The CAD data also strongly suggests that the Department's stated rationale for its targeted traffic enforcement, namely cannabis and drug interdiction, is largely unjustified, as very few of the Department's traffic stops resulted in the seizure of cannabis or other drugs. Based on the available CAD data, only 2.3% of the traffic stops conducted by the Sheriff's Department in 2021 resulted in the seizure of any cannabis, and far less resulted in the seizure of other drugs.

1

2

     *E.    Defendants' Knowledge of, Participation in, and Failure to Properly Train Against*
     *Racially Biased and Unlawful Traffic Enforcement*

3

4

5

6

     85.    The Defendants' practices of racial profiling and unjustified and prolonged stops of Asian Americans are the clear and expected consequence of Defendant LaRue's explicit decision to racialize the County's alleged cannabis problem and use drug interdiction as the stated goal of traffic enforcement.

7

8

     86.    As head of the Sheriff's Department, Defendant LaRue is the final decisionmaker for the County's law enforcement tactics and strategies.

9

10

11

     87.    Defendant LaRue has required or encouraged deputies in his Department to engage in racial profiling and unjustified traffic stops and searches. At the very least, Defendant LaRue has been aware or on notice of these practices and failed to take any actions to deter them.

12

13

14

15

16

17

     88.    In April of 2021, for instance, shortly after Defendant LaRue's CIU began conducting patrols, a deputy within the Department emailed Defendant LaRue, Undersheriff Randall, Administrative Lieutenant Behr Tharsing, and several deputies to relay a report that "the new tactic of the interdiction team does have some folks scared (especially the Hmungs) but the Chinese have started working with a ACLU attorney" to sue the Department. He went on: "[i]f they are trying to do that then what you are doing is working."

18

19

     89.    In response to this communication, Lieutenant Tharsing replied, "Great this is encouraging." Undersheriff Randall then added:

20

21

22

23

24

25

     I know that the task which we are asking of you will put each and every one of you on the front lines of any potential complaint and in the spotlight for accusations of civil rights violations or racial profiling. We trust in each of you to do your job within policy and case law while at the same time *pushing that envelope to the edge* . . . [t]he department and the county (Board of Supervisors and CAO), are all behind you and in full support of you…I know for a fact, the Sheriff and I are very happy with what you've accomplished so far, and are excited to see what more you can do . . . . (emphasis added)

26

27

28

     90.    Though parties to the communication, neither Randall nor Defendant LaRue expressed any concern regarding the allegations of racial profiling and civil rights violations, or the clear implication that their stops were intended to "scare" the Hmong and Chinese population.

91.     Critically, the practice of targeting Asian Americans for traffic enforcement is consistent across all regions of the County where the Sheriff's Department patrols, and the CAD data also shows that high-ranking command staff are integrally involved in these practices.

92.     For instance, Lieutenant Tharsing, the Administrative Lieutenant for the Department, appears to have conducted a significant number of traffic stops in 2021, over 71% of which were of Asian American drivers.[3] Defendant LaRue, who served in the Administrative Lieutenant role immediately before being appointed as Sheriff, described the position as involving management of "policy and procedure creation and implementation" and training.

93.     Similarly, Gary Pannell, who in 2021 was assigned to oversee Sheriff operations for the contract-city of Dorris, made 80% of his traffic stops against Asian American drivers.

94.     The participation of high-ranking and supervising personnel within the Department indicates that Defendant LaRue has required, encouraged, knew of, or was at least on notice of, the pattern of racial profiling and unconstitutional stops by his Department.

95.     Indeed, Defendant LaRue's responsibilities as Department head include the collection and reporting of information relating to his traffic interdiction program, both to the Board of Supervisors and to the outside agencies that provide funding support for his drug enforcement programs.

96.     Defendant LaRue would have to be willfully blind to be unaware of how one of his key enforcement strategies was functioning to target Asian Americans.

97.     Despite knowing about, or being on notice of, the pattern of constitutional violations, Defendant LaRue has persisted in the use of traffic stops for so-called drug interdiction, expanding the program from its use under his predecessor Jon Lopey.

98.     Defendant LaRue has done so without instituting corresponding checks on unconstitutional behavior by his officers, knowing that such failures are resulting in illegal stops and searches in violation of the Fourth Amendment and racially targeted stops in violation of the Fourteenth Amendment.

---

[3] Lieutenant Tharsing has also been quoted in media sources characterizing people of Hmong descent as the most "arrogant" and "dominant" growers in the County.

99.    Defendant LaRue has failed, and continues to fail, to properly train his personnel and departmental supervisors concerning adequate documentation of the bases for traffic stops and searches to ensure that stops are supported by reasonable suspicion and are of a reasonable duration, that searches are conducted for a lawful basis, and that none of these actions are undertaken because of perceived race or ethnicity.

100.    The Department does not consistently document or report the basis for its vehicle stops, the race of the people detained, or the justification for actions undertaken during these stops, despite having a policy dated December of 2019 mandating the preparation of such data for these stops.

101.    The County and the Sheriff have failed to train and supervise deputies, acting under color of state law, on how to lawfully conduct traffic stops and vehicle searches in a manner consistent with the Fourth and Fourteenth Amendments.

102.    The training and supervision policies of the County and the Sheriff are not adequate to prevent violations of law by the Sheriff and his deputies in the usual and recurring situations with which they must deal, including conducting traffic stops as described in this Complaint.

103.    The County and the Sheriff were and are deliberately indifferent to the substantial risk that the Department's policies are inadequate to prevent violations of law by the Sheriff and his deputies, and the known or obvious consequences of their failure to train and supervise them adequately, as described in this Complaint.

104.    The failure of the County and the Sheriff to prevent violations of law by the Sheriff and his deputies and to provide adequate training and supervision has played a substantial part in bringing about or actually causing the racially motivated and illegal stops and searches described in this Complaint.

    F.    *Allegations of Plaintiffs Vang and Moua*

        i.    *Mai Nou Vang*

105.    On or about March 19, 2021, Ms. Vang was stopped by Siskiyou Sheriff's deputies while driving on Big Springs Road near County Highway A12, outside of the Shasta Vista subdivision.

106.    Ms. Vang was driving with her husband Chong Lee Xiong and adult son in the car, when she noted a Siskiyou Sheriff's vehicle stopped on the side of the road and facing in her direction. As she

passed the patrol car, it pulled out onto the road behind her and two deputies in the car initiated a traffic stop. It was mid-morning and light outside, with full visibility at the time of the stop.

107. Two unknown deputies approached Ms. Vang's vehicle from either side and instructed Ms. Vang and her husband to get out of the vehicle. One of the deputies informed Ms. Vang that she was stopped because the cover of one of the external lights was cracked, even though it was daytime and there was no requirement that the light be activated.

108. Once Ms. Vang stepped out of the driver's side of the car, one of the deputies began questioning her about what she was doing in the County, what she did for work, where she had come from, whether she could provide verification of her son's identity, and whether she had anything illegal in the car. Ms. Vang understands but does not speak English, so her son assisted her in interpretation. She answered the deputy's questions to the best of her ability and could hear the other deputy questioning her husband on the passenger side of the car. This questioning took up a significant portion of the detention, although the deputies did not have reason to suspect Ms. Vang and her family had committed any offense other than a minor equipment infraction.

109. After concluding his questions, the deputy who was speaking with Ms. Vang indicated he wanted to search her car. He did not give her any option to refuse or leave. Based on the length and nature of the preceding detention, Ms. Vang did not believe they had any choice, as she believed the deputy would search the car no matter what she said, but told him the vehicle belonged to her husband. The deputy then turned to her husband and informed him that he wanted to search the car. Mr. Xiong feared arguing would extend their detention and interrogation, and acquiesced. The deputies searched the vehicle and did not find anything except for a bar of soap, which they asked Ms. Vang more questions about before returning it to her.

110. After being detained for approximately thirty minutes, Ms. Vang was released with a fix-it ticket.

111. Plaintiff Vang was unlawfully detained and had her vehicle searched as a direct result of the Siskiyou Sheriff's policies and practices.

ii.    *Jordan Chong Moua*

112.    On or about August 12, 2023, between noon and 1 p.m., Mr. Moua was stopped by a Sheriff's deputy on Mathews Road, outside of the town of Dorris, California.

113.    Prior to the stop, Mr. Moua and his passenger witnessed Sheriff's deputies pulling over several vehicles with Asian drivers or passengers in the same vicinity. Mr. Moua accordingly drove carefully through the area, fearing that he would be stopped and targeted because of his race.

114.    As Mr. Moua was driving on Mathews Road, a Sheriff's vehicle drove towards him heading in the opposite direction. Mr. Moua saw the deputy driving the vehicle look over at him and his passenger, who was also Asian American. Just after passing Mr. Moua's vehicle, the Sheriff's car conducted a U-turn and pulled around behind them, initiating a traffic stop. At the time of the stop, it was light out and there was full visibility.

115.    After pulling over, Mr. Moua was approached by Gary Pannell, who at that time held the rank of Sergeant in the Sheriff's Department. Pannell has since been promoted to the rank of Administrative Lieutenant. Sergeant Pannell told Mr. Moua that he stopped him for having an out-of-state license plate, before alleging that he saw them cross over a lane divider while driving. Mr. Moua and his passenger disputed that he crossed the dividing line or committed any traffic violations, and Mr. Moua's passenger accused Sergeant Pannell of racial profiling.

116.    Sergeant Pannell instructed Mr. Moua to provide his license and registration and to step out of the car. Once Mr. Moua was standing outside of his vehicle, Sergeant Pannell began questioning Mr. Moua about what he was doing in the area, whether he had a gun or any contraband in the car, and whether he owned property in the area. Mr. Moua's passenger was upset and continued to say that Sergeant Pannell had lied about the reason for the stop and profiled them. At some point during their interaction, Sergeant Pannell told Mr. Moua to tell his passenger to stop bothering him or he might give them a ticket.

117.    After questioning Mr. Moua, Sergeant Pannell instructed him to remain at his car while Sergeant Pannell went back to his patrol vehicle with Mr. Moua's license and information. Another Sheriff's vehicle arrived at the scene, although the occupant parked and did not approach or interact with

Mr. Moua. Eventually, Sergeant Pannell came back to Mr. Moua's vehicle and released Mr. Moua without any citation or ticket. The stop lasted for approximately 10 to 15 minutes.

118.    Plaintiff Moua was unlawfully detained, profiled, and subjected to a prolonged detention as a direct result of the Sheriff's policies, custom, or practice.

119.    This was not the first time Mr. Moua was questioned by Sheriff's deputies during a traffic stop. In or around June of 2022, Mr. Moua was stopped while driving from Mathews Road in unincorporated Siskiyou County towards the town of Dorris. This stop occurred later in the evening, around approximately 10 p.m.

