1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Russell Mathis, et al.,                          No. 2:22-cv-01378-KJM-AC

12                        Plaintiffs,                  ORDER

13          v.

14   County of Siskiyou, et al.,

15                        Defendants.

16

17          Siskiyou County and its Sheriff (together, "the County" for simplicity) move for summary

18   judgment of several claims against them.  The County has not shown it is entitled to judgment as

19   a matter of law, so its motion is **denied**, as discussed below.

20   **I.      BACKGROUND**

21          Some basic information about certain of the County's land use regulations is necessary to

22   understand the parties' competing positions.  First, the County has maintained a zoning ordinance

23   for many years.  Dean Decl. ¶¶ 3, 9, ECF No. 156-5; County Code § 10-6.303.  In general, the

24   purpose of this ordinance is to protect the public health and safety and to ensure land is developed

25   responsibly.  Dean Decl. ¶ 9; *see also* County Code § 10-6.102.  The ordinance establishes

26   several zoning "districts," including agricultural, residential, and industrial districts.  Dean Decl.

27   ¶ 9.  The rules for what can be done within these districts are permissive.  That is, the zoning

1

1   ordinance allows only those uses that it expressly permits (i.e., for which no permit is required)

2   and conditionally (for which a permit is required).  *Id.* ¶¶ 11–12; County Code § 10-6.303.

3        For example, the "Prime Agricultural" district, abbreviated "AG-1," is "intended to be

4   applied to land areas which are used or are suitable for intensive agricultural production."  County

5   Code § 10-6.5001.  Expressly permitted uses include single-family dwellings, farm labor housing,

6   accessory uses "incidental to agriculture," and agricultural uses, such as "tree, vine, row, field

7   crops, growing and harvesting of trees, livestock farming, and animal husbandry."  *Id.* § 10-

8   6.5002.  Conditionally permitted uses include private airports and landing fields, dairies,

9   commercial poultry operations, feed lots and hog farms.  *Id.* § 10-6.5003.  By contrast, the "Light

10  Industrial" district, abbreviated "M-M," is "intended to establish areas where light manufacturing

11  and the less abrasive industrial activities may take place, particularly where heavy industry may

12  not be appropriate."  *Id.* § 10-6.4601.  The ordinance includes a long list of expressly permitted

13  uses, from animal hospitals to lumber yards to bottling works.  *See id.* § 10-6.4302.

14  Conditionally permitted uses include airstrips, wineries, and truck terminals.  *Id.* § 10-6.4603.

15       In general, a landowner may ask the County's planning director to make a decision about

16  whether a specific proposed use is permitted if that proposed use is not specifically listed in the

17  zoning ordinance, but may arguably fall within a specifically listed category.  Resp. Stmt. Facts

18  No. 15; Dean Decl. ¶ 11.  A landowner could also ask to change the zoning designation for a

19  specific plot of land or even advocate an amendment to the zoning ordinance itself, but these

20  processes can be slow and difficult.  *See* Dean Decl. ¶ 13.

21       In addition to the County's zoning ordinance, the Siskiyou County Code includes a

22  building code.  Resp. Stmt. Facts No. 5; Dean Decl. ¶ 7; County Code §§ 9-1.01 to .09.  The

23  purpose of the building code is to impose restrictions "at least equal to those imposed by the State

24  Building Standards."  Dean Decl. ¶ 7; County Code § 9-1.0112.  A building permit is generally

25  required for the construction, enlargement, alteration or repair of any structure, with some

26  exceptions.  Resp. Stmt. Facts No. 7; Dean Decl. ¶ 8.  The building code also normally requires a

27  certificate of occupancy before any structure may be occupied.  Resp. Stmt. Facts No. 8; Dean

28  Decl. ¶ 8.

2

Finally, the County has a camping ordinance.  It applies to all unincorporated areas within its borders.  Resp. Stmt. Facts No. 2; Dean Decl. ¶ 4; County Code § 3-17.01 to .02.  If a property has not been designated as a campground, the camping ordinance generally allows camping for up to thirty days per calendar year, and since 2017, campers must obtain a permit as well.  Dean. Decl. ¶ 5.  The camping ordinance also requires campers to remove any tents and temporary structures they use, along with any waste they create.  *See id.*

Code enforcement officers have authority to issue citations for violations of these three parts of the County code.  Resp. Stmt. Facts No. 19; Dean Decl. ¶ 14.  A person who receives a citation can contest the citation and pursue an appeal, and County officials have discretion to grant hardship waivers for the fees that would normally apply to an appeal.  Resp. Stmt. Facts Nos. 20–21; Dean Decl. ¶ 14.

This case is about the application of these ordinances to an area within Siskiyou County known as the Mount Shasta Vista Subdivision—"Shasta Vista" for short—along with a few other nearby properties.  Shasta Vista is a collection of 1680 parcels of about 2.5 acres each in a remote area of central Siskiyou County.  Dean Decl. ¶ 16.  These parcels were originally created in the 1960s.  *Id.*  By all accounts, Shasta Vista is a rugged place.  There are roads, but they are unpaved.  *Id.* ¶ 17.  The infrastructure for electrical utilities is in place, but there is no public water system, nor a public wastewater disposal system, i.e., a sewer.  *Id.*  As a result, the County has ordinarily made both a septic system and a private well—a well drilled at the landowner's expense—mandatory prerequisites to the development and occupancy of any parcels in Shasta Vista.  *See id.* ¶¶ 17–18, 20.  The County's community development director, Rick Dean, explains this requirement prevents the spread of disease and harms to the environment.  *Id.* ¶ 19.