120.    As Mr. Moua was driving, he noticed a vehicle with bright headlights quickly accelerating behind him. Mr. Moua feared that the vehicle was driving aggressively and might hit him, so he increased his speed to try to reach the town of Dorris before the car got too close. It was dark outside, on an isolated stretch of road, and Mr. Moua could not see the vehicle other than its headlights.

121.    While Mr. Moua was nearing the outskirts of Dorris, however, the car behind him turned on flashing lights. At this point Mr. Moua realized it was a law enforcement vehicle and pulled over. An unknown deputy approached Mr. Moua and informed him that he was stopped for speeding. Mr. Moua explained that he didn't know the exact speed limit, but had sped up because he didn't realize that the car tailing him was a police car.

122.    The deputy then began questioning Mr. Moua and his passenger about how long they had been in the County and if there was any marijuana in the car. Mr. Moua indicated there was not. The deputy then questioned Mr. Moua about what was on his shirt. Mr. Moua looked and saw crumbs on his shirt from earlier when he was eating peanuts. When he informed the deputy of this, the deputy reached in to pick up the crumbs and asked if he was sure they were peanuts. Mr. Moua responded that he was. The deputy then returned to his vehicle, before coming back to Mr. Moua's car and releasing him without a ticket.

### *The County's Passage of Racially Motivated Water Ordinances Designed to Deprive Asian American Communities of Water*

123.    In addition to the discrimination seen in the enforcement of pre-existing traffic laws, between 2020 and 2021 the County also passed a dragnet of racially motivated ordinances designed to

drive out the Asian American community and punish their supporters. This included the passage of a **water nuisance ordinance** (Urgency Ordinance 20-13 and later Ordinance 20-15, codified at Siskiyou Cnty. Code § 3-13-702), a **water extraction ordinance** (Urgency Ordinance 21-07 and later Ordinance 21-13, codified at Siskiyou Cnty. Code § 3.5-13.101 et seq.), and a **water truck ordinance** (Urgency Ordinance 21-08 and later Ordinance 21-14, codified at Siskiyou Cnty. Code § 3-4.1501) (collectively, "**water ordinances**").

124.    On August 4, 2020, the Board passed the **water nuisance ordinance** which banned the "extracting and discharging groundwater underlying Siskiyou County for use in cultivating cannabis" as a nuisance. This ordinance, which did not require evidence that a well-owner *knew* of the unlawful end use for enforcement, was then used to bring civil actions against well operators like Steve Griset for providing necessary water to Shasta Vista and its Asian American residents.

125.    The County also disproportionately cited Asian American residents with fines under this ordinance, with 68% of all such citations being given to Asian-Americans.

126.    These actions resulted in a chilling effect on well-owners who previously sold or distributed groundwater to areas without well access, reducing the number of water sources for Asian American communities.

127.    On May 4, 2021, the Board passed the **water extraction ordinance,** which required a permit for any transportation of water off the parcel from which it was extracted, regardless of use. Both the water suppliers and water users required permits.

128.    But the May 4, 2021 ordinance erected a number of obstacles to acquiring a water permit, like property inspections, Siskiyou Cnty. Code § 3.5-13.103, and permit issuance conditioned on the property's compliance with all County codes.

129.    In effect, these provisions made denial of a permit and the basic water it would supply a penalty for any code violation on the property.

130.    In contrast to other, more developed areas of the County, many people in Shasta Vista and the areas around Dorris and Macdoel do not live in approved structures, because they do not have their own water wells. This is the very reason why they would apply for a water extraction permit in the first place, to receive water from a different parcel. Thus permits were available in theory only to most

people living in these communities. As they were effectively cut out from the permitting scheme, 73% of those cited under this ordinance were Asian American.

131.    Also on May 4, 2021, the Board passed the **water truck ordinance**, which prohibited hauling of water in excess of 100 gallons without a permit on streets to be named by the County. Although the water truck ordinance did not include geographic enforcement restrictions on its face, the Board adopted Resolution 21-61 on the same day, which limited the water truck ordinance to streets that service primarily Asian American neighborhoods, including access points to Shasta Vista, Dorris, and Macdoel. About 70% of those cited under this ordinance were Asian American.

     *A.    The County's Creation of a Water Crisis Aimed at Asian Americans*

132.    The water ordinances, individually and in the aggregate, deprived Asian Americans of water, leading to a humanitarian crisis in Asian American communities in Shasta Vista, Dorris, and Macdoel.

133.    Without wells, Asian American residents relied on water trucks to haul water from other parcels to meet their needs for bathing, hygiene, consumption, cleaning, gardens, fire protection, pets, and livestock. Much of this water was provided by nearby farmers with large agricultural wells, like Steve Griset.

134.    After the water ordinances were enacted and the County undertook enforcement actions against water haulers and water suppliers like Steve Griset (including under the water nuisance ordinance), residents in these communities relied on the few in their neighborhoods with wells or, in some instances, went to more extreme lengths like acquiring water from public parks and streams. Businesses limited the purchase of bottled water. Vehicles used to transport water were stopped, searched, seized, and not returned.

135.    The water ordinances degraded community members' health, killed off their livestock and gardens, left them unable to fend off wildfires, and resulted in many being forced to leave their homes.

136.    During the water prohibitions, the Lava Fire ravaged much of Shasta Vista, including land belonging to Asian American community members who were unable to abate the fire themselves.

137.    In one video captured during the Lava Fire, a Siskiyou Sheriff's deputy can be seen outside the Shasta Vista subdivision saying, "we're letting it burn." A month later, Undersheriff Randall emailed officers in the Department to discuss their efforts to have so-called growers "packed up and gone away," mentioning that "the fire helped in it's [sic] own way."

138.    On September 3, 2021, the Honorable Kimberly J. Mueller of the District Court for the Eastern District of California issued a preliminary injunction enjoining the County from enforcing the water extraction and water truck ordinances, but leaving the water nuisance ordinance in place, in the matter of *Lo v. County of Siskiyou,* Case no. 2:21-cv-00999-KJM-AC.

139.    Subsequently, as a condition of settlement of the *Lo* lawsuit, the County agreed to repeal the water truck and extraction ordinances, and to amend the water nuisance ordinance. Nonetheless, the threat and enforcement of the water ordinances remain. Despite lacking the legal authority to do so, the County continued to threaten, cite or fine people under the water ordinances even while the laws were enjoined or repealed.

140.    While some water access has been restored following the Court's injunction and the County's repeal or amendment of the water ordinances, large agriculture wells that Defendants targeted under the water nuisance ordinance remain unavailable and the chilling effects of that ordinance persist. This continuing barrier to water access is exacerbated by the other actions taken by Defendants to restrict Asian Americans' ability to secure their own water wells, and to target water transfers under different mechanisms like zoning restrictions, as described below.

B.    *The Defendants' Pretextual Justifications for the Water Ordinances*

141.    Defendants have attempted to justify the water ordinances by variously pointing to cannabis enforcement, drought, and public health as the motivating factor. These changing and at times contradictory rationales conceal the fact that a primary motivation was animus against the County's increasing Asian American population.

142.    First, Defendants have alleged that the water ordinances were directed at areas with illicit cannabis grows. But this allegation is undermined by the fact that Defendants have failed to enforce the County's cannabis restrictions as stridently in other areas of the County that are not predominantly Asian American.

143.    The County's own records of public complaints regarding cannabis indicate that the Defendants were on notice of substantial unlawful cultivation and alleged water use for this purpose in the *western* part of the County – which is predominantly white – but took relatively few enforcement actions in those areas of the County and did not include them at all in the initial water truck resolution that targeted the regions around Shasta Vista, Dorris, and Macdoel. Indeed, Defendants explicitly discussed and ignored suspected cannabis-related water truck movements in other parts of the County when passing the water truck ordinance.

144.    The County has also asserted that it was motivated to enact the three water ordinances because of concerns relating to drought and use of the County's water resources for cannabis. Yet several facts undercut this reasoning.

145.    First, after conducting a review in 2020, the State Water Board informed the County that cannabis cultivation and water truck movements had a negligible impact on ground and surface water, especially when compared to other agricultural uses the County leaves unchecked. In their analysis, the State Water Board found that, even if the County's claims of water use for cannabis farming were true, the amount of water for such uses was likely only around 0.4% of the water used for irrigated agriculture in the County.

146.    Second, as part of its effort to restrict water transported to the Asian American community near the city of Dorris, the County specifically targeted an out-of-state water tender that was supplying water brought in from across state lines. This action belies any rationale that the County sought to protect the water supply in Siskiyou or California and, ironically, would lead to additional reliance on local Siskiyou wells. The incongruity of this result is highlighted by the fact that the Governor's 2022 Executive Order N-7-22 calls for the use of water trucks carrying water from outside jurisdictions to ensure public water.

147.    Third, at least one County official explicitly conceded that the water ordinances were "not designed to protect the aquifer, or the groundwater." This statement, along with the other evidence cited above, indicates that the County's alleged conservation rationale is largely pretextual.

148.    Finally, Sheriff LaRue has contended that quality of life and public health are the driving concerns for the County, not cannabis enforcement, although this explanation flies in the face of the

dramatic detrimental effects of the ordinances on residents' health and safety. Moreover, while Defendant LaRue and Board members have complained of people living in unpermitted structures and other code violations in areas like Shasta Vista – purportedly out of concern for public health and safety – the County has ignored similar code violations elsewhere in the County.

149.    These ever-changing justifications are pretext for an actual motivating factor underlying the water ordinances: racial animus against Asian Americans.

C.    *Racial Animus in the County's Adoption of the Water Ordinances*

150.    Racial animus is reflected in the Board's official meeting minutes, recordings, and communications, which demonstrate an increasingly pejorative narrative about Asian Americans in Siskiyou County leading up to adoption of the water ordinances. In particular, the explicit racialization of cannabis issues over the last five years clearly illustrates the anti-Asian narratives the Board adopted in its subsequent actions.

151.    In a video of a 2017 Board meeting regarding a proposed emergency declaration classifying cannabis cultivation as a local emergency, one commenter noted, "I would just like to say that it's pretty evident that the county is under siege, just look at this room [gestures at Asian American attendees] most of these people are here, I assume, to be growing marijuana illegally and commercially. They're part of cartels." There was, of course, no basis to assume that people in the room grew cannabis or were part of so-called cartels by "just looking at the room" unless they assumed those things because of the way people looked – that is, Asian American. After some Asian American attendees used an interpreter, another speaker quipped, "although I am Italian and Albanian, I don't think I need interpretation," receiving laughter from the Board. Afterward, the Board passed the emergency declaration.