It can be very difficult and very expensive, even cost-prohibitive, to drill and maintain private wells in Shasta Vista.  *Id.* ¶¶ 26–28.  In some places, a well must reach 500 to 1000 feet below the surface if it is to be productive, and drilling may cost as much as $100 per foot, if not more.  *See* Resp. Stmt. Facts No. 39; Dean Decl. ¶ 27.  It also can be very difficult to develop a safe and functional septic system on many of the parcels in Shasta Vista.  *See* Resp. Stmt. Facts Nos. 41–44; Dean Decl. ¶¶ 28–30.  Up to four property owners could potentially share the costs

3

of the development of a shared well.  Dean Decl. ¶ 18.  But larger water systems may be subject

to additional state regulations.  *See* Resp. Stmt. Facts No. 29; Dean Decl. ¶ 18; Cal. Health &

Safety Code §§ 116275–76.  It is unclear whether multiple landowners could share the cost of a

single septic system.  *See* Resp. Stmt. Facts No. 30 (citing County Code §§ 5-2.13, 9-04.140).

Dean does not believe for his part that a shared septic system could comply with the County's

code.  *See* Dean Decl. ¶ 18.  In any event, high costs have dissuaded many property owners from

legally developing lots in Shasta Vista.  *See* Dean Decl. ¶¶ 26–27.  And so, for the overwhelming

majority of the available parcels within Shasta Vista, the County has no records of code-

compliant buildings and no certificates of occupancy, as required by the Building Code.  Resp.

Stmt. Facts No. 37; Dean Decl. ¶ 25.

This is not to say those Shasta Vista parcels are unoccupied.  Dean has been to Shasta

Vista many times over the past few years, and by his estimation, people have built structures and

are living on about 1000 of the 1680 lots there.  Dean Decl. ¶ 33.  It seems people began moving

into the area in larger numbers in about 2014 and 2015, when many Asian Americans came to

Siskiyou County, including many people of Hmong heritage.  *See* Resp. Stmt. Facts Nos. 49–50.

Many of these new residents settled in Shasta Vista, in part because it was an affordable area to

purchase land.  *Id.*  They built structures or parked recreational vehicles on parcels in Shasta

Vista, usually without first obtaining the necessary permits and without developing code-

compliant wells and septic systems.  *Id.*  Dean believes from what he has seen over the past

several years that many of the unpermitted structures in Shasta Vista are unsafe.  Dean Decl. ¶ 33;

*see also id.* Exs. 5–7 (photographs of structures in Shasta Vista).  He points to unpermitted

electrical systems, the storage of hazardous materials, and unvented propane cooking systems to

illustrate how dangerous the conditions have become.  *See id.* ¶ 33.  In his estimation, the dangers

are "extreme," and they put the residents' lives at risk.  *Id.*

Because there is no municipal water supply and few wells, Shasta Vista residents have

usually satisfied their water needs by purchasing non-potable groundwater pumped to the surface

on nearby agricultural properties, which is then typically delivered to Shasta Vista in large water

trucks.  *See* Resp. Stmt. Facts No. 63; Dean Decl. ¶ 35.  For example, the first plaintiff named in

4

this lawsuit, Russell Mathis, is a Shasta Vista resident.  Mathis Decl. ¶¶ 2–3, ECF No. 180-31.

There are no written building, development or occupancy permits associated with his property;

that is, neither Mathis nor any previous landowner has obtained the necessary permits.  Dean

Decl. ¶¶ 31–32; Pisano Decl. ¶ 5 & Ex. 1; Mathis Decl. ¶ 4.  Nor has he applied for a permit to

drill a well.  Pisano Decl. ¶ 5 & Ex. 1.  He relies on bottled water for drinking and cooking, but he

buys trucked groundwater for washing his dishes, raising chickens, cooling himself and his dogs

in hot weather, preventing fires, bathing, and cleaning his truck and farm equipment.  *See* Mathis

Decl. ¶¶ 3–12.  Bao Lee is another Shasta Vista resident.  Bao Lee Decl. ¶ 2, ECF No. 180-30.

She has lived in Siskiyou County with her husband since 2014.  *Id.*  It is unclear whether Bao Lee

or her husband have ever applied for a permit to drill a well; they do not say.  But they do not

have a well on their property, so like Mathis, they rely on bottled water for cooking and drinking,

and they use trucked groundwater for their other needs, like feeding the chickens and other birds

they raise for sustenance, watering their vegetable and herb gardens, washing their dishes and

clothes, and showering or bathing.  *Id.* ¶¶ 5–12.  Mathis and Bao Lee both say they can obtain

trucked groundwater for much less money than bottled water.  *See* Mathis Decl. ¶ 14; Bao Lee

Decl. ¶ 13.  Bottled water costs about one or two dollars per gallon, and local water haulers

usually charge only a few cents per gallon.  *See* Mathis Decl. ¶ 14; Bao Lee Decl. ¶ 13; Verner-

Crist Decl. ¶¶ 4–15, ECF No. 180-29.

It appears undisputed that people do not haul groundwater by truck into Shasta Vista only

to supply its residents with affordable water for their legitimate day-to-day needs.  There has been

a persistent trend in increasing numbers of illegal cannabis grow operations in Shasta Vista,

which water haulers also service.  *See* Dean Decl. ¶¶ 33–34.  On many properties in Shasta Vista,

County officials have found haphazard wastewater disposal systems, piles of garbage, discarded

fertilizer, and other waste that people have left behind after growing marijuana illegally in Shasta

Vista.  *Id.* ¶ 34 & Ex. 7 (photos of grow operations and waste).  For example, the complaint in

this case describes a Shasta Vista resident named Bill Yang.  *See* Second Am. Compl. ¶ 230.

According to the complaint and a declaration he later submitted, Yang has a well on his property,

and he has made well water available to other Shasta Vista residents.  *See* Yang Decl. ¶¶ 3–4,

1   ECF No. 83-17.  But in May 2024, while this case has been pending, Siskiyou County Sheriff's

2   Deputies and County code enforcement officers obtained a warrant to search one of Yang's

3   properties, and they found greenhouses, more than 900 illegally cultivated cannabis plants, large

4   water tanks, and other code violations, such as an unpermitted wood pellet stove and irrigation

5   lines.  *See* Dean Decl. ¶¶ 41–42 & Ex. 9.  Dean believes the County's land use ordinances,

6   especially the camping ordinance, were designed to prevent the types of environmental harms the

7   County's officers have observed on Yang's properties and elsewhere in Shasta Vista.  *See id.*

8   ¶ 34.