152.    These expressions of animus continued into the next year when homeowners complained of newcomers to the Shasta Vista subdivision. One frequent commenter called on the Board and Sheriff to take stronger action in this neighborhood, arguing "they need to not only be eradicated but there needs to be something that says, 'don't come back.' Thank you very much."

153.    In June of 2020, shortly before the Board proposed the first of the three water ordinances, Supervisor Ray Haupt emailed Supervisor Michael Kobseff and another county employee to complain

SECOND AMENDED COMPLAINT CASE NO. 22-CV-01378-KJM-AC

of a reported proliferation of water trucks in the Shasta Vista area. He wrote, "I am fearful that we are losing a portion of our county and being turned into a no-go zone, similar to what we see if foreign countries like Europe where Sharia Law has replaced local governance." Haupt went on to complain that the state was stopping water diversions to one long-term rancher in the Scott Valley, indicating that he was not concerned with water use generally, but rather a xenophobic fear that the water was going to the wrong people.

154.    In the lead up to the passage of the water ordinances, the Board and Sheriff heard and responded to frequent public comments which echoed this hostility toward Shasta Vista and Asian Americans.

155.    On August 4, 2020, the Board passed the first reading of the water nuisance ordinance to target the Griset Ranch for providing water to the Hmong community. Its passage followed public comment about residents of Shasta Vista "garnishing . . . their needs," the presence of human trafficking and "people here from other countries," and the need to "eradicate this illness." One commenter noted that the "neighborhood is changing rapidly" and "Big Springs is the holding line" and asked, "[w]ould you want to send your kids to a school in that neighborhood?" The Board responded by encouraging the public to send in their complaints and passed the water nuisance ordinance on a second read. Siskiyou Cnty. Code § 3-13-702. Three weeks later, the County filed a suit alleging violation of the water nuisance ordinance against the Griset Ranch.

156.    In October 2020, when Deputy District Attorney Aker contacted the Water Board to discuss cannabis cultivators of "Hmong descent," she specifically referenced this lawsuit, writing that the County was responding by filing "two civil cases against owner/operators of wells."

157.    At a November 2020 Board meeting, Sherry Ellison of Ellison Ranch spoke out about the County targeting her for her well operation and her friendship with the Hmong community, and a representative of a local well driller explained that the County's underlying water table was untouched by the complained-of well usage. But a backlash ensued, with comments including: "The water they are pumping is not for citizens of the County"; "This is not a people without a country"; "It is mob-like activity"; "And Ms. Ellison saying that these people are respectful? They are a slap in the face"; "As a citizen and a Christian it is really unheard of"; "We have laws in these lands . . . And we as the citizens

have only one requirement of anybody in this nation, anybody, anybody from any planet: follow our laws, respect them like the rest of us do."

158.    During the December 2020 Board meetings on the water nuisance ordinance, the Board responded to public comments that largely painted all Hmong people and residents of Shasta Vista as criminals. A member of the public asked a series of rhetorical questions explicitly aimed at Hmong people: "Hmong[,] why do they spend their life savings on land that does not support farming or living?"; "Do they not hold employment or rely on state resources?"; "Why do the Hmong choose to farm and grow marijuana?"; "Are the individuals legally residents of Siskiyou?" Another speaker characterized all Hmong people as criminals, stating "I do not refer to them as Hmong. I refer to them as illegal pot growers. There's a reason for that. It's because they're doing illegal activity." One speaker alleged that "everyone up here in Shasta Vista [] is violating the law." Others complained of a "massive population increase in the Shasta Vista subdivision," "watch[ing] [the] neighborhood go down the drain," "Hmong and Chinese black market marijuana growers," and "unpermitted housing [and] RVs."

159.    At the end of public comment on the water nuisance ordinance, a letter was read equating the Hmong clan structure to "thievery," murder, and "a third world country" and the idea that the "the Hmong want to make this their home" was ridiculed. The Board was responsive to these public comments, being sure to request a copy of the letter.

160.    The Board neither disavowed nor disapproved of the bigoted public comments on the water nuisance ordinance.

161.    The Board then asked the Sheriff to give a presentation on his cannabis enforcement efforts at the next Board meeting, although there was no related agendized ordinance or action upcoming. At that last meeting of 2020, following the Sheriff's presentation, members of the public asked the Sheriff to increase his focus on water extractions and water haulers themselves. Defendants did just that the next year.

162.    Following the Sheriff's release of the 2021 Strategic Plan for Marijuana Enforcement that listed races and ethnicities of cannabis growers and argued for cannabis-related water enforcement, the Board presented two emergency ordinances at the May 4, 2021 meeting: the water extraction ordinance and the water transportation ordinance. Public comment attempted to downplay any racist intent, yet still

portrayed Asian Americans as outsiders rather than true members of the community. "They don't live here," said one member of the public. Another speaker suggested to the Board that "if the communities that do the illegal growing wanted to do it in a legal way, they would have done it when they got here in 2014 . . . . These people are not residents." When an Asian American attendee accused the Board of discrimination, the Board responded that "the rest of the county" complied with their laws.

163.    Concerns over the water ordinances and related resolution did not come only from Asian Americans. County CalFire Chief Phil Anzo cautioned that "[t]he County's ban on non-fire water tenders may have impact on fires in the area." One Board member noted that there was similar cannabis-related water truck usage in the eastern part of the County that "no one cares about." In response, the Sheriff proclaimed:

> I think it is important that we direct our anger at the right people. You know, we have good people in this county that have agriculture and we have people who are abusing that. We know who they are. And frankly, I'm perplexed that those people are not shamed more… we focus on the people that are causing the problems… this is all I think about lately… we need the cooperation of our local people… [to] really choke it out… if people were going to do it right, they would have done it right from the beginning . . . .

164.    A County Supervisor agreed that the water ordinances targeted the people "that thumb their nose at us, [] thumb their nose at society, and thumb their nose at our way of life."

165.    The Board emphasized that the water ordinances would be enforced with "absolute discretion" by the Sheriff in response to complaints – effectively delegating prioritization of enforcement areas to the public, notwithstanding their evident racial hostility and prejudice toward perceived Asian American outsiders.

166.    The Board passed the water extraction ordinance, the water transport ordinance, and the related resolution identifying streets that serve the Asian American communities in Shasta Vista, Dorris, and Macdoel on an emergency basis.

167.    The Sheriff immediately set out to enforce the water ordinances by issuing citations and even unlawfully seizing vehicles, although no signage was posted as required by the water truck ordinance and permits were not made available for lawful off-parcel transportation until over a week after the passage of the water extraction ordinance.

168.    In a message to Sheriff's Department personnel regarding enforcement of the extraction ordinance on the day of its passage, Undersheriff Randall urged "we are going big and pushing boundaries" while noting that the Sheriff's enforcement plans had been approved by County Counsel, the DA's Office and other County agencies. Notably, these plans were drafted well in advance of the passage of either ordinance.

169.    Because the Board passed the original water extraction and transportation ordinances on an emergency basis, it took further public comment over the following months. Once again, the racial implications of the commentary were clear. Such comments were directed at the entire Asian American community in Shasta Vista, not individuals believed to be cultivating cannabis, and included: "They're not innocent," "The community out there is not a community[,] it is squalor out there." Others warned of an impending crisis for the Asian American and Hmong community. Ahead of the August 3, 2021 Board meeting, Ellison Ranch cautioned that because "[t]here is no guidance as to . . . how the end user is evaluated to determine whether their ultimate use of the water is non-conforming or illegal," "it is highly likely that no permits would or could be issued." Because a person applying for a permit to extract or transport water cannot know the actual end use, the water ordinances threatened to create a humanitarian crisis by discouraging and preventing permit issuances.

170.    At the August 3, 2021 Board meeting, Asian American and Shasta Vista residents spoke of their attempts to be part of the community as others could be heard outside rallying in opposition to the water ordinances.

171.    Outside the August 3, 2021 meeting, the Sheriff limited the movements of protesters in favor of water access while white counter-protesters roamed free.

172.    Inside the August 3, 2021 meeting, the predominantly Asian American protesters were met with comments expressing racialized fear and indignation. Describing the people gathering outside, one commenter blanketly asserted that "they are outside right now . . . illegal growers are now out around us." The same person complained "they are stealing water from fire hydrants now," not recognizing the extremes some residents were forced to take to secure water access for survival. Another complimented the Board: "We within the community recognize . . . the Board of Supervisors, who under extreme pressure to bend to the drums of the mob, have stood ground against lawlessness. We believe

you are all warriors for what America truly believes in: that law matters," before offering a warning, "[l]astly, I would like those who came here with intentions of violating the law: you came to the wrong county . . . ." The next speaker, emphasizing they were a "permanent Big Springs resident," dismissed the Hmong community's history of military service and any claims of a humanitarian crisis from "poor farmers." Yet another speaker made no attempt to hide her animus toward Asian people. Referring to the Asian American residents who wrote letters about the ordinances, the speaker remarked, "It's funny, you just heard a list of names there that we are dealing with in our subdivision with illegal marijuana grows" and "they invade our County on an annual basis." The speaker then admonished Hmong people directly to "live like normal people . . . be good citizens, you came here to lie to us in the first place about being good citizens. Oh, we want to be good citizens, we fought for you. No, you didn't. You were brought over here to this county and to this country to take advantage of what we offer here . . . ."

173.    The Board adopted the final water extraction ordinance and the final water transportation ordinance the same day, expressing no concern with the sentiment expressed by speakers that Asian Americans invaded the County to engage in criminal activity.

174.    At the first Board meeting following the Court's September 3, 2021 preliminary injunction order, neighboring Big Springs residents came out in force to demand action. Public comment included questions about whether non-citizens would be counted for redistricting purposes to create an entire district of special interest community like "let's say, illegal marijuana growers." Another person, with the Court's preliminary injunction order in hand, dismissed the racism faced by the Asian Americans and Hmong people as "a bunch of baloney" and suggested that it was "the permanent resident citizens that actually live in homes [who] have been intimidated by these people, these illegal pot growers." "These are people who are calling themselves a community out here, give me a break," a public commentator continued, "[t]hese people are not residents . . . please don't tell me these people are a community, they're all criminals."

175.    Seemingly in response to the above vitriol, the Board agendized a new resolution, Resolution 21-139, which made the water truck ordinance apply to all county roads, not just those surrounding Asian American communities, barring all water trucks from transporting water without

special permits. A County Supervisor characterized the change as designed to merely give the appearance of equal enforcement:

> To me it's a cleaner thing to make it county-wide, that way it's not perceived that we're just going after any one . . . when we talk about illegal . . . and I will tell you that marijuana, as we all know, has been around since I've been supervisor. Not only a problem, but an issue. It was initially when I got here, forest service sites, so think about that that surrounds us, they could be using any county road to get there. To me this eliminates that perception that we're going after XYZ . . . . If we do this more consistently it will eliminate that perception that we're always targeting someone or something.