9        Siskiyou County officials have long attempted to combat illegal marijuana cultivation and

10   unpermitted development within the County's borders, especially in Shasta Vista.[1]  In 2020,

11   when efforts to enforce criminal and environmental prohibitions seemed to be coming up short,

12   County officials tried a new strategy: cutting off the supply of trucked groundwater completely.

13   The County adopted an ordinance declaring the extraction of groundwater for marijuana

14   cultivation to be a nuisance.  Resp. Stmt. Facts Nos. 57–58.  And the next year, in 2021, the

15   County adopted two more ordinances prohibiting water hauling without a permit on certain roads

16   near Shasta Vista.  *See id.* Nos. 59–60.  At about the same time, the County also began

17   interpreting its zoning ordinances as barring the large-scale extraction and distribution of

18   groundwater from agricultural and residential zoning districts (those designated as R-R, AG-1 and

19   AG-2), and it undertook code enforcement actions to stop landowners in these zoning districts

20   near Shasta Vista from distributing pumped groundwater.  *See* Dean Dec. ¶¶ 10, 36–39, 43–46 &

---

[1] Although California voters approved a 2016 proposition that legalizes marijuana for recreational use by adults, cities and counties within the state retain their authority to "make and enforce within [their] limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws."  *City of Vallejo v. NCORP4, Inc.*, 15 Cal. App. 5th 1078, 1081 (2017) (quoting Cal. Const., art. XI, § 7).  State law confirms expressly that local governments may even "completely prohibit" marijuana and cannabis businesses, including by adopting "local zoning and land use requirements."  *See* Cal. Bus. & Prof. Code § 26200(a).  Siskiyou County ordinances have banned marijuana cultivation since 2015.  *Lo v. County of Siskiyou*, 558 F. Supp. 3d 850, 854 (E.D. Cal. 2021).  Federal law also continues to prohibit most marijuana cultivation, in addition to its use, possession and sale.  *See* 21 U.S.C. §§ 811–12, 821–30, 841(a), 844(a)).  But that prohibition is not relevant to the pending motion.

Exs.8.  The County concluded a property would need to be within an industrial zoning district

before a large-scale pumping and distribution business could be operated legally.  *See id.* ¶ 10.

The County's taking these steps made it much more difficult for people to obtain water in

the quantities necessary for cultivating marijuana on a commercial scale.  But by cutting off the

supply of trucked water into Shasta Vista, the County did more than just deprive commercial

marijuana growers of water for irrigation.  The County's enforcement efforts also deprived people

of the water they had come to rely on for the legitimate day-to-day uses described above, from

cooking and bathing to raising animals, cooling themselves and fighting fires.  Residents of the

Mount Shasta Vista Subdivision have thus challenged the County's enforcement efforts in two

lawsuits.

In the first case, originally filed in 2021, this court issued a preliminary injunction barring

the enforcement of the County's water truck ordinances while the case was pending.  *See*

*generally Lo v. County of Siskiyou*, 558 F. Supp. 3d 850 (E.D. Cal. 2021).  The court found the

plaintiffs showed those ordinances were likely depriving people in Shasta Vista of water in some

of the hottest and driest times of the year.  *Id.* at 857–58, 862–63, 868.  The plaintiffs also cited

evidence raising serious questions about whether County officials were motivated at least in part

by anti-Asian racial animus, although the record fell short of showing the plaintiffs were likely to

prove County officials actually harbored racially discriminatory intentions.  *Id.* at 869–71.  After

all, the County had legitimate interests in "preventing crime, environmental harm, water waste,

and dangerous living conditions."  *Id.* at 871.  But given the sharp imbalance in the harms that

would likely accompany the continued enforcement of the water truck ordinances, serious

unanswered questions about official motivations sufficed to justify a preliminary injunction under

the relevant legal standard.  *Id.* at 871–72.  And although the court preliminarily enjoined portions

of the challenged water truck ordinances, the court did not bar the County from enforcing its

broader 2020 ordinance, i.e., the basic prohibition on using groundwater for illegal marijuana

cultivation, nor any other portions of the County's code, such as its zoning ordinances and

building codes.  *See id.* at 872.  The parties ultimately reached a settlement agreement before trial,

1    and the plaintiffs agreed to dismiss their claims voluntarily.  As part of that agreement, the

2    County repealed the enjoined water truck ordinances and modified the 2020 ordinance.

3          This case, the second, was filed in 2022, while the first was still pending.  It is broader

4    than the first, among other reasons because the plaintiffs propose litigation on behalf of a putative

5    class.  It also targets different official conduct and ordinances.  But like the first case, it includes

6    allegations about anti-Asian discrimination within Siskiyou County, as well as claims about the

7    County's efforts to enforce the zoning and other ordinances described above.  The court denied

8    the County's motion to dismiss a little more than a year ago.  Order (Aug. 21, 2024), ECF No. 85.

9    The court also granted the plaintiffs' motion for a preliminary injunction.  *See generally* Order

10   (Oct. 25, 2024), ECF No. 100.  Plaintiffs offered unrebutted evidence to show the County's

11   zoning enforcement efforts were affirmatively putting them in danger by depriving them of water,

12   and they offered unrebutted evidence to show County officials had deliberately disregarded their

13   safety and well-being.  *Id.* at 21–23, 28–29.  At the time, the County did not dispute this evidence

14   would likely support a successful claim under the Fourteenth Amendment.  *See id.* at 20.  Nor did

15   the County address the other two requirements a plaintiff must satisfy to show a preliminary

16   injunction is warranted in a case against a government actor, i.e., that irreparable harms are likely

17   without an injunction and that an injunction will serve the broader public interest.  *See id.* at 24.