The resolution was approved, but the water ordinances themselves were left as is.

176.     When not referring to the Asian Americans or Hmong people by name, the Board, Sheriff, and members of the public use the barely coded language of drug cartels, enemies of war, noncitizens, of the subdivision "Shasta Vista," the "third world," human traffickers, and people living in squalor and unpermitted housing. Asian American residents are consistently contrasted with long-term permanent residents, "Americans," and law-abiding homeowners, suggesting they are foreigners and have no right to be in the County. In this context, officials have used troubling language regarding the need to "choke out" or "eradicate" "an illness" in reference to communities where Asian Americans reside. These statements and actions, by County decisionmakers and the public, show that the water ordinances were passed with racial animus as at least one motivating factor and likely the predominant one.

   D.     *Allegations of Plaintiff Mathis Regarding the Water Ordinances*

177.     Plaintiff Russell Mathis lives in the Shasta Vista subdivision on a small plot. Mr. Mathis moved to the subdivision in 2013 from the Bay Area, where he was born and raised. Mr. Mathis was previously homeless in the East Bay. He came to Siskiyou due to the affordable property. Mr. Mathis is disabled and survives on a fixed, limited income. He lives with his dogs.

178.     Mr. Mathis does not have a well for his water needs. He understands that the County makes it difficult to obtain well permits and a well is otherwise cost prohibitive. He previously bought water from the City of Yreka, but the city discontinued that service for anyone who lived outside the city limits. He then began to transport water from his friends and neighbors, many of whom are also Asian American and received their water from the Griset well. Prior to the water ordinances, he would get

water from others using two tanks, one 500 gallon and the other 325 gallon, which he would load onto his truck bed.

179.    After the water ordinances took effect, Mr. Mathis did not have water access for the summer months. He could no longer transport water from others' parcels and people became afraid to provide water to him. He did not try to get a water truck permit because he knew that he could not find a water source. In late June 2021, the Lava Fire burned through Shasta Vista. After Mr. Mathis saw CalFire leaving the subdivision even though the fire continued, he returned to his property to defend it against the flames. He used most of his remaining water fighting the fire and managed to save his property.

180.    After the fire, Mr. Mathis had depleted water reserves in his water tanks and was unable to obtain more due to the water ordinances. He carefully conserved the little water he had. To cool off during the hot summer months, he would pour the water over his head. His dogs would then lie in the wet soil where he had poured the water. With less water for bathing, hygiene, and cooling off, Mr. Mathis, a senior with a history of cancer and current kidney problems, was put under significant bodily stress. The whole experience reminded him of being homeless – it felt like the whole area was against him, just like then, and he had to concentrate his time on getting his basic needs met. His dogs suffered without much water as well.

181.    At one point, Mr. Mathis called County Supervisor Ed Valenzuela to express his concern over the lack of water. Mr. Mathis also asked whether he voted for the ordinance that targeted Asians to which Mr. Valenzuela replied, "Why wouldn't I?"

182.    Since the preliminary injunction and subsequent repeal or amendment of the water ordinances, Mr. Mathis's options for water have improved but remain limited as he and potential water providers are still afraid of being targeted by the County and Sheriff. He has also experienced further restrictions in water access due to the County's more recent targeting of off-parcel water transfers under its zoning laws, detailed further below.

183.    Mr. Mathis points out that the targeting of Asian Americans is the continuation of a long history of discrimination in the County, stemming back to the 1800s. He has seen the discrimination get worse in recent years since more Hmong people began moving to Siskiyou. When outside of Shasta

1    Vista, Mr. Mathis purposefully wears western and country styled clothing in order to obscure his Asian

2    heritage and avoid discrimination. He worries about being targeted all the time, including when he

3    drives anywhere in the County.

4        184.    Siskiyou County has not been friendly to Mr. Mathis since his arrival. When he moved

5    there, he could not get a post office box even though he properly submitted an application with the

6    required identification. A few months after he arrived, a code enforcement officer came by and told him

7    that he could not live in his unpermitted dwelling for more than three weeks in a year. He has heard that

8    the Sheriff has told businesses not to help the Hmong. He has tried calling an electrician and a plumber

9    to come to his property in Shasta Vista, but they would not.

10        ***The County's Unlawful Use of Property Liens to Recover Cannabis-Related Fines***

11        185.    In addition to Defendants' unlawful water restrictions and targeted enforcement to push

12    people seen as undesirable from the County, Defendants have continued their campaign against Asian

13    Americans through the assertion of authority to issue property liens and foreclose against property that is

14    subject to unpaid administrative fines.

15        186.    In 2020, as part of the County's increasingly punitive approach to cannabis cultivation,

16    the Board of Supervisors adopted Ordinance No. 20-11 amending the Siskiyou County Code section 10-

17    14.100 to increase the fines associated with cannabis cultivation from $500 for a first offense to a $5,000

18    per day fine that could be assessed immediately, multiplied by multi-day citations, and combined with

19    steep fines for supposedly related building and water violations. This section of the County Code

20    explicitly cited California Government Code section 53069.4, which authorizes local governments to

21    issue administrative fines or penalties for violation of an ordinance.

22        187.    Ordinance No. 20-11 also permitted the County to issue real property liens to recover

23    fines or penalties issued for violations under the same section.

24        188.    Under the language of these amendments, if a property owner did not satisfy their fines

25    within ninety days of receipt, the Board of Supervisors would have the power to approve issuance of a

26    lien against the property. The amendments further provided that a lien could be foreclosed, and the

27    property sold, to satisfy the unpaid fine amounts and interest, and that the County would be entitled to its

28    fees and costs in addition to satisfaction of the fines.

189.     Several Board of Supervisors members explicitly urged their colleagues to approve these amendments, noting that the County could consider seeking outside assistance to undertake foreclosure proceedings. Supervisor Haupt told his colleagues that he was "fully in favor of" the ordinance in order to "clean up the mess" that the County was dealing with. Then-Supervisor Lisa Nixon urged her colleagues to "not be afraid to foreclose on the properties," telling them that "if the fines are high enough then the growers won't be able to purchase the properties" in the first place.

190.     Following the adoption of Ordinance No. 20-11, the County's Planning Department began imposing fines – almost entirely against Asian American-owned properties – that were several times higher than not only the previous fines but the *value* of many of the properties being fined.

191.     Several months later, during an interview discussing alleged "Hmong" and "Chinese cartel" growers, Sheriff LaRue told a local reporter that "water restrictions," "water trucks," and "taking land" were three methods that he was looking at to expand the Sheriff's traditional enforcement powers and address the "community problem" of marijuana.

192.     Sheriff LaRue's comments suggested that property liens and the threat of foreclosure were one piece of a concerted effort by the Defendants to drive undesirables out.

193.     On January 19, 2021, the Board of Supervisors issued liens for unpaid cannabis-related fines under section 10-14.100 for the first time. Ten properties were issued liens that day; all were Asian-owned.

194.     After January of 2021, the County Board of Supervisors continued to record liens against properties for unpaid cannabis fines at increasing frequency, with approximately 40 liens issued through August 2022. The lists of property owners affected by liens indicate that well over 80% of all liens issued under section 10-14.100 were issued against Asian American property owners in the County.

195.     On or around January 16, 2024, in response to this litigation, Defendants repealed the portion of the County Code purporting to authorize property liens for administrative fines and subsequently ordered the rescission of previously issued liens. Notably, Defendants took no action to remove the property liens earlier, despite acknowledging that they lacked authority to issue such liens under state law since at least April of 2023, when they sent a letter to the state Legislature advocating for a change to existing law to give them such authority.

*A.    Liens Issued Under County Code Section 10-14.100 Were Unauthorized Under State Law*

196.    While the Board of Supervisors relied on California Government Code section 53069.4 to authorize the setting of cannabis-related fines, this section does not authorize the issuance of property liens to collect on such penalties and fines. Nor does any other statute. California Government Code section 38773.1 authorizes a local legislative body to establish a procedure to collect abatement *costs* by nuisance abatement lien. In no way does it authorize the collection of fines and penalties.

197.    The County has cited no other authority that would authorize its use of real property liens and the drastic remedy of foreclosure to collect on fines and penalties assessed for local ordinance violations.

198.    While the liens ordinance and the Board's subsequent lien authorizations were consistent with the County's pattern of racially targeted and increasingly punitive enforcement, the County actually lacks the authority to impose liens in this manner. This enforcement and collection mechanism, which was used almost exclusively against Asian property owners, was unauthorized and conflicted with state law.

*B.    Allegations of Plaintiffs Va and Vang*

    *i.    Susanna Va*

199.    Among those impacted by property liens issued under section 10-14.100 is Plaintiff Susanna Va. Ms. Va acquired a ten-acre property (APN 003-650-270) around the Macdoel area in or around 2020. At that time, the property's assessed value was $23,460. Ms. Va previously lived in North Carolina with her now-adult children, and in Sacramento with her sister, but hoped to settle and retire in Siskiyou County to be closer to where her parents are buried.

200.    The previous owners of the property had left two greenhouses on the land. Ms. Va did not remove these additions to the property but inquired about getting a well so that she would not have to purchase water from an external source. She received a referral for a white well-driller, who told her he could dig the well upon payment. She did not understand at that time that a permit was required, nor did the driller inform her of such a requirement.

201.    In or around February of 2021, Ms. Va received a letter posted to her gate. Her son-in-law helped her translate the letter, which informed her that the County was requesting to be allowed to

inspect her property. Her son-in-law called the County office to make an appointment, and in late February 2021 Siskiyou Code Enforcement Officer John Ottenberg arrived to inspect the property with several Sheriff's deputies and County employees.

202.    Mr. Ottenberg inspected the entire property, and cited Ms. Va for various code violations including use of the unpermitted well and a number of small cannabis seedlings and containers located on the property. Ms. Va's son-in-law was present for the search and helped translate for Ms. Va. Mr. Ottenberg informed them that they had ten days from the date of the search to destroy the seedlings.

203.    Ms. Va destroyed the plants as instructed, but neither Mr. Ottenberg nor the other County employees ever returned to confirm that this was done.

204.    Later, Ms. Va went to the County Code Enforcement Office to inquire about whether she could remedy the well-permit issue and see if they could reduce the fines, as she was unable to pay the $28,000 in fines and penalties issued by Mr. Ottenberg.

205.    Mr. Ottenberg informed Ms. Va that she could apply for a well permit and have an inspector come to the property for that purpose. Regarding the fine amount, he told her that if she was unable to pay, she needed to go to an appeal hearing with the County.

206.    Ms. Va applied for and paid the fee for a well permit as Mr. Ottenberg had instructed, but when a County employee came to inspect the well, they informed her that it needed to be closed because the driller had improperly constructed the well. Ms. Va did as they instructed but did not have enough money remaining to pay for a new well at that time.