18         After receiving further briefing about the proper scope of the injunction, the court barred

19   the County and its officials from enforcing zoning code provisions "to prevent the transfer of

20   water . . . to residents of parcels in the Mount Shasta Vista Subdivision that lack a residential well

21   or a municipal water source."  Order (Dec. 18, 2024) at 10, ECF No. 116.  The court did not,

22   however, order County officials to stand by as people used groundwater to cultivate marijuana

23   illegally.  Nor did the court bar the County from enforcing its building code or camping

24   ordinances in Shasta Vista or anywhere else.  The court's order covered water transfers for

25   specific purposes only: "drinking, cooking, bathing, caring for pets, raising domestic animals,

26   firefighting as ordered by local fire officials and other similar day-to-day personal necessities."

27   *Id.*  The court also appointed the assigned Magistrate Judge as a Special Master and gave her

28   authority to receive evidence, hold hearings, make factual findings, hear and resolve motions, and

1    ultimately to determine whether Shasta Vista residents "have an adequate interim source or

2    sources of water" for the purposes listed above. *Id.* at 11. If the County made that showing, the

3    court would lift the preliminary injunction. *See id.* at 10.

4        The County has not attempted to make that showing, however, and the case is now well

5    into the discovery phase. *See* Order (Sept. 10, 2025), ECF No. 178. Although discovery is not

6    complete, the County moves for summary judgment on the claims that support the preliminary

7    injunction. It argues plaintiffs cannot prove the County or its officials violated the Due Process

8    Clause or equivalent provisions of the California Constitution. *See* Mot. at 16–25, ECF No. 156.

9    The County also argues plaintiffs' claims about the repealed and modified water ordinances are

10   moot. *See id.* at 25–26. The motion is fully briefed. *See* Opp'n, ECF No. 180; Reply, ECF

11   No. 182. The court took it under submission after a hearing on October 17, 2025. Mins., ECF

12   No. 183. Avram Frey, Grayce Zelphin, Stanley Young and Emi Young appeared for plaintiffs.

13   Christopher Pisano and Elise Rice appeared for defendants.

14   **II.    MOOTNESS**

15       Federal courts have no jurisdiction over moot cases. *See Brach v. Newsom*, 38 F.4th 6, 11

16   (9th Cir. 2022). For that reason, the court begins with the County's argument that claims eight

17   and nine are moot. In these claims Mathis alleges on his own behalf and on behalf of a proposed

18   class that the County violated the Due Process Clause of the Fourteenth Amendment of the

19   United States Constitution and Article I, section 7(a) of the California Constitution, respectively,

20   by depriving him of water, thus affirmatively placing him and the proposed class in danger. *See*

21   Second Am. Compl. ¶¶ 302–05 (claim eight under U.S. Constitution); *id.* ¶¶ 306–10 (claim nine

22   under California Constitution). The County argues plaintiffs' eighth and ninth claims are moot

23   because they arise out of the water truck ordinances, which the County has now repealed, and the

24   broader nuisance ordinance, which it has amended. *See* Mot. at 25.

25       The County made a similar if not identical argument in support of its motion to dismiss.

26   *See* Order (Aug. 21, 2024) at 12. The court denied that motion because plaintiffs alleged the

27   amended ordinance still "has the effect of chilling suppliers from providing water to Asian

28   Americans." *Id.* at 16. The Supreme Court has held that a case does not become moot simply

1    because a defendant makes changes to a challenged law or ordinance, even if those changes

2    reduce the "degree" of the damages to the plaintiffs. *Ne. Fla. Chapter of Associated Gen.*

3    *Contractors of Am. v. City of Jacksonville, Fla.*, 508 U.S. 656, 662 (1993). Here, the case is not

4    moot if the new ordinance still "disadvantages [the plaintiffs] in the same fundamental way." *Id.*

5    The court found in its previous order that the amended water ordinance fits this description. *See*

6    Order (Aug. 21, 2024) at 16. The County has not demonstrated this finding was incorrect, nor

7    that the relevant facts or legal standards have changed. The court finds again that the eighth and

8    ninth claims are not moot.

9    **III.    STATE-CREATED DANGER**

10    As explained above, the court previously granted plaintiffs' motion for a preliminary

11    injunction based on their claims that the County has violated the Fourteenth Amendment's Due

12    Process Clause under the so-called "state-created danger" doctrine. *See* Order (Oct. 25, 2024),

13    21–23, 28–29. The plaintiffs' state-created danger claims are found in the eighth, ninth, fifteenth

14    and sixteenth claims of their operative Second Amended Complaint. *See* Mot. at 15; Second Am.

15    Compl. ¶¶ 302–05 (claim eight under U.S. Constitution); *id.* ¶¶ 306–10 (claim nine under

16    California Constitution); *id.* ¶¶ 334–37 (claim fifteen under U.S. Constitution); *id.* ¶¶ 338–42

17    (claim sixteen under California Constitution). The County argues without contradiction that the

18    same basic legal principles apply to all four claims, and the parties do not separate their

19    arguments claim by claim. *See* Mot. at 16 (citing *S.F. Taxi Coal. v. City & County of San*

20    *Francisco*, 979 F.3d 1220, 1224 n.1 (9th Cir. 2020)); Opp'n at 9–19 (citing and applying cases

21    interpreting federal constitutional law). They confirmed at hearing the court can measure each

22    claim against the same federal standard and consider all four claims together.

23    To obtain summary judgment, the County must show "there is no genuine dispute as to

24    any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A

25    dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party."

26    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect

27    the outcome of the suit under the governing law." *Id.* The parties must cite "particular parts of

28    materials in the record." Fed. R. Civ. P. 56(c)(1). The court then views the record in the light

1    most favorable to plaintiffs, who are the non-moving parties, and draws reasonable inferences in

2    their favor.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986);

3    *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

4            The Constitution protects against "'executive abuses of power' that 'shock the

5    conscience.'"  *Estate of Soakai v. Abdelaziz*, 137 F.4th 969, 976 (9th Cir. 2025) (alterations

6    omitted) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998)).  One way a plaintiff

7    can show a defendant is liable for such an abuse of power is by proving two things as true: (1) the

8    defendant's affirmative conduct exposed the plaintiff to a foreseeable danger the plaintiff would

9    not otherwise have faced, and (2) the defendant acted with deliberate indifference to a known or

10    obvious danger.  *Id.* at 982.  The court begins with the first requirement, i.e., whether plaintiffs

11    have cited evidence that could prove the County affirmatively exposed them to a foreseeable

12    danger they would not otherwise have faced.