207.    Ms. Va also went to the abatement fines hearing with the County, where a community member helped to translate, as no interpreter was provided by the County. She attempted to explain that she was unable to pay the fines in her citation, but the hearing officer would not reduce the fines on this basis.

208.    In October of 2021, the County Board of Supervisors issued a lien against Ms. Va's property for the unpaid fines associated with her February citation.

209.    Ms. Va lived in fear of the County foreclosing on her property because she would have no place to live. The lien against Ms. Va's property remained in place until sometime in early 2024, when the County removed it in response to this litigation.

ii.      *Mai Nou Vang*

210.    Plaintiff Mai Nou Vang owns a property in Shasta Vista located at APN 100-434-050. The assessed value of that property is $15,000.

211.    In July of 2020, while the property was being leased out, Siskiyou County officials conducted a search and issued citations and fines pursuant to County Code section 10-14.100 for a cannabis grow located on the property. Ms. Vang was not at the property or even living in Siskiyou County at the time, but she later received notice of approximately $50,000 in related fines and penalties assessed against her for the property.

212.    On January 19, 2021, the Board of Supervisors issued a lien against Ms. Vang's property for the outstanding cannabis nuisance fines and penalties. Notably, the lien amount was over three times the assessed value of the property, and Ms. Vang's property remained encumbered by the lien until early 2024 when the County removed it in response to this litigation.

### *The County's Novel Policy and Discriminatory Application of its Zoning Ordinance to Continue to Deprive Asian American Communities of Water*

213.    As part of its campaign to restrict water to Asian Americans and drive them from the County, Siskiyou County more recently adopted and applied a novel interpretation of the County Zoning Ordinance. The County, through or with its Community Development Department ("CDD"), its Director Richard J. Dean, the District Attorney, and the Sheriff's Department, has utilized this interpretation to investigate, cite, fine, and sue well owners who provide water to Asian Americans, while ignoring or even facilitating the extraction of water by well owners who do not predominantly serve Asian American communities. As Defendants are aware, Asian American communities in Siskiyou County rely on off-parcel water for domestic use, including maintaining health, fire protection, hygiene, bathing/cleaning, cooking, and caring for livestock, pets, and gardens. Yet Defendants have affirmatively implemented this policy, custom, or practice despite the danger that it would deprive Asian American communities of necessary access to water, creating a water crisis.

214.    Siskiyou County's Zoning Ordinance is codified at Title 10, Chapter 6 of the County Code. The Zoning Ordinance sets forth several districts that the County can establish in the unincorporated County area. Among these are the "Prime Agricultural District" (AG-1), the "Non-Prime

Agricultural District" (AG-2), the "Rural Residential Agricultural District" (R-R), the "Light Industrial District" (M-M), and the "Heavy Industrial District" (M-H). Siskiyou County Code 10-6.202.

215.    The vast majority of the properties in and around the areas of the County where Asian Americans are concentrated are zoned AG-1, AG-2, or Rural Residential, as are properties with wells that provide water to those communities.

216.    Various sections of the County Code define the permitted uses of the different zoning districts, as well as additional uses that are permitted in each zoning district subject to obtaining a use permit ("conditional uses"). Agricultural uses and "[a]ccessory uses incidental to agriculture" are permitted on both AG-1 and AG-2 land. Siskiyou County Code 10-6.4902, 10-6.5002. In the Rural Residential district, accessory uses normally incidental to farming are permitted. Siskiyou County Code 10-6.4802.

217.    The County first adopted its Zoning Ordinance in 1953. The sections of the Zoning Ordinance that establish the permitted uses of the relevant zoning districts were enacted in 1986. Despite this decades-long history, the County never used the Zoning Ordinance to regulate extraction or distribution of water until 2020.

218.    Around 2020, the County developed a new interpretation of the Zoning Ordinance. Under this new interpretation, the County asserts that it is a zoning violation to transfer water off-parcel in most types of zoning districts, including AG-1, AG-2, and Rural Residential. Specifically, the County interprets the permitted and conditional uses of these districts to exclude *any* water distribution, while maintaining that the only districts that allow water distribution are those that permit "bottling works and spring and mineral bottling works at the source." The Zoning Ordinance provides for water bottling facilities in Light Industrial and Heavy Industrial districts. The County adopts this interpretation regardless of the manner, amount, or use of extracted water; regardless of whether it is sold or given away; and regardless of whether it is potable or non-potable.

219.    Because the County now views water transfers as neither a permitted nor conditional use in non-industrial zoning districts, well owners on AG-1, AG-2, or Rural Residential land cannot obtain a permit that would allow them to provide water off-parcel in any amount or for any purpose, including for accessory uses incidental to agriculture or small farming. The County's new interpretation of the

Zoning Ordinance is therefore a stricter prohibition on water extraction and distribution than the 2021 water extraction ordinance, which allowed for water extraction permits (though in practice those permits were not generally available to Asian Americans).

220.    This interpretation of the Zoning Ordinance marks a departure from prior policy, custom, or practice within Siskiyou County and across the state.

221.    The extraction and transportation of groundwater off the parcel where it was extracted is commonplace in rural areas across California, and counties throughout the state typically do not rely on zoning restrictions to limit water use. Nor do other counties generally outright bar water transfers within watersheds or within a county. Under Siskiyou's extreme reading of its Zoning Ordinance, moving water to a neighboring parcel in any amount, even for necessary domestic use, is prohibited.

222.    The County's new interpretation and application of its Zoning Ordinance is also a departure from its own past practice. During the decades the Zoning Ordinance has been in place, the County never used it to restrict water transfers until 2020. This is not because no water distribution was taking place. Moving water between parcels was and is a common practice among farmers and ranchers in Siskiyou County. The County is aware of this practice[4] and has even taken steps to *preserve and promote* non-Asian farmers' and ranchers' ability to transfer water.

223.    For example, after the passage of the water extraction ordinance, the County's Agricultural Commissioner contacted certain well owners, whom he referred to as "legal and legitimate operators," to advise them they would now need to obtain permits to extract water from their wells for off-parcel use. On information and belief, these well owners have not provided water to Asian American communities and are not themselves Asian American. Under the County's current interpretation of the Zoning Ordinance, *any* extraction of water from these well owners' properties, regardless of permitting

---

[4] During the Board of Supervisors' debate on the water extraction ordinance, supervisors raised concerns that requiring a permit to extract and transfer water off-parcel would "be an encumbrance" for "our agriculture people, farmers, ranchers," especially those who "provide services to other ranchers," such as water hauling.

status, is prohibited.[5] Nonetheless, the County has not cited any of these well owners for violating the Zoning Ordinance by extracting water for off-parcel use.

224.    Likewise, during the first few months of enforcement of the water extraction ordinance, the County issued permits to white property owners to haul water from their parcels. Though such water distribution apparently violates the Zoning Ordinance under the County's current interpretation, the County has not cited any of these property owners. In fact, in issuing the permits, County staff *explicitly* notated that the requested water hauling was compliant with the County's Zoning Ordinance.

A.    *The County's Use of Its Zoning Ordinance as a New Tool to Restrict Water to Asian Americans*

225.    Around 2020, Siskiyou County began testing a new interpretation of the Zoning Ordinance to target well owners who provide water to Asian American communities.

226.    Steve Griset was one such well owner. The lawsuit Siskiyou County brought against Mr. Griset, *see supra* ¶ 155, also included a claim for violation of the County Zoning Ordinance under the theory that "bulk groundwater extraction, collection, and distribution" are not permitted in the AG-1 zoning district where his property is located. As a result of that lawsuit, Mr. Griset was discouraged from providing water and generally refrained from providing water from his well out of fear of further prosecution.

227.    The County's targeting of the Ellison Ranch, *see supra* ¶ 157, also included a claim for violation of the Zoning Ordinance by extracting and distributing groundwater. In October 2023, the County and the owners of Ellison Ranch entered into a settlement agreement that prohibited the well owners from "providing water from the Property for off-site use by a third party, or otherwise allowing the Property to be a place of water supply and distribution for third party use."

228.    County officials, including the Sheriff's Department at the request of CDD, continue to track, surveil, and tail vehicles and water trucks, and now use these activities to identify well owners to cite under the new interpretation of the Zoning Ordinance.

---

[5] On information and belief, these well owners' properties are zoned for agricultural, not industrial, uses. Under the County's new interpretation of the Zoning Ordinance, the only zoning districts that allow any type of water distribution are Light Industrial and Heavy Industrial districts.

229.    In late 2023 and 2024, the County sharply increased its use of the Zoning Ordinance, under its newly adopted interpretation, to go after well owners who provide water to Asian Americans. From December 2023 to July 2024, the County issued notices and citations for violation of the Zoning Ordinance to owners of small wells on four properties. The owners of each of these four wells provided water to Asian Americans and are Asian American themselves.

230.    Bill Yang was one of these well owners. He lives in the Big Springs area of Siskiyou County, near Shasta Vista. He has provided water from his well to other Asian Americans who live in Shasta Vista and do not have wells on their properties. On December 18, 2023, Siskiyou County Code Enforcement Officer John Ottenberg issued a Notice to Comply to Mr. Yang, indicating that AG-2 zoning did not allow for a "water distribution enterprise." Mr. Yang talked with Code Enforcement later that month and was told he could not bring water from his well to other properties, even if he owned those properties. On May 15, 2024, Mr. Ottenberg cited Mr. Yang for violating the Zoning Ordinance by "unpermitted Removal of water from property" and fined him $100. Mr. Yang is afraid that if he continues providing water to his Asian American neighbors, the County will sue or fine him.

231.    On June 18, 2024, Mr. Ottenberg issued a Notice to Comply to the Asian American owners of another well. Similarly, the notice indicated, "Ag-2 zoning makes no allowance for a water distribution enterprise."

232.    Another of the well owners was Vue Moua. In March 2024, Mr. Vue Moua bought a property with a well in the Big Springs area, near Shasta Vista. The property is zoned AG-2. Before Mr. Vue Moua bought the property, water trucks would fill up there with the permission of the owner at the time, who was white. The former owner was never cited for violating the Zoning Ordinance.

233.    After Mr. Vue Moua bought the property, he continued to allow water trucks to fill up there. Much of the water pumped from his well went to Asian Americans living nearby who lacked wells on their properties.

234.    On April 24, 2024, a few weeks after closing on the property, Mr. Vue Moua received a Notice to Comply from Mr. Ottenberg. The notice stated Mr. Moua was violating the Zoning Ordinance by allowing water trucks to fill up at the property.

235.    On May 15, 2024, Mr. Vue Moua received a citation with a $100 fine. A cover letter accompanying the citation stated that it was a "zoning violation to operate a water distribution center" on his property.