13            **A.      Affirmative Conduct and Danger**

14            Because a claim of state-created danger can be based on a defendant's failure to take some

15    specific protective action, courts have sometimes described the state-created danger doctrine as an

16    exception to the ordinary rule that the Fourteenth Amendment does not impose a duty on state or

17    local governments to protect people from harm.  *See, e.g.*, *Patel v. Kent Sch. Dist.*, 648 F.3d 965,

18    971–72 (9th Cir. 2011) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189,

19    202 (1989)).  Despite that label, a plaintiff cannot succeed without proving affirmative conduct of

20    some kind, i.e., that the defendant created or magnified a danger or exposed a person to harm,

21    putting that person in a worse position.  *See, e.g.*, *Johnson v. City of Seattle*, 474 F.3d 634, 641

22    (9th Cir. 2007).  If the defendant did not put the plaintiff in a worse position, then the plaintiff

23    cannot prevail.  *See id.*  Or from the opposite perspective, if a plaintiff puts himself in the more

24    dangerous situation, then he cannot prevail by arguing the defendant failed to extract him from it.

25    *See id.*  In *Johnson*, for example, the plaintiffs were assaulted at a riotous Mardi Gras parade and

26    blamed the onlooking police officers.  *See id.* at 637.  These officers had decided "not to insert

27    themselves into the crowd" based on their prediction that any attempt to intervene "would incite

28    greater panic and violence."  *Id.*  In hindsight, a more aggressive response might have prevented

1    some injuries, but the officers' tactical decisions were not what put the plaintiffs in a dangerous

2    situation. *See id.* at 641. They had chosen to enter the raucous crowd. *See id.* Their claims were

3    not viable. *See id.*

4         The County argues Mathis and others who live in Shasta Vista are like the plaintiffs in

5    *Johnson*. In the County's view, the plaintiffs here have always depended on an unreliable water

6    source that could dry up at any time for reasons beyond their control, and they put themselves in

7    the dangerous situation they now face. *See* Reply at 6–9. There is no suggestion that the County

8    compelled Mathis or anyone else to buy undeveloped land in a place where it is difficult and

9    costly to secure a reliable source of clean water. As the County puts it, Mathis and the members

10   of the class he seeks to represent "did not have, and have never had, a legally permitted right to a

11   steady and ongoing water supply for their properties." *Id.* at 7. The County argues similarly that

12   it has not prevented anyone from applying for permits, from installing wells and septic systems,

13   or from complying with the County's land-use rules and other ordinances. *See id.* at 7–8. The

14   plaintiffs' own decisions are, in the County's telling, what forced them to rely on "the mercy of

15   others to supply [them] with water at a price [they] could afford." *Id.* They have options, in other

16   words—options they have not exercised.

17        Plaintiffs do not agree the County was enforcing a longstanding or legitimate zoning

18   regulation, but it is not necessary to decide whether it was. The court assumes for purposes of

19   this order that the County has interpreted and enforced its zoning ordinances consistently and

20   reasonably. Even so, it is not entitled to summary judgment. A defendant can face liability under

21   a theory of state-created danger even if the defendant had authority to take the action in question,

22   even if the defendant was enforcing an otherwise legitimate law, and even if the plaintiff's or

23   another person's decisions might have exacerbated the alleged injury.

24        For example, in *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), the first case in which

25   the Ninth Circuit confirmed expressly that a defendant can be liable for affirmatively exposing a

26   person to danger, the defendant officer had stopped a car on the side of a road at 2:30 a.m. *Id.* at

27   586. After the officer discovered the driver was intoxicated, he arrested the driver and

28   impounded the car. *Id.* There was also a passenger in the case. *See id.* The passenger asked the

1  officer what she was supposed to do—how was she supposed to get home?  *Id.*  The officer

2  apologized but said she "would have to get out of the car."  *Id.*  According to the woman, the

3  officer then simply drove away.  *See id.*  This left her to walk home through an area with a high

4  aggravated crime rate in the middle of the night.  *Id.*  On the way, she accepted a ride from an

5  unknown man and was attacked.  *Id.*  The Circuit expressed no doubts about the officer's

6  authority to make the stop, arrest the driver, impound the car and force the woman out of it.  The

7  court's reasoning did not depend on the constitutionality, interpretation, or wisdom of any state

8  laws about drinking and driving or impounding a stopped car, nor on the officer's authority.  And

9  yet the Circuit held that if a jury were to credit the woman's version of these events, then the

10  officer had violated clearly established law.  *See id.* at 589–96.  Perhaps it could be said that the

11  woman was partially to blame for her dangerous situation.  She was riding as a passenger with an

12  intoxicated driver in the middle of the night.  And yet the Circuit held the officer could be liable

13  for putting her in a dangerous situation.

14        In cases decided after *Wood*, courts have been similarly untroubled by the neutrality or

15  wisdom of the laws the defendants were enforcing and by their apparent authority to do so.  In

16  *Munger v. City of Glasgow*, for example, the court did not question whether the defendant

17  officers had authority to eject a drunken and belligerent man from a bar, nor whether the local

18  trespassing rules were neutral and well established, but it held those officers could be liable

19  because it was a bitterly cold night and the man was wearing only jeans and a t-shirt.  *See*

20  227 F.3d 1082, 1084–85, 1087 (9th Cir. 2000).  In *Polanco v. Diaz*, there was no doubt the

21  defendant prison officials had authority to transfer inmates from one facility to the next and might

22  have perfectly good reasons to do so.  *See* 76 F.4th 918, 923–24 (9th Cir. 2023), *cert. denied*,

23  144 S. Ct. 2519 (2024).  The court nevertheless held those officials could face liability under the

24  state-created danger doctrine because the plaintiffs alleged the officials had disregarded the risk of

25  a COVID-19 outbreak.  *See id.* at 926–30.  For these reasons, the County here might very well

26  face liability even if its officials were enforcing well-established and neutral laws with important

27  environmental and public-safety purposes, and even if they had authority to do so.