236.    On May 23, 2024, Code Enforcement went to Mr. Vue Moua's property to inspect it. They told him that he would need to change his zoning designation if he wanted to provide water off-parcel.

237.    Mr. Vue Moua contacted the CDD to inquire about changing the zoning designation on his property, explaining that he wanted to provide water to friends and relatives for their daily use because they did not have wells on their properties. CDD responded that, "The only zoning districts that allow for any sort of water distribution are the Light Industrial and Heavy Industrial zoning districts." Mr. Moua was informed that he could not get a zoning change because an industrial zoning district would not be compatible with the neighborhood, which was made up of AG-1, AG-2, and Rural Residential districts.

238.    Mr. Vue Moua received subsequent citations for pumping water in violation of the Zoning Ordinance on June 4, 2024; June 20, 2024; and July 10, 2024. The citations included fines for $200, $500, and $1000, respectively.

239.    Mr. Vue Moua knows that members of the Asian American community rely on him for water; and that without water from his well, they will be unable to bathe in the extreme heat, care for their animals, and protect against wildfires. However, he does not know if he can continue providing water if the County persists in issuing escalating fines against him.

240.    The fourth well owner was Neng Vue. Mr. Vue and his wife live in Shasta Vista. They previously provided water to their neighbors without wells, who are also Asian American. On July 25, 2024, Mr. Vue received a notice from the County stating that he was violating the Zoning Ordinance by operating a "water distribution center" by allowing water to be pumped at his property. After Mr. Vue received the notice, he and his wife stopped providing water to their neighbors because they were scared the County would fine them.

241.    Defendants have not used the Zoning Ordinance to restrict well owners who do not provide water to Asian Americans from extracting or distributing water.

242.    Defendants' actions have had a chilling effect on well owners who provided water to Asian Americans in Siskiyou County. Afraid that they will become targets of citations and fines, well owners have ceased allowing water to be pumped on their properties. As intended, Defendants' targeting of water providers under its Zoning Ordinance has led to a reduction in the provision of water, uniquely impacting Asian American communities, who rely on off-parcel water.

243.    The County's use of the Zoning Ordinance against well owners may lead to another humanitarian crisis, similar to what Asian Americans experienced in the County in the summer of 2021. As a result of increasing enforcement in 2024, many Asian Americans experienced scarcity of water, which posed a grave danger to their health and safety. If the County's zoning practices are allowed to continue, they will go without water to meet their basic health and hygiene needs, care for pets, maintain livestock and gardens, and prevent and fight fires that are all too common.

*B.    Allegations of Plaintiff Mathis Regarding Zoning Ordinance Enforcement*

244.    The County's recent use of the Zoning Ordinance to stop off-parcel water extraction again made it difficult for Plaintiff Russell Mathis to obtain water for his basic or lawful needs like water for his health, hygiene, cooling off, fire protection, and caring for his dogs.

245.    In addition to Steve Griset, another person who otherwise would have provided water to Mr. Mathis declined to do so in 2024, during the County's increased targeting of well owners under the Zoning Ordinance, out of fear that the County would target him for enforcement.

246.    With local well owners increasingly afraid to provide water due to the County's zoning enforcement actions, it was challenging for Mr. Mathis to obtain enough water for his basic needs, putting his health and safety in serious danger. He was unable to secure a consistent or reliable water source, and the water he obtained was poor quality. In order to conserve the small amount of water he had, Mr. Mathis used only about five gallons of water per day.

247.    This scarcity of water was and is especially dangerous during the summer months, when there is a high risk of wildfires. There were a number of fires in Shasta Vista, the subdivision where Mr. Mathis lives, during the summer of 2024, including a large fire in June that occurred less than a mile from him. Local volunteer firefighters struggled to secure enough water to control or put out fires. And,

if a fire reached his property, Mr. Mathis would not have had enough water in his depleted water tanks to fight it.

248.    On December 18, 2024, this Court issued a Preliminary Injunction Order in this case, ECF 116, enjoining the County from enforcing its Zoning Ordinance to prevent the transfer of water to residents of non-well parcels in the Mount Shasta Vista Subdivision for specific uses. Although this Order mitigates the immediate danger to Mr. Mathis and others in Shasta Vista from the County's Zoning Ordinance enforcement, a permanent remedy is needed to protect them in the longer term.

### PLAINTIFFS' THREE PROPOSED CLASSES

249.    Pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure, Plaintiffs bring this lawsuit as a class action on behalf of themselves and all other persons similarly situated. Plaintiffs propose three distinct classes: (1) "Traffic Class"; (2) "Water Class"; and (3) "Lien Class." Each is further defined below:

250.    Traffic Class; represented by Plaintiff Jordan Chong Moua and Mai Nou Vang: All Asian Americans who drive or ride in vehicles in Siskiyou County, California.

251.    Water Class; represented by Plaintiff Russell Mathis: All Asian Americans who reside within unincorporated Siskiyou County who rely on off-parcel water for health and safety purposes. For avoidance of doubt, this class would not include persons whose sole need for offsite water would be for unlawful cannabis cultivation, and the relief sought in this case does not include access to water to be used for that unlawful purpose.

252.    Lien Class; represented by Plaintiffs Ying Susanna Va and Mai Nou Vang: All Asian Americans whose property was liened pursuant to Siskiyou County Code section 10-14.100, or who will be subject to a lien due to unpaid administrative fines in the future.

253.    Each proposed Class meets the Rule 23(a) requirements. Based on Siskiyou County's own data, each class meets the Rule 23 numerosity requirement: Siskiyou County records indicate that more than 1,000 persons are members of the Traffic Class; hundreds of persons are members of the Water Class; and that more than 30 persons are members of the Lien Class.

254.    The interests of the Plaintiffs are not antagonistic to, or in conflict with, the interests of others in the proposed Classes, and there are no material conflicts between Plaintiffs' claims and those

of absent Class members that would make class certification inappropriate. The attorneys representing the Classes are highly trained, duly qualified, and well experienced in representing plaintiffs in civil rights class actions.

255.    Plaintiffs' legal claims will be decided by questions of law and fact common as to all members of each discrete Class.

256.    Plaintiffs' claims are appropriate for class treatment pursuant to Rule 23(b)(2) because the Defendants have engaged in a discriminatory and/or unlawful course of action as to each proposed Class, thereby making final declaratory and injunctive relief on each of the three specific Class-Wide bases appropriate.

## LEGAL CLAIMS

### CLAIM ONE

**Conspiracy to Violate Constitutional Rights**

**Under the Fourth and Fourteenth Amendment to the U.S. Constitution**

***Pursuant to 42 U.S.C. § 1983***

**All Plaintiffs and Each Class against Defendants**

257.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

258.    When government actors collectively agree to violate individuals' constitutional rights—and take any steps in furtherance of that agreement – all relevant public agencies and employees are liable for constitutional conspiracy pursuant to 42 U.S.C. § 1983.

259.    Defendants, and/or their constituent parts, have entered into explicit or implicit agreement(s) with one another to violate the Plaintiffs' constitutional rights by having a policy, practice, and/or custom of making the Siskiyou County inhospitable to Asian Americans vis-à-vis restricted water access, discriminatory enforcement of laws, unreasonable searches and seizures, and unlawful property encumbrances.

260.    Defendants have each taken concrete steps in furtherance of the agreement(s) as evidenced by Defendants' ongoing policy, pattern, and/or practice of coordinating with one another to target Asian Americans in violation of their constitutional rights.

261.    Plaintiffs, and those similarly situated, have been and will continue to be harmed as a direct and proximate result of Defendants' ongoing conspiracy.

## CLAIM TWO

### Violation of Equal Protection – Racially Discriminatory Traffic Stops

### Under the Fourteenth Amendment to the U.S. Constitution

### *Pursuant to 42 U.S.C. § 1983*

### (Plaintiff Moua, Plaintiff Vang, and the Traffic Class against Defendants)

262.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

263.    The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution requires that all people be treated equally under the law without regard to, among other things, their race or ethnicity. The Equal Protection Clause prohibits law enforcement from policing in a manner that has a discriminatory effect on a racial or ethnic group and is motivated by a discriminatory purpose.

264.    Plaintiff Moua, Plaintiff Vang and members of the Traffic Class are Asian American and are, therefore, members of a protected class under the Equal Protection Clause.

265.    Defendant Sheriff LaRue, acting under color of state law, has a policy, practice, or custom of stopping, detaining, questioning, and searching members of the Traffic Class based upon their race that is still in effect. Defendant Siskiyou County is liable for the Sheriff's policy, practice, or custom because he is the final decisionmaker for the County on police practices, and the County has further sanctioned or ratified this policy.

266.    Further, Defendant LaRue has failed to train and supervise deputies, acting under color of state law, on how to lawfully conduct traffic stops and vehicle searches in a manner consistent with the Fourteenth Amendment. He has acted with deliberate indifference to the obvious consequence of his failure to adequately train and supervise members of the Sheriff's Department.

267.    The Sheriff's Department targeted Plaintiff Moua and Plaintiff Vang for traffic stops, and subjected them to questioning or searches, based on their race. Defendants' unlawful policy, practice, or custom of racial profiling and discriminatory treatment of Asian American drivers, and failure to train

1    and supervise members of the Sheriff's Department to prevent racially motivated stops, was and is the

2    moving force causing the ultimate injury to the Traffic Class, including Plaintiffs Moua and Vang.

3        268.    The Traffic Class's race was and continues to be an unlawful factor in Defendants' traffic

4    enforcement scheme, which places all members of the Class at risk of continued racially motivated

5    stops, detentions, and searches.

6                                    **CLAIM THREE**

7        **Violation of Equal Protection – Racially Discriminatory Traffic Stops**

8           **Under Article I, Section 7 of the California Constitution**

9       **(Plaintiff Moua, Plaintiff Vang, and the Traffic Class against Defendants)**

10       269.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though

11   fully set forth herein.

12       270.    The Equal Protection right under the California Constitution is comparable to, if not more

13   expansive than, the Equal Protection Clause under the U.S. Constitution.

14       271.    Plaintiff Moua, Plaintiff Vang, and members of the Traffic Class are Asian American and

15   are, therefore, members of a protected class under the Equal Protection Clause.

16       272.    Defendant Sheriff LaRue, acting under color of state law, has a policy, practice, or

17   custom of stopping, detaining, questioning, and searching members of the Traffic Class based upon their

18   race that is still in effect.

19       273.    Defendant LaRue has failed to train and supervise deputies, acting under color of state

20   law, on how to lawfully conduct traffic stops and vehicle searches in a manner consistent with Article I,

21   section 7 of the California Constitution. He has done so with deliberate indifference to the obvious

22   consequence of his inaction.