1        Nor can the court agree with the County that it must prevail if Shasta Vista residents are to

2   blame, either in part or on the whole, for their precarious circumstances.  As plaintiffs correctly

3   argue in opposition, the County's position conflicts with the Ninth Circuit's controlling opinions.

4   *See* Opp'n at 11.  Even a plaintiff who has contributed to his own danger can pursue a state-

5   created danger claim, like the man who went out into the cold winter night with only jeans and a

6   t-shirt in *Munger*, 227 F.3d at 1086.  A plaintiff can also prevail even though he could have

7   escaped the alleged danger, like the government employee who could have quit his job to avoid

8   the toxic mold in his office in *Pauluk v. Savage*, 836 F.3d 1117, 1125 (9th Cir. 2016).  As the

9   Circuit wrote in *Munger*, a court must not "look solely to the agency of the individual," nor to the

10   "options" that "may or may not have been available," but rather must "examine whether the

11   officers left the person in a situation that was more dangerous than the one in which they found

12   him." 227 F.3d at 1086.  For these reasons, Mathis and other Shasta Vista residents ultimately

13   could prevail at trial even if the County proves conclusively that they chose to live on land

14   without a reliable, permitted source of clean water.  "The only relevant question," the Circuit has

15   written, is whether the defendant's actions created an "actual, particularized danger [the plaintiff]

16   would not otherwise have faced."  *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1063 (9th Cir.

17   2006).  Plaintiffs have cited evidence that, if credited, could prove the County created a danger by

18   stopping the water deliveries they had come to rely upon.

19        In its reply, the County presses a similar point based on the district court's decision in

20   *Scwarz v. Town of Fairfax*.  *See* Reply at 7 (citing No. 25-06395, 2025 WL 2410522, at *2 (N.D.

21   Cal. Aug. 19, 2025)).  In *Scwarz* and at least some other recent cases, California federal district

22   courts have rejected claims by homeless plaintiffs who allege a local government has put them in

23   danger by clearing their camps.  *See* 2025 WL 2410522, at *1–2; *Hous. is a Hum. Right Orange*

24   *Cnty. v. County of Orange*, No. 19-388, 2019 WL 6481311, at *12 (C.D. Cal. Aug. 12, 2019).

25   The plaintiffs in these cases faced the danger of an unsheltered life both before and after their

26   camps were cleared.  The government had forced them to move from their camp, but they did not

27   allege the government had put them in that camp to begin with.  *See Scwarz*, 2024 WL 2410522,

28   at *3; *Hous. is a Human Right*, 2019 WL 6481311, at *12.  Here, by contrast, the evidence could

1  show the County's enforcement efforts put Shasta Vista residents in a different and inferior

2  situation.  Before the County's zoning enforcement efforts they had enough water, but after they

3  did not.  That change in circumstances makes them more like the plaintiff in *Alfred v. City of*

4  *Vallejo*, whose allegations raised serious questions under the state-created danger doctrine.  *See*

5  No. 24-3317, 2025 WL 435900, at *1 (E.D. Cal. Feb. 7, 2025).  In *Alfred*, the plaintiff alleged the

6  defendants were threatening to destroy her shelter, which included among other things a raised

7  floor, insulation, a locking door, and a bathroom.  *See id.*

8       On a similar note, the County argues this case is different from others in which district

9  courts have enjoined local governments from clearing homeless encampments.  *See* Mot. at 16–

10 17, 21–22.  The parties cite no relevant controlling appellate authority in this line of cases.  *See*

11 *id.*; Opp'n at 13–14.  As confirmed at hearing, they rely on these decisions for their persuasive

12 value only.  The court agrees with the County that their persuasive value is limited.  First, these

13 cases focus on the risks unique to people who live in cities without shelter.  *See, e.g.*, *Sacramento*

14 *Homeless Union v. County of Sacramento*, 617 F. Supp. 3d 1179, 1186, 1189–90 (E.D. Cal. 2022)

15 (heat); *Where Do We Go Berkeley v. Caltrans*, 21-4435, 2021 WL 5964594, at *12 (N.D. Cal.

16 Dec. 16, 2021) (COVID-19); *Sanchez v. City of Fresno*, 914 F. Supp. 2d 1079, 1100 (E.D. Cal.

17 2012) (cold).  It is far from obvious that the same or similar reasoning should come into force in a

18 case about people living in homes they have built on property they own in a remote part of

19 Siskiyou County.  Second, the County also is correct to note the defendants in these other cases

20 allegedly took much more extreme and direct actions, such as expelling people from tents when

21 they had nowhere else to go.  *See, e.g.*, *Santa Cruz Homeless Union v. Bernal*, 514 F. Supp. 3d

22 1136, 1138–40 (N.D. Cal. 2021).  Plaintiffs have not cited evidence of similarly direct or extreme

23 official actions in Shasta Vista.  Third, the district courts issued many of the cited orders in urgent

24 circumstances, such as in response to ex parte applications for temporary restraining orders and

25 motions for preliminary injunctions.  These courts therefore expressed their reasoning in

26 temporary and tentative terms.  *See, e.g.*, *Alfred*, 2025 WL 435900, at *8 (finding only a "serious

27 question" on the merits).  Despite these limitations and differences, the orders cited here do

28 suggest public officials might face potential liability under the state-created-danger doctrine if

1    their affirmative actions deprive people of the basic resources they need to live, including water.

2    *See, e.g.*, *id.* at *8–9.  In that way, these decisions offer support to plaintiffs' position, while only

3    limited support.  The court therefore has relied primarily on the published appellate opinions

4    discussed above.

5        For these reasons, the court finds there is evidence in the record that could permit a fact-

6    finder to decide the County has taken an affirmative action that put Mathis and other Shasta Vista

7    residents in a worse position.  It is not enough for a plaintiff to prove a defendant acted

8    affirmatively, however.  The danger must be "particularized," i.e., it must be specific to a victim.