23       274.    Plaintiff Moua and Plaintiff Vang each were targeted for traffic stops, and subjected to

24   questioning or searches, based on their race. Defendants' unlawful policy, practice, or custom of racial

25   profiling and discriminatory treatment of Asian American drivers, and failure to train members of the

26   Sheriff's Department, was and is the moving force causing the ultimate injury to the Traffic Class,

27   including Plaintiffs Moua and Vang.

28

                                      49

275.    The Traffic Class's race was and continues to be an unlawful factor in Defendants' traffic enforcement scheme, which places all members of the Class at risk of continued racially motivated stops, detentions, and searches.

## CLAIM FOUR

**Unreasonable Search and Seizure**

**Under the Fourth Amendment to the U.S. Constitution**

***Pursuant to 42 U.S.C. § 1983***

**(Plaintiff Moua, Plaintiff Vang, and the Traffic Class against Defendants)**

276.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

277.    The Fourth Amendment mandates that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." Traffic stops are seizures under the Fourth Amendment and must be supported by reasonable suspicion to believe that a law violation, such as a Vehicle Code violation, has occurred.

278.    A seizure that is reasonable at the outset may become unreasonable when it is prolonged beyond the time necessary to address the violation that warranted the stop and any related safety concerns.

279.    Moreover, the search of a vehicle during a stop generally requires probable cause to believe that the area of the vehicle searched contains contraband. A search may also be justified by consent, if consent is freely and voluntarily given.

280.    Defendant Sheriff LaRue has, under color of state law and as the final law enforcement decisionmaker for Defendant County, implemented or sanctioned a policy, practice, or custom of unlawfully seizing members of the Traffic Class in violation of the Fourth Amendment and is continuing to do so.

281.    Defendant Sheriff LaRue has, under color of state law and as the final decisionmaker for Defendant County, implemented or sanctioned a policy, practice, or custom of unlawfully searching members of the Traffic Class in violation of the Fourth Amendment and is continuing to do so.

282.     Further, Defendant LaRue has failed to train and supervise deputies, acting under color of state law, on how to lawfully conduct traffic stops and vehicle searches in a manner consistent with the Fourth Amendment. He has acted with deliberate indifference to the obvious consequence of his failure to adequately train and supervise members of the Sheriff's Department.

283.     Plaintiffs Moua and Vang each have been directly and proximately harmed as a result of these policies, practices, or customs. Plaintiff Moua was stopped without reasonable suspicion and subjected to an unreasonably prolonged detention. Plaintiff Vang was subject to an unreasonably prolonged detention, followed by a search procured through coerced consent.

284.     The Department's policy, practice, or custom of unlawful vehicle-based seizures and searches, and Defendant LaRue's failure to train and supervise members of the Department, were and are the moving forces causing the ultimate injury to members of the Traffic Class and place them and Plaintiffs Moua and Vang at continuing risk of such harm.

## <u>CLAIM FIVE</u>

### Unreasonable Search and Seizure

### Under Article I, Section 13 of the California Constitution

### (Plaintiff Moua, Plaintiff Vang, and the Traffic Class against Defendants)

285.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

286.     The California Constitution's protections against unreasonable search and seizure are comparable to, if not more expansive than, those protections under the U.S. Constitution.

287.     Defendant Sheriff LaRue has, under color of state law and as final decisionmaker for Defendant County, implemented or sanctioned a policy, practice, or custom of unlawfully seizing and searching members of the Traffic Class in violation of Article I, section 13 of the California Constitution, and will continue to do so.

288.     Defendant LaRue has failed to train and supervise deputies, acting under color of state law, on how to lawfully conduct traffic stops and vehicle searches in a manner consistent with Article I, section 13. He has acted with deliberate indifference to the obvious consequence of his failure to adequately train and supervise members of the Sheriff's Department.

289.     Plaintiff Moua and Plaintiff Vang were unlawfully seized and/or searched in violation of Article I, section 13, as a direct and proximate result of this policy, practice, or custom.

290.     The Department's policy, practice, or custom of unlawful vehicle-based seizures and searches, and Defendant LaRue's failure to train and supervise members of the Department, were and are the moving forces causing the ultimate injury to members of the Traffic Class and place them and Plaintiffs Moua and Vang at continuing risk of such harm.

<u>**CLAIM SIX**</u>

**Violation of Equal Protection – Racially Discriminatory Water Ordinances**

**Under the Fourteenth Amendment to the U.S. Constitution**

***Pursuant to 42 U.S.C. § 1983***

**(Plaintiff Mathis and the Water Class against Defendants)**

291.     Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

292.     Plaintiff Mathis and the Water Class are Asian American and are, therefore, members of a protected class under the Equal Protection Clause.

293.     The water ordinances were advanced and adopted with racial animus as an unlawful, motivating factor.

294.     Defendant Siskiyou County's water ordinances restricted water access to Plaintiff Mathis and the Water Class and continue to do so, in the form of the current water nuisance ordinance.

295.     The passage and enforcement by Defendants of the water ordinances are so closely related as to be the moving force causing the ultimate injury to Plaintiff Mathis and members of the Water Class and, in the form of the water nuisance ordinance, places them at continuing risk of such harm.

SECOND AMENDED COMPLAINT CASE NO. 22-CV-01378-KJM-AC

1

## CLAIM SEVEN

2

**Violation of Equal Protection – Racially Discriminatory Water Ordinances**

3

**Under Article I, Section 7 of the California Constitution**

4

**(Plaintiff Mathis and Water Class against Defendants)**

5        296.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though

6 fully set forth herein.

7        297.    The right of equal protection under the California Constitution is comparable to, if not

8 more expansive than, the right under the U.S. Constitution.

9        298.    Plaintiff Mathis and the Water Class are Asian American and are, therefore, members of

10 a protected class under the Equal Protection Clause.

11        299.    The water ordinances were advanced and adopted with racial animus as an unlawful,

12 motivating factor.

13        300.    Defendant Siskiyou County's water ordinances restricted water access to Plaintiff Mathis

14 and the Water Class and continue to do so, in the form of the current water nuisance ordinance.

15        301.    The passage and enforcement by Defendants of the water ordinances are so closely

16 related as to be the moving force causing the ultimate injury to Plaintiff Mathis and members of the

17 Water Class and, in the form of the current water nuisance ordinance, places them at continuing risk of

18 such harm.

19

## CLAIM EIGHT

20

**Violation of Substantive Due Process – State Created Danger – Water Ordinances**

21

**Under the Fourteenth Amendment to the U.S. Constitution**

22

***Pursuant to 42 U.S.C. § 1983***

23

**(Plaintiff Mathis and the Water Class against Defendants)**

24        302.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though

25 fully set forth herein.

26        303.    Defendants affirmatively and intentionally put Plaintiffs Mathis and the Water Class in

27 great physical and bodily danger by depriving them of water to bathe, regulate temperature, engage in

28 other cleaning and hygiene, protect against wildfire, and otherwise sustain life and health.

304.    Defendants were aware of, and expressly indifferent to, the danger Defendants' actions inflicted upon Plaintiff Mathis and the Water Class yet refused to take obvious steps to address the risks created.

305.    The passage and enforcement by Defendants of the water ordinances are so closely related as to be the moving force causing the ultimate injury to Plaintiff Mathis and members of the Water Class and, in the form of the current water nuisance ordinance, places them at continuing risk of such harm.

**CLAIM NINE**

**Violation of Substantive Due Process – State Created Danger – Water Ordinances**

**Under Article I, Section 7(a) of the California Constitution**

**(Plaintiff Mathis and the Water Class against Defendants)**

306.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

307.    Governmental action that affirmatively places a person in a position of danger deprives that person of substantive due process rights guaranteed by the California Constitution. Cal. Const., art. I, § 7(a). The substantive due process protections under the California Constitution are at least as expansive as those under the U.S. Constitution.

308.    Defendants affirmatively and intentionally put Plaintiffs Mathis and the Water Class in great physical and bodily danger by depriving them of water to bathe, regulate temperature, engage in other cleaning and hygiene, protect against wildfire, and otherwise sustain life and health.

309.    Defendants were aware of, and expressly indifferent to, the danger Defendants' actions inflicted upon Plaintiff Mathis and the Water Class, yet refused to take obvious steps to address the risks created.

310.    The passage and enforcement by Defendants of the water ordinances are so closely related as to be the moving force causing the ultimate injury to Plaintiff Mathis and members of the Water Class and, in the form of the current water nuisance ordinance, places them at continuing risk of such harm.

1

## CLAIM TEN

### Violation of Substantive Due Process – Unlawful Liens

### Under the Fourteenth Amendment to the U.S. Constitution

### *Pursuant to 42 U.S.C. § 1983*

### (Plaintiff Va, Plaintiff Vang, and the Liens Class against Defendant Siskiyou County)

311.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

312.    A land use action "that fails to serve any legitimate governmental objective may be so arbitrary or irrational that it runs afoul of the Due Process Clause." *Lingle v. Chevron U.S.A. Inc*., 544 U.S. 528, 542 (2005). The Ninth Circuit has concluded that there is a substantive due process claim where a challenged regulation or action "serves no legitimate government purpose." *North Pacifica LLC v. City of Pacifica*, 526 F.3d 478, 484 (9th Cir. 2008). Such a claim must be grounded in the wrongful interference with a property interest through arbitrary regulation. *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990).

313.    Lien Class Plaintiffs, including Plaintiff Va and Plaintiff Vang, suffered an injury to their property interests due to the imposition of liens on their real property. The Board of Supervisors' action authorizing the imposition of these liens was in direct conflict with and preempted by California law. *Mechammil v. City of San Jacinto*, 653 F. App'x. 562, 563–64 (9th Cir. 2016). There can be no "legitimate" exercise of the county's power that conflicts with the state's general laws. Cal. Const., art. XI, § 7. As such, the Defendant's actions were arbitrary and illegitimate, and constituted a violation of Plaintiff Va, Plaintiff Vang, and the Liens Class's substantive due process rights.

## CLAIM ELEVEN

### Preemption

### Under Article XI, Section 7 of the California Constitution

### (Plaintiff Va, Plaintiff Vang, and the Liens Class against Defendant Siskiyou County)

314.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

315.    Under the California Constitution, "a county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." Cal. Const., art. XI, § 7. Local legislation that conflicts with general state laws is preempted and void. *Big Creek Lumber Co. v. Cnty. of Santa Cruz*, 38 Cal. 4th 1139, 1150 (2006). "Conflicts exist if the ordinance duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication." *Id.* (internal citations omitted).

316.    "Whenever the Legislature has seen fit to adopt a general scheme for the regulation of a particular subject, the entire control over whatever phases of the subject are covered by state legislation ceases as far as local legislation is concerned." *Ex Parte Lane*, 58 Cal. 2d 99, 102 (1962). The legislature may expressly or impliedly signal its intent to fully occupy an area of law, as is the case where: "(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the locality." *Am. Fin. Servs. Ass'n. v. City of Oakland*, 34 Cal. 4th 1239, 1252 (2005) (internal citations omitted).