9    *See, e.g.*, *Sinclair v. City of Seattle*, 61 F.4th 674, 682–83 (9th Cir. 2023) (collecting authority).

10   The County argues Shasta Vista residents do not face such a particularized danger.  *See* Mot. at

11   20–23.

12       In many cases about the state-created danger doctrine, the "particularized" danger or harm

13   is a specific assault, an attack or a similarly targeted crime.  *See generally, e.g.*, *Martinez v. High*,

14   91 F.4th 1022 (9th Cir.) (attack by a domestic abuser), *cert. denied*, 145 S. Ct. 547 (2024);

15   *Hernandez v. City of San Jose*, 897 F.3d 1125 (9th Cir. 2018) (assaults by violent rally-goers);

16   *L.W. v. Grubbs*, 974 F.2d 119 (9th Cir. 1992) (attack by violent inmate); *Wood*, 879 F.2d 583

17   (rape by unknown attacker).  This case involves no such attack or assault.  But in other cases,

18   claims have moved forward based on allegations and evidence about more diffuse dangers, such

19   as the weather or a disease.  *See, e.g., Polanco*, 76 F.4th at 923–24 (virus); *Pauluk*, 836 F.3d at

20   1125 (toxic mold); *Munger*, 227 F.3d at 1084–85 (weather); *Sacramento Homeless Union*,

21   617 F. Supp. 3d 1179 (weather).  The dangers in this case could fit this second category.

22   Plaintiffs could ultimately prove a lack of water would deprive them of food, clean clothing, and a

23   means to bathe and cool themselves and their animals in hot weather.

24       That said, this case is about more than just one person and one event, and the Ninth Circuit

25   has recognized some uncertainty about "whether a plaintiff can bring a state-created danger claim

26   when the danger was not particularized to a specific, known individual."  *Sinclair*, 61 F.4th at

27   683.  On the one hand, "state action that exposes a broad swath of the public to

28   'generalized dangers' cannot support a state-created-danger claim."  *Polanco*, 76 F.4th at 927

16

1    (quoting *Sinclair*, 61 F.4th at 683). But on the other hand, "a danger can be 'particularized' even

2    if it is directed toward a group rather than an individual," that is, "a 'discrete and identifiable

3    group.'" *Id.* (quoting *Sinclair*, 61 F.4th at 683).

4          The difference is apparent in the contrast between the dangers alleged in *Polanco* and

5    *Sinclair*, two cases the parties discuss in their briefing and at hearing. In *Sinclair*, the plaintiff

6    alleged Seattle officials had taken "the unprecedented step of surrendering an entire precinct and

7    a large area of the surrounding neighborhood to protestors for a month," effectively abandoning

8    part of the city to "unchecked lawlessness and rampant crime." 61 F.4th at 676, 684. The

9    plaintiff was the mother of a nineteen-year-old man with special needs. *See id.* at 676. He had

10    been shot to death in the allegedly abandoned neighborhood by someone who believed it was a

11    "no-cop zone." *Id.* at 677. The Circuit rejected the mother's claim of a state created danger

12    because the city had no previous interactions with her son, had directed no actions toward him

13    and did not even know about him before his death. *Id.* at 683. According to the complaint, the

14    city had put "all visitors" to the neighborhood in danger. *Id.* (emphasis omitted). The danger

15    was thus "a generalized danger experienced by all those members of the public who chose to visit" the

16    neighborhood, so it could not support a viable claim. *Id.*

17          In *Polanco*, prison officials allegedly transferred more than a hundred inmates from a

18    prison where COVID-19 was spreading unchecked to a prison with no known cases, where aging

19    facilities made it vulnerable to an outbreak. *See* 76 F.4th at 923–24, 926. The Circuit cited

20    *Sinclair* and reaffirmed the general principle that exposing "a broad swath of the public to

21    'generalized dangers' cannot support a state-created-danger claim." *Id.* at 927 (quoting 61 F.4th

22    at 676, 683). The danger in *Polanco*, however, was not so generalized, in the court's view,

23    because there was a "discrete and identifiable group" of victims vulnerable to the danger of

24    COVID-19: "prison guards and inmates" at the new prison. *Id.* at 927 (citations and quotation

25    marks omitted).

26          On the record currently before the court, the circumstances here are more like those in

27    *Polanco* than *Sinclair*. Plaintiffs have cited evidence related to a specific, discrete, and limited

28    group of people: those living on the parcels within Shasta Vista that lack wells and municipal

1    sources of water.  The danger was specific to them, not the public at large.  The loss of trucked

2    groundwater would not put a broad, undefined swath of the public at risk.  It would cut off the

3    supply of water to only those people living on parcels without wells in Shasta Vista and who were

4    relying on water trucks.  In addition, unlike the city in *Sinclair*, plaintiffs here have cited evidence

5    that could ultimately show the County knew people in Shasta Vista were uniquely vulnerable to a

6    loss of trucked water, for example from the preceding litigation.  The danger in question was

7    sufficiently "particularized."

8        Defendants argue in addition that Mathis and others can obtain water from commercial

9    water distributors and other "legal" sources, *see* Dean Decl. ¶ 54, and they argue water can be

10   stored in a local fire district facility, *see* Roath Decl. ¶¶ 4–5.  They contend these alternative

11   sources show a lack of trucked groundwater does not in fact create an actual danger.  The County,

12   as the moving party, must show at this juncture that there is no genuine dispute of material fact.

13   It has not demonstrated on the record currently before the court that water is available in the

14   quantities that would be necessary to avoid all of the dangers plaintiffs identify in their operative

15   complaint, such as bathing and raising animals.  Plaintiffs also have cited evidence that could

16   show "legal" water sources are unavailable as a practical matter due to costs and the difficulty of

17   securing regular deliveries to Shasta Vista.  *See* Verner-Crist Decl. ¶¶ 4–5, 11–13 & Ex. A.