317.    A conflict existed between the Defendant's action authorizing property liens under Siskiyou County Code section 10-14.100 against Plaintiff Va, Plaintiff Vang, and the Liens Class, and the relevant body of state law prescribing what actions localities may take to collect local nuisance fines and penalties.

318.    The California legislature has given local governments the power to enforce ordinances by way of nuisance fines and penalties. Cal. Gov't Code § 53069.4. However, the state does not permit local governments to levy property liens as a collection mechanism for these penalties, limiting the use of liens to recover the actual costs of abatement only. The Ninth Circuit has previously addressed this issue, finding that localities cannot attach liens or impose special assessments to collect outstanding nuisance fines or penalties, as such action violates state law. *Mechammil,* 653 F. App'x. at 563–64.

SECOND AMENDED COMPLAINT CASE NO. 22-CV-01378-KJM-AC

319.    Because Defendant Siskiyou County's lien authorizations conflicted with and entered into an area fully occupied by state law, the property liens issued against Plaintiff Va, Plaintiff Vang, and the Liens Class under Siskiyou County Code section 10-14.100 were impermissible. Plaintiff Va, Plaintiff Vang, and the Liens Class suffered an injury and are threatened by potential recurrence of that injury from this unlawful practice, such that without relief the violations may recur.

## CLAIM TWELVE

### California Government Code Section 11135

### (Plaintiff Mathis, Water Class, Plaintiff Moua, Plaintiff Vang, and Traffic Class against Defendants)

320.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

321.    California Government Code section 11135 sets forth a nondiscrimination requirement for state programs. It provides that in pertinent part:

> [n]o person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

Cal. Gov't Code § 11135(a).

322.    Defendants are recipients of financial assistance from the State of California.

323.    Defendants were, at all times relevant to this action, and are currently operating or administering a program or activity that receives state financial assistance, within the meaning of section 11135.

324.    Defendants have violated the rights of Plaintiff Mathis, the Water Class, Plaintiffs Moua and Vang, and the Traffic Class secured by Cal. Gov't Code § 11135 et seq., and those violations were and are a substantial factor in causing Plaintiffs' harms.

## CLAIM THIRTEEN

### Violation of Equal Protection – Racial Discrimination – Zoning

### Under the Fourteenth Amendment to the U.S. Constitution

### *Pursuant to 42 U.S.C. § 1983*

### (Plaintiff Mathis and the Water Class against Defendants)

325.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

326.    Plaintiff Mathis and members of the Water Class are Asian American and are, therefore, members of a protected class under the Equal Protection Clause.

327.    Defendants, acting under color of state law, have a policy, practice, or custom of using the Siskiyou County Zoning Ordinance to stop well owners from providing water to members of the Water Class. Along with other water restrictions imposed by Defendants, like the water ordinances, the zoning policy, practice or custom was adopted with racial animus against the intended water recipients as an unlawful, motivating factor.

328.    Defendants targeted well owners who supplied water to Plaintiff Mathis and other members of the Water Class based on their race. Defendants' unlawful policy, practice, or custom of using the Zoning Ordinance to target well owners who provide water to Asian Americans was and is the moving force causing the ultimate injury to the Water Class, including Plaintiff Mathis, and places them at continuing risk of such harm.

## CLAIM FOURTEEN

### Violation of Equal Protection – Racial Discrimination – Zoning

### Under Article I, Section 7 of the California Constitution

### (Plaintiff Mathis and the Water Class against Defendants)

329.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

330.    The Equal Protection right under the California Constitution is comparable to, if not more expansive than, the Equal Protection Clause under the U.S. Constitution.

331.    Plaintiff Mathis and members of the Water Class are Asian American and are, therefore, members of a protected class under the Equal Protection Clause.

332.    Defendants, acting under color of state law, have a policy, practice, or custom of using the Siskiyou County Zoning Ordinance to stop well owners from providing water to members of the Water Class. Along with other water restrictions imposed by Defendants, like the water ordinances, the zoning policy, practice or custom was advanced and adopted with racial animus against the intended water recipients as an unlawful, motivating factor.

333.    Defendants targeted well owners who supplied water to Plaintiff Mathis and other members of the Water Class based on their race. Defendants' unlawful policy, practice, or custom of using the Zoning Ordinance to target well owners who provide water to Asian Americans was and is the moving force causing the ultimate injury to the Water Class, including Plaintiff Mathis, and places them at continuing risk of harm.

## CLAIM FIFTEEN

**Violation of Substantive Due Process – State Created Danger – Zoning**

**Under the Fourteenth Amendment to the U.S. Constitution**

***Pursuant to 42 U.S.C. § 1983***

**(Plaintiff Mathis and the Water Class against Defendants)**

334.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

335.    Defendants affirmatively, despite the danger, put Plaintiff Mathis and the Water Class in great physical and bodily danger by depriving them of water to bathe, regulate temperature, engage in cleaning and other hygiene, protect against wildfire, and otherwise sustain life and health.

336.    Defendants were aware of, and expressly indifferent to, the danger its actions inflicted upon Plaintiff Mathis and the Water Class yet refused to take obvious steps to address the risks created.

337.    Along with other water restrictions imposed by Defendants, like the water ordinances, the use of the Zoning Ordinance against those who provide water to Asian Americans is so closely related as to be the moving force causing the ultimate injury to Plaintiff Mathis and members of the Water Class and places them at continuing risk of such harm.

## CLAIM SIXTEEN

### Violation of Substantive Due Process – State Created Danger – Zoning

### Under Article I, Section 7(a) of the California Constitution

### (Plaintiff Mathis and the Water Class against Defendants)

338.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

339.    Governmental action that affirmatively places a person in a position of danger deprives that person of substantive due process rights guaranteed by the California Constitution. Cal. Const., art. I, § 7(a). The substantive due process protections under the California Constitution are at least as expansive as those under the U.S. Constitution.

340.    Defendants affirmatively, despite the danger, put Plaintiffs Mathis and the Water Class in great physical and bodily danger by depriving them of water to bathe, regulate temperature, engage in cleaning and other hygiene, protect against wildfire, and otherwise sustain life and health.

341.    Defendants were aware of, and expressly indifferent to, the danger Defendants' actions inflicted upon Plaintiff Mathis and the Water Class, yet refused to take obvious steps to address the risks created.

342.    Along with other water restrictions imposed by Defendants, like the water ordinances, the use of the Zoning Ordinance against those who provide water to Asian Americans is so closely related as to be the moving force causing the ultimate injury to Plaintiff Mathis and members of the Water Class and places them at continuing risk of such harm.

## CLAIM SEVENTEEN

### California Government Code Section 11135 – Zoning

### (Plaintiff Mathis and the Water Class against Defendants)

343.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as though fully set forth herein.

344.    California Government Code section 11135 sets forth a nondiscrimination requirement for state programs. It provides that in pertinent part:

> [n]o person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information or disability, be unlawfully denied full and equal access to the benefits of, or be unlawfully subjected to discrimination under, any program or activity that is conducted, operated, or administered by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

Cal. Gov't Code § 11135(a).

345.    Defendants are recipients of financial assistance from the State of California.

346.    Defendants were, at all times relevant to this action, and are currently operating or administering a program or activity that receives state financial assistance, within the meaning of section 11135.

347.    Defendants have violated the rights of Plaintiff Mathis and the Water Class, secured by Cal. Gov't Code § 11135 et seq., by applying the Zoning Ordinance to prohibit others from providing water to them, and those violations were and are a substantial factor in causing Plaintiffs' harms. The zoning policy, practice or custom was adopted with racial animus as an unlawful, motivating factor and has a disparate impact on Asian Americans who uniquely rely on hauled water.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of a class of all those similarly situated, demand the following relief:

A.    A certification of the proposed Classes as indicated above, and an appointment of the named Plaintiffs as class representatives and the undersigned counsel as class counsel;

B.    A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants have engaged in discrimination based on race, color, and/or ethnicity and denied Plaintiffs and plaintiff class due process and equal protection of the laws in violation of the Fourteenth Amendment of the U.S. Constitution and 42 U.S.C. § 1983;

C.    A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' stops, interrogations, detentions, and/or searches of Plaintiffs Moua and Vang and others similarly situated without probable cause or reasonable, articulable suspicion to believe that they had committed a crime

violated the Fourth Amendment guarantee against unreasonable searches and seizures and 42 U.S.C. § 1983;

D.      A declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that Defendants' imposition of property liens for unpaid administrative fines violated state law, the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.

E.      An order enjoining Defendants from continuing to engage in such race, color, and/or ethnicity-based discrimination or deprive Plaintiffs of due process as described herein and putting in place safeguards sufficient to ensure that such discrimination or endangerment of their health and safety does not continue in the future;

F.      A permanent injunction prohibiting Defendants from engaging in traffic stops, interrogations, detentions, and/or searches of Plaintiffs and other similarly situated individuals without probable cause or reasonable, articulable suspicion to believe that they have committed a crime;

G.      A permanent injunction prohibiting Defendants from engaging in racial profiling of Asian American people in stops, interrogations, detentions, and/or searches stemming from traffic stops;

H.      A permanent injunction prohibiting Defendants from enforcing Ordinances Nos. 20-13, 21-07, and 21-08;

I.      A permanent injunction that prohibits Defendants from imposing property liens for unpaid administrative fines, unless and until such action becomes authorized under state law;

348.    A permanent injunction prohibiting Defendants from enforcing Title 10, Chapter 6 of the Siskiyou County Code to restrict the extraction, collection, or distribution of water that is used for health and safety purposes;

J.      An award to Plaintiffs of attorneys' fees and service awards;

K.      An award to Plaintiffs Va, Vang and the Liens Class of nominal damages as to Claim 10;

L.      An award to Plaintiffs of costs and expenses incurred in the filing and prosecution of this action;

M.      Monitoring, training, reporting obligations, and other prophylactic measures to ensure compliance with this Court's orders; and

N.      Such other and further relief in favor of Plaintiffs as is just and proper.

DATED this 28th day of February 2025.

/s/ *Emi Young* (authorized on 2/28/2025)
John Thomas H. Do
Emi Young
Grayce Zelphin
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA


/s/ *Megan Vees* (authorized on 2/28/2025)
Megan Vees
Carl Takei
ASIAN LAW CAUCUS


/s/ *Stanley Young*
Stanley Young
Michael Plimack
Hakeem S. Rizk
Ellen Y. Choi
Daniel Esses
Conor Kennedy
COVINGTON & BURLING LLP

*Counsel for Plaintiffs Mathis, et al.*