18       Finally, the court has considered the County's reference to an "emerging line of Ninth

19   Circuit opinions" and a "growing recognition in the Ninth Circuit that due process does not

20   transform land use policy or public health enforcement into constitutional violations, absent

21   coercive state action or individual targeting." Mot. at 21 (citing *Sacramento Homeless Union v.*

22   *City of Sacramento*, 115 F.4th 1149, 1151 (9th Cir. 2024) (statement of R. Nelson, J, respecting

23   the denial of rehearing en banc)).  This reference is similar to the County's argument at hearing

24   about regulated markets: that the Constitution should not be interpreted as barring state and local

25   governments from enforcing laws and regulations that make consumers and markets safer, such

26   as the zoning, land use, and environmental regulations at issue in this case.  As the County

27   pointed out, many regulations increase costs, so higher prices cannot alone create a "danger" for

28   purposes of the state-created danger doctrine.  The court agrees with this general principle, as

1    well as the general principle that only particularized dangers can support a claim that the

2    government has affirmatively put someone in danger.  But as summarized above, this is not a case

3    about a broad swath of the public, nor about higher costs.  At this stage the court must view the

4    evidence in the light most favorable to plaintiffs.  When the evidence is taken in that light, it

5    could ultimately demonstrate the County's actions cut off the only sufficient and reliable supply

6    of water that a specific, defined group of residents had come to rely on for their basic, day-to-day

7    needs.  The court must therefore move to the second part of the relevant test, i.e., whether

8    plaintiffs also have cited evidence that could show defendants acted with deliberate indifference.

9         **B.    Deliberate Indifference**

10        The Ninth Circuit employs a "subjective" standard of deliberate indifference.  *Soakai*,

11   137 F.4th at 984.  Under this standard, it is ultimately the plaintiff's burden to prove at trial that

12   the defendant knew the intentional action in question would expose the plaintiff to an

13   unreasonable risk.  *Id.*  The plaintiff must prove, in other words, that the defendant "knew that

14   something was going to happen" but "ignored" that risk.  *Id.* (alterations omitted) (quoting

15   *Martinez v. City of Clovis*, 943 F.3d 1260, 1274 (9th Cir. 2019)).  A "lapse in judgment" is not

16   deliberate indifference under this standard, *Patel*, 648 F.3d at 976, but it is not necessary to prove

17   the defendant's purpose was to cause harm, *see Soakai*, 137 F.4th at 984, nor that the defendant

18   was acting without any legitimate purpose whatsoever, *see Polanco*, 76 F.4th at 929.  To be sure,

19   public officials must often balance "competing priorities" and make difficult decisions, so if an

20   official takes steps to mitigate a known risk, it might be impossible to prove deliberate

21   indifference.  *See id.* at 928–29.  Evidence showing an official ignored warning signs, by contrast,

22   can support a claim of deliberate indifference.  *See id.*

23        Here, plaintiffs have cited evidence that could show the County knew many people in

24   Shasta Vista would have no water for their basic day-to-day needs if the County enforced its

25   zoning ordinances against nearby distributors.  The court previously summarized this evidence in

26   its order granting plaintiffs' motion for a preliminary injunction:

27              This is the second case about the effects of the county's efforts to cut
28              off water to illegal cannabis cultivation, the second time it has used

ordinances to achieve its goals, and the second time people in Shasta
Vista have come to this court with claims that the county's
enforcement efforts have deprived people of the water they need to
cook, bathe, fight fires and raise plants and animals. One of the
plaintiffs, proposed class representative Russell Mathis, also has
claimed without contradiction that he spoke with Siskiyou County
Supervisor Ed Valenzuela "to complain about the County's water
ordinances" in 2021. He states that in response, also without
contradiction, that Valenzuela said he would not provide water, did
not care whether Mathis had water, and did not care what Mathis
thought about water access. Nor does the county dispute the evidence
showing its employees have refused to change zoning designations
or even accept applications to change zoning designations.

Order (Oct. 25, 2024) at 22–23 (citations omitted).  The County does not contend and has not

proven this summary was inaccurate.  It has cited no evidence that could show it attempted to

mitigate the risks of cutting off water access to Shasta Vista, for example by ensuring relatively

small quantities of water would be available at low cost on a temporary basis or by expediting

permits to drill wells.

     The County argues again it has legitimate goals and did not "force" anyone to live "on

undeveloped land without a reliable (and legal) water source," nor prevent anyone from applying

for a permit to drill a well or from requesting a change a zoning designation.  Mot. at 23–24.  As

explained above, a local government and its officers can face liability for acting with deliberate

indifference even if they were pursuing legitimate goals in difficult circumstances, and even if the

plaintiff could have avoided some of the alleged harms.  The County cannot prevail by proving

the legitimacy of its goals.

     In any event, the County's arguments undermine its position.  As it argues in reply, it

"could have enforced any number of laws against Plaintiff Mr. Mathis and the purported class,"

such as issuing citations against them for "building structures without permits in violation of

Building Code laws, disposing of wastewater on their properties without a permitted septic

system in violation of Health and Safety laws, and camping on the properties for years on end in

violation of the County's Camping Ordinance."  Reply at 5.  The fact that it chose to halt the

supply of trucked groundwater rather than enforcing these other laws could support plaintiffs'

claims of deliberate indifference to their well-being.  In addition, as summarized in the

1    background section above, the court would permit the County to resume all zoning enforcement

2    actions while this case is pending, if the County shows people in Shasta Vista will have enough

3    water for their legitimate day-to-day needs while the case is pending.  The County has not

4    attempted to do so.  While the court declines to speculate about the County's reasons, the

5    County's not having taken the opportunity make this showing raises a question in the court's

6    mind regarding the County's assurances that its purposes are wholly legitimate.

7    **IV.    CONCLUSION**

8         For the reasons explained above, the court **denies** the motion for summary judgment at

9    ECF No. 156.  The court therefore does not reach plaintiffs' alternative request to defer

10   consideration of the pending motion under Federal Rule of Civil Procedure 56(d).

11       IT IS SO ORDERED.

12   DATED:  November 3, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE